LAURA E. DUFFY
United States Attorney
THOMAS STAHL
Assistant U.S. Attorney
Chief, Civil Division
California State Bar No. 078921
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone:  (619) 546-7664
E-mail: thomas.stahl@usdoj.gov

Attorneys for Respondents

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGEANT GARY A. STEIN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>COLONEL C.S. DOWLING, et al.,<br><br>　　　　　Defendants. | Case No. 12cv0816-H(BGS)<br><br><br>OPPOSITION TO MOTION FOR<br>PRELIMINARY INJUNCTION |

## I.

## **PRELIMINARY STATEMENT**

Plaintiff is a sergeant in the United States Marine Corps with nine years of service.  On March 21, 2012, Plaintiff's commanding officer, Colonel C.S. Dowling, informed Plaintiff that he had recommended Plaintiff for separation from the Marine Corps; he did so by providing Plaintiff with a Notification of Administrative Separation Proceedings, as required by paragraph 6303(3) of the Marine Corps Separation Manual ("Separation Manual" or "Sep. Mem.").  That Notification listed two bases for the proposed separation: (1) "that on or about 1 March 2012, you allegedly made statements regarding the President of the United States that are prejudicial to good order and discipline, as well as service discrediting in violation of Article 134, UCMJ[,]" and (2) that "from on or about November 2010 to the present you allegedly created, administered, and provided content to a Facebook page, as well as other online media sources, in violation of DOD Directive 1344.10."  As to the first basis for separation, Colonel Dowling was referring to Plaintiff's statement in an online forum for Marine Corp

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES                                                                    ii

I.      PRELIMINARY STATEMENT                                                            1

II.     BACKGROUND                                                                       4

        A.      Statutory, Regulatory, & Regulatory Framework                            4

                1.      Marine Corps Separation Manual                                    4

                2.      BCNR and Judicial Review of Personnel Decisions                  5

                3.      Factual And Procedural History                                   7

III.    ARGUMENT                                                                         10

        A.      Plaintiff Will Not Suffer Irreparable Harm Absent An Injunction          11

        B.      Plaintiff's Requested Injunction Will Harm Defendants And The
                Public Interest                                                          13

        C.      Plaintiff Cannot Demonstrate A Likelihood Of Success on The
                Merits                                                                   14

                1.      The Marine Corps Has Not Violated The Due Process Clause          15

                2.      Plaintiffs' Potential Discharge Would Not Violate The First
                        Amendment                                                        19

IV.     CONCLUSION                                                                       23

1

TABLE OF AUTHORITIES

2

<u>Cases</u>                                                                    <u>Page</u>

3

<u>Arnett v. Kentucky,</u>
    416 U.S. 134 (1974)

4
    Overruled on other grounds, <u>Loudermill</u>, 470 U.S. at 539        17

5
<u>Barrett v. Smith,</u>
    530 F.2d 829 (9th Cir. 1976)        17

6
<u>Caribbean Marine Services Co. v. Baldrige,</u>

7
    844 F.2d 668 (9th Cir. 1988)        2, 3, 11, 10

8
<u>Chappell v. Wallace,</u>
    462 U.S. 296 (1983)        6, 11, 14

9
<u>Cornelius v. NAACP Legal Defense & Education Fund,</u>

10
    473 U.S. 788 (1985)        21

11
<u>Elrod v. Burns,</u>
    427 U.S. 347 (1976)        12

12
<u>Ethredge v. Hail,</u>

13
    56 F.3d 1324 (11th Cir. 1995)        2

14
<u>Frizelle v. Slater,</u>
    111 F.3d 172 (D.C. Cir. 1997)        12, 16

15
<u>Goldman v. Weinberger,</u>

16
    475 U.S. 503 (1986)        20, 21

17
<u>Gonzalez v. Department of the Army,</u>
    718 F.2d 926 (9th Cir.1983)        14

18
<u>Greer v. Spock,</u>

19
    424 U.S. 828 (1976)        20

20
<u>Guerrero v. Stone,</u>
    970 F.2d 626 (9th Cir. 1992)        7

21
<u>Hartikka v. United States,</u>

22
    754 F.2d 1516 (9th Cir. 1985)        2, 11

23
<u>Jeffries v. Harleston,</u>
    52 F.3d 9 (2d Cir. 1995)        22

24
<u>Khalsa v. Weinberger,</u>

25
    779 F.2d 1393 (9th Cir. 1985)        13

26
<u>Lindenau v. Alexander,</u>
    663 F.2d 68 (9th Cir. 1981)        13

27

28

ii

TABLE OF AUTHORITIES - Continued

<u>Cases</u>                                                                    <u>Page</u>

<u>Loomis v. United States</u>,
        68 Fed. Cl. 503 (2005)                                              6

<u>Martinez v. United States</u>,
        333 F.3d 1295 (Fed. Cir. 2003),
        cert. denied, 540U.S. 1177 (2004)                                   3

<u>Miller v. Department of the Navy</u>,
        601 F. Supp. 2d 90 (D.D.C. 2009)                                    7

<u>Millican v. United States</u>,
        744 F. Supp. 2d 296 (D.D.C. 2010)                                  23

<u>Mindes v. Seaman</u>,
        453 F.2d 197 (5th Cir. 1971)                                        3

<u>Muhammad v. Secretary of the Army</u>,
        770 F.2d 1494 (9th Cir. 1986)                                   11, 15

<u>Patterson v. City of Utica</u>,
        370 F.3d 322 (2d Cir. 2004)                                        17

<u>Pickell v. Reed</u>,
        326 F. Supp. 1086 (N.D. Cal. 1971), <u>aff'd</u>, 446 F.2d 898
        (9th Cir. Cal. 1971), <u>cert. denied</u>, 404 U.S. 946 (1971)       14

<u>Pickering v. Bd of Education</u>,
        391 U.S. 563 (1968)                                                21

<u>Priest v. Secretary of the Navy</u>,
        570 F.2d 1013 (D.D.C. 1977)                                        21

<u>Rendish v. City of Tacoma</u>,
        123 F.3d 1216 (9th Cir. 1997)                                      12

<u>Ridgon v. Perry</u>,
        962 F. Supp. 150 (D.D.C. 1997)                                      9

<u>Sampson v. Murray</u>,
        415 U.S. 61 (1974)                                              11, 13

<u>Sandidge v. Washington</u>,
        813 F.2d 1025 (9th Cir. 1987)                                      14

<u>Sebra v. Neville</u>,
        801 F.2d 1135 (9th Cir. 1986)                                      14

<u>Segal v. City of New York</u>,
        459 F.3d 207 (2d Cir. 2006)                                        17

iii

TABLE OF AUTHORITIES - Continued

Cases                                                                                    Page

Waters v. Churchill,
    511 U.S. 661 (1994)                                                              22

Wenger v. Monroe,
    282 F.3d 1068 (9th Cir. 2002)                                                 4, 9, 10

Western Watersheds Project v. Kraayenbrink,
    632 F.3d 472 (9thCir. 2011)                                                       15

Wilcox v. United States,
    66 M.J. 442 (C.A.A.F. 2009)                                                       21

Constitutions and Statutes

First Amendment                                                        2, 12, 15, 18-23

Fifth Amendment                                                          1, 4, 8, 12, 19

10 U.S.C. § 1552                                                                           6

10 U.S.C. § 1553                                                                           6

Rules

32 Cal. Fed. R. § 723.3(e)(4)                                                              6

32 Cal. Fed. R.§ 724.902-03                                                                6

iv

meteorologists ("METOC") that "As an Active Duty Marine I saw [sic] 'Screw Obama' and I will not follow all orders from him."  Gov't Ex. 5 [1/].  As to the second, Colonel Dowling was referring to Plaintiff's maintenance of a Facebook page titled "Armed Forces Tea Party."

The Marine Corps has not decided yet whether to discharge Plaintiff.  Its process for making that decision began on March 21, 2012, when Plaintiff was provided the Notification of Administrative Separation Proceedings, and it expects to make a decision in the next several weeks, consistent with the guidance of the Separation Manual that, once begun, the process set forth therein for making separation decisions "should be completed within 50 working days."  Sep. Man. ¶ 6102(1).  As explained in the Separation Manual, the Marine Corps' decision will come via a written decision from the "separation authority," id. ¶ 6309, in this case Brigadier General Daniel Yoo (also named as a defendant by Plaintiff).  When General Yoo ultimately makes his decision, the full record before him will include not just the record and recommendation of the administrative separation board hearing completed last Thursday, April 5, 2012, id. ¶ 6320, but also a written memorandum from a legal advisor in the Judge Advocate General's office commenting on, *inter alia*, the legal issues Plaintiff raised during his hearing. Id. ¶ 6308.

Plaintiff asks the Court to wade into the middle of the Marine Corps' ongoing decision-making process, and says the Court should take this drastic step because the decision to discharge him, if and when it comes, will violate the Due Process Clause of the Fifth Amendment and infringe impermissibly upon the freedom of speech guaranteed by the First Amendment.  But Courts do not, on an emergency basis, interfere with the personnel decisions of the military—let alone the process by which the military makes those decisions—any time a Plaintiff alleges a violation of the Constitution.  Rather, "[a]t a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that [he] will be exposed to irreparable harm," Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988).  And in a case, like this one, "where military personnel seek preliminary injunctive relief prohibiting a discharge," Hartikka v. United States, 754 F.2d 1516, 1517 (9th Cir. 1985), the Sampson test applies

---

[1/] The exhibits submitted by the Marine Corps at the Separation Board Hearing are attached to this brief as "Separation Hearing - Government Exhibits."  For ease of use, the internal exhibit numbers in that document are used.

2

1   to "require that the moving party make a much stronger showing of irreparable harm" than in the

2   "ordinary" case.  Id. at 1518 (citing Sampson v. Murray, 415 U.S. 61, 84, 91-92 n. 68 (1974)).

3   Plaintiff's motion fails at this first step.

4        Plaintiff cannot meet his burden of showing irreparable harm for two reasons.  First, Plaintiff's

5   assumption that he will be harmed—irreparably or otherwise—is entirely speculative, because the

6   Marine Corps has not decided whether to discharge him, or how to characterize any potential discharge

7   should it render such a determination.  Similarly, Plaintiff's assumption that, if and when the Marine

8   Corps decides to discharge him, it will violate the Fifth and First Amendments in doing so is still more

9   speculative.  But "[s]peculative injury does not constitute irreparable injury sufficient to warrant

10  granting a preliminary injunction."  Baldridge, 844 F.2d at 674.

11       Second, as the Court observed in denying without prejudice Plaintiff's initial motion, even if the

12  Marine Corps does decide to discharge Plaintiff and Plaintiff thinks that decision intrudes upon a

13  constitutional or other right of his, he may "seek a review process . . . to the Board for Correction of

14  Naval Records [("BCNR")] where Plaintiff may seek redress for any injustice or error."[2]   Order

15  Denying Pl's Mot. for Temporary Restraining Order Without Prejudice at 15, ECF No. 10 (April 4,

16  2012) ("April 4 Order").  That is still true.  If discharged, Plaintiff could press his case before the

17  BCNR, and if successful could eventually receive reinstatement and back pay.  As a result, the only

18  harm Plaintiff can allege between the time of any discharge and an eventual BCNR decision is legally

19  insufficient.  Binding precedent dictates that "loss of income, loss of retirement and relocation pay, and

20  damage to [] reputation resulting from the stigma attaching to a less than honorable discharge . . . are

21  insufficient [injuries] under the Sampson standard to justify injunctive relief," Hartikka, 754 F.2d at

22  1518, and this rule applies "however severely they may affect a particular individual."  Id.

23       Even if Plaintiff could show he would be irreparably harmed absent an injunction—and he

24  cannot—judicial intervention would nonetheless be unwarranted.  Pursuant to the test of Mindes v.

25  Seaman, 453 F.2d 197 (5th Cir. 1971), which is applied in this Circuit (and the similar test for

26

27  [2]  Resort to these remedies is permissive, not mandatory, to the filing of a suit in district court.
    See Martinez v. United States, 333 F.3d 1295 (Fed. Cir. 2003) (en banc), cert. denied, 540 U.S. 1177
    (2004).  The availability of these remedies, however, prevents Plaintiff from demonstrating the
28  irreparable harm necessary for the preliminary injunctive relief he seeks, as explained above.

preliminary relief), the Court "weighs four factors to determine whether judicial review . . . is appropriate." Wenger v. Monroe, 282 F.3d 1068, 1072 (9th Cir. 2002). These are "(1) [t]he nature and strength of the plaintiff's claim"; "(2) [t]he potential injury to the plaintiff if review is refused"; "(3) [t]he extent of interference with military functions"; and "(4) [t]he extent to which military discretion or expertise is involved"; and "[t]he nature and strength of the plaintiff's claim." Id. Each factor counsels strongly against judicial review here.

As discussed above, the second Mindes factor—harm to Plaintiff if review is refused—counsels against review because Plaintiff can show no harm, but even if he could, any such harm would be insufficient. Furthermore, the third and fourth Mindes factors counsel strongly against review: Plaintiff's motion asks the Court to interfere significantly in a core Marine Corps function, personnel decision-making and discipline, in a way that would threaten significant harm to the Corps, as explained in the declaration of Colonel Dowling already filed with the Court. ECF No. 8. And the questions Plaintiff asks the Court to evaluate would draw the Court into areas that depend heavily upon military judgment and expertise; for example, Plaintiff's claim that he did not violate Article 134 of the Uniform Code of Military Justice ("UCMJ") depends entirely upon an assessment of whether Plaintiff's actions interfered with good order and discipline.

Finally, as for the first Mindes factor, Plaintiff's (potential) due process and First Amendment claims are not just untimely but insubstantial. Plaintiff's due process claim fails for a number of reasons, among them that it is premised upon a misunderstanding of the administrative separation process set forth in the Separation Manual and, surprisingly, an entirely inaccurate characterization by Plaintiff of what happened during the April 5 administrative separation board hearing. And his First Amendment claim fails because long-standing precedent makes clear that the Marine Corps may prohibit Marines from interfering with the order and discipline of its ranks.

## II.

## BACKGROUND

**A.    Statutory Regulatory, and Administrative Framework.**

### 1.    The Marine Corps Separation Manual.

The Marine Corps has set forth the procedures governing administrative separation of enlisted

Marines in great detail in the Marine Corps Separation Manual; those procedures are explained in detail in the attached April 11, 2012 declaration of Major Christian Hur ("Hur Decl."; Bates No. 585-788). In addition to procedures, the Manual sets forth "'processing time goals' to guide the Convening Authority in conducting the separation process in an expeditious manner." Hur Decl. ¶ 4. The goal for the sort of proceeding at issue here–a contested proceeding involving a hearing–is 50 working days. Id. ¶ 4.

The process starts when the Convening Authority ("CA") notifies the Marine that he has been recommended for separation, id. ¶ 6, and explains the bases for the proposed separation. Sep. Man. ¶¶ 6303(a), 6304. The Marine then has a minimum of two working days to respond and indicate whether he desires counsel. Hur Decl. ¶ 7. The Marine Corps assigns counsel if requested, but a Marine may also elect to hire private counsel. If he does, though, the Manual provides that "[c]onsultation with civilian counsel shall not unduly delay administrative separation board proceedings," Sep. Man. ¶ 6304.3(c), and that "[i]f undue delay appears likely, the convening authority may require the respondent to proceed without the desired civilian counsel." Id.

The next step is for the CA to "convene in writing" an administrative separation board, id. ¶ 10, and the Manual sets forth in detail how the board must be composed and the procedures that govern it. Hur Decl. ¶ 10, 15, 18-22. These procedures govern the rules of evidence that apply to the administrative proceeding, id. ¶ 18, and make clear that the administrative separation board hearing is not a court martial, but an administrative proceeding. Sep. Man. ¶ 6316.1. Ultimately, the Board decides "whether each allegation in the notice of proposed separation is supported by a preponderance of the evidence." Id. ¶ 22.

The administrative separation board then forwards its recommendation to the separation authority, in this case General Yoo. Hur Decl. ¶ 23; Sep. Man. ¶ 6319. The record of proceedings is then reviewed by a judge advocate or civilian attorney, who evaluates in writing any legal issues raised during the hearing. Sep. Man. ¶ 6308(1)(c). Once that legal review is complete and has been described in a written statement, the recommendation of the administration separation board is forwarded to the separation authority for a final decision, id., which itself "shall be recorded in writing," id. ¶ 6309.

**2.    BCNR and Judicial Review of Marine Corp Personnel Decisions.**

5

The Marine Corps' administrative separation process is not the only administrative forum in which Plaintiff could challenge a potential discharge decision. Congress "has established a comprehensive internal system of justice to regulate military life, taking into account the special patterns that define the military structure," Chappell v. Wallace, 462 U.S. 296, 302 (1983), which includes, among other things, the right of a discharged Marine to seek review of his discharge before the Board for Correction of Naval Records. Id. at 303 (citing 10 U.S.C. § 1552). The BCNR is a "board[] of civilians" empowered by statute to "correct any military record . . . when the Secretary considers it necessary to correct an error or remove an injustice." Id. § 1552(a)(1). This includes the power to consider alleged "constitutional, statutory and/or regulatory violations." 32 C.F.R. § 723.3(e)(4). Should the BCNR conclude a Marine's discharge was improper, it can recommend relief including reinstatement and back pay. See Rood v. England, 16 Fed. Appx. 706, 709 (9th Cir. 2001); Nichols v. Hughes, 721 F.2d 657, 660 (9th Cir. 1983). If the BCNR denies Plaintiff's claim without a hearing, it "is required to provide a statement of its reasons," Chappell, 462 U.S. at 303, and in any event "Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence." Id. (internal citations omitted).

Additionally, Plaintiff could seek redress from the Naval Discharge Review Board ("NDRB"). 10 U.S.C. § 1553; 32 C.F.R. § 724.903. That body does not have the power to recommend reinstatement, but after a hearing it can issue a different type of discharge or characterization of service, 32 C.F.R. §§ 724.902-03, and it reviews not just whether the discharge was appropriate but also whether the procedures employed were equitable.

Finally, rather than go before the BCNR or the NDRB, a discharged Marine can bring suit in the Court of Federal Claims, e.g. Loomis v. United States, 68 Fed. Cl. 503, 510-11 (2005), or in Federal District Court (so long as such suit does not seek monetary relief of sufficient magnitude to bring it within the Court of Federal Claims' exclusive jurisdiction). In such a proceeding, the court would apply the familiar standard applicable to administrative claims, evaluating whether the administrative separation decision was "arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantial nature by which plaintiff has been seriously prejudiced." Clayton v. United States, 225 Ct. Cl. 593, 595 (1980); see

1   Miller v. Dep't of the Navy, 601 F. Supp. 2d 90, 94 (D.D.C. 2009).  Should the Court find a defect in

2   the Marine Corps' decision-making, it would ordinarily remand to the Corps for reconsideration,

3   Guerrero v. Stone, 970 F.2d 626, 635-36 (9th Cir. 1992), which could grant reinstatement or other

4   appropriate relief.

5              **3.        Factual and Procedural History.**

6              Plaintiff is an active duty Marine meteorologist with almost nine years of service. ECF Doc. 1-2,

7   ¶ 2.  Plaintiff has a Facebook Page (with three other individuals), and he contributes to a METOC

8   [Meteorologist Community] Facebook Page. ECF Doc. 1-2, ¶ 2; ECF Doc. 9.  On all of his Facebook

9   pages, Plaintiff commented on public policy issues and political candidates. ECF Doc. 1-2, ¶ 3.  The

10  name of Plaintiff's personal Facebook Page is the "Armed Forces Tea Party" Page.  Government

11  Exhibits 6, 7.

12             In April or May, 2010, Plaintiff's Chief Warrant Officer approached him concerning his personal

13  Facebook page because of the possibility that it may be construed as emanating from military sources,

14  rather than from private sources.  ECF Doc. 1-2, ¶ 5.  Plaintiff removed his personal Facebook page in

15  order to review the matter.  ECF Doc. 1-2, ¶ 4.  At the urging of a Marine Corps attorney, Plaintiff put

16  his personal Facebook Page back up and added a disclaimer to his personal Facebook page that the

17  views expressed were personal in nature and not those of the Marine Corps  ECF Doc. 1-2, ¶¶ 7-8.

18             From November, 2010 through March 1, 2012, the Marines allege that Plaintiff posted various

19  criticisms of President Obama on Facebook and on another social media site, the METOC Facebook

20  Page.  ECF Doc. 1-2, ¶ 12, Doc. 9.  On the METOC Facebook Page, Plaintiff made the following

21  statement on March 1, 2012:

22             As an Active Duty Marine I saw [sic] 'Screw Obama' and I will not follow all orders
             from him…Will do my job better then [sic] the next guy…But has [sic] for saluting
23           Obama as commander-in-chief…I will not' and "Your [sic] right it said to defend the 'I
             will support and defend the Constitution of the United States against all enemies,
24           foreign, and domestic' Obama is the economic enemy…He is the religious enemy…he
             is the "Fundamentally change' America enemy…he IS the Domestic Enemy.
25

26  ECF No. 9.  Plaintiff maintains that during this time (until March 1, 2012), no attempt was made to

    restrict or correct his activities.  ECF Doc. 1-2, ¶¶ 9-10.  On March 5, 2012, Plaintiff's company first
27
    sergeant read him his rights and notified Plaintiff that he was suspected of making disrespectful
28

statements in violation of a lawful regulation, specifically for the March 1, 2012 Facebook posts.  ECF Doc. 9.  Plaintiff's first sergeant approached him again on March 9, 2012, advising him that he was required to comply with Department of Defense Directive ("DoDD") 1344.10, which prohibits service-members from engaging in specific activities related to partisan politics.  ECF Doc. 9.

On March 21, 2012, consistent with the Separation Manual, Plaintiff's commanding officer, Colonel Dowling, notified Plaintiff that he was being processed for separation from the Marine Corps because of the commission of a serious offense, namely the willful and continued violation of DOD Directive 1344.10 and Article 134 of the UCMJ.  The Command's bases for administrative separation processing are as follows:

> 1) Sergeant Stein made statements regarding the President that were prejudicial to good order and discipline, as well as service discrediting in violation of Article 134, UCMJ; and
>
> 2) From on or about November, 2010, to the present, he allegedly created, administered, and provided content to a Facebook page, as well as other online media sources, in violation of DOD Directive 1344.10, a violation of Article 92, UCMJ.

ECF Doc. 1-2, ¶ 12; Doc. 9; Doc. 10 at 4.

Consistent with the Separation Manual, Plaintiff's Commanding Officer notified Sergeant Stein that the worst characterization of service he faced if separated was an "Other Than Honorable" discharge.  He was also notified of his other procedural rights.  Plaintiff acknowledged his rights, including his right to apply to the NDRB should he be separated.  ECF Doc. 10 at 8; ECF Doc. 9; Government Exhibit 2.

On March 22, 2012, over his Command's warnings, Plaintiff spoke at a Tea Party gathering and continued to use disparaging remarks toward national leaders, including the President.  ECF Doc. 9.  On March 23, 2012, Colonel Dowling counseled Plaintiff as to his statements about his Commander-in-chief on March 1, 2012 and several other statements that he made on the METOC Facebook Page.  ECF Docs. 9 and 10.

In this counseling, Colonel Dowling also notified Plaintiff that he had conveyed to his company first sergeant that he understood the provisions of DoDD 1344.10 and that he still planned to do media interviews.  ECF Docs. 9 and 10.  Colonel Dowling noted that Plaintiff spoke before a partisan political

1   gathering on March 22, 2012 and continued to utilize the media to advocate partisan politics and

2   undermine the chain of command.  ECF Docs. 9 and 10.

3        On March 26, 2012, Plaintiff retained civilian counsel.  ECF Docs. 10 at 9.  Plaintiff was

4   assigned and is still represented by military counsel.  ECF Docs. 10 at 9.  The administrative discharge

5   board scheduled its hearing for March 30, 2012.  ECF Doc. 1-2, ¶ 15; ECF Doc. 10 at 9.  When

6   Plaintiff's military counsel indicated he had a schedule conflict, the hearing was moved to

7   March 31, 2012.  ECF Doc. 1-2, ¶ 16; ECF Doc. 10 at 9.  At the request of his civilian counsel,

8   Plaintiff's hearing was again rescheduled to April 5, 2012.  ECF Doc. 1-2, ¶ 19.  Plaintiff's counsel

9   requested an additional delay but that request was denied.  ECF Doc. 1-2, ¶ 20; ECF Doc. 10 at 9.

10       On March 30, 2012, Plaintiff's military attorney submitted a request to Defendants for a Legal

11  Ethics Opinion, which was denied on April 4, 2012.  ECF Doc. 1-2, ¶ 20; ECF Doc. 7.

12       On April 3, 2012, Plaintiff filed a complaint and an ex-parte motion for a TRO in this Court.

13  ECF Doc. 1.  Plaintiff alleged that he did not have adequate time to present a defense and that failure

14  to postpone the proceedings would cause irreparable injury.  Id.; ECF Doc. 10 at 1-2.  Defendants

15  submitted four documents in response to Plaintiff's motion on April 4, 2012:  Headquarters, Marine

16  Corps' declination of an "Ethics Advisement" (ECF Doc. 7), an affidavit from Plaintiff's commanding

17  officer (ECF Doc. 8), Plaintiff's "Page 11" counseling entry (ECF Doc. 9), and Appendix 12 of the

18  Manual for Courts-Martial (ECF Doc. 12).

19       This Court held a hearing on April 4, 2012 and refused to grant Plaintiff's request for a TRO

20  under Wenger v. Monroe, 282 F.3d at 1073.  ECF Doc. 10 at 16.  This Court held that exhaustion by

21  Plaintiff was not futile as it was not "foregone" that he would be separated.  ECF Doc. 10 at 15.

22  However, this Court did strongly advise that the Marines delay the board for at least 24 hours, noting

23  that the Court "questioned the government's insistence on proceeding so expeditiously after Sergeant

24  Stein's nearly nine years of service." ECF Doc. 10 at 16-17.  This Court also directed additional briefing

25  as to the scope of the injunction in Ridgon v. Perry, 962 F. Supp. 150, 166 (D.D.C. 1997).  ECF Doc.

26  10 at 7.  Both parties filed briefs on the issue.  ECF Docs. 11 and 15.

27       The Marines proceeded with the Administrative Board.  ECF Doc. 15-2 ¶ 5.  Plaintiff filed

28  another TRO on April 6, 2012, claiming that the conduct of the board violated his due  process rights.

ECF Doc. 15.  Plaintiff claimed that he was denied a fair hearing and notice as the Marines failed to grant any continuance as strongly suggested by the Court, restricted voir dire, provided extensive prosecution documents to defense counsel for the first time during the hearing, limited evidentiary objections, and barred all defense witnesses (including a retired Marine Corps Brigadier General called as an expert witness) from testifying as to the standard to determine what violated "good order and discipline" and "service discrediting" as well as whether Plaintiff's conduct violated "good order and discipline" and was "service discrediting".  ECF Doc. 15 ¶ 4.

This Court again denied Plaintiff's request and ordered an additional hearing on April 13, 2012 at 0900 PST.  ECF Doc. 19.  This briefing follows.

## I.

## ARGUMENT

The parties, and the Court, have already addressed the standards of review that apply here, and they do not appear to be in dispute.  Briefly: an injunction is a "drastic and extraordinary remedy, which should not be granted as a matter of course," Order Denying Pl's Mot. for Temporary Restraining Order Without Prejudice (ECF No. 10) (April 4, 2012) ("April 4 Order") (internal citations omitted); Plaintiff has the burden of showing he is entitled to this remedy, and in order to do so he must satisfy the four-part <u>Winter</u> test.  <u>Id.</u>  Furthermore, and importantly in this case, a separate (but largely overlapping for present purposes) test governs the justiciability of any request that a court interfere with military decision-making.  Under the <u>Mindes</u> test, as articulated in <u>Wenger v. Monroe</u>, 282 F.3d 1068, 1072 (9th Cir. 2002), if a Plaintiff meets the threshold requirements of alleging "(a) a violation of a constitutional right, federal statute, or military regulations, and (b) exhaustion of administrative remedies, unless exhaustion is excused," <u>id.</u> at 12, the Court weights four factors:"(1) [t]he nature and strength of the plaintiff's claim"; "(2) [t]he potential injury to the plaintiff if review is refused"; "(3) [t]he extent of interference with military functions"; and "(4) [t]he extent to which military discretion or expertise is involved."  <u>Id.</u> (internal quotation marks omitted).  As explained below, each of these factors counsels against interfering with the Marine Corps' decision-making process, but the Court need go no further than evaluating the injury to Plaintiff if review is refused, because there would be no injury of the sort that can support preliminary injunctive relief.

**A.      Plaintiff Will Not Suffer Irreparable Harm Absent and Injunction.**

"At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that [he] will be exposed to irreparable harm," Caribbean Marine Servs. Co. v. Baldridge, 844 F.2d at 674.  In government personnel cases, a plaintiff must satisfy a particularly stringent standard for showing irreparable harm. Sampson v. Murray, 415 U.S. at 91-92; Hartikka v. United States, 754 F.2d at 1517. In Sampson a government employee sought to enjoin her pending discharge, alleging that it represented irreparable injury.  Sampson, 415 U.S. at 92 n. 68.  The Supreme Court rejected that argument, holding that absent a "genuinely extraordinary situation," discharge does not constitute irreparable harm.  Id.

The Ninth Circuit applies Sampson where, as here, "military personnel seek preliminary injunctive relief prohibiting a discharge." Hartikka v. United States, 754 F.2d at 1517.  As a result, courts "require that the moving party make a much stronger showing of irreparable harm" than in the "ordinary" case.  Id. at 1518 (citing Sampson v. Murray, supra. Indeed, the heightened irreparable harm requirement of Sampson is especially warranted where a service member seeks to prevent a potential discharge, because premature or unnecessary judicial intervention in such cases implicates separation of powers concerns and may adversely affect military morale and discipline.  See Chappell v. Wallace, 462 U.S. 296, 300 (1983) ("Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the Military Establishment.");  Muhammad v. Secretary of the Army, 770 F.2d 1494, 1495 (9th Cir. 1986) ("Strict application of the exhaustion requirement in military discharge cases maintains the balance between military authority and the federal courts.").

Plaintiff cannot, and has not, met his burden of showing irreparable harm, for two reasons. First, Plaintiff's assumption that he will be harmed—irreparably or otherwise—is entirely speculative, but "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." Baldridge, 844 F.2d at 674.  Plaintiff's claim to harm is speculative in two ways.  It is speculative because the Marine Corps has not decided whether to discharge him, or how to characterize any potential discharge. And it is speculative because Plaintiffs' claim of constitutional harm rests upon the assumption that, if and when the Marine Corps decides to discharge him, it will violate the Fifth and

1   First Amendments in doing so.[3/]  That assumption is not just speculative, it runs counter to "the strong

2   but rebuttable presumption that administrators of the military, like other public officers, discharge their

3   duties correctly, lawfully, and in good faith."  <u>Frizelle v. Slater</u>, 111 F.3d 172, 177 (D.C. Cir. 1997)

4   (internal citations omitted).

5           Second, even if the Marine Corps does decide to discharge Plaintiff and Plaintiff thinks that

6   decision intrudes upon a constitutional or other right of his, he may "seek a review process . . . to the

7   Board for Correction of Naval Records where Plaintiff may seek redress for any injustice or error."

8   April 4 Order at 15.  Indeed, the Court pointed to that fact in concluding "Plaintiff has not made the

9   requisite showing of irreparable injury" in its April 4, 2012 decision.  Plaintiff has added nothing to alter

10  that conclusion.  Besides the BCNR, Plaintiff may also proceed before the NDRB or even, in the

11  appropriate circumstances, in the Court of Federal Claims or Federal District Court.  Through such post-

12  discharge proceedings, Plaintiff could eventually receive reinstatement and back pay.  The only harm

13  Plaintiff can allege – a temporary loss of income and an alleged stigma associated with his potential

14  "Other Than Honorable" discharge between the time of his potential discharge and a subsequent

15  decision overturning the discharge and awarding him back pay – is a legally insufficient basis upon

16  which to show irreparable harm.  As the Ninth Circuit has held, "loss of income, loss of retirement and

17

18          [3/] This particular assumption forms the basis for Plaintiff's argument that any First Amendment
    harm would be *per se* irreparable.  As a preliminary matter, the rule that "[t]he loss of First Amendment
19  freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," <u>Elrod v.</u>
    <u>Burns</u>, 427 U.S. 347, 373 (1976), is not triggered here because Plaintiff does not challenge a direct
20  interference with his freedom of speech–he does not allege that he will lose his First Amendment
    freedoms for any period of time–but rather alleges he faces discharge "in retaliation for protected
21  speech."  <u>Pl's Mem. in Support of Motion for TRO</u> at 2, ECF NO. 2.  "In this circuit, no presumption
    of irreparable harm arises in a First Amendment retaliation claim."  <u>Rendish v. City of Tacoma</u>, 123
22  F.3d 1216, 1226 (9th Cir. 1997).  In any event, as discussed above, the speculative nature of Plaintiffs'
    First Amendment claim undermines any allegation of First Amendment harm that could form the basis
23  for such a *per se* rule.  Indeed, Plaintiffs' disagreement with any eventual discharge might well be
    focused on factual findings that he violated Article 134 or DOD Dir. 1344.10, not the validity of those
24  rules under the First Amendment.  For example, thus far Plaintiff has not argued that Article 134 is itself
    unconstitutional, but instead that he did not violate the provision with his comments on March 1, 2012.
25  <u>See Pl's Mem. in Support of Motion for TRO</u> at 11-12, ECF NO. 2 (arguing that Plaintiff has not
    violated Article 134); <u>Pl's Mem. in Support of Renewed Mot.</u>, at 4, ECF No. 15 (asserting that the
26  standard for assessing a violation of Article 134 and "whether plaintiff's conduct violated" the Article
    are "two of the most critical issues in this case"); *compare* Compl. ¶ 40 (as to Article 134, alleging only
27  that Plaintiff's "activities ... did not violate Article 134 ") *with* Compl. ¶ 41 (alleging that Plaintiff did
    not violate DOD Dir. 1344.10 *and* that "[e]ven if [he] did, DOD Directive 1344.10 violates the First
28  Amendment as applied . . .").

relocation pay, and damage to [] reputation resulting from the stigma attaching to a less than honorable discharge . . . are insufficient [injuries] under the <u>Sampson</u> standard to justify injunctive relief," <u>Hartikka</u>, 754 F.2d at 1518.  This rule applies "however severely they may affect a particular individual." <u>Id.</u> (internal citations omitted).

> **B.     Plaintiff's Requested Injunction Will Harm Defendants and the Public Interest.**

The third and fourth <u>Mindes</u> factors focus upon discrete issues–the extent of interference with military functions that would be occasioned by judicial review and the extent to which military discretion or expertise is involved–but ultimately "present a single inquiry, focusing on disruption of military functions and distortion of factors such as troop morale which are important to the operation of the military." <u>Khalsa v. Weinberger</u>, 779 F.2d 1393, 1400 (9th Cir. 1985) (citing <u>Lindenau v. Alexander</u>, 663 F.2d 68, 74 (9th Cir. 1981)).  The issues that the Marine Corps is deciding in considering whether to discharge Plaintiff, the impact of Plaintiff's actions on military morale, discipline, and defense, are peculiarly within the expertise and judgment of the military, <u>Khalsa</u>, 779 F.2d at 1400 n. 4, and judicial interference with the Marine Corps' decision-making process would unquestionably disrupt important military functions and draw the Court into matters requiring military judgment and expertise.

There is abundant evidence before the Marine Corps upon which it could conclude that Plaintiff's discharge is warranted to prevent harm to good order and discipline within his unit and the Marine Corps as a whole, such that any judicial interference with Plaintiff's potential discharge would amount to a significant intrusion into the functioning of the Corps.  Plaintiff has publicly spoken disrespectfully about, and stated that he will not follow the orders of, his Commander-in-Chief.  ECF Doc. 9.  In addition, Plaintiff spoke at a partisan political gathering a mere one day after his Commanding Officer notified him that he suspected him of violating the DoD Directive prohibiting such conduct.  ECF Doc. 8 at 1.  His actions have triggered on-duty altercations with fellow non-commissioned officers in front of a junior Marine.  Separation Hearing Transcript at 145[4]; ECF Doc. 8 at 2.  Indeed, Sergeant Stein's conduct is especially dangerous to his command because of its training

---

[4]  The transcript of the Separation Board Hearing is attached to this brief as "Separation Hearing Transcript" or "Tr."  For ease of use, the internal page numbers in that document are used.

1    mission.  ECF Doc. 8 at 2.  Sergeant Stein's actions have became fodder for the media and this has

2    caused other Marines to question his Commander's dedication to good order and discipline.  ECF Doc.

3    8 at 3.  At the administrative separation board hearing, a Marine in Sergeant Stein's job community

4    testified that his statements about refusing to follow the orders of his Commander-in-Chief on the

5    Marine Corps Meteorology and Oceanographic Services (METOC) Facebook Page had been subversive

6    to good order and discipline.  Board Transcript at 175-180.  The Marine stated that he only saw Sergeant

7    Stein's retraction and not his original posting on the actual Page. Board Transcript at 182-183.  Sergeant

8    Stein's comments were captured and circulated within the METOC community.  Board Transcript at

9    186, 190-192. Another Marine Master Sergeant testified that he received the postings via email and that

10   he felt the postings were "uncalled for, inappropriate, and against good order and discipline."  Board

11   Transcript at 192-193.

12            Furthermore, in addition to marking a significant interference with the functioning of the Marine

13   Corps, the injunction Plaintiff asks the Court to grant would draw the Court into issues that are

14   peculiarly appropriate to military, not judicial, judgment.  The Court is simply not competent to evaluate

15   the affect of Plaintiff's various actions on the good order and discipline of the Marine Corps, let alone

16   on an emergency basis. "An administrative discharge is closely related to maintenance of military

17   discipline and courts should be wary of interfering with the Armed Forces' discretion in deciding

18   whether a serviceman should be discharged or what form of discharge should be given." Pickell v.

19   Reed, 326 F. Supp. 1086, 1090 (N.D. Cal. 1971), aff'd, 446 F.2d 898 (9th Cir. Cal. 1971), cert. denied,

20   404 U.S. 946 (1971).  The Ninth Circuit has repeatedly held that even routine personnel decisions in the

21   armed forces implicate military expertise.  See Gonzalez v. Department of the Army, 718 F.2d 926, 930

22   (9th Cir.1983) (noting that while it would not hesitate to review a personnel decision in the civilian

23   context, it had to refrain from this "very sensitive area of military expertise"); Sandidge v. Washington,

24   813 F.2d 1025, 1027 (9th Cir. 1987); Sebra v. Neville, 801 F.2d 1135, 1142 (9th Cir. 1986) (When

25   applying the last two Mindes factors, a court must be wary as military transfer decisions go to the core

26   of deployment of troops and overall strategies of preparedness).  When it comes to the determination

27   of whether Plaintiffs should be discharged from the Marine Corps, the Supreme Court's admonition that

28

14

1   judges are "ill-equipped" to determine the impact of judicial intrusion on military authority, <u>Chappell</u>

2   <u>v. Wallace</u>, 462 U.S. at 305, is especially apt.

3           **C.      Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits.**

4          Plaintiff asserts two constitutional arguments: violation of the Due Process Clause of the Fifth

5   Amendment, and violation of the Free Speech Clause of the First Amendment.[5/]   As a preliminary

6   matter, neither of his assertions is timely because no final decision has been rendered.   Until the

7   administrative decision-making process is completed, there will be neither a decision for the Court to

8   review nor a record upon which Plaintiff might base any allegations of constitutional infirmity.   <u>See</u>

9   <u>Muhammad v. Sec'y of Army</u>, 770 F.2d 1494, 1496 (9th Cir. 1985) ("if the military appeal process fails

10   to give appropriate relief, the process itself will produce a record for appeal to the courts").   As a result,

11   the issues presented in Plaintiffs' complaint are simply not yet fit for judicial resolution, and the

12   requirement of ripeness stands as a barrier to the relief Plaintiff seeks separate and apart from the

13   stringent showing necessary to establish entitlement to emergency injunctive relief and the <u>Mindes</u>

14   standard for evaluating the justiciability of military decisions.   <u>See</u> <u>Western Watersheds Project v.</u>

15   <u>Kraayenbrink</u>, 632 F.3d 472, 486 (9thCir. 2011) ("We apply a two-part test to determine if a case

16   satisfies requirements for ripeness: the fitness of the issue for judicial decision and the hardship to the

17   parties of withholding court consideration.").   In any event, even assuming they were properly before

18   the Court, Plaintiff's constitutional arguments fail.

19               **1.      The Marine Corps Has Not Violated the Due Process Clause.**

20          The due process requirements of the Fifth Amendment apply to this case, if at all, not by virtue

21   of the fact that Plaintiff may be discharged—for he has no property interest in continued employment

22   as a Marine—but rather by the fact that any such discharge might carry with it a stigmatizing affect, and

23   thereby allegedly implicate a liberty interest.   <u>See generally</u> <u>Ulrich v. City and County of San Francisco</u>,

24   308 F.3d 968, 982 (9th Cir. 2002) (describing test for liberty interest premised upon "stigma plus").

25

26        [5/] In addition to these constitutional arguments, Plaintiff asserts two insubstantial arguments that

27   the Marine Corps has violated its own regulations.   <u>See</u> Compl. ¶¶ 32-36.   The Government's brief in
    response to Plaintiff's initial motion for a preliminary injunction explained why both arguments are

28   wrong, Gov't Mem. at 5-6, ECF No. 5, and Plaintiff did not re-assert them in his renewed motion, which
    focuses exclusively upon alleged procedural irregularities at the administrative separation board hearing.

Indeed, Plaintiff does not allege that he has a property interest in continued participation in the Marine Corps; he asserts only a liberty interest in the way his discharge is characterized.  See Pl's Mem. In Support of Mot. For TRO at 7-8, ECF No. 2 (alleging that separation proceeding "denied [Plaintiff] of liberty without due process of law" because Plaintiff may be subject to an "Other than Honorable Discharge").

Even assuming that a protected liberty interest of Plaintiff's is at stake (the Government does not concede that point), Plaintiff's due process argument would fail for three separate reasons.  First, Plaintiff misunderstands the role of the administrative separation process, which is not a formal, adversarial proceeding akin to a court martial.  As the Separation Manual states, in no uncertain terms: "An administrative separation board functions as an administrative rather than a judicial body. Accordingly, in the board's proceedings, the strict rules of evidence governing trials by court-martial are not applicable."[6] Sep. Man. ¶ 6316(1).  Indeed, the Separation Manual instructs that the board need not rule on legal objections or motions, such as many of those raised by Plaintiff, but rather "[s]uch motions or objections should be heard and merely noted in the record for resolution by the separation authority."    Id. ¶ 6315(2)(b).  The separation authority is not alone in addressing such issues and otherwise evaluating the record before the administrative separation board; under ¶ 6308(1)(c), before the separation authority makes his decision an officer from the Staff Judge Advocate's office must submit a written review of the legal bona fides of the separation, including, "[i]f the respondent has raised specific legal issues," a "comment on the merits of the issues raised."  This review is "attached as a permanent part of the record of proceedings," which Plaintiff could then submit to the BCNR or a court. Consistent with the "presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith," Frizelle v. Slater, 111 F.3d at 177 (internal citation omitted), the Court must assume that any material defects at the administrative separation board hearing will be corrected before the Marine Corps makes its decision.

---

[6]  See also id. ("There is a sharp and distinct delineation between the administrative process which has as its purpose the administrative elimination of unsuitable, unfit, or unqualified Marines, and the judicial process, the purpose of which is to establish the guilt or innocence of a member accused of a crime and to administer punishment when appropriate.").

1    Second, even if the administrative separation board did not exist and the Marine Corps had

2    summarily discharged Plaintiff without a hearing, the post-discharge procedures available to Plaintiff

3    through both the BCNR and the NDRB would provide to Plaintiff the process he is due under the Fifth

4    Amendment.  Before either board, Plaintiff could challenge the characterization of his discharge.  This

5    post-deprivation remedy would suffice to protect any liberty interest Plaintiff may have in avoiding the

6    stigma of an "Other Than Honorable" discharge; "[s]ince the purpose of the hearing in such a case is

7    to provide the person 'an opportunity to clear his name,' a hearing afforded by administrative appeal

8    procedures after the actual dismissal is a sufficient compliance with the requirements of the Due Process

9    Clause."  Arnett v. Kentucky, 416 U.S. 134, 157 (1974) (plurality op., overruled on other grounds,

10   Loudermill, 470 U.S. at 539); see also Barrett v. Smith, 530 F.2d 829, 833 n. 6 (9th Cir. 1976) (adopting

11   reasoning of district court that "courts which have examined the Arnett opinions have consistently held

12   that a pre-termination hearing is not required in such circumstances"); Patterson v. City of Utica, 370

13   F.3d 322, 335 (2d Cir. 2004) ("The appropriate remedy for a stigma-plus claim premised on a plaintiff's

14   termination from at-will government employment is a post-deprivation name-clearing hearing."); Segal

15   v. City of New York, 459 F.3d 207, 218 (2d Cir. 2006) ("The availability of such a [post-deprivation]

16   hearing ... defeats [plaintiff's] stigma-plus claims.").

17       Third, each and every one of the various alleged defects in the administrative separation board

18   process put forward by Plaintiff is based upon a mischaracterization of what happened before the Board.

19   Defendants will respond to take the alleged deficiencies articulated in Plaintiff's filing after the hearing

20   one-by-one:

21       Alleged demonstration of disrespect for the Court: Plaintiff alleges that the Administrative

22   Separation Board demonstrated disrespect for the Court's suggestion of a 24-hour continuance because

23   the Legal Advisor to the Board denied without consulting the board members Plaintiff's initial April 4,

24   2012 request, the day before the hearing and after this Court had rendered its decision, for a 24-hour

25   continuance.  Pl's Mem. In Support of Renewed Mot. at 2-3, ECF No. 15.  In fact, as the discussion of

26   this issue in the transcript, Tr. 14-16, 55, 65-75 shows, Plaintiffs' account of what happened is

27   deceptively incomplete. Major Houtz indeed initially denied the continuance request without consulting

28   the board members, but that was only because his understanding at that time was that the Marine Corps

17

1    had already decided that, after the ten-day continuance that was granted Plaintiff, no more continuances

2    would be granted in order to avoid undue delay in the case.  Tr. 16.  Furthermore, the morning of the

3    board hearing Plaintiff was allowed to re-submit his continuance request and submit arguments in

4    support thereof.    Tr. 64-75.  Plaintiff sought both a two-week continuance, Tr. 65, and a 24-hour

5    continuance, Tr. 74, and both were denied after consideration by the Board President.  Tr. 73 (denying

6    two-week continuance); Tr. 75 (denying 24-hour continuance).  Plaintiff also alleges that Major Houtz

7    "throughout the hearing made it clear that the Board was not going to 'make a record for the federal

8    court.'"  The single comment to which Plaintiffs are referring, in context, is in no way objectionable.

9    Major Houtz said, in indicating that counsel for Plaintiff's should wrap up or move forward with their

10   questions during *voir dire* of him regarding his decision to deny a continuance:  "I think we've covered

11   it.  If you have questions about my impartiality or ability to advise the president, please go down that

12   path.  We're not going to sit here and build up a record for federal court.  That's not what this hearing

13   is about."  Tr. at 16.  Major Houtz was simply offering the reasoning for his conclusion that no further

14   questioning on the continuance issue was appropriate at the voir dire stage of the proceedings; indeed,

15   Plaintiffs were later allowed to set forth in great detail their case for a continuance at the appropriate

16   time, when the Board considered motions.  Tr. 65-75.

17        Alleged retaliation for seeking judicial relief:  Plaintiff also alleges that "Defendants have acted

18   to punish [Plaintiff] for having availed himself of the right to seek the protection of the Court."  Pl's Br.

19   at 3.  That is not so.  The Marine Corps began separation proceedings long before Plaintiff filed this

20   lawsuit, and none of the proposed bases for his separation references the lawsuit in any way.  The basis

21   for Plaintiff's unfounded allegation is a passing reference to the lawsuit made by Captain Torresala in

22   his closing statement.  Tr. at 257.  Captain Torresala "did not present the lawsuit as evidence of the

23   underlying misconduct that served as the basis for the hearing and he explicitly affirmed that Sergeant

24   Stein had the right to bring the lawsuit."   Gwartney Decl. ¶ 7.  As for Plaintiff's counsel, they

25   themselves sought to use the fact of this lawsuit in painting a picture of Plaintiff in their closing

26   statement, telling the Board "Sergeant Stein is on our hill.  We have an oath to hold it and we fight for

27   it.  And Sergeant Stein fights for himself.  He fights in U.S. federal court if that's what it takes, because

28   the Marine Corps and being a Marine is worth fighting for."  Tr. at 259.

Alleged failure to examine First Amendment claims: Plaintiff alleges that the Marine Corps' process is defective because the Board did not examine certain First Amendment claims raised by Plaintiff, and that as a result the Marine Corps has acted contrary to the Court's statement that "'the military should properly evaluate [Plaintiff's] contentions in the administrative separation proceedings.'"  Pl's Br. at 3 (quoting April 4 Order at 8).  Plaintiff misunderstands how the Marine Corps' administrative separation proceedings operate.  As discussed above, the Separation Manual instructs that "motions or objections should be heard and merely noted in the record for resolution by the separation authority," id. ¶ 6315(2)(b), whose decision will be based in part upon the written review prepared by the Staff Judge Advocate's office under ¶ 6308(1)(c).

Alleged denial of fair hearing: Plaintiff makes a grab bag of claims in support of his allegation he was denied a fair hearing, asserting that, in addition to the Board's refusal to grant a continuance (discussed above), the Board (1) "restricted voir dire," (2) "provided extensive prosecution documents to defense counsel for the first time during the hearing, limiting evidentiary objections," and (3) barred defense witnesses from testifying as to the legal standard for assessing a violation of Article 134 of the UCMJ. Pl's Br. at 4.  None of these allegations–to the extent there is any truth to them–undermines the fairness of the hearing, which the record reveals followed the Separation Manual's instructions to the tee: (1) Fifty pages of the transcript are devoted to voir dire, Tr. at 3-53, which began soon after the hearing started at 8:33 am and continued until 10:29 am, less two thirteen-minute recesses. (2) The "vast majority" of the government exhibits were provided to Plaintiff "on 23 March 2012," and only four of the Government's twenty-nine exhibits (exhibits 22, 23, 24, and 29) were provided for the first time at the hearing, Gwartney Decl. ¶ 3.  By contrast, "the defense did not disclose any documentary exhibits to the Government until the day of the hearing."  Id..  And (3) several witnesses testified on behalf of the Defense, "including Sergeant Stein's father, childhood pastor, and Marine Corps recruiter, without objection from the Government"; two other Defense witnesses, including Brigadier General Brahms, were excluded because they had no first-hand knowledge of the proceeding but intended to testify on legal issues, Gwartney Decl. ¶¶ 11, 12, and the Defense successfully sought the exclusion of a Government Exhibit on the same basis, id. ¶ 13.  The exclusion of these two witnesses was fully consistent with the Separation Manual's guidance that "[t]he testimony of a witness may be excluded

1   if the legal advisor . . . determines that its probative vlalue is substantially outweighed by considerations

2   of undue delay, waste of time, or needless presentation of cumulative evidence."  Sep. Man. ¶ 6317.

3               **2.        Plaintiff's Potential Discharge Would Not Violate the First Amendment.**

4          Distilled to its essence, Plaintiff's Count IV constitutes a claim that he is somewhere in the

5   process of being wrongfully discharged on the basis of public speech protected under the First

6   Amendment.  Plaintiff's notion that the First Amendment in this context protects his public speech –

7   including, <u>inter</u> <u>alia</u>, assertions on his Facebook site that President Obama, his Commander-in-Chief,

8   is the "economic" and "religious" enemy of the United States Constitution and statements that he "will

9   not follow all orders from him" – is flatly incorrect.  Thus, he cannot demonstrate that he is likely to

10  succeed on the merits of this claim.

11         The Supreme Court has made clear that First Amendment rights are limited in the military.

12  "While members of the military are not excluded from the protection granted by the First Amendment,

13  the different character of the military community and of the military mission requires a different

14  application of those protections."  <u>Parker v. Levy</u>, 417 U.S. 733, 758 (1974).   As the Court explained

15  in <u>Parker v. Levy</u>:

16                    In the armed forces some restrictions exist for reasons which have no
                     counterpart in the civilian community.  Disrespectful and contemptuous
17                    speech, even advocacy of violent change, is tolerable in the civilian
                     community, for it does not directly affect the capacity of the government
18                    to discharge its responsibilities unless it is both directed to inciting
                     lawless action and is likely to produce such action.  In military life,
19                    however, other considerations must be weighed.  The armed forces
                     depend on a command structure that at times must commit men to
20                    combat, not only hazarding their lives but ultimately involving the
                     security of the Nation itself.   Speech that is protected in the civil
21                    population may nonetheless undermine the effectiveness of the
                     responsiveness to command.  If it does it is constitutionally unprotected.

22         <u>Id.</u> at 758-59 (internal citations omitted).  Thus, "nothing in the Constitution . . . disables a

23  military commander from acting to avert what he perceives to be a clear danger to the loyalty, discipline,

24  or morale of troops . . . under his command."  <u>Greer v. Spock</u>, 424 U.S. 828, 840 (1976).[7/]

25

26         [7/]  The Court emphasized the same point in <u>Goldman v. Weinberger</u> in the First Amendment
    context of religious expression within the military:

27
              Our review of military regulations challenged on First Amendment grounds is far more

28                                                                              (continued...)

Moreover, in evaluating the degree of danger to the responsiveness to command, the government is not obligated to show proof of actual harm. Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 810 (1985) ("government need not wait until actual havoc is wreaked to restrict access to a non-public forum" under First Amendment forum-analysis test). Rather, as explained by the D.C. Circuit in Priest v. Secretary of the Navy, 570 F.2d 1013 (D.D.C. 1977), it is the potential for the erosion of loyalty, discipline, or morale that is considered when determining whether sanction is warranted in response to a service member's speech. Id. at 1018. In Priest, the court reviewed the Navy's conviction of a former seaman under UCMJ Art. 134 for distribution of a newsletter urging insubordination and concluded that the challenged conviction withstood First Amendment review. In so holding, the court emphasized that "[t]he government does not have the burden of showing a causal relationship between [the defendant's] newsletter and specific examples of weakened loyalty, discipline or morale; the question . . . is whether there is a clear tendency . . . to diminish them." Id.; see also Ethredge v. Hail, 56 F.3d 1324, 1327-28 (11th Cir. 1995); but see Wilcox v. United States, 66 M. J. 442 (C.A.A.F. 2009).

In reviewing such a determination, courts must recognize the military's unique constitutional function, and thus "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." Goldman v. Weinberger, 475 U.S. at 507; see also Orloff v. Willoughby, 345 U.S. 83, 93-94 (1953). As the Eleventh Circuit noted in Ethredge, "[n]ot only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." 56 F.3d at 1328.

Finally, even outside of the military context, settled case law permits the government, as an employer, to restrict speech that is likely to interfere with "the efficiency of the public services it performs through its employees." Pickering v. Bd of Educ., 391 U.S. 563, 568 (1968). In particular,

---

[7]/(...continued)
deferential than constitutional review of similar laws and regulations designed for civilian society. The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, until, commitment and esprit de corps.

475 U.S. 503, 507 (1986).

21

the Supreme Court has recognized that a governmen employee may be discharged for engaging in speech likely to cause a significant disruption. <u>Waters v. Churchill</u>, 511 U.S. 661, 667 (1994). As the Second Circuit has observed, "<u>Waters</u> indicates that the government's burden is to make a substantial showing of <u>likely</u> interference and not an <u>actual</u> disruption . . . even when the speech is squarely on public issues . . . and thus earns the greatest constitutional protection." <u>Jeffries v. Harleston</u>, 52 F.3d 9, 13 (2d Cir. 1995).

Measured against these standards, it is readily apparent even as a general matter that Plaintiff's public speech carries the potential for significant disruption to loyalty, discipline, or morale within the Marine Corps. As recently as March 1, 2012, Plaintiff engaged in a Facebook dialogue with other posters on the "Marine Corps Meteorology and Oceanography (METOC) Services" group page, in which Plaintiff made the following statements:

> As an Active Duty Marine I saw [sic.] "Screw Obama" and I will not follow all orders from him. . . . Will do my job better then [sic.] the next guy . . . But has [sic.] for saluting Obama as commander-in-chief . . . I will not!
>
> * * * *
>
> Your [sic.] right it said to defend the "I will support and defend the Constitution of the United States against all enemies, foreign and domestic" Obama is the economic enemy . . . He is the religious enemy . . . he is the "Fundamentally change" America enemy . . . he IS the Domestic Enemy."

Gov't Ex. 5. Under substantively similar facts, the Eleventh Circuit in <u>Ethredge</u> upheld an Air Force administrative order barring from Robins Air Force Base the display of "bumper stickers or other similar paraphernalia" that "embarrass or disparage" the President against an as-applied First Amendment challenge asserted by a civilian base employee. 56 F.3d at 1327. Applying the forum-analysis test, the court held that the Air Force had a right to promulgate the order in response to the base command's evaluation that the plaintiff's bumper stickers – one of which read "HELL WITH CLINTON AND RUSSIAN AID" – "constituted a clear danger to military order and morale." <u>Id.</u> at 1326, 1328. As did the Air Force with the plaintiff's bumper stickers in <u>Ethredge</u>, Plaintiff's chain of command here has made an evaluation that his public statements constitute a clear danger to loyalty, discipline, and morale. That determination would be sufficient to warrant Plaintiff's discharge, if that is the ultimate decision at the conclusion of the ongoing administrative separation proceeding.

The Marine Corps could also reasonably conclude that Plaintiff's statements fall within the scope

of Article 134, UCMJ – the first specified basis for his ongoing administrative separation proceeding – which authorizes appropriate punitive action in response to "disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces[,]" and fall outside of the First Amendment's protective scope.  Such statements by Plaintiff as calling the President – his Commander-in-Chief – the "Domestic Enemy," among other labels, and asserting that he would not "follow all orders from him" and that he would not salute him can fairly be evaluated as undermining the command structure, thereby presenting a clear danger to loyalty, discipline, or morale.  See, e.g., Millican v. United States, 744 F. Supp. 2d 296, 307 (D.D.C. 2010) (Air Force major's speech urging other personnel to refuse to receive Anthrax vaccine "constitutionally unprotected because it may undermine the effectiveness of response to command." (internal quotations omitted)).

## IV.

## CONCLUSION

For the reasons explained above, Defendants respectfully request that the Court deny Plaintiff's motion for a preliminary injunction.


Dated: April 12, 2012                         Respectfully submitted,

                                              LAURA E. DUFFY
                                              United States Attorney

                                              s/ Tom Stahl
                                              TOM STAHL
                                              Assistant U.S. Attorney
                                              Chief, Civil Section
                                              Attorneys for Respondents