**MARINE CORPS RECRUIT DEPOT SAN DIEGO**
**WESTERN RECRUITING REGION**

| | | |
|---|---|---|
| U N I T E D  S T A T E S | ) | ADMINISTRATIVE SEPARATION |
| | ) | BOARD |
| v. | ) | |
| | ) | |
| STEIN, Gary A. | ) | GOVERNMENT EXHIBIT LIST |
| Sergeant | ) | |
| U.S. Marine Corps | ) | |
| XXX XX 0101 | ) | (4 APR 12) |
| | ) | |

I. Pursuant to MCO 1900.16F (MARCORSEPMAN), the Government offers the following exhibits for consideration:

> **GE-1: APPOINTING LETTERS**
>
> - **Original Appointing Letter, dtd 21 Mar 12**
> - **Revised Appointing Letter, dtd 29 Mar 12**
>
> **GE-2: ADMINISTRATIVE SEPARATION NOTIFICATION PACKAGE**
>
> **GE-3: DEFENSE REQUESTS**
>
> - **Delay Request #1, dtd 25 Mar 12 and endorsements**
> - **Civilian Defense Counsel Notice of Appearance, dtd 27 Mar 12**
> - **Delay Request #2, dtd 27 Mar 12 and endorsement**
> - **Request for Meeting with CA (undated, submitted 28 Mar 12)**
> - **SJA email, dtd 29 Mar 12 (declination of CA meeting)**
> - **Withdraw Request, dtd 27 Mar 12 (with enclosure)**
> - **Withdraw Request, dtd 31 Mar 12 (with enclosure)**
> - **CA Endorsement to both Withdraw Requests**
> - **ACLU ltr, dtd 30 Mar 12**
> - **Ethics Advisement Request, dtd 30 Mar 12 and endorsements**
> - **Request for Info, RE: members challenges, dtd 2 Apr 12 and endorsement**
> - **Government Rebuttal Memo, dtd 4 Apr 12**
>
> **GE-4: DEFENSE REQUEST TO CHANGE SITUS**
>
> **GE-5: METOC FACEBOOK PAGE, DTD 1 MAR 12 (WITH TRANSCRIPT)**
>
> **GE-6: GARY STEIN STATEMENT, DTD 5 MAR 12**

**GE 7: ARMED FORCES TEA PARTY (AFTP) WEBSITE**

**GE-8: REDSTATE.COM POSTINGS**

- "armedforcesteaparty.com" home page
- Vic Luebker Posts, dtd 19-21 Mar 12

**GE 9: ARMED FORCES TEA PARTY (AFTP) FACEBOOK PAGE PICTURES**

**GE 10: ARMED FORCES TEA PARTY (AFTP) FACEBOOK PAGE POSTINGS**

- Gary Stein Statement, dtd 21 Mar 12
- AFTP Sitrep, dtd 4 Jan 12

**GE 11: GARY STEIN FACEBOOK PAGE**

**GE 12: ARMED FORCES TEA PARTY FACEBOOK PAGE**

**GE 13: MEDIA REPORT SUMMARIES**

- 7 Mar 12
- 7 Mar 12
- 13 Mar 12
- 13 Mar 12
- 22 Mar 12
- 22 Mar 12
- 23 Mar 12

**GE 14: DoD DIRECTIVE 1344.10 ("POLITICAL ACTIVITES BY MEMBERS OF THE ARMED FORCES")**

**GE 15: SGT STEIN 6105 COUNSELING, DTD 23 MAR 12**

**GE 16: SRB/BIR/BTR/MBS FOR SGT STEIN**

**GE 17: SGT STEIN SECURITY CLEARANCE REVOCATION**

- Revocation Letters
- SF-86 Questionnaire

**GE 18: SGT STEIN BIO MEMO (without enclosures – repeated elsewhere)**

**GE 19: COURT JUDGMENT FOR COLLECTION AGENCY, DTD 24 JAN 12**

**GE 20: APR 2010 SGT STEIN COUNSELING**

2

- Fox News Interview with Gary Stein, dtd 15 Apr 12
- Affidavit of LtCol Daren Erickson, dtd 29 Mar 12
- Affidavit of Maj Gabrielle Chapin, dtd 29 Mar 12

## GE 21: WITNESS AFFIDAVITS

- SgtMaj Trevor Jackson, USMC, Bn SgtMaj, WFTBN
- Mr. Ron Brundige, Security Manager, MCRDSD
- Col David Shumake, USA, JACG

## GE 22: CWO2 MILLS PERSONNEL RECORDS FOR SGT STEIN

- Annual FITREP for Sgt Stein (20100801-20110331)
- Annual FITREP extension for Sgt Stein (20110401-20110620)
- CWO2 Mills RS Evaluation Record (Sergeants)
- Counseling Sheet for Sgt Stein, dtd 20110308
- Counseling Sheet for Sgt Stein, dtd 20101006
- Appointment Letter as METCO Training NCO

## GE 23: CWO4 BURNS METOC FACEBOOK MESSAGES WITH SGT STEIN

## GE 24: PRESIDENT OBAMA REELECTION CAMPAIGN ANNOUNCEMENT

## GE 25: ARTICLE 92 AND 134, UCMJ

## GE 26: MARCORSEPMAN SECTIONS 1004, 1004.4, 6210, 6210.6

## GE 27: MARINE CORPS TIMES ARTICLE

## GE 28: US ARMY WAR COLLEGE QUARTERLY, AUTUMN 2007

- Maj John Kiel, Jr., USA, JAGC, "When Soldiers Speak Out: A Survey of Provisions Limiting Freedom of Speech in the Military"

## GE 29: CMC WHITE LETTER 1-12

## GE 30: GOVERNMENT WRITTEN SUMMATION

## GE 31: COMPLAINT FOR DECLARATION AND INJUNCTIVE RELIEF

/s/
J. W. TORRESALA
Capt, USMC
Recorder

3

000003

## CERTIFICATE OF SERVICE

A true copy of this document was served upon the President on this date: 4 April 2012.

/s/
J. W. TORRESALA
Capt, USMC
Recorder

# GE-1A

UNITED STATES MARINE CORPS
WEAPONS AND FIELD TRAINING BATTALION
MARINE CORPS RECRUIT DEPOT SAN DIEGO
EDSON RANGE, BOX 555181
CAMP PENDLETON, CALIFORNIA 92055-5181

IN REPLY REFER TO:
1900
S-1
21 Mar 12

From:   Commanding Officer, Weapons and Field Training Battalion,
        Marine Corps Recruit Depot San Diego, CA
To:     President, Administrative Discharge Board

Subj:   APPOINTMENT LETTER FOR THE ADMINISTRATIVE DISCHARGE BOARD
        ICO SERGEANT GARY A. STEIN, USMC, 0101/6842

Ref:    (a) MCO P1900.16F (MARCORSEPMAN)

1. In accordance with paragraph 6314 of the reference, an
Administrative Separation Board will be convened on 30 March 2012 at
Weapons and Field Training Battalion, Camp Pendleton, CA to hear the
subject case.  The officer(s) and staff non-commissioned officer(s)
listed below are appointed as Administrative Separation Board Members:

### MEMBERS

        LtCol R. L. Hairston, USMC, President;
        Maj T. D. Wardinsky, USMC, member; and
        SgtMaj P. A. Siaw, USMC, member.

2. Your attention is directed to the provisions of Section 3 of
Chapter 6 of the reference for guidance and compliance.  Attendance at
the proceedings of the Board is the primary duty for each member.  All
absences must be approved by the Staff Judge Advocate, MCRD San Diego.

3. The Recorder will be assigned by the Staff Judge Advocate, MCRD San
Diego.  Counsel for the Respondent will be assigned by the Senior
Defense Counsel, Office of the Staff Judge Advocate, MCRD San Diego.

4. The Board will be conducted at the Weapons and Field Training
Battalion Conference Room or at other places as directed.

5. The board's report and record will be prepared according to the
references and forwarded to me within 30 days after the Board has
adjourned.  Extensions of this due date must be requested in writing.

                                    C. S. DOWLING

# GE-1B



**UNITED STATES MARINE CORPS**
WEAPONS AND FIELD TRAINING BATTALION (MCRD)
EDSON RANGE, BOX 555181
CAMP PENDLETON, CA 92055-5181

IN REPLY REFER TO:
1900
S-1
29 Mar 12

From:   Commanding Officer, Weapons and Field Training Battalion,
        Marine Corps Recruit Depot San Diego, CA
To:     President, Administrative Discharge Board

Subj:   APPOINTMENT LETTER FOR THE ADMINISTRATIVE DISCHARGE BOARD ICO SERGEANT
        GARY A. STEIN, USMC, 0101/6842

Ref:    (a) MCO P1900.16F (MARCORSEPMAN)

1. In accordance with paragraph 6314 of the reference, an Administrative
Separation Board will be convened on 5 April 2012 at Weapons and Field
Training Battalion, Camp Pendleton, CA to hear the subject case.  The
officer(s) and staff non-commissioned officer(s) listed below are appointed
as Administrative Separation Board Members:

<u>**MEMBERS**</u>

        LtCol R. L. Hairston, USMC, President;
        Maj T. D. Wardinsky, USMC, member; and
        SgtMaj M. D. Brookman, USMC, member.

2. Your attention is directed to the provisions of Section 3 of Chapter 6 of
the reference for guidance and compliance.  Attendance at the proceedings of
the Board is the primary duty for each member.  All absences must be approved
by the Staff Judge Advocate, MCRD San Diego.

3. The Recorder will be assigned by the Staff Judge Advocate, MCRD San Diego.
Counsel for the Respondent will be assigned by the Senior Defense Counsel,
Office of the Staff Judge Advocate, MCRD San Diego.

4. The Board will be conducted at the Weapons and Field Training Battalion
Conference Room or at other places as directed.

5. The board's report and record will be prepared according to the references
and forwarded to me within 30 days after the Board has adjourned.  Extensions
of this due date must be requested in writing.

                              C. S. DOWLING

GE-2


IN REPLY REFER TO:
1900
S-1
21 Mar 12

From:   Commanding Officer, Weapons and Field Training Battalion,
        Marine Corps Recruit Depot San Diego, CA
To:     Sergeant Gary A. Stein, USMC, 0101/6842

Subj:   NOTIFICATION OF ADMINISTRATIVE SEPARATION PROCEEDINGS

Ref:    (a) MCO P1900.16F (MARCORSEPMAN)

Encl:   (1) Purpose and Scope of the Naval Discharge Review Board
            (NDRB) and Board for Correction Naval Records (BCNR)
        (2) Acknowledgement of Respondent's Rights

1.   You are hereby notified that I intend to recommend to the
Separation Authority that you be discharged from the U.S. Marine
Corps per paragraph 6210.6 of reference (a) by reason of
misconduct, specifically commission of serious offenses.

2.   The bases for this recommendation are as follows: (1) that on
or about 1 March 2012, you allegedly made statements regarding
the President of the United States that are prejudicial to good
order and discipline, as well as service discrediting in
violation of Article 134, UCMJ; (2) from on or about November
2010 to the present you allegedly created, administered, and
provided content to a Facebook page, as well as other online
media sources, in violation of DoD Directive 1344.10.

3.   The least favorable characterization of service which you may
receive is Under Other Than Honorable Conditions characterization
of service.  Although the Commanding General, Marine Corps
Recruit Depot, San Diego will make the final determination of
characterization if you are separated, I am recommending that you
be given a Other Than Honorable Conditions characterization of
service.

4.   As a result of these separation proceedings, you have the
following rights:

     a.   You have the right to consult with qualified counsel
prior to electing or waiving any of your rights.  It is in your
best interest to do so prior to waiving any of your rights.

     b.   You have the right to request a hearing before an
Administrative Separation Board per paragraph 6304 of reference
(a).

c.  You have the right to present written statements to the Commanding General in rebuttal to this proposed separation in lieu of having a hearing.

d.  You have the right to obtain copies of documents that will be forwarded to the Commanding General supporting this proposed separation.  Classified documents shall be summarized.

e.  You have the right to waive any of these rights after being afforded an opportunity to consult with counsel.

5.  Should you request a hearing before an Administrative Discharge Board, you would be afforded the following rights:

a.  To appear in person before such a board or be represented by counsel if you are confined by civilian authorities.

b.  To be represented by military counsel, appointed of your choice, if available.

c.  To be represented by civilian counsel if you desire at your own expense.

d.  To challenge voting members of the board or the legal advisor, if any, for cause only.

e.  To testify on your own behalf, subject to the provisions of Article 31, UCMJ (Compulsory self-incrimination Prohibited).

f.  At any time during the proceedings you or your counsel may submit written or recorded matter for consideration by the board.

g.  You or your counsel may call witnesses on your behalf.

h.  You or your counsel may question any witness who appears before the board.

i.  You or your counsel may present argument prior to the board closing the hearing for deliberation on the finding and recommendations.

j.  Upon written request to the Commanding Officer, to be provided with a copy of the report of the board and the endorsement.

k.  Failure to appear without good cause at a hearing constitutes waiver of your right to be present at the hearing.

l.  You have the right to make a sworn or unsworn statement.

000011

m.   You have the right to examine evidence presented by the board, to cross examine witnesses appearing before the board, to submit evidence before the board, and to present final argument before the board.

n.   Failure to respond after being afforded a reasonable opportunity to consult with counsel constitutes waiver of the rights in paragraphs 6304.1d to 1m of reference (a).

6.   If you are separated before you complete your active duty service requirement incurred because you received advanced education assistance, bonuses, or special pays, you may be required to reimburse the U.S. Government on a pro-rated basis for the unserved portion of the active service requirement.

7.   Due to being recommended for administrative separation, you understand that if you are serving in the pay grade of E-4 or above and you are administratively separated with an other than honorable characterization of service, you will be administratively reduced to pay grade E-3, such reduction to become effective upon separation.

8.   Information on the Purpose and Scope of the Naval Discharge Review Board and Board for Correction of Naval Records is provided to you as an enclosure.

9.   You are directed to respond in writing to this notice no later than two (2) working days after this notification by completing and returning the enclosure.   Failure to respond by the prescribed time constitutes a waiver of your rights.

C. S. DOWLING

3

000012

The Board for Correction of Naval Records, consisting of not less than three members, was established pursuant to 10 U.S.C. 1552, and considers all applications properly before it for the purpose of determining the existence of an error or an injustice, and to make appropriate recommendations to the Secretary of the Navy. Application may be made by the member or former member, or such other persons as the board determines to be competent for such purpose. The Board for Correction of Naval Records, unlike the NDRB, may review discharges awarded by a general court-martial. Other types of cases reviewed by this board include, but are not limited to those involving requests for physical disability retirement; the cancellation of a physical disability discharge, and substituting, in lieu thereof, retirement for disability; and increase in the percentage of physical disability; the removal of derogatory material from an official record; the review of nonjudicial punishment; and the restoration of rank, grade, or rating. Also, this board will review the case of a person who is in a Reserve component and who contends that the release from active duty should have been honorable, rather than under honorable conditions.

The law requires that application be filed with the Board for Correction of Naval Records within 3 years of the date of the discovery of the error or injustice. However, the board is authorized to excuse the fact that the application was filed at a later date if it finds it to be in the interest of justice to consider the application. The board is empowered to deny an application without a hearing if it determines that there is insufficient evidence to indicate the existence of probable material error or injustice to the respondent.

No application will be considered by this board until the applicant has exhausted all other effective administrative remedies afforded by existing law or regulations, and such other legal remedies as the board shall determine are practical and appropriately available to the applicant.

An application to the board for the correction of a record shall not operate as a stay of any proceedings being taken with respect to the person involved.

The board will consider the applicant's case on the basis of all the material before it, including but not limited to, the application for correction filed by the applicant, any documentary evidence filed in support of such applications, any brief submitted by or in behalf of the applicant, and all available pertinent records in the Department of the Navy. The applicant's service record is but one of the records which may be considered by the board.

In cases other than denied applications, the record of proceedings of the board will be forwarded to the Secretary of the Navy who will direct such actions as determined to be appropriate.

In connection with review of executed discharges by the Board for Correction of Naval Records, there is no law or regulation which provides that an unfavorable discharge may be changed to a more favorable discharge solely because of the expiration of period of time after discharge during which the respondent's behavior has been exemplary.  To permit relief, an error or injustice must be found to have existed during the period of the enlistment in question and the respondent's good conduct after discharge, in an of itself, is not sufficient to warrant changing an unfavorable discharge to a more favorable type of discharge.

Applications for review and explanatory matter may be obtained by writing the Board for Correction of Naval Records, Department of the Navy, Washington, D.C. 20370.

The Navy Discharge Review Board (NDRB), consisting of five members, was established pursuant to 10 U.S.C. 1553 in order to review, on its own motion; or upon the request of any former member of the Navy or Marine Corps; or in the case of a deceased member or former member of the Navy or Marine Corps, upon the request of the surviving spouse, next of kin, or legal representative, or if incompetent by the member's guardian; the type and nature of final discharges in order to determine whether or not, under reasonable standards of naval law and discipline, the type and nature of the  discharge should be changed, corrected, or modified, and if so, to decide what  modification should be made.  The board may also issue a new discharge in record with the facts presented to it.

The NDRB may review all final separations from the naval service, irrespective of the manner evidenced or brought about, except a discharge awarded by a general court-martial, or a discharge executed more than 15 years before date of review application. Such review is based on all available records of the Department of the Navy pertaining to the former member, and such evidence as may be presented or obtained by the board.

The NDRB has no authority to revoke any discharge; nor to reinstate any person in the military service subsequent to discharge; nor to recall any person to active duty; nor to waive prior disqualifying discharges to permit enlistment in the naval service or any other branch of the Armed Forces; nor to cancel enlistment contracts; nor to change, correct nor modify and document other than the discharge document; nor to change the reason for discharge from or to physical disability; nor to determine eligibility for veterans' benefits.  The board may, at its discretion, record a recommendation for reenlistment as part

000014

of its decision in any case; however, such recommendation is not binding upon the Commandant of the Marine Corps or upon the Secretary of the Navy.

Relevant and material facts germane to the former member concerned found by a general or special court-martial, or by a inquiry or board of investigation where the former member was in the status of a defendant or an interested party, as approved by the reviewing authorities, shall be accepted by the board as established facts in the absence of manifest error or unusual circumstances clearly justifying a different conclusion. Relevant and material facts stated in a specification to which the former member concerned pleaded guilty before a general or special court-martial, or where, upon being confronted by such a specification, the former member elected to request discharge for the good of the service, shall be accepted by the board as established facts in the absence of manifest error or unusual circumstances clearly justifying a different conclusion, or unless the former member shall show to board's satisfaction, or it shall otherwise appear, that arbitrary or coercive action was taken against the member at the time, which action was not apparent to the reviewing authority from the face of the record. The evidence before the board which may be considered in connection with a particular discharge document will normally be restricted to that which is relevant and material to the former member's particular term of Marine Corps service or during that term of Marine Corps service, or at the time of separation. In order to warrant a change, correction, or modification of the original document evidencing separation from the Marine Corps, the former member concerned must show to the satisfaction of the board, or it must otherwise satisfactorily appear, that the original document was improperly or inequitably issued under standards of naval law and discipline existing at the time of the former member's original separation, or under such standards differing there from in the former member's favor which subsequent to separation, were made expressly retroactive to separations of the type and character had by the former member.

In connection with review of executed discharges by the NDRB there is no law or regulation which provides that an unfavorable discharge may be changed to a more favorable discharge solely because of the expiration of a period of time after discharge during which the respondent's behavior has been exemplary. To permit relief, an error or injustice must be found to have existed during the period of the enlistment in question and the respondent's good conduct after discharge, in and of itself, is not sufficient to warrant changing an unfavorable discharge.

Applications for review and explanatory matter may be obtained by writing the Navy Discharge Review Board, Department of the Navy, Washington, D.C. 20370.

000015

## STATEMENT OF THE INDIVIDUAL

I have been advised of the purpose and procedure for making
application to the Board for Correction of Naval Records and the
Navy Discharge Review Board.

_____  20120321
Signature / Date

_____  20120321
Witness / Date

4

000016

# UNITED STATES MARINE CORPS

WEAPONS AND FIELD TRAINING BATTALION
MARINE CORPS RECRUIT DEPOT SAN DIEGO
EDSON RANGE, BOX 555181
CAMP PENDLETON, CALIFORNIA 92055-5181

IN REPLY REFER TO:
1900
S-1
21 Mar 12

From:  Sergeant Gary A. Stein, USMC
To:    Commanding Officer, Weapons and Field Training Battalion,
       Marine Corps Recruit Depot San Diego, CA

Subj:  ACKNOWLEDGEMENT OF MY RIGHTS TO BE EXERCISED OR
       WAIVED DURING SEPARATION PROCEEDINGS

Ref:   (a) Notification of Administrative Separation Proceedings
       (b) MCO P1900.16F (MARCORSEPMAN)

1. _____ I acknowledge receipt of reference (a) notifying me
of proceedings to discharge me by reason of misconduct,
specifically commission of serious offenses pursuant to
paragraph 6210.6 of reference (b).

2. _____ I understand that I am being recommended for
separation with an other than honorable conditions
characterization of service and that the least favorable
characterization which I may receive is under other than
honorable conditions.  I understand that if I am
administratively separated with an other than honorable
characterization of service, I will be administratively reduced
to lance corporal and such reduction to become effective upon
separation.

3.  In view of the above, I chose to execute to following
rights:

    a. _____ I (have) (have not) consulted with counsel.  I
realize it is in my best interests to so prior to exercising
or waiving any of my rights.  My counsel's name is:
_____TBD_____.

    b. _____ I (do) (do not) request a hearing before an
Administrative Separation Board.

    c. _____ In lieu of a hearing, I (have) (have not) included
written statements in rebuttal to this proposed separation.

    d. _____ I (do) (do not) desire to obtain copies of documents
that will be forwarded to the (Separation Authority)
supporting this proposed separation.

4. If I requested a hearing before an Administrative Separation Board, I realize I have the following rights:

a. _____ To be present or represented by counsel if I am confined by civil authorities.

b. _____ To be represented by appointed military counsel, or counsel of my choice, if available.

c. _____ To be represented by civilian counsel if I desire and at my own expense.

d. _____ To challenge voting members of the board or legal advisor, I f any, for cause only.

e. _____ To testify in my own behalf, subject to the provisions of article 31, UCMJ (Compulsory self-incrimination Prohibited).

f. _____ At any time during the proceedings I or my counsel may submit recorded matter for consideration by the board.

g. _____ I or my counsel may call witnesses on my behalf.

h. _____ I or my counsel may question any witness who appears before the board.

i. _____ I or my counsel may present argument prior to the board's closing the hearing for deliberation on findings and recommendations.

j. _____ Upon written request to the (Convening Authority), to be provided with a copy of the report of the board and the endorsement.

k. _____ Failure to appear without good cause at a hearing constitutes waiver of my rights to be present at the hearing.

l. _____ I have the right to make a sworn or unsworn statement.

m. _____ I have the right to examine evidence presented by the board and to submit evidence before the board.

000018

n.   _____  That failure to respond after being afforded a
reasonable opportunity to consult with counsel constitutes
waiver of the rights in Para 6304.1d to 6304.1m of the
reference.

5.   _____  I understand that if I am separated before I complete
an active duty service requirement incurred because I received
advance education assistance, bonuses, or special pays, I may be
required to reimburse the U.S. Government on a pro rata basis
for the unserved portion of the active service requirement.

6.   _____  I have read and fully understand the Purpose and
Scope of the NDRB and BCNR.

_____   2010321   _____   20120321
Gary A. Stein      Date      Witness      Date
Sgt, USMC

000019

Subj:  GOVERNMENT REBUTTAL ARGUMENTS ICO SERGEANT GARY A. STEIN,
       USMC

Sgt Stein's failure to comprehend the inappropriate nature of
his comments.  Likewise, reference (f) illuminates how little
the ACLU knows about the current charges facing Sgt Stein and
how they have been influenced by the slanted media campaign that
Sgt Stein has created.

   b.  Second, Sgt Stein's continued partisan political
comments on various media, as well as his speaking before a
partisan political gathering on or about 22 March 2012, are
completely separate and distinct violations of reference (d) and
form the bases for the Article 92 charge against Sgt Stein.  The
ACLU's letter fails to account for this misconduct as sufficient
bases for discharge.

4.  Reference (g) mistakenly relies on reference (h) as a basis
to challenge the current Article 134 charge supporting the
administrative separation of Sgt Stein.

   a.  At issue in reference (h) was a U.S. Army paratrooper
who made several racist and supremacist comments to an
undercover CID agent during a private online chat session, as
well as on his AOL profile.  *Wilcox*, 66 M.J. at 445-446.

   b.  The court in reference (h) held that initially, two
threshold determinations must be made: "First, the speech
involved must be examined to determine whether it is otherwise
protected under the First Amendment.  Second, the Government
must have proved the elements of an Article 134, UCMJ, offense."
*Id*. at 447.  If the speech is otherwise protected under the
First Amendment and the Government has proved the elements of
the offense, a balance must be struck "between the essential
needs of the armed forces and the right to speak out as a free
American."  *Id*.

   c.  However, the court in reference (h) never reached the
balancing test, as it found the Government had failed to
establish the elements of Article 134 (specifically, that
insufficient evidence was produced to establish the accused's
speech was prejudicial to good order and discipline).  The court
held "[t]here is no evidence that any of Appellant's statements
were directed at military members or ever reached his unit. And
it is pure speculation that the racist views propounded on the
Internet by a single person purporting to be a paratrooper
either were viewed or would be viewed by other service-members
or would be perceived by the public or a service-member as an
expression of Army or military policy."  *Id*. at 450.  Put
another way, the court held the Government could not show a

6

Subj:  GOVERNMENT REBUTTAL ARGUMENTS ICO SERGEANT GARY A. STEIN, USMC

"reasonably 'direct and palpable' connection between [the] appellant's statements and the military mission."  *Id*. at 448 (internal citations omitted).

The court in reference (h) specifically noted: "The leading cases involving the intersection of Article 134, UCMJ, and the First Amendment have involved facts adduced at trial that showed that the appellant at least attempted to direct his speech to service-members…Because in those cases the speech was directed to service-members, the effect of the speech on the military mission was both palpable and obvious."  *Id*. (internal citations omitted).

In the present case, the METOC postings in question were made on a public forum specifically established for members of the METOC community.  They were in fact viewed by Marines and were brought to the attention of the chain of command by the Marines associated with that Facebook page.  Specifically, MSgt David Rose, himself a METOC Marine, saw those posts and immediately informed his SgtMaj, as he believed those comments to be prejudicial to good order and discipline within the Marine Corps.  Additionally, Sgt Stein himself has publicized those posts, which have become the subject of a Marine Corps Times article available in every post exchange across the Marine Corps.  The Government will have no problem establishing the elements of Article 134, thereby taking the issue outside the holding of *Wilcox*.

5.  Taken together, references (a), (e), (f) and (g) are misguided attempts to confuse the current administrative proceedings against Sgt Stein.  The Government recommends these arguments be noted for the record in accordance with reference (i), and be considered by the Separation Authority after the Board has issued its recommendations.

6.  The point of contact for questions regarding this memorandum is the undersigned at (619) 524-4089.

J. W. TORRESALA

GE-3A



**UNITED STATES MARINE CORPS**
DEFENSE SERVICES ORGANIZATION
MARINE CORPS RECRUIT DEPOT
3700 CHOSIN AVENUE
SAN DIEGO, CA 92140

IN REPLY REFER TO:
5800
9D
25 Mar 2012

From:  Respondent's Detailed Military Counsel
To:    President, Administrative Discharge Board

Subj:  REQUEST FOR DELAY

Ref:   MCO P1900.16F (MARCORSEPMAN)

1.   Respondent through counsel requests the administrative discharge board be delayed until 6 April 2012 to allow respondent the opportunity to secure civilian counsel.

2.   Paragraph 6315.1.a. permits the President of the board to grant continuances.  Paragraph 6304.3.c. grants the respondent the right to civilian counsel representation at the board hearing so long as consultation does not unduly delay the proceedings.

3.   Respondent's Military Counsel was detailed to the case on Friday, 23 March.  At that time Military Counsel described to the Respondent his right to have civilian counsel present at the board hearing.  Respondent expressed an interest in securing civilian counsel and began immediate inquiries. Respondent anticipates securing civilian counsel within the week but is concerned that the eventual counsel may not be available for the 31 March hearing and may not be fully read into the case by that date.

N.R. Grey

CC: Legal Advisor
    Recorder



**UNITED STATES MARINE CORPS**
WEAPONS AND FIELD TRAINING BATTALION
MARINE CORPS RECRUIT DEPOT SAN DIEGO
EDSON RANGE, BOX 555181
CAMP PENDLETON, CALIFORNIA 92055-5181

IN REPLY REFER TO:
1900
S-1
26 Mar 12

FIRST ENDORSEMENT on Defense Counsel ltr 5800 9D of 25 Mar 12

From:  President, Administrative Discharge Board
To:    Convening Authority

Subj:  REQUEST FOR DELAY

1.  Pursuant to paragraph 6304.3c of the reference, your request
is readdressed and forwarded.

R. L. HAIRSTON

2



**UNITED STATES MARINE CORPS**
WEAPONS AND FIELD TRAINING BATTALION
MARINE CORPS RECRUIT DEPOT SAN DIEGO
EDSON RANGE, BOX 555181
CAMP PENDLETON, CALIFORNIA 92055-5181

IN REPLY REFER TO:
1900
S-1
26 Mar 12

SECOND ENDORSEMENT on Defense Counsel ltr 5800 9D of 25 Mar 12

From:  Convening Authority
To:    Detailed Defense Counsel

Subj:  REQUEST FOR DELAY

1.  Pursuant to paragraph 6304.3c of the reference, your request is denied.

C. S. DOWLING

# GE-3B

**Brewer & Pritchard**

A PROFESSIONAL CORPORATION
ATTORNEYS & COUNSELORS

Three Riverway, 18th Floor
Houston, Texas 77056
Tel: (713) 209-2950
Fax: (713) 659-5302
Website: www.BPLaw.com

27 March 2012

Col. C. S. Dowling
Commanding Officer
Weapons and Field Training Battalion
Edson Range, Box 555181
Camp Pendleton, California 92055-5181

Re:  *Notice of Appearance of J. Mark Brewer on behalf of Sgt. Gary Stein in regard to the Notification of Administrative Separation Proceedings dated 21 Mar 12*

Dear Colonel Dowling:

Please be advised that I have accepted the representation of Sgt. Gary Stein in connection with the referenced administrative separation proceedings. Please be further advised that I hereby enter my appearance on behalf of Sgt. Gary Stein in these proceedings.

I am admitted to practice before the United States Supreme Court and the United States Court of Appeals for the Armed Forces. I am a member in good standing of the State Bar of Texas, the Missouri Bar, the United States Courts of Appeals for the Eighth and Fifth Circuits, and the United States District Courts for the Western District of Missouri, Southern District of Texas and Western District of Texas. I have been admitted *pro hac vice* to numerous other U.S. Courts of Appeals and U.S. District Courts, as well as state district courts in California. I have never been disciplined by any court or bar.

I am sworn and certified under Articles 27(b) and 42(a) of the Uniform Code of Military Justice, having taken the oath at the United States Court of Appeals for the Armed Forces on 7 April 1983 immediately preceding my commission to the USAF Reserve (Judge Advocate).

I am authorized to represent Sgt. Stein.

I may be contacted at the following location: Brewer & Pritchard, P.C., Three Riverway, Suite 1800, Houston, Texas 77056, Tel: (713) 209-2950, Facsimile (713) 659-5302 and Email brewer@bplaw.com.

Sincerely

J. Mark Brewer

000027

GE-3C

**Brewer & Pritchard**

A PROFESSIONAL CORPORATION
ATTORNEYS & COUNSELORS

Three Riverway, 18th Floor
Houston, Texas 77056
Tel: (713) 209-2950
Fax: (713) 659-5302
Website: www.BPLaw.com

27 March 2012

Col. C. S. Dowling
Commanding Officer
Weapons and Field Training Battalion
Edson Range, Box 555181
Camp Pendleton, California 92055-5181

Re: Administrative Separation of Sgt Gary Stein

Dear Sir,

I have been retained by Sgt Gary Stein to represent him at his pending administrative separation board. We request a delay of up to ten days to adequately prepare for the hearing. This request is based upon several considerations. First, the detailed military counsel, Capt Grey, is occupied with a separate administrative hearing on 27 March and will be in Twenty nine Palms during 29-30 March. His appointment to the case occurred only on Friday, 23 March. Second, my own attachment to the case began only on 26 March and I will require additional time to get up to speed on the facts and law of the case. Third, critical evidence, specifically the entirety of the 1 March 2012 Facebook posts (as opposed to the single page of posts currently available) must be retrieved from Facebook.com in order to put the comments in the proper context. Fourth, we need time to assemble witnesses as to Sgt Stein's performance of his military duties during his current enlistment as well as witnesses who would testify as to the impact Sgt Stein's public comments have had on unit discipline and service reputation. Fifth, it is our intention to request an advisory ethics opinion from the cognizant judge advocate to submit to you and the board.

Per paragraph 6304.3.b of MCO P1900.6, Sgt Stein is permitted to have civilian counsel present with him at the board hearing unless the presence of civilian counsel would unduly delay the administrative separation board proceedings. A delay of up to ten days is not unreasonable in the present circumstances. Four of the five considerations outlined above argue in favor of an extension without regard to the addition of civilian counsel to the case. The proposed delay would be in keeping with the spirit of the procedural protections of MCO P1900.6 and would allow an eight-year veteran an opportunity to fairly present his case before the board makes a decision with far reaching and permanent consequences.

Sincerely,

J. Mark Brewer



**UNITED STATES MARINE CORPS**
WEAPONS AND FIELD TRAINING BATTALION
MARINE CORPS RECRUIT DEPOT SAN DIEGO
EDSON RANGE, BOX 555181
CAMP PENDLETON, CALIFORNIA 92055-5181

1900
CSD
28 March, 12

J. Mark Brewer
Brewer & Pritchard, P.C.
Three Riverway, 18th Floor
Houtson, TX 77056

Mr. Brewer,

    I approve, in part, your 27 March request for a continuance of
the Administrative Separation Board for Sgt Gary Stein, USMC, that was
originally set to occur on 31 March 2012. I hereby grant a
continuance of that board until 0830 5 April 2012.

    Please direct any further requests regarding the conduct of the
board to the Recorder, Captain John Torresala, USMC, at 619.524.4089.

Respectfully,

C. S. Dowling
Colonel, U.S. Marine Corps

1

GE-3D

*In re Sgt. Gary Stein*, USMC, 0101/6842

**AO:**    Col. C. S. Dowling, USMC
Commanding Officer, Weapons and Field Training Battalion
Marine Corps Recruit Depot
San Diego, CA 92140

Lt. Col. Sean M. Sullivan, USMCR
Staff Judge Advocate, MCRD
3700 Chosin Ave, Building 12
San Diego Ca 92140

Capt. John W. Torresala, USMCR
Assistant Staff Judge Advocate, MCRD
3700 Chosin Ave, Building 12
San Diego Ca 92140

**Summary:**

1. <u>PURPOSE</u>.  Civilian counsel for Sgt. Gary Stein requests to meet with Col. Dowling on or before this Friday, 30 March 2012 to discuss, off-record and for "settlement" purposes only, disposition of the separation action initiated 21 March 12, in lieu of having a hearing.

2. <u>DISCUSSION</u>.  The proposed meeting would obviate the need for a hearing at a significant savings to the USMC of time and expense while helping to facilitate the intent of the Convening Authority.  The meeting would be attended by above-listed addressees, undersigned civilian counsel and detailed military defense counsel. Areas of discussion would include the proposed solution of Sgt. Stein ending internet and media communications during the remainder of his four months of active duty.

3. <u>RECOMMENDATION</u>. That the CO agree to meet off record for disposition of this matter in lieu of hearing.

J. Mark Brewer
Civilian Counsel to Sgt. Gary Stein
Ph:  (713) 209-2910
brewer@bplaw.com

GE-3E

Torresala Capt John W

| | |
|---|---|
| **From:** | Sullivan LtCol Sean |
| **Sent:** | Thursday, March 29, 2012 11:50 AM |
| **To:** | Mark Brewer; Torresala Capt John W |
| **Cc:** | Grey Capt Nicholas R |
| **Subject:** | RE: In re Sgt. Gary Stein |
| **Signed By:** | sean.sullivan@usmc.mil |

Mr. Brewer,

Please be advised that Col Dowling has respectfully declined the requested meeting this Friday.

Please continue to route all requests that you have for the Commanding Officer, Weapons Field Training Battalion, via me as the cognizant Staff Judge Advocate.

Very respectfully

LtCol Sean M. Sullivan, USMCR
Staff Judge Advocate, MCRD
3700 Chosin Ave, Building 12
San Diego Ca 92140
(O)  619 524 4104 DSN 524 4104
(BB) 619 302 2145

WARNING: ATTORNEY WORK PRODUCT
Information contained in this correspondence may be ATTORNEY WORK PRODUCT; this material is confidential and protected by applicable law, and is authorized for viewing by its intended recipients only. If you have received this message in error, reply to the sender immediately, and destroy any copies and attachments, electronic or print, which you have made of this message.

PRIVACY ACT WARNING:
This message may also contain information protected by the Privacy Act of 1974 and other law or regulation pertaining to the safeguarding of Personally-Identifiable Information (PII). Improper disclosure of the contents of this email may give rise to civil and/or criminal penalties.


-----Original Message-----
From: Mark Brewer [mailto:brewer@bplaw.com]
Sent: Wednesday, March 28, 2012 1:56 PM
To: Dowling Col Christopher S; Sullivan LtCol Sean; Torresala Capt John W
Cc: Grey Capt Nicholas R
Subject: In re Sgt. Gary Stein
Importance: High

Dear Colonel Dowling:


Please see the attached request for meeting this Friday.

1

000034

Respectfully,


J. Mark Brewer | Brewer & Pritchard PC | 3 Riverway, Ste 1800 | Houston, Tx 77056 |
713.209.2910

www.bplaw.com <http://www.bplaw.com/>

2

GE-3F

**In re: Sgt. Gary Stein, USMC, 0101/6842**

**AO:**    Col. C. S. Dowling, USMC
Commanding Officer, Weapons and Field Training Battalion
Marine Corps Recruit Depot
San Diego, CA 92140

       Lt. Col. Sean M. Sullivan, USMCR
Staff Judge Advocate, MCRD
3700 Chosin Ave, Building 12
San Diego Ca 92140

       Capt. John W. Torresala, USMCR
Assistant Staff Judge Advocate, MCRD
3700 Chosin Ave, Building 12
San Diego Ca 92140

**DATE**: 27 March 2012

**Re**:   Request to withdraw, or in the alternative, continue the Administrative Separation
Proceedings initiated 21 March 2012 relating to Sgt. Gary Stein, USMC, 0101/6842

---

On behalf of Sgt. Gary Stein, I respectfully request that you withdraw the subject 21 March 2012 notification of administrative separation proceedings to Sgt. Stein in compliance with the permanent injunction issued by the Honorable Stanley Sporkin, United States District Judge for the District of Columbia (7 April 1997) (see attached), *to wit:*

> "ORDERED that the defendants [Secretaries of Defense, United States Air Force, United States Army, and United States Navy], the defendants' officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with the defendants who receive actual notice of this order are hereby ENJOINED from interpreting DoD Directive 1344.10, or any similar law or regulation, in a manner that prohibits the plaintiffs from exercising their free speech and free exercise rights under the First Amendment of the Constitution [ ]"

I respectfully submit that the pending proceedings against Sgt. Stein are not in compliance with this permanent injunction and, if allowed to continue, I am concerned that the Commanding Officer, the Board, and the Recorder would be deemed to be in contempt of the court's order.

In the alternative to my request for withdrawal of the 21 March 2012 notification, I respectfully request that you delay these proceedings until at least 14 days following the issuance of an ethics advisory opinion in response to the attached request.

Respectfully submitted,

J. Mark Brewer

J. Mark Brewer
Civilian Counsel to Sgt. Gary Stein
Ph:  (713) 209-2910
brewer@bplaw.com

962 F.Supp. 150
United States District Court,
District of Columbia.

Father Vincent RIGDON, et al., Plaintiffs,
v.
Dr. William J. PERRY, et al., Defendants.

Civil Action No. 96–02092. | April 7, 1997.

Military chaplains and congregants sued Secretaries of Defense, United States Air Force, United States Army, and United States Navy, challenging prohibition imposed on chaplains forbidding them from encouraging congregants to contact Congress on pending antiabortion legislation. Chaplains moved for preliminary injunction, and parties brought cross-motions for summary judgment. The District Court, Sporkin, J., held that: (1) claims were justiciable; (2) military directive did not preclude chaplains from encouraging congregants to contact Congress on pending legislation; (3) even if directive did prohibit such conduct, prohibition would violate chaplains' First Amendment rights and rights under Religious Freedom Restoration Act (RFRA).

Judgment for plaintiffs.

West Headnotes (10)

**[1]    Federal Courts**
⬥⬥Particular Cases or Questions, Justiciable Controversy
⊔

Active duty military rabbi, who alleged that his religious duties included speaking out to congregation against abortion procedure and telling congregants that they had duty to oppose procedure and to support pending antiabortion legislation, had justiciable claims challenging military's antilobbying restriction and interpretation of political activity directive as prohibiting military chaplains from encouraging congregants to contact Congress on pending legislation, and because rabbi's claims were justiciable, justiciability of claims by other plaintiffs, including other military chaplains, was not necessary.

**[2]    Armed Services**
⬥⬥Rights and Privileges

Department of Defense directive on political activities of active duty armed forces members, that precludes active duty members from using official authority or influence for soliciting votes for particular candidate or issue, did not apply to speech by military chaplains urging congregants to contact congressional representatives to vote in favor of certain antiabortion legislation; chaplains' solicitation would be indirect and was not intended to influence votes of their congregants, and as military chaplains could not issue orders, they were not superior commissioned officers and did not speak with official authority when speaking from pulpit or in counseling or confession. 10 U.S.C.A. §§ 801(5), 3581, 8581; Military Rules of Evid., Rule 503(b)(2).

2 Cases that cite this headnote

**[3]    Armed Services**
⬥⬥Rights and Privileges

Military chaplains can have communications with their congregants solely in religious capacity, regardless of fact that they have official status as members of the military, and even though chaplains are employed by military to perform religious duties, not everything they say bears imprimatur of official military authority. Military Rules of Evid., Rule 503(b)(2).

**[4]    Armed Services**
⬥⬥Rights and Privileges

For purposes of determining whether statements made during worship are controlled by military

000039

Rigdon v. Perry, 962 F.Supp. 150 (1997)

directive precluding active duty member of Armed Forces from using his official authority or influence for soliciting votes for particular candidate or issue, when military chaplains are conducting worship and are surrounded by accouterments of religion, they are acting in their religious capacities and not as representatives of military or under color of military authority.

**[5]     Civil Rights**
⟐⟐Particular Cases and Contexts

Armed services' prohibition imposed on military chaplains forbidding them from encouraging congregants to contact Congress to support antiabortion legislation imposed substantial burden on chaplains' Religious Freedom Restoration Act (RFRA) free exercise rights. Religious Freedom Restoration Act of 1993, § 3(a, b), 42 U.S.C.A. § 2000bb–1(a, b).

**[6]     Civil Rights**
⟐⟐Particular Cases and Contexts

Politically-disinterested military, good order and discipline, and protection of service members' rights to participate in political process are compelling governmental interests, for purposes of determining whether substantial burden on Religious Freedom Restoration Act (RFRA) free exercise rights furthers compelling governmental interest. Religious Freedom Restoration Act of 1993, § 3(a, b), 42 U.S.C.A. § 2000bb–1(a, b).

**[7]     Civil Rights**
⟐⟐Particular Cases and Contexts

Military chaplains' free exercise rights under

Religious Freedom Restoration Act (RFRA) were violated by restriction prohibiting chaplains from encouraging parishioners to contact Congress in support of pending antiabortion legislation; restriction was substantial burden on chaplains' free exercise rights under RFRA, restriction was not least restrictive means of furthering compelling government interest, and chaplains' right to autonomy in determining religious content of their sermons outweighed military's compelling interests in politically-disinterested military with good order and discipline and in protecting service members' rights to participate in political process, especially absent showing of how restriction advanced military's interests. Religious Freedom Restoration Act of 1993, § 3(a, b), 42 U.S.C.A. § 2000bb–1(a, b).

1 Cases that cite this headnote

**[8]     Constitutional Law**
⟐⟐Military Installations

Certain facilities on military property, such as chapels, are designated public forum as government intends that chapels and chaplains be dedicated exclusively to service people's rights to free exercise of religion, and religious nature of these military facilities is compatible with expressive activity. U.S.C.A. Const.Amend. 1.

**[9]     Armed Services**
⟐⟐Rights and Privileges
**Constitutional Law**
⟐⟐Members of Armed Services

Military's antilobbying restriction prohibiting military chaplains from encouraging congregants to contact Congress concerning proposed antiabortion legislation violated chaplains' free speech rights under First Amendment as restriction did not comport with designated public forum of military religious facilities; speech at issue was within forum's limitations, restriction was content-based and

Rigdon v. Perry, 962 F.Supp. 150 (1997)

viewpoint-based, and presumption of impermissibility was not overcome as restriction was not narrowly drawn to achieve compelling governmental interest. U.S.C.A. Const.Amend. 1.

[10]   **Civil Rights**
     Preliminary Injunction

Military chaplains were entitled to preliminary injunction preventing enforcement of restriction prohibiting chaplains from urging their military congregants to communicate with Congress about pending antiabortion legislation; restriction unlawfully impinged on chaplains' Religious Freedom Restoration Act (RFRA) free exercise rights and First Amendment free speech rights, chaplains would suffer irreparable harm if military defendants' conduct was not enjoined, defendants did not point to any interest or person that would be substantially harmed if conduct was enjoined, and injunction would serve public interest. U.S.C.A. Const.Amend. 1; Religious Freedom Restoration Act of 1993, § 3(a, b), 42 U.S.C.A. § 2000bb–1(a, b).

**Attorneys and Law Firms**

*152 Kevin J. Hasson, Becket Fund for Religious Liberty, Washington, DC, for plaintiffs.

Kimberly Nickelson Tarver, U.S. Attorney's Office, Washington, DC, for defendants.

Opinion

**MEMORANDUM OPINION OF THE HONORABLE STANLEY SPORKIN UNITED STATES DISTRICT JUDGE**

SPORKIN, District Judge.

## I.

### INTRODUCTION

The plaintiffs filed a complaint in the above-captioned case on September 10, 1996. The case originally was assigned to the Late Honorable Charles R. Richey of this Court, but was transferred to the undersigned when he became incapacitated. Judge Richey held a status conference pursuant to Rule 16 of the Federal Rules of Civil Procedure on September 20, 1996 at which time he set dates for the completion of discovery and the filing of dispositive motions. Before the Court are the parties' cross-motions for summary judgment. Also before the Court are the plaintiffs' motion for a preliminary injunction filed on March 25, 1997 and the defendants' opposition thereto.

The plaintiffs have brought a challenge under the Religious Freedom Restoration Act and the free exercise and free speech clauses of the First Amendment to the defendants' interpretation of military regulations and a federal anti-lobbying statute that purportedly prohibit military chaplains from encouraging their congregants to contact Congress on pending legislation, in particular on legislation that would outlaw an abortion procedure commonly known as "partial birth" abortion. For the reasons discussed below, the Court shall GRANT the plaintiffs' motion for preliminary injunction and motion for summary judgment.

## II.

### UNDISPUTED FACTS

#### A. Background

This lawsuit was precipitated by events surrounding the so-called "Project Life Postcard Campaign," in which the Catholic Church in the United States sought to speak with a unified voice urging Congress to override the President's veto of HR 1833, also known as the Partial Birth Abortion Ban Act. The campaign began on June 29, 1996 and was set to last "at least until the Congress votes on whether to override the President's veto." *Id.* at ¶ 12. The Campaign consisted of Catholic priests throughout

© 2012 Thomson Reuters. No claim to original U.S. Government Works.

000041

the country preaching to their parishioners against an abortion procedure known medically as intact dilation and evacuation, and colloquially as "partial birth abortion". Priests were encouraged to "ask their parishioners to sign postcards urging their U.S. Senators and Representatives to vote to override the President's veto." *Id.* at ¶ 13.

On or about May 29, 1996, the Archdiocese for the Military Services sent a letter informing Catholic chaplains in the U.S. military of the Post Card Campaign. Among other things, the letter stated, "You might well consider asking your parishioners to be a part of this joint effort. I am sending you information and addresses of the appropriate legislators as well as a copy of the project postcard that you could copy and give to your parishioners to enlist their cooperation in these efforts on behalf of human life."

Apparently in response to a request by the Office of the Chief Chaplain, on June 5, 1996, an Air Force Judge Advocate General ("JAG") issued an opinion letter regarding participation in the Post Card Campaign by Air Force chaplains. The JAG stated, "We believe that the applicable directives prohibit you from participating in this campaign or encouraging other Air Force chaplains or members to participate in it." The JAG's stated reasons were three-fold. First, he cited a Department of Defense Directive and an Air Force regulation (DoD 1344.10, ¶ D.1.B(1); AFI 51–902, ¶ 3.1) prohibiting a member on active duty from using "his official authority or influence for soliciting votes for a particular issue." Second, the memorandum cited an Air Force regulation (AFI 51–902, ¶ 3.3) that prohibits a member on active duty from participating in partisan political activity, defined to include "supporting *153 issues identified with national political parties or ancillary organizations." Third, the memorandum cited a DoD Instruction (5500.7–A § 6–100) which provides that an "Air Force member may not participate in political activities while on duty; while wearing a uniform, badge insignia or other similar item that identifies his position; or while in any building occupied in the discharge of official duties by an individual employed by the United States Government."[1]

On June 21, 1996, a memorandum from Navy Deputy Chief of Chaplains A.B. Holderby, Jr. to staff chaplains stated that members on active duty may not use "their official position to solicit votes for a particular candidate or issue." It further stated that "[a]nti-lobbying laws prohibit government employees from using appropriated funds to directly or indirectly influence congressional action on pending legislation." Therefore, the memorandum instructed, Navy personnel may not "officially participate or urge others to participate in" the Post Card Campaign. The memorandum specifically instructed that "[n]o one acting in an official capacity may

distribute post-cards or use government resources such as congregation newsletters to publicize the campaign." However, these restrictions would not preclude chaplains from "discuss[ing] the morality of current issues in their sermons or religious teachings pursuant to their religion." Additionally, members were not restricted from communicating with members of Congress in their "personal or private capacities."

On June 24, 1996, the United States Army Headquarters sent a message to commanders of the Major Army Commands that was almost identical to the Holderby memorandum. On that same day, the Army's Office of the Chief of Public Affairs issued a similar memorandum; this memorandum explicitly invoked the Anti–Lobbying Act, 18 U.S.C. § 1913. The Anti–Lobbying Act provides that, absent express congressional authorization, no part of any money appropriated by any enactment of Congress, may be "used directly or indirectly to pay for any personal service, advertisement, ..., letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress ..." 18 U.S.C.A. § 1913 (West 1984). Anyone who violates or attempts to violate the Act "shall be fined ... or imprisoned not more than one year or both; and after notice and hearing by the superior officer vested with the power of removing him, shall be removed from office or employment." *Id.*

### B. The Plaintiffs

Plaintiff Father Rigdon holds the rank of Lieutenant Colonel in the Air Force. He is a Roman Catholic chaplain in the Ready Reserve who provides Catholic Coverage at Andrews Air Force Base, which means that he is available to fill in for the regular chaplain on short notice to say mass, hear confession, or provide counseling. He provides such coverage at least twenty days per year.[2] Upon receiving the May 29 letter regarding the "Project Life Postcard Campaign" from the Military Archdiocese, Father Rigdon "considered [it] to be a directive from [his] bishop concerning the content of [his] preaching," a directive that his conscience as well as Canon 768 of the Catholic Code of Canon Law required him to follow. According to Father Rigdon's declaration submitted on November 8, 1996, the "Air Force memorandum issued in June[3] created a conflict of *154 conscience between the demands of [his] faith and [his] desire to conform to military directives."

The military directives prevailed in Father Rigdon's mind. While on active duty during the last three days of the Post Card campaign in September,[4] Father Rigdon did not feel

Rigdon v. Perry, 962 F.Supp. 150 (1997)

"free ... to preach[ ] in favor of overriding the President's veto and distribute[ ] postcards." Further, he interpreted and continues to interpret the "encourage other[s] to participate" language contained in the Judge Advocate General opinion as prohibiting him from encouraging others to write to Congress "in all contexts, including private counseling of Air Force members as well as urging them to write their members of Congress in a homily." He further interprets the opinion as barring him from urging Air Force personnel from contacting Congress about any legislative issue, not just the Partial Birth Abortion Bar Act. Consequently, Father Rigdon was and continues to be "wary of addressing moral issues that intersect with legislation in homilies or counseling for fear of disciplinary action" against him. Father Rigdon notes that the Project Life Postcard Campaign was not the first such campaign sponsored by the Roman Catholic Church and "surely will not be the last."

In his declaration submitted on March 25, 1997 in support of his motion for preliminary injunction, Father Rigdon states that the Partial Birth Abortion Ban Act, which failed to become law in the 104th Congress, has been reintroduced in the 105th Congress and has already passed the House of Representatives. He further notes,

> "If called upon to say Mass at Andrews Air Force Base, I would like to encourage my congregation to call or write their Senators in support of this bill. Because of the Memoranda issued by the Air Force last June, and the position articulated by the Defendants since then, I am afraid to speak to my congregation about the Partial Birth Abortion Ban Act for fear of prosecution or other action against me."

*Second Declaration of Father Rigdon* at ¶ 3. The defendants argue that since Father Rigdon is a Reservist, "it is only speculative whether [he] ... will be called upon to say Mass at Andrews Air Force Base during the pendency of the proposed legislation." *Defendants' Memorandum in Opposition to Motion for Preliminary Injunction* at 5.

Plaintiff Rabbi Kaye is an active duty Air Force chaplain stationed at Offutt Air Force Base in Nebraska and currently holds the rank of Captain. According to Rabbi Kaye, "it is impossible, indeed incoherent, to separate moral teachings from Judaism. And when a law is immoral [he] believe[s] that as a Rabbi [he] must not remain silent." Thus, Rabbi Kaye believes that he must be able to speak out against or in favor of legislation concerning what he considers to be immoral practices,

including "partial birth" abortion, euthanasia, and "various forms of sexual immorality."

In his declaration submitted on November 8, 1996, Rabbi Kaye states that he feels potentially threatened with punishment if he speaks out against immoral laws. However, he does not say that he ever desired in the past or in the future to encourage his congregants to write to Congress.

On March 26, 1997, Rabbi Kaye submitted a second declaration in light of the newly-introduced bill on partial birth abortion. This time, Rabbi Kaye states that "partial birth" abortion is "infanticide," "an abomination before God and violate's God's law." He further complains that

> "as a Rabbi I must tell my Congregation that this abomination must not be allowed to continue in a society that calls itself just. I believe that I must tell my Congregation that as Jews they have a duty to oppose injustice. I wish to tell my congregation that the Partial Birth Abortion Ban Act *155 presents them with an opportunity to oppose one of the greatest injustices that exists in the United States. Under current Air Force policy, I cannot say this to my Congregation."

*Second Kaye Declaration* at ¶ 4.5

There is no dispute that the military continues to prohibit military chaplains from encouraging their military congregants to contact Congress in favor of the Partial Birth Abortion Ban Act. There also is no dispute that the existence of the military chaplaincy is critical to fulfilling the free exercise rights of service men and women and their families, and that service members are forced to rely exclusively on chaplains when stationed in parts of the country in regions where clergy of their faith are not available, in countries overseas where religious freedom is not recognized or their religion not prevalent, and when deployed in conflicts. The defendants merely contend that the anti-lobbying restrictions on preaching and counseling by military chaplains (which also apply to all other service members) advance the compelling interests of a politically disinterested military establishment, the good order and discipline of service members essential to military readiness and national defense, and the protection of the political rights of individual service members.

III.

## DISCUSSION

### A. The Plaintiffs' Claims Are Justiciable.

In their briefs filed in November 1996, the defendants argued that the plaintiffs lack standing and their lawsuit was both moot and unripe, because the 104th Congress adjourned without passage of the Partial Birth Abortion Ban Act and, as a consequence, there was no longer legislation about which the chaplains wanted to encourage their congregants to contact Congress. Intervening events, however, have substantially undermined the thrust of the defendants' argument about nonjusticiability. A bill to amend the United States Code to ban partial birth abortions (H.R.1122) passed the House of Representatives on March 20, 1997. *See* 143 Cong. Rec. H1202–05 (March 20, 1997). A similar Senate bill (S.6) was introduced on January 21, 1997. *See* 143 Cong. Rec. § 158–02, § 158 (Jan. 21, 1997). While the plaintiffs do not allege that there is currently an ongoing Post Card Campaign, they have proffered facts that support a finding of justiciability, specifically with regard to plaintiff Rabbi Kaye.

The defendants contend that Rabbi Kaye's desire to tell his congregants that " 'the procedure known as Partial Birth Abortion' is an 'abomination before God and violate's God's law' ... does not implicate the statute and **\*156** regulation at issue in this action ..." because he is free to "speak out on the issue of abortion or a particular abortion procedure." *Defendants' Opp'n to Prelim. Inj.* at 6 (quoting Rabbi Kaye's Second Declaration). As noted above, however, Rabbi Kaye wishes to convey more than his belief in the immorality of an abortion procedure. He wishes to tell his Jewish congregants that they have "a duty to oppose injustice" and that "the Partial Birth Abortion Ban Act presents them with an opportunity to oppose one of the greatest injustices that exists in the United States." Because Rabbi Kaye explicitly references the pending anti-abortion legislation, it would be reasonable for his congregants to interpret these words as a call to urge Congress to pass the Partial Birth Abortion Ban Act.

The defendants' opposition brief is utterly silent with respect to the permissibility of these particular words. Similarly, at oral argument, when the Court asked defendants' counsel about whether these particular words would violate the defendants' anti-lobbying proscription, counsel failed to provide a direct answer, merely stating that Rabbi Kaye generally is precluded from urging his congregants to lobby on the legislation. Accordingly, the Court finds that while Rabbi Kaye's declaration does not explicitly contain the words "I wish to tell my

congregants to tell Congress to vote for the Partial Birth Abortion Ban Act," the defendants have not disavowed an intention to interpret the words in his declaration as violative of their speech restriction. Especially because the defendants have not disavowed an intention to impose discipline should Rabbi Kaye speak these words which he believes to be mandated by his Jewish faith, the Court must be vigilant to avoid an unduly narrow interpretation of his contemplated speech.

**[1]** Thus, Rabbi Kaye's claims are not moot, because there is an "actual, ongoing controvers[y]" over the application of a military directive to his contemplated speech. *Honig v. Doe,* 484 U.S. 305, 317, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988) (citations omitted). His claims also are ripe, because the controversy is imminent and concrete—Rabbi Kaye wants to utter his contemplated speech now. *Cf. Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (holding that the ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements"). Finally, Rabbi Kaye has standing because he has alleged (1) a concrete, particular, and imminent "invasion of a legally-protected interest"—his First Amendment and statutory rights to utter certain religious speech; (2) "a causal connection between the injury and conduct complained of"—Rabbi Kaye is prevented from uttering certain religious speech because of the defendants' proscription; and (3) it is "likely" that this injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992) (citations omitted).

Because Rabbi Kaye's claims are justiciable, the Court need not decide the justiciability of the other plaintiffs' claims. *See General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 402 n. 22, 102 S.Ct. 3141, 3156 n. 22, 73 L.Ed.2d 835 (1982); *accord State of Kansas v. United States,* 797 F.Supp. 1042, 1046 (D.D.C.1992) (Pratt, J.), *aff'd,* 16 F.3d 436 (D.C.Cir.), *cert. denied,* 513 U.S. 945, 115 S.Ct. 354, 130 L.Ed.2d 309 (1994).

### B. The Evidence Does Not Support the Defendants' Contention that DoD Directive 1344.10 Precludes Military Chaplains from Encouraging Their Congregants to Contact Congress on Pending Legislation.

Prior to oral argument, the defendants contended that the following law and military directives prohibit military chaplains from urging their military congregants to

Rigdon v. Perry, 962 F.Supp. 150 (1997)

communicate with Congress about pending legislation: (1) the Anti–Lobbying Act, 18 U.S.C. § 1913, prohibiting the use of appropriated funds "to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress"; (2) § 8001 of the Defense Appropriations Act for Fiscal Year 1996, prohibiting the use of appropriated funds for "publicity or propaganda purposes not authorized *157 by Congress;" and (3) Department of Defense ("DoD") Directive 1344.10, entitled *Political Activities of Members of the Armed Forces on Active Duty* (June 15, 1990), prohibiting an active duty member of the Armed Forces from using "his or her official authority or influence for ... soliciting votes for a particular candidate or issue."

The defendants presented no argument in their briefs or at oral argument regarding the relevance of the Defense Appropriations Act. Further, at oral argument, defendants' counsel conceded that the Anti–Lobbying Act is not relevant to the facts of this case. The Act applies only to the expenditure of appropriated funds, and there is no evidence that the plaintiffs intend to use appropriated funds in their ecumenical activities. Accordingly, the defendants rely solely on DoD Directive 1344.10 to justify the restraints they now seek to impose on the plaintiffs.

**[2]** DoD Directive 1344.10, entitled *Political Activities of Members of the Armed Forces on Active Duty* (June 15, 1990), regulates the political activities of active duty members of the Armed Forces. *See Defendants' Exhibit 2.* The Directive provides that a member may "express his or her personal opinion on political candidates and issues, but not as a representative of the Armed Forces." *Id.* at 1. The Directive precludes an active duty member of the Armed Forces from using "his or her official authority or influence for ... soliciting votes for a particular candidate or issue ... " *Id.* at 2. *See also* 18 U.S.C. § 609 (prohibiting the use of "military authority to influence the vote of a member of the Armed Forces"). The defendants have interpreted this Directive to prohibit active duty members of the Armed Forces, including chaplains, from "lobbying Congress or influencing others to lobby Congress." *Defendants' Opposition* at 8.

Initially, it does not appear that this Directive applies to the speech contemplated by Father Rigdon and Rabbi Kaye. It is reasonably clear that if they were to urge their congregants to vote for Congressmen or Congresswomen with anti-abortionist views, that they would be soliciting votes for particular candidates in contravention of the Directive. The same is true if they were to encourage their congregants to vote in favor of a state ballot initiative imposing a parental consent requirement on minors seeking abortions; they would be directly soliciting the votes of their congregants for a particular issue.

The factual predicate of this case, however, is at least one degree removed from these hypothetical, direct-voter solicitations. Here, Father Rigdon and Rabbi Kaye do not intend to influence the votes of their congregants (e.g., "Vote for that anti-abortion Congresswoman"), but to encourage their congregants to contact members of Congress who, in turn, could vote in favor of a piece of anti-abortion legislation. Thus, the chaplains' contemplated solicitation is indirect—encouraging congregants to encourage members of Congress to vote a certain way. The defendants have failed to explain how Directive 1344.10 is intended to prohibit such indirect solicitations for votes.

Moreover, Directive 1344.10 prohibits the misuse only of "official" authority or influence to solicit votes, not religious or spiritual influence. The plaintiffs argue that since a chaplain's legal status in the military is "rank without command" (*see* 10 U.S.C. §§ 3581, 8581 (West 1959)), military chaplains cannot give orders and have no official authority to misuse. For instance, while Father Rigdon acknowledges that he has "certain supervisory and administrative functions in the course of [his] duties, such as having clerical workers assisting [him] in the chaplain office," he maintains that if he had difficulty with any personnel assigned to him, he "would have to go to their commanding officer or First Sergeant for assistance, and could not issue any order to them ... nor initiate any disciplinary action." *Rigdon Dec.* at ¶ 9.

While conceding that military chaplains have "rank without command," the defendants counter that military chaplains do have "official" authority, because they "are commissioned officers with all rights, privileges, responsibilities, and restrictions that attend a military commission, including the authority to issue lawful orders." In support of their assertion, the defendants cite the statutory provisions governing (1) the appointment of officers above the rank of colonel in the *158 Army, Air Force and Marines and above the rank of captain in the Navy; (2) the punishment of a person who behaves with disrespect toward his superior commissioned officer; (3) the punishment of a person who commits a violent act against a superior commissioned officer or who willfully disobeys a lawful command of his superior commissioned officer; and (4) the punishment of a person who violates any lawful general order or regulation or who is derelict in his duties. *See* 10 U.S.C. §§ 531, 889, 890, 892 (West 1983).

The defendants have failed to show how the above-cited statutory provisions vest military chaplains with the authority to issue orders. The appointment provision (10

000045

U.S.C. § 531) is irrelevant. At most, it describes how military chaplains join the Armed Forces. The other three provisions (10 U.S.C. §§ 889, 890 and 892) merely provide for punishment when someone in the Armed Forces disobeys the command of a "superior commissioned officer." The defendants' reliance on these provisions, however, merely begs the question; these statutes in no way state that a military chaplain is a "superior commissioned officer" who can give orders on pain of punishment.

In their reply brief, the defendants point out that the term "superior commissioned officer" is defined to mean a "commissioned officer superior in rank *or* command." 10 U.S.C. § 801(5) (emphasis added). Thus, at least under this definition, a military chaplain could be a superior commissioned officer because he has rank. The defendants infer from this definition that chaplains can give orders subject to pain of punishment.

The defendants's inference rests upon certain language in the Manual for Courts–Martial. Punitive Article 89 of the Manual, captioned *Disrespect toward a superior commissioned officer,* provides that "[a]ny person ... who behaves with disrespect toward his superior commissioned officer shall be punished as a court-martial may direct." *Manual for Courts–Martial* at Part IV–17, ¶ 13a (1995). The *Manual* explains that if "the accused and the victim are in different armed forces, the victim is a 'superior commissioned officer' of the accused when the victim is a commissioned officer and superior in the chain of command over the accused or when the victim, *not a medical officer or a chaplain,* is senior in grade to the accused and both are detained by a hostile entity so that recourse to the normal chain of command is prevented." *Id.* at Part IV–18, ¶ 13c.(1)(b) (emphasis added). The defendants assert that because chaplains are *not* "superior commissioned officers" when detained by a hostile entity along with someone from a different armed force, it follows that they "are 'superior commissioned officers' under other circumstances, and may issue orders." *See Defendants Reply Memorandum* at 8–9.

The defendants' argument is logically flawed. The *Manual* explicitly defines a victim of disrespect to be a "superior commissioned officer" when (1) the victim is a commissioned officer *and* superior in the chain of command over the accused *or* (2) the victim is not a medical officer or a chaplain but is senior in grade to the accused and both are detained by a hostile entity. Chaplains do not qualify under definition (1), because they cannot be superior in the chain of command; they have rank without command. Chaplains are specifically excluded from definition (2). Thus, the example cited by the defendants explicitly provides that chaplains are *not*

included within the definition of "superior commissioned officers." The defendants ask this Court to draw the wholly unsupported inference that because chaplains are not "superior commissioned officers" in one context, that they are in other contexts.

The Court is not prepared to take such a leap in logic, especially because another example from the same section of the *Manual* also excludes chaplains from the definition of "superior commissioned officer." Paragraph 13c.(1)(a) states, "If the accused and the victim are in the same armed force, the victim is a 'superior commissioned officer' of the accused when either superior in rank or command to the accused; however, the victim is not a 'superior commissioned officer' of the accused if the victim is inferior in command, even though superior in rank." *Id.* at Part IV–18, ¶ 13c.1(a). Although it is possible for a chaplain to have greater rank than an *159 accused, he is always "inferior in command" because he has rank *without command.* Thus, a chaplain is not a "superior commissioned officer" under Article 89 and the other Punitive Articles in the *Manual* that incorporate the definition set forth in Article 89. The defendants have pointed to nothing in the record to dispute the plaintiffs' contention that military chaplains lack the authority to issue military orders.

The plaintiffs further point out that a chaplain does not speak with "official" authority when he speaks from the pulpit or in counseling or confession—the speech that is at issue in this litigation. The defendants counter in a circular fashion, arguing that military chaplains' primary military duties are performance of religious functions: "Thus, when chaplains perform these religious functions they are acting in their official capacity as a military officer, even if they are acting in a religious capacity at the same time." *Defendants' Opposition* at 9. In other words, according to the defendants, every word a military chaplain utters from the pulpit or in private counseling with service members constitutes an "official" act taken under "the color of military authority."

[3] The defendants inappropriately equate a military chaplains' official conduct with his religious activities, a distinction expressly recognized by military law. *See, e.g., Plaintiffs' Exhibit 23; Chaplain Activities in the United States Army, Army Regulation 165–1, § 4–4a.(1) (August 31, 1989 )* ("Army Chaplains have dual roles as religious leaders and staff officers."). While military chaplains may be employed by the military to perform religious duties, it does not follow that every word they utter bears the imprimatur of official military authority; if anything, the content of their services and counseling bears the imprimatur of the religious ministries to which they belong. *See id.* § 4–5e.(1) ("Chaplains perform their duties as clergy representing specific religious

Rigdon v. Perry, 962 F.Supp. 150 (1997)

denominations, and are accountable in their ministries to those groups regarding rites, sacraments, and services.").[6]

Indeed, the Military Rules of Evidence, in recognizing an evidentiary privilege for communications to clergy, state that a communication is confidential if made to a clergyman "in the clergyman's capacity *as a spiritual adviser.*" MILITARY R. EVID. 503(b)(2) (emphasis added); *accord Plaintiff's Exh. 23, § 4–5h.(1).* Military chaplains, therefore, can have communications with their congregants solely in a religious capacity, regardless of the fact that they have an official status as members of the military.

Similarly, military regulations governing the wearing of religious apparel implicitly acknowledge the distinction between a chaplain's official capacity as a representative of the military and his or her religious capacity. A Department of Defense Directive permits the wearing of visible items of religious apparel while in uniform so long as their appearance is "discreet" and "tidy," the apparel does "not replace or interfere with the proper wearing of any authorized article on the uniform," and the apparel is "not temporarily or permanently affixed or appended to any authorized article of the uniform." *Plaintiffs' Exhibit 21, Dep't of Directive 1300.17 (February 3, 1988)* at p. 2. Notwithstanding these limitations, "chaplains may wear any required religious apparel or accouterments with the uniform while conducting worship services and during the performance of rites and rituals distinct to their faith groups." *Id.* at 3.7 Such regulations contemplate that **\*160** chaplains act as representatives of their religions when conducting services or performing rituals, and, therefore, there is no military need for them to adhere to the uniform dress requirements at these times.

[4] In sum, when chaplains are conducting worship, when they are surrounded by all the accouterments of religion, they are acting in their religious capacity, not as representatives of the military or, as defendants' counsel suggested at oral argument, "under the color of military authority." *Compare Geller v. Secretary of Defense,* 423 F.Supp. 16 (D.D.C.1976) (Robinson, J.) (holding that a Jewish chaplain in the Air Force should be permitted to wear a beard in accordance with Jewish tradition because he "was employed specifically by the military to serve in a religious capacity") *with Banks v. Garrett,* 901 F.2d 1084, 1088 (Fed.Cir.) (affirming finding that Navy reservist had acted in his official capacity when he sent a letter to Congress on official Navy letterhead, wrote his letter as Commander of the squadron, and signed the letter as Commander), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990).[8]

Still, the defendants maintain that a service member might "feel constrained to adhere to what may be perceived as

an 'order' from ... a chaplain[ ] to support, endorse, or follow, any particular political message." *Defendants' Summary Judgment Memorandum* at 25. The defendants, however, have submitted no evidence in support of this speculative assertion. Indeed, that parishioners might interpret religious sermonizing as a military order defies common sense. As the plaintiffs persuasively counter:

> "If a chaplain were to say to a congregant who had confessed to having a bitter argument with his wife, 'Go and forgive her, and say ten Hail Mary's,' surely this could not by any stretch of the imagination be considered the issuance of a military order, the disobedience of which opens the service member to prosecution under the Uniform Code of Military Justice ... If what a chaplain tells his congregants to do or believe while preaching is an order, then for years orders have been being [sic] issued from all the branches of the military for service members to believe in the resurrection of Jesus, to believe that the Torah was written by Moses who was inspired by God, that Moslem soldiers must pray daily, and that Catholic service members must go to Mass every week."

*Plaintiffs' Reply* at 4.

The defendants have failed to show how DoD Directive 1344.10 prohibits military chaplains from urging parishioners to contact Congress in support of the Partial Birth Abortion Ban Act. But assuming *arguendo* that it does, as discussed below, such a prohibition violates the plaintiffs' rights under the Religious Freedom Restoration Act and the First Amendment.

### C. The Plaintiffs Are Entitled To Redress under the Religious Freedom Restoration Act.

The Religious Freedom Restoration Act ("RFRA") provides:

> "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability ... Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest."

**\*161** 42 U.S.C. § 2000bb–1(a), (b) (West 1994). The term "exercise of religion" means "the exercise of religion

**Rigdon v. Perry, 962 F.Supp. 150 (1997)**

under the First Amendment of the Constitution." *Id.* § 2000bb–2(4).

### 1. The Anti–Lobbying Restriction Imposes A "Substantial Burden" on Chaplains' Free Exercise Rights.

[5] The initial question is whether the defendants' prohibition on military chaplains' encouragement of congregants to contact Congress imposes a "substantial burden" on their free exercise rights. The plaintiffs argue that the prohibition constitutes a substantial burden because the preaching of military chaplains is censored. The defendants counter that the plaintiffs have not shown that "it is an important component of their religion that they use the military or their conditionally conferred status as military officials to advance their religious beliefs or lobbying efforts." *Defendants' Summary Judgment Memorandum* at 31. According to the defendants, the RFRA does "not confer on any individuals the right to conscript unwilling third parties, the government, or employers into joining their religious exercise." *Id.*

As discussed above, military chaplains do not invoke the official imprimatur of the military when they give a sermon; they are acting in a religious capacity, and, therefore, it is wholly appropriate for them to "advance their religious beliefs" in that context. Also, it is not for this Court to determine whether encouraging parishioners to contact Congress on the Partial Birth Abortion Ban Act is an "important component" of the Catholic or Jewish faiths. *See Thomas v. Review Bd. of Indiana Employment Sec.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981) ("The determination of what is a 'religious' belief or practice ... is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."). Encouraging parishioners to contact Congress on abortion legislation appears to be no less important to the Catholic faith or to Orthodox Judaism than other religiously-motivated activity courts have held to be important enough to a religion such that its prohibition amounts to a substantial burden. *See Western Presbyterian Church v. Bd. of Zoning Adjustment of the District of Columbia*, 862 F.Supp. 538, 545–46 (D.D.C.1994) (Sporkin, J.) (Church's program to feed the needy); *Sasnett v. Sullivan*, 91 F.3d 1018, 1022 (7th Cir.1996) (wearing a crucifix around one's neck).

Finally, the defendants have proffered no evidence whatsoever that Rabbi Kaye's or Father Rigdon's congregants are "unwilling conscripts" or a "captive

audience" to their allegedly political messages. Congregants know that religious sermons are not military orders. Service members know that there is no official requirement that they attend religious services; such a requirement would be unconstitutional. In fact, the plaintiffs have submitted undisputed evidence that congregants are not only willing, but at times want to hear what their spiritual leaders have to say about a whole host of subjects. *See Declaration of John M. Johnston* at ¶ 3.

### 2. The Defendants' Speech Restriction Is Not the Least Restrictive Means of Furthering a Compelling Governmental Interest.

The next question is whether the substantial burden on the plaintiffs' free exercise rights is the least restrictive means of furthering a compelling governmental interest. The defendants argue that the anti-lobbying restriction is "meant to maintain a politically disinterested military establishment under civilian control ... serv[ing] both the stability of our democratic political system and the ability of the military to focus on its mission of military readiness and national defense." Also, these restrictions purportedly prevent "attempts to influence the political activities of others ... [and] undue interference in individual service members' rights to participate in their personal capacities in the political process." According to the defendants, these ends would not be served "if each chaplain were permitted to turn his or her ministry into a political action forum. Political conflicts within the service ranks could easily arise from different religions or denominations *162 instructing their members to lobby differently from one another on particular political issues." *Defendants' Opposition* at 17.

[6] A politically-disinterested military, good order and discipline, and the protection of service members' rights to participate in the political process are compelling governmental interests, but the defendants have not shown how these interests are in any way furthered by the restriction on the speech of military chaplains. Relying on nothing more than what they claim is "common sense," the defendants assert that if service people receive different religious counsel on lobbying, "[p]olitical conflicts" will result. They further assert that "[c]onflicts of this nature could severely undermine military discipline, cohesion, and readiness to the serious detriment of the National Security." *Defendants' Summary Judgment Memorandum* at 24.
It is difficult to understand why the defendants have singled out for proscription a seemingly innocuous request to congregants to write to Congress. There is no suggestion that Rabbi Kaye or Father Rigdon wish to have their congregants "proselytize" their fellow soldiers

000048

on the morality of a piece of abortion legislation or encourage their fellow troops to contact Congress. While this Court should be deferential to what the defendants "perceive[ ] to be a clear danger to the loyalty, discipline, or morale of troops,"9 the defendants have failed to submit any evidence showing how Rabbi Kaye's or Father Rigdon's contemplated speech would in any way enhance a potential for "political conflicts" that the defendants already tolerate, let alone create a clear danger to the loyalty, discipline or morale of the troops.10

[7] Recently, this Circuit held under the RFRA that the federal government's interest in eradicating sex discrimination—a compelling governmental interest11—was outweighed by a religious university's right to autonomy in its employment of ministers. *See Equal Employment Opportunity Commission v. Catholic Univ. of Am.,* 83 F.3d 455, 467–68 (D.C.Cir.1996). Here, the compelling interests advanced by the military are outweighed by the military chaplains' right to autonomy in determining the religious content of their sermons, especially because the defendants have failed to show how the speech restriction as applied to chaplains advances these interests.12

### D. The Defendants' Interpretation of Directive 1344.10 Violates the Chaplains' Free Speech Rights under the First Amendment.

The Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). The three types of forums that may exist on government property are (1) traditional public forums, (2) designated *163 public forums, and (3) nonpublic forums. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. Traditional public forums are places such as streets and parks that "by long traditional ... have been devoted to assembly and debate." *Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). Designated public forums are those "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. "The touchstone for determining whether government property is a designated public forum is the government's intent in establishing and maintaining the property." *Stewart v. District of Columbia Armory Bd.,* 863 F.2d 1013, 1016 (D.C.Cir.1988) (citing *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449). A court may examine "the nature

of the property and its compatibility with expressive activity to discern the government's intent." *Stewart,* 863 F.2d at 1016 (quoting *Cornelius,* 473 U.S. at 802–03, 105 S.Ct. at 3448–49).

[8] There is no dispute that the government has, by statute and regulation, institutionalized the provision of religious services in the Armed Services by creating the office of the chaplaincy and by dedicating facilities and personnel sufficient "to satisfy the religious needs of military members and their families and thus further to provide for the free exercise of religion by members of the Armed Forces ..." *Defendants' Summary Judgment Memorandum* at 6.13 Thus, it has been the government's clear intent that certain facilities on military property (e.g., chapels) and personnel (e.g., chaplains) be dedicated exclusively to the free exercise rights of its service people. The religious nature of these military facilities, therefore, is wholly compatible with expressive activity; indeed, the very purpose underlying these facilities is expressive, religious activity.

[9] The question remaining is whether the defendants' anti-lobbying restriction comports with the designated public forum doctrine. At oral argument, defendants' counsel contended that the restriction is content-neutral because it applies "regardless of the candidate or issue" and that granting an exception for chaplains would enmesh the military in having to make content-based distinctions. The defendants' concern rings hollow, because the military already has made not only a content-based, but a viewpoint-based, distinction by favoring the religious views of one chaplain (Captain Friel) over another's (Father Rigdon's).

During the Project Life Post Card Campaign last summer, Captain John F. Friel, a Catholic priest on active duty in the United States Navy, spoke masses at the U.S. Naval Academy Chapel. Captain Friel told his parishioners about Navy policy prohibiting service members from using their official position to lobby for a particular candidate or issue. He further told them "that in (his) opinion, they were sophisticated enough to know how to contact their senators and congressmen if the [sic] felt the need to do so,.. and if their conscience called them to write to their congressmen and senators, they knew how to contact them." *Declaration of Captain John F. Friel* at ¶ 5. Unlike Father Rigdon, Captain Friel did not believe that urging Congress to vote in favor of the Partial Birth Abortion Ban Act was mandated by the Catholic faith. *164 While Captain Friel's speech is permissible, Father Rigdon's speech is not. Therefore, although the defendants claim otherwise, they have sanctioned one view of Catholicism (it is not necessary to write to Congress) over another (it is necessary). Such favoritism

Rigdon v. Perry, 962 F.Supp. 150 (1997)

not only impinges on Father Rigdon (and on Rabbi Kaye because of his view of Judaism), but on their congregants, because these chaplains are not free to advocate what they believe to be appropriate religious conduct. If, after an emotional sermon about the "abomination" of partial birth abortion, congregants were to rise from the pews and ask Father Rigdon or Rabbi Kaye what they can do to stop this practice, these chaplains would have to respond, "I cannot say." This muzzling of religious guidance is the direct result of the defendants' viewpoint discrimination.14

Viewpoint discrimination in a designated public forum "is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, ———, 115 S.Ct. 2510, 2517, 132 L.Ed.2d 700 (1995). The speech at issue here is within the forum's limitations. Other than the defendants' erroneous interpretation of Directive 1344.10, the statutes and regulations cited above evidence a government intent to treat religious speech on a military base on par with religious speech off base, in order to respect the free exercise rights of service personnel.

The defendants counter that Father Rigdon's and Rabbi Kaye's contemplated speech is really "political," not religious. The defendants, however, provide no basis for the Court in this case to distinguish the political from the religious. For example, Father Rigdon's desire to urge his Catholic parishioners to contact Congress on legislation that would limit what he and many other Catholics believe to be an immoral practice—partial birth abortion—is no less religious in character than telling parishioners that it is their Catholic duty to protect every potential human life by not having abortions and by encouraging others to follow suit. Writing to Congress is but one way in which Catholics can fulfill this duty, and it coincidentally involves communicating with the political branches of government.

Even assuming *arguendo* that Father Rigdon's intended speech is in some sense political, it is not the role of this Court to draw fine distinctions between degrees of religious speech and to hold that religious speech is protected but religious speech with so-called political overtones is not. *See Widmar v. Vincent,* 454 U.S. 263, 270 n. 7, 102 S.Ct. 269, 274 n. 7, 70 L.Ed.2d 440 (1981) (refusing to hold that "religious worship" is unprotected speech while speech about religion is protected; "even if the distinction drew an arguably principled line, it is highly doubtful that it would lie within the judicial competence to administer"). Accordingly, Father Rigdon's and Rabbi Kaye's intended speech lies within the limitations on the religious forum in which they speak.

To overcome the presumption of impermissibility, the defendants must show that their content- and viewpoint-based restriction is "necessary to serve a compelling ... interest and that it is narrowly drawn to achieve that end." *Widmar,* 454 U.S. at 270, 102 S.Ct. at 274; *Church on the Rock v. City of Albuquerque,* 84 F.3d 1273, 1279–80 (10th Cir.1996) (holding that viewpoint-based restriction of speech in designated public forum must be " 'narrowly drawn to effectuate a compelling state interest' ") (quoting *165 *Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)). As discussed above in connection with the Religious Freedom Restoration Act, the defendants have not made this showing.

**E. The Plaintiffs Are Entitled to a Preliminary Injunction and to Summary Judgment.**

To obtain a preliminary injunction, the plaintiffs must show that (1) they have a substantial likelihood of succeeding on the merits; (2) they will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) the public interest will be furthered by the injunction. *See Sea Containers Ltd. v. Stena AB,* 890 F.2d 1205, 1208 (D.C.Cir.1989).

**[10]** The plaintiffs have met their burden. First, they are likely to succeed on the merits, because the Court already has found above that the defendants unlawfully have impinged upon their free exercise and free speech rights. Second, if the defendants' conduct is not enjoined, the plaintiffs will suffer irreparable harm to their constitutional and statutory rights to preach without being censored. Third, the defendants have not pointed to a single person or interest that would be substantially harmed if their conduct is enjoined; rank speculation about interference with good order and discipline or the political rights of soldiers does not suffice. Fourth, an injunction will serve the public interest by protecting the free speech and free exercise rights of chaplains and observant soldiers. Again, there is no evidence that military readiness or efficiency would be jeopardized by permitting chaplains to preach in accordance with their religious beliefs.

In addition to injunctive relief, summary judgment must be rendered for the plaintiffs if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As discussed above, the undisputed material facts show the defendants' anti-lobbying proscription violates the plaintiffs' First

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

000050

Amendment rights and their rights under the Religious Freedom Restoration Act. Accordingly, the plaintiffs' also are entitled to judgment as a matter of law.

## IV.

## CONCLUSION

What we have here is the government's attempt to override the Constitution and the laws of the land by a directive that clearly interferes with military chaplains' free exercise and free speech rights, as well as those of their congregants. On its face, this is a drastic act and can be sanctioned only by compelling circumstances. The government clearly has not met its burden. The "speech" that the plaintiffs intend to employ to inform their congregants of their religious obligations has nothing to do with their role in the military. They are neither being disrespectful to the Armed Forces nor in any way urging their congregants to defy military orders. The chaplains in this case seek to preach only what they would tell their non-military congregants. There is no need for heavy-handed censorship, and any attempt to impinge on the plaintiffs' constitutional and legal rights is not acceptable.

For all the foregoing reasons, the Court grants the plaintiffs' motion for preliminary injunction and motion for summary judgment, and denies the defendants' motion to dismiss or for summary judgment.

## ORDER

This matter came before the Court on the parties' cross-motions for summary judgment and on the plaintiffs' motion for preliminary injunction. For the reasons stated in the Court's Memorandum Opinion of even date herewith, it is, by the Court, this 7th day of April, 1997,

ORDERED that the plaintiffs' motion for preliminary injunction is GRANTED; and it is

FURTHER ORDERED that the plaintiffs' motion for summary judgment is GRANTED; and it is

FURTHER ORDERED that the defendants' motion to dismiss, or, in the alternative, *166 for summary judgment is DENIED; and it is

FURTHER ORDERED that the plaintiffs' motion to amend the complaint to add Chief Warrant Officer John M. Johnston and Cheryl M. Johnston as party plaintiffs is hereby denied as MOOT; and it is

DECLARED that the speech contemplated by the plaintiffs, to urge their military congregants to communicate with Congress on passage of the Partial Birth Abortion Ban Act, does not violate Department of Defense ("DoD") Directive 1344.10 and any other military regulation based thereon; and it is

FURTHER DECLARED that the defendants' interpretation of DoD Directive 1344.10 and similar regulations as barring the plaintiff chaplains from urging their military congregants to communicate with Congress on passage of the Partial Birth Abortion Ban Act violates the plaintiffs' rights under the First Amendment and the Religious Freedom Restoration Act; and it is

FURTHER ORDERED that the defendants, the defendants' officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with the defendants who receive actual notice of this order are hereby ENJOINED from interpreting DoD Directive 1344.10, or any similar law or regulation, in a manner that prohibits the plaintiffs from exercising their free speech and free exercise rights under the First Amendment of the Constitution, and in particular from urging their military congregants to communicate with Congress on passage of the Partial Birth Abortion Ban Act; and it is

FURTHER ORDERED that because the Court has granted summary judgment in this case, the Clerk is directed to dismiss this case from the docket of this Court.

Footnotes

1   On June 7, 1996, a memorandum regarding the Post Card Campaign was disseminated to all senior chaplains; it quoted extensively from the Judge Advocate General's June 5 letter. The parties dispute the source of this June 7 memorandum. The plaintiffs claim that it was issued by Air Force Headquarters, whereas the defendants claim that it was issued by the Air Force Office of the Chief Chaplain. The dispute over the source of the memorandum does not appear to be a dispute over a material fact, because it is undisputed that the content of this and like memoranda were communicated to the plaintiff military chaplains.

2   There is no evidence in the record indicating whether Father Rigdon is compensated for these services.

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

Rigdon v. Perry, 962 F.Supp. 150 (1997)

3      The Court presumes that Father Rigdon is referring to the June 7 memo quoting the June 5 memo from the Judge Advocate General.

4      The defendants have submitted evidence that Father Rigdon was not on active duty in June 1996. They have not submitted any evidence showing that Father Rigdon was not on active duty in September 1996 when the alleged violation of his free speech and free exercise rights occurred.

5      There are several other plaintiffs in this lawsuit. Plaintiff Muslim American Military Association ("MAMA") consists of service members in all the branches of the Armed Services. Ghayth Nur Kashif is Imam of the MAMA. He claims that the Quran requires a Muslim to give alms to the poor. According to him, if Congress "is considering welfare reform, as it did this [past] summer, a Muslim Chaplain should be free to tell his Congregants how this command of the Quran should affect their view of welfare reform, and he should be free to tell them if they have an obligation to contact their Congressman." Other than this hypothetical situation, the Imam does not indicate that he or any other Muslim chaplain in the military ever desired to tell his congregants to urge Congress to vote in favor of the Partial Birth Abortion Ban Act, but did not do so due to the military regulations at issue herein. Because at least one of the plaintiffs' claims are justiciable (Rabbi Kaye's), the Court need not address the justiciability of the MAMA's claims.

      The two other plaintiffs are Liam Downes, a Third Class Petty Officer in the Navy, and his wife, Karen, both of whom are Roman Catholics and who are parishioners of the Naval Academy Chapel. They assert that the defendants' actions interfere with their right to receive information pertaining to moral issues during religious services and individual counseling from their priest. On November 8, 1996, the plaintiffs advised the Court that Mr. Downes was recently discharged from the Navy. Consequently, they have moved to add U.S. Army Chief Warrant Officer John M. Johnston and his wife, Cheryl M. Johnston, to the complaint in place of the Downes. Mr. Johnston is a Catholic, and his wife is a Protestant, and both attend worship services of their respective faiths at Fort Dix. The defendants oppose the addition of the Johnstons to this case solely on the ground that the plaintiffs' claims allegedly are not justiciable. As noted above, the Court need not address the justiciability of these plaintiffs' claims, because Rabbi Kaye's claims are justiciable. Therefore, the plaintiffs' motion to amend shall be denied as moot.

6      *See also id. 5 4-4a.(2)* ("The chaplain is a fully qualified member of the clergy of a religious denomination or faith group. Endorsement by the candidate's denomination or religious body is a requirement for service as a chaplain."); *Plaintiffs' Exhibit 26, SECNAV Instruction 1730.7A, Enclosure (1)* at p. 1 (September 2, 1993) ("Chaplains shall be professionally qualified clergy, certified and endorsed by their ecclesiastical endorsing agency ... Navy chaplains shall maintain their endorsement as an essential element of their professional qualification.").

7      *See also Plaintiff's Exh. 23, § 4-5b.(1)* ("When conducting religious services, a chaplain will wear the military uniform, vestments, or other appropriate clerical attire established by church law or denominational practice. In addition, the chaplain's scarf, stole, or tallit may be worn with the uniform, vestments, or other appropriate attire when conducting services."); *Plaintiffs' Exhibit 25, Air Force Instruction 52–101, ¶ 1.4 (January 28, 1994)* (permitting chaplains to "[w]ear the prescribed Air Force uniform or worship apparel consistent with [their] faith group tradition when conducting religious services").

8      The words that a chaplain utters during the course of religious worship no more bear the official imprimatur of the military than the magazines, alcohol and tobacco sold by military exchanges. *See General Media Communications, Inc. v. Perry*, 952 F.Supp. 1072, 1080 (S.D.N.Y.1997) (Scheindlin, J.) (rejecting as "unreasonable" the government's argument that the sale and rental of magazines in military exchanges "might be interpreted as an official endorsement of the material published therein" because "[m]ilitary exchanges sell those produces that are popularly demanded by military personnel, even products that may be harmful to those who buy them").

9      *Greer v. Spock*, 424 U.S. 828, 840, 96 S.Ct. 1211, 1218, 47 L.Ed.2d 505 (1975).

10     *Cf. Ethredge v. Hail*, 56 F.3d 1324, 1328 n. 3 (11th Cir.1995) (holding that a military commander had supported his assertion that a bumper sticker disparaging the President would undermine military order, discipline and responsiveness where the record showed that service members had complained that the sticker was offensive and anonymous callers had contacted the commander and said that they intended to break the windows of the truck displaying the bumper sticker). *See also Cornelius v. NAACP Legal Defense and Educ. Fund*, 473 U.S. 788, 810, 105 S.Ct. 3439, 3453, 87 L.Ed.2d 567 (1985) (holding that the government's exclusion of a legal defense fund from participation in a charity drive aimed at federal employees on the ground that its exclusion was necessary to avoid workplace controversy was justified by numerous letters and telephone calls from federal employees, evidence of extra effort to persuade disgruntled employees to contribute, and evidence of declining contributions).

11     *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623–24, 104 S.Ct. 3244, 3252–53, 82 L.Ed.2d 462 (1984) (holding that a state government had a compelling interest in eradicating sex discrimination).

Rigdon v. Perry, 962 F.Supp. 150 (1997)

12     Because the Court has held that the plaintiffs' free exercise rights under the Religious Freedom Restoration Act have been violated, it need not reach the question of whether their free exercise rights under the First Amendment also have been violated.

13     *See also Plaintiffs' Exhibit 23, Chaplain Activities in the United States Army, Army Regulation 165–1, § 2–3b. (August 31, 1989)* ("[I]n providing religious services and ministries in many forms to the command and its members, the chaplaincy is an instrument of the U.S. Government to ensure that religious 'free exercise' rights are protected."); *Plaintiffs' Exhibit 24, Air Force Policy Directive 52–1, ¶ 1–1 (September 7, 1993)* ("The Air Force provides the opportunity for military members and their families to exercise [the right of freedom of religion] by providing chaplain service personnel and allocating required resources."); *Plaintiffs' Exh. 25, Air Force Instruction 52–101, ¶ 1.4 (January 28, 1994)* at ¶ 3.4 (precluding the use of "the chapel sanctuary, chancel, or nave to conduct non-religious activities"); 10 U.S.C. § 3073 (West 1959) (establishing institution of chaplaincy in the Army); 10 U.S.C. § 3547 (West 1959) (requiring chaplains to hold religious services at least once on each Sunday and to perform religious burial services; requiring the furnishment of facilities to assist the chaplain in performing his duties).

14     The anti-lobbying restriction is content- and viewpoint discriminatory, even apart from the defendants' favoritism of Captain Friel's brand of Catholicism. Contrary to defendants' counsel's claim at oral argument, that the anti-lobbying restriction applies "regardless of the candidate or issue" does not render it content-neutral. The fact remains that the restriction prohibits a particular class of speech—speech in which a chaplain urges a congregant to contact Congress on pending legislation. It also is viewpoint-based, because while it prohibits the use of official authority or influence to encourage the solicitation of Congressional votes, it does not preclude chaplains from *discouraging* their congregants from contacting Congress on pending legislation. The latter speech would comply with the anti-lobbying restriction, because chaplains would be asking parishioners not to communicate with Congress and, therefore, not to lobby for the votes of Congress on pending legislation.

**End of Document**                    © 2012 Thomson Reuters. No claim to original U.S. Government Works.

000053

# GE-3G

**In re: Sgt. Gary Stein, USMC, 0101/6842**

**AO:**   Colonel Christopher S. Dowling, USMC
          C/O Lt. Col. Sean Sullivan, USMC
          sean.sullivan@usmc.mil

**DATE:**  31 March 2012

**Ref:**   Request to withdraw, or in the alternative, continue the
          Administrative Separation Proceedings initiated 21 March
          2012 relating to Sgt. Gary Stein, USMC, 0101/6842

Dear Lt. Col. Sullivan:

Further to our telephone call yesterday at about 14:00
(Pacific), I am forwarding you a copy of *United States v.
Wilcox*, 66 M.J. 442, 446-47 (C.A.A.F. 2008) which affirms that
speech "on issues of social and political concern … has been
recognized as 'the core of what the First Amendment is designed
to protect.'"   To be sure, courts have held that the First
Amendment operates differently in the military and civilian
contexts, nevertheless "members of the military are not excluded
from the protection granted by the First Amendment." *Parker v.
Levy*, 417 U.S. 733, 758 (1974).

The military itself has recognized that "[t]he right to express
opinions on matters of public and personal concern is secured to
soldier and civilian…." *Committee for GI Rights v. Callaway*,
518 F.2d 466, 470 (D.C. Cir. 1975) (quoting "Guidance on
Dissent," AGAM-P, Headquarters, Department of the Army, 23 June
1969). Therefore, military courts have held that
"servicemembers as well as the public in general have a right to
voice their views so long as it does not impact on discipline,
morale, esprit de corps, and civilian supremacy." *United States
v. Brown*, 45 M.J. 389, 396 (C.A.A.F. 1996).

Even if a servicemember identifies himself as a Marine, this is
insufficient to censor his speech, even under existing law. In
*Wilcox*, the Court of Appeals for the Armed Forces struck down
the conviction of a servicemember who posted "an online profile
containing … views in which the author identified himself as a
'US Army Paratrooper.'" 66 M.J. at 445. According to the
court, the First Amendment prohibited a conviction based on the
message "expressed in his online profiles," without any evidence
that "the communications either 'interfere[d] with or
prevent[ed] the orderly accomplishment of the mission,' or

'present[ed] a clear danger to loyalty, discipline, mission, or morale of the troops.'"   *Id.* at 446, 449.  As the court noted:

> There is no evidence that any of Appellant's statements were directed at military members or ever reached his unit.  And it is pure speculation that the … views propounded on the Internet by a single person purporting to be a paratrooper either were viewed or would be viewed by other servicemembers or would be perceived by the public or a servicemember as an expression of Army or military policy. [*Id.* at 450.]

If the speech in *Wilcox* was protected, then Sgt. Stein's speech is protected as well, particularly in view of there being no allegation that he advocated the kind of extreme views advocated by the defendant in *Wilcox*.  In Sgt. Stein's case, there is no evidence of any direct threat to loyalty, discipline, mission, or morale in any of his Facebook postings.

Of course, none of these constitutional questions need be reached if we could work out a reasonable settlement on mutually agreeable terms.  To that end, I am aware of no effort made by Sgt. Stein's superiors to counsel him regarding the circumstances of his Facebook activity before the initiation of the involuntary separation proceeding.  (Indeed, I understand that in April 2010, he was counseled by the CO's Warrant Officer and the SJA that he could maintain his Facebook activities provided he posted a disclaimer of service connection.  He complied immediately and maintained the prescribed disclaimer at all times thereafter.)  MARCORPSMAN 6302 clearly provides for such counseling before taking such a drastic step – especially where, as here, a lifelong, stigmatizing OHT service characterization is sought.  In light of Sgt. Stein's past conduct, making changes on request back in 2010, one wonders why a similar approach was not taken here.  Respectfully, given Sgt. Stein's impending end of active duty, would it not be in the best interests of good order and discipline to resolve this matter short of a full blown hearing and possible court action?

Thank you for your consideration of these points in regard to our request for a withdrawal of the notice of separation and in the alternative, for a continuance until our request for a Legal Ethics Opinion is answered.

J. Mark Brewer
Civilian Counsel to Sgt. Gary Stein
Ph: (713) 209-2910
brewer@bplaw.com

66 M.J. 442
U.S. Court of Appeals for the Armed Forces.

UNITED STATES, Appellee,
v.
Jeremy T. **WILCOX**, Private First Class, U.S.
Army, Appellant.

No. 05–0159.
Crim.App. No. 20000876.
Argued April 10, 2008.
Decided July 15, 2008.

**Background:** Accused was convicted by general
court-martial, Robert L. Swann, J., of disobeying an
officer, larceny of property of some value less than $100,
making a false official statement, and violating the
general article by wrongfully advocating anti-government
and disloyal sentiments, and advocating racial intolerance.
The United States Army Court of Criminal Appeals
affirmed. Review was granted.

**[Holding:]** The United States Court of Appeals for the
Armed Forces, Ryan, J., held that evidence was legally
insufficient to support accused's conviction for violating
the general article by wrongfully advocating
anti-government and disloyal sentiments, and advocating
racial intolerance.

Affirmed in part and reversed in part.

Baker, J., filed dissenting opinion.

West Headnotes (5)

**[1]**    **Constitutional Law**
           ⬤Members of Armed Services
           **Military Justice**
           ⬤In General; Nature and Elements

In the military context, dangerous speech
unprotected by the First Amendment is that
speech that interferes with or prevents the
orderly accomplishment of the mission or
presents a clear danger to loyalty, discipline,
mission, or morale of the troops. U.S.C.A.
Const.Amend. 1.

**[2]**    **Constitutional Law**
           ⬤Members of Armed Services
           **Military Justice**
           ⬤In General; Nature and Elements

In the context of the First Amendment, in order
to meet the second general article element for
conduct charged under a "prejudice of good
order and discipline" theory or a
service-discrediting theory, the prosecution
show a reasonably direct and palpable
connection between an accused's statements and
the military mission. U.S.C.A. Const.Amend. 1;
UCMJ, Art. 134, 10 U.S.C.A. § 934; MCM
2005, Pt. IV, ¶ 60(b).

3 Cases that cite this headnote

**[3]**    **Constitutional Law**
           ⬤Members of Armed Services
           **Military Justice**
           ⬤In General; Nature and Elements

If an accused's speech charged under the general
article is otherwise protected by the First
Amendment, and if a reasonably direct and
palpable connection between the speech and the
military mission or military environment is
established, the Court of Appeals for the Armed
Forces must determine whether criminalization
of that speech is justified despite First
Amendment concerns by performing a balancing
test; however, where the record does not
establish a reasonably direct and palpable
connection between the speech and the military
at all, let alone the military mission or military
environment, the balancing test is mooted by the
legal insufficiency of the charged offense.
U.S.C.A. Const.Amend. 1; UCMJ, Art. 134, 10
U.S.C.A. § 934; MCM 2005, Pt. IV, ¶ 60(b).

5 Cases that cite this headnote

**[4]**    **Constitutional Law**

⇐Members of Armed Services
**Military Justice**
⇐In General; Nature and Elements

Accused's statements in the Internet which formed basis for charge of violating the general article by wrongfully advocating anti-government and disloyal sentiments, and advocating racial intolerance, constituted protected speech under the First Amendment, absent evidence that they constituted dangerous speech which interfered with or prevented the orderly accomplishment of the mission or presented a clear danger to loyalty, discipline, mission, or morale of the troops. U.S.C.A. Const.Amend. 1; UCMJ, Art. 134, 10 U.S.C.A. § 934.

2 Cases that cite this headnote

[5]   **Military Justice**
⇐In General; Nature and Elements

Evidence was legally insufficient to support accused's conviction for violating the general article by wrongfully advocating anti-government and disloyal sentiments, and advocating racial intolerance, based on statements he made on the Internet to undercover CID agent; mere possibility that a servicemember or member of the public might stumble upon accused's expression of his beliefs, believe he was in the military, and attribute his views to the military, was insufficient to satisfy element of either service discrediting behavior or conduct prejudicial to good order or discipline. UCMJ, Art. 134, 10 U.S.C.A. § 934.

4 Cases that cite this headnote

**\*443** RYAN, J., delivered the opinion of the Court, in which EFFRON, C.J., and ERDMANN and STUCKY, JJ., joined. BAKER, J., filed a dissenting opinion.
For Appellant: *Captain Christopher W. Dempsey* (argued); *Colonel Christopher J. O'Brien, Lieutenant Colonel Steven C. Henricks,* and *Major Sean F. Mangan* (on brief); *Major Scott T. Ayers* and *Major Tyesha E.*

*Lowery.*

For Appellee: *Captain Michael G. Pond* (argued); *Colonel John W. Miller II* and *Captain Michael C. Friess* (on brief).

RYAN, Judge, delivered the opinion of the Court.
The issue before us is whether the evidence adduced at trial demonstrated that Appellant's statements on government, race, and religion were made under circumstances legally sufficient to criminalize his conduct under Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000).[1] Under the specific circumstances of this case, we hold that the evidence presented by the Government was insufficient as a matter of law to meet the element of either service discrediting behavior or conduct prejudicial to good order and discipline under Article 134, UCMJ.[2]

### I. *Background*

Appellant's case has wound through the military justice system for almost eight years. During that time several of the original offenses, which both shared a factual basis with the offense in question today and were central to the Government's theory of the case, were either mooted by the military judge's findings of not guilty or have been modified or dismissed by the United States Army Court of Criminal Appeals (CCA). This procedural history is important, as it frames the narrow issue presently before this Court.

### A. *Procedural History*

Appellant was charged with disobeying an officer, violation of an Army regulation by attending a Ku Klux Klan rally, violation of an Army regulation by wrongfully recruiting other members of the Army in extremist activity, violation of an Army regulation by distributing extremist literature, making a false official statement, larceny of property of some value less than $100, and finally:

> wrongfully advocat[ing] anti-government and disloyal sentiments, and encourag[ing] participation in extremist organizations while identifying himself as a "US Army Paratrooper" on an America OnLine [AOL] Profile and advocat[ing] racial intolerance by counseling and advising individuals on racist views and that under the **\*444** circumstances, the

000059

[Appellant's] conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit to the armed forces

in violation of Articles 90, 92, 107, 121, and 134, UCMJ, 10 U.S.C. §§ 890, 892, 907, 921, 934 (2000).

Appellant pleaded guilty to disobeying an officer in violation of Article 90, UCMJ, and to stealing a watchband worth $2.99 in violation of Article 121, UCMJ. He pleaded not guilty to the remaining charges.

Appellant was tried by military judge alone and was found not guilty of the Article 92, UCMJ, charges associated with recruiting servicemembers into extremist activity and distributing extremist literature, and guilty of violating Article 92, UCMJ, by attending a Ku Klux Klan rally, violating Article 107, UCMJ, by making a false official statement in which he denied having extremist views, and violating Article 134, UCMJ. Appellant was sentenced to a bad-conduct discharge, confinement for eight months, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The convening authority approved the adjudged sentence.

On appeal, the CCA held that the evidence was legally insufficient to affirm the conviction for a violation of Article 92, UCMJ, based on attending a Ku Klux Klan rally in violation of an Army regulation, but affirmed the remaining charges. *United States v. Wilcox (Wilcox I)*, No. ARMY 20000876, slip op. at 2 (A.Ct.Crim.App. Nov. 4, 2004) (unpublished). After this, the only offense remaining that imposed criminal culpability on Appellant for expressing his views was the Article 134, UCMJ, specification.

This Court initially granted review of Appellant's case to determine whether the Article 134, UCMJ, offense was unconstitutionally overbroad as charged. *United States v. Wilcox (Wilcox II)*, 61 **M.J.** 462 (C.A.A.F.2005). After hearing oral argument this Court held that:

Upon further consideration of the granted issue, we note that many of the facts at issue in the constitutional challenge to the Article 134 offense were at issue with respect to the offenses charged under Article 92. In light of the fact that the closely related Article 92 offenses were resolved favorably to Appellant, it is not apparent which facts were relied upon by the court below for purposes of addressing Appellant's constitutional challenge to his Article 134 conviction. Under these circumstances, we conclude that it is appropriate to remand this case for further consideration of the following by the court below:

(1) The constitutionality of the Article 134 findings. *See, e.g., Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *United States v. Brown*, 45 **M.J.** 389 (C.A.A.F.1996); *United States v. Priest*, 21 C.M.A. 564, 45 C.M.R. 338, 1972 WL 14190 (1972).

(2) The legal and factual sufficiency of the evidence of the Article 134 findings. *See* Article 66(c), 10 U.S.C. § 866(c) (2000).

*United States v. Wilcox (Wilcox III)*, 62 **M.J.** 456, 457 (C.A.A.F.2006).

On remand, the CCA held that the evidence was "legally and factually sufficient to support appellant's conviction based on the [Article 134 specification], except that part of the specification alleging appellant encouraged participation in extremist organizations." *United States v. Wilcox (Wilcox IV)*, No. ARMY 20000876, slip op. at 3 (A.Ct.Crim.App. Dec. 22, 2006). Based on this holding, the specification remaining alleged that Appellant "did, at or near Fort Bragg, North Carolina, between on or about 28 April 2000 and 30 May 2000": (1) "wrongfully advocate anti-government and disloyal sentiments while identifying himself as a 'U.S. Army Paratrooper' in an America Online profile, and advocate racial intolerance by counseling and advising individuals on racist views"; (2) "which conduct was, under the circumstances, prejudicial to good order and discipline and service discrediting." *Id.* slip op. at 11.

The CCA held that the facts, taken in the light most favorable to the Government, showed that Appellant did make statements on the Internet that were anti-government and disloyal as well as statements that promoted extreme racial intolerance. *Id.* slip **\*445** op. at 7. The CCA also held that those statements had a tendency to discredit the service or to be prejudicial to good order and discipline because "[y]oung, immature soldiers surfing the internet and discovering a U.S. Army paratrooper's profile advocating anti-government sentiments and extreme racist views could believe such disloyalty and racial intolerance is entirely acceptable conduct in our Army" and because "members of the general public have access to [A]ppellant's publicly-posted comments, and upon reading them, may tend to find the Army—as represented by [A]ppellant—a disreputable institution, or one disserving [sic] less than full public esteem and respect." *Id.* slip op. at 8–9.

While Appellant was initially charged, *inter alia*, with multiple violations of Article 92, UCMJ, associated with recruiting servicemembers into extremist activity, distributing extremist literature, attending a Ku Klux Klan rally, and a violation of Article 134, UCMJ, for the

U.S. v. Wilcox, 66 M.J. 442 (2008)

Internet communications discussed above, at the end of consideration by the military judge at trial and the CCA, the only remaining charge related to extremist views was a remnant of the original Article 134, UCMJ, offense. Thus, the sole issue presently before the Court is whether the evidence is legally sufficient to support the second element of the attenuated version of the charged Article 134, UCMJ, offense remaining. We hold that it is not.

## B. Factual Background

Appellant first came to the attention of Army Criminal Investigative Division (CID) when a civilian police officer noticed an online profile containing racist views in which the author identified himself as a "US Army Paratrooper." The civilian officer notified CID at Fort Bragg. Army CID viewed two profiles assigned to Appellant's AOL e-mail address. The first, a general AOL profile, listed Appellant's occupation as "Army/Paratrooper" and listed as a "personal quote" that " '[w]e must secure the existence of our people and a future for white children.' THE 14 WORDS—written by imprisoned matyr [sic] David Lane ...."

The second, a love.aol.com profile, stated, *inter alia,* that Appellant's occupation was an Army paratrooper, that he was single, seeking a "[f]emale for a casual or serious relationship" and was:

> a Pro–White activist doing what I can to promote the ideals of a healthier environement [sic]. I do not base my deeds on Hate [sic], but that of love for my folk's women & children. Political Affiliation is none—This government is not worth supporting in any of its components. Natures [sic] and God's laws are eternal—Love your own kind & fight for your own kind. There's no "HATE" in that!

A CID agent, Investigator Sturm, created an AOL instant messenger account and began conversing with Appellant via that service and eventually via e-mail. Sturm posed as a young female interested in the white supremacist movement. During their online conversations Appellant made racist statements and encouraged her to read various racist and anarchist websites and books. Sturm recorded her online conversations and e-mails with Appellant. She compiled a synopsis of those conversations which was admitted at trial along with the original transcripts of the conversations and e-mails.

At trial, Sturm testified in detail about her Internet communications with Appellant. She testified about Appellant's views, and also testified that Appellant had posted on various websites catering to. those with racist and anarchist views, identified himself as a member of the armed forces, and espoused similar views in message forums—those posts were not admitted as evidence, based on the military judge sustaining the defense's hearsay objection. Eventually, Appellant invited Sturm to a white supremacist rally and rock concert, which she did not attend. Sturm did not testify that Appellant encouraged her to join a white supremacist group, overthrow the government, or take any specific action towards or against any person.

The Government's evidence concerning the Article 134, UCMJ, charge as it remains today consists of the testimony of Sturm, the evidence she gathered in the course of her online conversations, including Appellant's **\*446** online profiles, and expert testimony that confirmed Appellant's statements in his online profiles, in particular the reference to the "14 Words," were consistent with the white supremacist movement. No evidence was introduced as to either the actual or potential adverse impact of Appellant's online profile or statements on good order and discipline or to the actual or potential discredit to the armed forces. In contrast, the defense introduced evidence from soldiers in Appellant's unit that he had good working relationships with minorities in the unit and that there was no evidence that his racist views adversely affected his military performance or his unit.

At trial, the Government argued that Appellant was a racist, distributed racist material to his fellow soldiers, and attempted to recruit individuals into extremist activities. Specifically, Government counsel stated that the Article 134, UCMJ, offense was proven because "the accused, while holding himself out as a member of the United States Army ... recruited others into activities involving racial intolerance" and because he violated Army Regulation 600–20, which prohibits participation in extremist organizations. In arguing before the military judge regarding the evidence to support the Article 134, UCMJ, offense, trial counsel focused solely on manifestations of the message expressed in the speech captured in the now-defunct Article 92, UCMJ, charges.

Appellant has long since been acquitted of distributing racist materials, attending racist rallies, and recruiting servicemembers into extremist activities. While Sturm's testimony and Appellant's online profiles show that Appellant held beliefs that are both disturbing and inconsistent with Department of Defense policies regarding racial equality and other matters, that alone is insufficient under the facts of this case to impose criminal sanctions under Article 134, UCMJ.

## II. *Analysis*

We review questions of legal sufficiency *de novo* as a matter of law. *United States v. Young,* 64 **M.J.** 404, 407 (C.A.A.F.2007). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Dobson,* 63 **M.J.** 1, 21 (C.A.A.F.2006) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). As reflected in our remand to the Court of Criminal Appeals, *see supra* at 444, this case involves legal sufficiency in the context of First Amendment considerations.

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. This protection permits the expression of ideas, even the expression of ideas the vast majority of society finds offensive or distasteful. *See Virginia v. Black,* 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (citing *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting)); *R.A.V. v. St. Paul,* 505 U.S. 377, 395–96, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). The sweep of this protection is less comprehensive in the military context, given the different character of the military community and mission. *Parker v. Levy,* 417 U.S. 733, 758, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *United States v. Priest,* 45 C.M.R. 338, 344–46, 21 C.M.A. 564, 570–72 (1972); *United States v. Gray,* 20 C.M.A. 63, **66**, 42 C.M.R. 255, 258 (1970). But even under the potentially less protective First Amendment right afforded to servicemembers, and despite the offensive nature of Appellant's views and communications, we hold that the evidence is legally insufficient to support Appellant's conviction for the amended and remaining violation of Article 134, UCMJ.

### A. *Free Speech and Article 134, UCMJ*

Appellant's sole remaining conviction rests clearly on the offensive message of racial intolerance and dissatisfaction with the government expressed in his online profiles, communications with Sturm, and communications with others on Internet message boards, as relayed by Sturm. The substantive messages conveyed therein, while distasteful, constitute Appellant's ideas on issues of social and political concern, which has \*447 been recognized as "the core of what the First Amendment is designed to protect." *Black,* 538 U.S. at 365, 123 S.Ct. 1536 (finding that the act of burning a cross may be a form of political speech); *see also United States v. Brown,* 45 **M.J.** 389,

398 (C.A.A.F.1996) (recognizing that political speech " 'occupies the core of the protection afforded by the First Amendment' " (quoting *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995))).

*Parker v. Levy* reiterated the point that differences between the military community and the civilian community result in military law that "regulate[s] aspects of the conduct of members of the military which in the civilian sphere are left unregulated." 417 U.S. at 749, 94 S.Ct. 2547. But the Supreme Court upheld Article 134, UCMJ, against constitutional attack for vagueness and overbreadth *in light of* the narrowing construction developed in military law through the precedents of this Court and limitations within the *Manual for Courts–Martial (MCM)* itself. *Id.* at 752–61, 94 S.Ct. 2547. As such, a limited Article 134, UCMJ, does not make every "irregular or improper act" a court-martial offense *and* does not reach conduct that is only indirectly or remotely prejudicial to good order and discipline. *MCM* pt. IV, para. 60.c. (2)(a); *see also* William Winthrop, *Military Law and Precedents* 723–24 (2d ed.1920 reprint) (commenting on Article 62 of the American Articles of War, the predecessor to Article 134, UCMJ, and stating that to be punishable, acts prejudicial to good order and discipline "must have been committed under such circumstances as to have directly offended against the government and discipline of the military state"). If it were otherwise, the forces of narrowing interpretation that saved Article 134, UCMJ, from constitutional challenge in *Parker v. Levy* would fail.

Our jurisprudence on charged violations of Article 134, UCMJ, involving speech thus recognizes the importance of the context of that speech. *See United States v. Daniels,* 19 C.M.A. 529, 534–35, 42 C.M.R. 131, 136–37 (1970) (holding that although a request for mast would generally be lawful, under the circumstances, the appellant's encouraging other servicemembers to request mast and refuse to fight in Vietnam was punishable under Article 134, UCMJ); *see also infra* at 20–22.

Consistent with the focus on context necessary to establish a violation of Article 134, UCMJ, while speech that would be impervious to criminal sanction in the civilian world may be proscribed in the military, this Court has long recognized that when assessing a criminal violation implicating the First Amendment:

the proper balance must be struck between the essential needs of the armed services and the right to speak out as a free American. Necessarily, we must be sensitive to protection of "the principle of free thought—not free thought for those who agree with us but freedom for the

thought that we hate."

*Priest,* 21 C.M.A. at 570, 45 C.M.R. at 344 (quoting *United States v. Schwimmer,* 279 U.S. 644, 654–55, 49 S.Ct. 448, 73 L.Ed. 889 (1929) (Holmes, J., dissenting)).

Prior to applying this balancing test to a charged violation of Article 134, UCMJ, involving speech, two threshold determinations must be made. First, the speech involved must be examined to determine whether it is otherwise protected under the First Amendment. Second, the Government must have proved the elements of an Article 134, UCMJ, offense.

## 1. Unprotected speech

No one disputes that servicemembers enjoy some measure of the right to free speech granted by the First Amendment. *See Parker,* 417 U.S. at 758, 94 S.Ct. 2547; *Brown,* 45 **M.J.** at 395; *Gray,* 20 C.M.A. at **66,** 42 C.M.R. at 258. However, the right to free speech is not absolute, and some speech—e.g., dangerous speech, obscenity, or fighting words—is not protected by the First Amendment, regardless of the military or civilian status of the speaker. *Brown,* 45 **M.J.** at 395 (citing *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *Chaplinsky v. New* **\*448** *Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). [1] The test for dangerous speech in the civilian community is whether "the words are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree." *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Under the standard applicable to the civilian world, "clear and present danger" extends to speech "directed to inciting or producing imminent lawless action ... likely to incite or produce such action." *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). A lower standard pertains in the military context, where dangerous speech is that speech that "interferes with or prevents the orderly accomplishment of the mission or presents a clear danger to loyalty, discipline, mission, or morale of the troops." *Brown,* 45 **M.J.** at 395.3

## 2. Sufficiency of proof for a charged violation of Article 134, UCMJ, in the First Amendment context

[2] For any offense charged under Article 134, UCMJ, clauses 1 or 2, the government must prove: (1) that the accused did a certain act, and (2) that the act was, under the circumstances, to the prejudice of good order and discipline or was of a nature to bring discredit upon the armed forces. *MCM* pt. IV, para. 60.b. To satisfy the due process requirements of the Fifth Amendment, the Government must prove beyond a reasonable doubt every element of the charged offense. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Jackson v. Virginia,* 443 U.S. at 321, 99 S.Ct. 2781. In the context of the First Amendment, in order to meet the second element for conduct charged under a "prejudice of good order and discipline" theory, we have required that the prosecution show a " 'reasonably direct and palpable' " connection between an appellant's statements and the military mission. *See Priest,* 21 C.M.A. at 569, 45 C.M.R. at 343 (citation omitted); *see also Brown,* 45 **M.J.** at 396 (" '[O]ur national reluctance to inhibit free expression dictates that the connection between statements or publications involved and their effect on military discipline be closely examined'." (quoting *Priest,* 21 C.M.A. at 569–70, 45 C.M.R. at 343–44)). This Court has not directly addressed the connection needed between an appellant's statements and the military mission in the context of speech alleged to be "service discrediting." We note that the Government has cited no case in which this Court has upheld a conviction in a contested case based upon a violation of Article 134, UCMJ, for service discrediting speech *solely* because the speech would be offensive to many or most. We conclude that a direct and palpable connection between speech and the military mission or military environment is also required for an Article 134, UCMJ, offense charged under a service discrediting **\*449** theory. If such a connection were not required, the entire universe of servicemember opinions, ideas, and speech would be held to the subjective standard of what some member of the public, or even many members of the public, would find offensive. And to use this standard to impose criminal sanctions under Article 134, UCMJ, would surely be both vague and overbroad. *Cf. United States v. O'Connor,* 58 **M.J.** 450, 455 (C.A.A.F.2003) ( "[T]he connection between any conduct protected by the First Amendment and its effect in the military environment [must] be closely examined. The absence of ... record development concerning the service-discrediting character of [the] conduct precludes us from engaging in that 'close examination' in the present case.") (citation omitted).

## 3. Balancing test may be mooted

[3] If the speech is otherwise protected by the First Amendment, and if a reasonably direct and palpable connection between the speech and the military mission or military environment is established, only then need we determine whether criminalization of that speech is

justified despite First Amendment concerns. Ultimately, this Court must weigh the gravity of the effect of the speech, discounted by the improbability of its effectiveness on the audience the speaker sought to reach, to determine whether the conviction is warranted. *Priest,* 21 C.M.A. at 570–71; 45 C.M.R. at 344–45. Where, as here, the record did not establish a reasonably direct and palpable connection between the speech and the military at all, let alone the military mission or military environment, the balancing test is mooted by the legal insufficiency of the charged offense.

## B. *Appellant's Speech*

### 1. *Appellant's speech as protected speech*

[4] Appellant's various communications on the Internet—which, while repugnant, are not criminal in the civilian world, *seeBrandenburg,* 395 U.S. at 447, 89 S.Ct. 1827 (holding that even advocacy of racist violent speech is protected speech if it is not likely to incite or produce such violence)—did not constitute unprotected "dangerous speech" under the circumstances of this case. No evidence was admitted that showed the communications either "interfere[d] with or prevent[ed] the orderly accomplishment of the mission," or "present[ed] a clear danger to loyalty, discipline, mission, or morale of the troops." *Brown,* 45 **M.J.** at 395 (citations omitted).

Further, while one might colloquially describe the ideas expressed by Appellant as obscene,4 they are not legally obscene as defined by First Amendment jurisprudence. *See Miller,* 413 U.S. at 24–25, 93 S.Ct. 2607 (requiring that the material contain a depiction or description of sexual conduct in a patently offensive way to be considered obscenity). Neither can they be classified as unprotected "fighting words." *See Chaplinsky,* 315 U.S. at 572, 62 S.Ct. 766 (defining "fighting words" as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace").

Consequently, we conclude that Appellant's speech is protected speech under the First Amendment and must now turn to an analysis of whether the Government has shown a reasonably direct and palpable connection between the speech and the military mission or military environment.

### 2. *No evidence of a connection between Appellant's speech and the military mission*

[5] We address the speech at issue in this case in light of

the specification alleging Appellant's offense as modified by the CCA. After modification, the specification alleges that Appellant:

> wrongfully advocated anti-government and disloyal sentiments, while identifying himself as a "US Army Paratrooper" on an American OnLine Profile and advocat[ed] racial intolerance by counseling and advising **\*450** individuals on racists views and that under the circumstances, the [Appellant's] conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.5

We must consider the e-mails and instant messages, the forum posts, and the AOL profile statements to determine whether any or all of them was shown to have a reasonably direct and palpable effect on the military mission or military environment. Looking to our prior cases involving speech and Article 134, UCMJ, neither the form, forum, nor substance of Appellant's speech is clearly analogous to the speech at issue in prior cases examining exigencies of the military service and mission that permitted limitations on the protections of the First Amendment. *See, e.g., Parker,* 417 U.S. at 736–37, 94 S.Ct. 2547; *Priest,* 21 C.M.A. at 568, 45 C.M.R. at 342; *Gray,* 20 C.M.A. at 63, 42 C.M.R. at 255.

The leading cases involving the intersection of Article 134, UCMJ, and the First Amendment have involved facts adduced at trial that showed that the appellant at least attempted to direct his speech to servicemembers. *See, e.g., Parker,* 417 U.S. at 761, 94 S.Ct. 2547 (finding a violation of Article 134, UCMJ, when servicemember "publicly urge[d] enlisted personnel to refuse to obey orders"); *Brown,* 45 **M.J.** at 398 (holding that organizing a unit-wide meeting to advocate desertion violated Article 134, UCMJ); *Priest,* 21 C.M.A. at 572, 45 C.M.R. at 346 (finding direct and palpable connection to good order and discipline when the appellant distributed an extremist newspaper at the Pentagon and Navy exchange); *Daniels,* 19 C.M.A. at 533–35, 42 C.M.R. at 135–37 (concluding that there was a direct connection to good order and discipline when the appellant assembled all African–American members of his unit and attempted to convince them to not fight in "the white man's war"). Because in those cases the speech was directed to servicemembers, the effect of the speech on the military mission was both palpable and obvious.

We are faced with a very different set of facts in this case. There is no evidence that any of Appellant's statements were directed at military members or ever reached his

000064

unit. And it is pure speculation that the racist views propounded on the Internet by a single person purporting to be a paratrooper either were viewed or would be viewed by other servicemembers or would be perceived by the public or a servicemember as an expression of Army or military policy.

We need not tarry long over the private statements made by Appellant through e-mails and instant messages to a person whom he believed to be a like-minded civilian friend. The Government cites no authority supporting criminal penalties for unpopular and distasteful views made in private between two individuals that fall short of proposing criminal activity.6 *See, e.g., United States v. Williams*, —— U.S. ——, 128 S.Ct. 1830, 1842, 170 L.Ed.2d 650 (2008) (drawing distinction between advocating child pornography and proposals to provide or obtain child pornography).

**\*451** Moreover, while statements made on an online message board catering to those with anarchistic and racist views may theoretically be more likely to have a direct and palpable effect on the military mission or environment, no evidence of this likelihood or effect was produced at trial, and copies of the postings themselves were excluded based on a hearsay objection that the military judge sustained.

Finally, and for many of the same reasons, there is no evidence that Appellant's statements in his AOL profiles had a reasonably direct and palpable effect on the military mission or military environment. First, no evidence was produced that the profiles were directed at other members of the military, or that any military member other than the investigators stumbled upon them or was likely to do so. Moreover, one of the profiles was posted in connection with a "love.aol.com" account. Nothing in the record supports the conclusion that the purpose or likely outcome of including the racist statements was anything other than to attract women whose beliefs were similar to Appellant's own. Nor did the Government provide any evidence that either servicemembers or members of the general public would even understand the source or larger import of the quoted "14 Words" or other language. The experts who testified spoke only to the meaning of the phrases themselves, not to how such statements might be received.

The lower court supported the legal sufficiency of the Article 134, UCMJ, offense by postulating that Appellant's speech was: (1) service discrediting because "members of the general public have access to appellant's publicly-posted comments, and upon reading them, may tend to find the Army—as represented by [A]ppellant—a disreputable institution, or one disserving less than full

public esteem and respect"; and (2) undermined good order and discipline because "[y]oung, immature soldiers surfing the internet and discovering a U.S. Army paratrooper's profile advocating anti-government sentiments and extreme racist views could believe such disloyalty and racial intolerance is entirely acceptable conduct in our Army." *Wilcox IV*, No. Army 20000876, slip op. at 8–9.

It is telling, given the explicit instructions by this Court and the factfinding power of the CCA, that based on the record of trial this is the best rationale supporting the legal sufficiency of the remaining Article 134, UCMJ, offense available. Of course a rationale supplied by the CCA is not itself evidence. The mere possibility, assumed by the CCA and unsupported by the record, that a servicemember or member of the public might stumble upon Appellant's expression of his beliefs, believe he was in the military, and attribute his views to the military is so tenuous and speculative as to be legally insufficient to support the second element of the charged violation of Article 134, UCMJ.

### 3. *No balancing required*

Having concluded that there is no evidence establishing that Appellant's speech was either prejudicial to good order and discipline or service discrediting, we are unable to conduct the ultimate balancing of First Amendment considerations and military needs that *Priest* requires. See *O'Connor*, 58 **M.J.** at 455 (similarly declining to examine balance in the absence of record development). Rather, we conclude that there can be no conviction under Article 134, UCMJ, for Appellant's otherwise protected speech.

### III. *Decision*

It is worth restating that the issue in this case is whether Appellant's statements constituted a criminal offense in light of the evidence set forth in the record of this case, not whether this Court approves of the statements made by the Appellant. We do not. But condemnation and conviction are drastically different when the First Amendment is involved, and our disagreement with his statements cannot substitute for the Government's failure to introduce evidence legally sufficient to meet the element of either service discrediting behavior or prejudice to good order and discipline necessary for a conviction under Article 134, UCMJ. While a different record might support a conviction for the offense as charged, because no evidence established the second element of the Article 134, UCMJ, offense in this case, it is **\*452** clear that no reasonable factfinder could have

000065

found the essential elements of the charged offense beyond a reasonable doubt.[7]

The decision of the United States Army Court of Criminal Appeals as to Charge V and its Specification and the sentence is reversed. The findings as to Charge V and its Specification are set aside and that charge and specification are dismissed. The decision is affirmed as to the remaining charges. The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Criminal Appeals for sentence reassessment on the affirmed charges.

BAKER, Judge (dissenting):

I respectfully dissent for two reasons.

First, I do not agree with the majority's conclusion that no rational trier of fact could find that under the circumstances, the posting of Appellant's AOL profile was "of a nature to bring discredit upon the armed forces." Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000). Indeed, the majority concludes that there is "[n]o evidence ... introduced as to either the actual or potential adverse impact of Appellant's online profile or statements on good order and discipline or to the actual or potential discredit to the armed forces." *United States v. Wilcox*, 66 M.J. at 446 (C.A.A.F.2008). To the contrary, a publicly available Internet profile that: (1) indicates that the profile is posted by an "Army Paratrooper" at Fort Bragg; (2) gives the paratrooper's name as "Wskullhead"; and (3) indicates his race as "Aryan" and that he is a pro-white activist (among other things) is of a nature to bring discredit upon the Army. More to the point, from a legal sufficiency standpoint the Government is not required to offer direct proof of discredit; a rational trier of fact is allowed to reasonably draw such an inference from proof of the circumstances surrounding the conduct at issue.

Second, having concluded that "the sole issue presently before the Court is whether the evidence is legally sufficient to support the second element of the attenuated version of the charged Article 134, UCMJ, offense,"*id.* at 445, the majority nonetheless considers constitutional questions that might otherwise be raised if the evidence were legally sufficient. Generally, courts should avoid constitutional questions where cases are properly resolved on other grounds. *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ("When the validity of an act of the Congress is drawn in question, and ... a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the

question may be avoided."); *accord, e.g., Haynes v. United States*, 390 U.S. 85, 92, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968) (dictum); *Schneider v. Smith*, 390 U.S. 17, 27, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968); *United States v. Rumely*, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

As a result, it is not clear what relationship, if any, this constitutional discussion has to the Court's conclusion regarding legal sufficiency. In my view, one does not reach the constitutional questions in this case unless one first concludes that the evidence would otherwise be legally sufficient, at which point the question becomes whether the conduct is constitutionally protected as free speech. For the reasons stated below, Appellant's profiles fell outside the zone of free speech protection; the Government had a compelling interest in regulating Appellant's speech and did so using narrowly tailored means.

## SUFFICIENCY OF THE EVIDENCE

This case is not a model of clarity, or much else. But the question remains: Was there legally sufficient evidence presented to the military judge such that "after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact" could have found beyond a reasonable doubt that *\*453 Appellant's posting of his AOL profile was of a service discrediting nature? *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In my view, the evidence is sufficient.

First, Appellant's two AOL profiles were entered into evidence and were before the military judge as trier of fact. So were Appellant's e-mail exchanges with Investigator Sturm, also known as, "Country Bumpkin," an undercover Army CID agent playing the role of a fellow traveler on the road of racial extremism.

Second, the statements were intended for a wider audience, and therefore demonstrated a tendency to discredit. The record—or reasonable inferences drawn from the record—indicates that Appellant's AOL profiles were posted on the Internet and were (at least) available to AOL subscribers. As to who had access to such profiles, Investigator Sturm testified, "It can be anyone that has an AOL account or is online." In any event, the profiles were available to members of the public.

Third, there is sufficient evidence that this conduct reflected disrepute on the armed forces. The profiles

identified Appellant as an "Army Paratrooper" and "Army/Paratrooper" respectively. For "location," Appellant entered, "Fort Bragg." One profile includes a thumbnail picture of Appellant with close-cropped hair. Fourth, the profiles included the following statements, and included a hyperlink to a website associated with the white supremacy extremist and convicted murderer David Lane:1

I'd also like to say ...

I am a Pro–White activist doing what I can to promote the ideals of a healthier environement [sic]. I do not base my deeds on Hate, but that of love for my folk's women & children. Political Affiliation is none—This government is not worth supporting in any of its components. Natures [sic] and God's laws are eternal—Love your own kind & fight for your own kind. There's no "HATE" in that!

Personal Quote: "We must secure the existence of our people, and a future for white children" THE 14 WORDS—written by imprisoned matyr [sic] David Lane www.14words.com.

In response to this evidence, the majority makes four arguments in concluding that the evidence was legally insufficient to prove a tendency to discredit.

First, the majority argues that "the racist views propounded on the Internet by a single person purporting to be a paratrooper" would not be viewed as an expression of Army policy. There are three problems with this argument. First, Appellant did not "purport" to be an Army paratrooper; he was an Army paratrooper. Second, service discredit is not hinged to service policy. To the contrary, service discredit is likely to occur precisely because the conduct in question does not reflect service policy or values. This Court, for example, has consistently upheld convictions under the second clause of Article 134, UCMJ,2 for viewing child pornography; we have done so because servicemembers discredit the armed forces when they view pornography, not because the public or the courts might believe the viewing of child pornography is military policy. Third, even when conduct is contrary to express military policy, a failure to punish such conduct may nonetheless suggest or reflect the public military tolerance for the conduct in question.

Second, the majority argues that "no evidence was produced that the profiles were directed at other members of the military." *Wilcox*, **66 M.J.** at 451. This might be relevant if Appellant had been charged alone with conduct of a nature to prejudice good order and discipline, but he was charged in the alternative with conduct that had a

tendency *454 to discredit the armed forces. It has long been the case in military law that the discrediting nature of conduct alleged under Article 134(2), UCMJ, is assessed from the perspective of the public. *United States v. Thompson*, 3 C.M.A. 620, 623, 14 C.M.R. 38, 41 (1954).

Here, I agree with the majority's facts, but not its conclusion. The legal analysis correctly focuses on the profiles, because the Government did not offer evidence that Appellant sought to proselytize racism within his unit, or otherwise take steps that would constitute threats to good order or discipline. Indeed, as the majority points out, the defense presented evidence to the contrary. In *United States v. Gray*, 20 C.M.A. 63, 68, 42 C.M.R. 255, 260 (1970), the Court concluded "the evidence must establish 'reasonably direct and palpable' prejudice to good order and discipline," but the first half of this conclusion gives the reason: "Since the statement was published on a military reservation and only military persons were involved." The inverse is true here. The evidence—the profiles—indicates that Appellant's efforts were directed outward to the public on the Internet.

Third, the majority argues that "no evidence was produced that ... any military member other than the investigators stumbled upon them or was likely to do so." *Wilcox*, **66 M.J.** at 451. As noted above, with respect to the issue of discredit, the relevant audience is not the military, but the public at large. Here, the investigator testified that the profiles were available to AOL account holders. Moreover, the critical test is not whether Appellant caused discredit, but whether his conduct had a tendency to do so. *United States v. Saunders*, 59 **M.J.** 1, 11 (C.A.A.F.2003) ("The test of service discredit is whether Appellant's acts had a 'tendency to bring the service into disrepute[.]' ") (citation omitted). Thus, while it is hard to argue that something could have a tendency to cause discredit if it is impossible for others to become aware of the conduct, it is not a requirement that the Government prove actual awareness on the part of the public.

Fourth, the majority argues, "[n]or did the Government provide any evidence that either servicemembers or members of the general public would even understand the source of the quoted '14 Words' or other language." *Wilcox*, **66 M.J.** at 451. I think the words speak for themselves: "We must secure the existence of our people, and a future for white children"; "I am a Pro–White activist"; and "W/boy seeks White female."

Putting aside the plain meaning of the words, the majority's position ignores the rationale for the standard set forth in *Jackson* which "gives full play to the

U.S. v. Wilcox, 66 M.J. 442 (2008)

responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." 443 U.S. at 319, 99 S.Ct. 2781. The question presented is whether a rational trier of fact might reasonably infer or conclude that the words were racist, extremist, and service discrediting.

Any rational trier of fact as well as the general public would understand that these are racist words.3 But if there was any confusion regarding the racist nature of these words, Appellant's profile entry for "ethnicity" might help out: "White (propper [sic] historical name is 'Aryan')." This same trier of fact might then reasonably infer that these racist words uttered in the form of a personal quote from an "Army Paratrooper" might have a tendency to discredit the Army.

Finally, in *United States v. Guerrero*, 33 **M.J.** 295 (C.M.A.1991), a cross-dressing case, this Court concluded "it is not the [conduct] *per se* which gives rise to the offense. Rather, it is (1) the time, (2) the place, (3) the circumstances, and (4) the purpose for the [conduct], all together, which form the basis for determining if the conduct is 'to the **\*455** prejudice of good order and discipline ... or was of a nature to bring discredit upon the armed forces.' " *Id.* at 298 (citation omitted). Therefore, the "circumstances" of the posting of Appellant's AOL profile, including the e-mail conversations between Appellant and Investigator Sturm are relevant on the question of legal sufficiency.

One of Appellant's purposes for posting the profile was to attract like-minded individuals to whom he could espouse his white supremacist views and to whom he could deliver propaganda devoted to these views. He sought to facilitate this endeavor by holding himself out as a member of the armed forces, an "Army Paratrooper." The investigator's testimony is rife with Appellant's expression of his views, and some illustrations follow:

Q: Did [the accused] mention anything about racial views?

A: ... He says, [reading from an e-mail] "Be cautious, they're openly [atheist], but WAR's [White Aryan Resistance] racial views are solid...."

....

Q: ... What, if anything, did you find out about the possible identity of Wskullhead ...?

A: He identifies himself as PFC **Wilcox** and gives me his unit and his address.

....

Q: Okay; and, what books does he recommend to you?

A: The *AST Bible*.

Q: What is that?

A: ... "It is a Jew free bible translated from the Greek that Christ spoke (sic). It shows the bible was a pro-white religious writing and for God's true covenant people."

During a later colloquy between the trial counsel and the investigator, the witness describes how Appellant recommended she read a book entitled *Vigilante [ ]s of Christendom*:

Q: Does he ... talk about the action that the people took that are depicted in the book?

A: ... Yes. He states that they went out—"They didn't ask for government permission or their neighbors' approval, they just did it...."

Q: And he was referring to a killing of a race-mixed couple?

A: Yes, Ma'am.

While Appellant no longer faces charges related to these e-mail discussions, the testimony remains part of the record for sufficiency purposes and is relevant on the issue of the discrediting nature of the profile.

In summary, the military judge had before him abundant evidence to find specific conduct under circumstances having a tendency to discredit the armed forces or from which he could reasonably infer that such conduct had a tendency to discredit the armed forces.4

## THE CONSTITUTIONAL QUESTION

Having concluded that the evidence is legally sufficient, the question becomes whether Appellant's words might otherwise fall within a zone of protection as a constitutional exercise in free speech. This is a closer question than that presented on legal sufficiency.

At the start, it is critical to focus on the speech in question, as opposed to the figurative slippery slope. The question is:

Does the right to free speech enshrined in the First Amendment extend to a soldier who makes racist, service

discrediting statements in a public manner while holding himself out as a member of the armed forces?

The question is *not*:

Does a soldier have a constitutional right to make racist, unpopular, or distasteful *456 statements in private to his comrades, or when not in uniform or otherwise holding himself out as a member of the armed forces?

This is a complicated question, in part because it is a novel question. "[T]he 'search for the outer limits [of the First Amendment right]' has, in the main, been restricted to the civilian and not to the military community and, even then, as we have said, the right is not to be exercised totally unrestricted." *United States v. Howe*, 17 C.M.A. 165, 177, 37 C.M.R. 429, 441, (1967) (citation omitted), *abrogated on other grounds by United States v. Frelix-Vann*, 55 **M.J.** 329, 332 (C.A.A.F.2001).

This Court has not had occasion to address a First Amendment challenge to the application of an Article 134(2), UCMJ, specification. The Court has addressed conduct unbecoming an officer and a gentleman under Article 133, UCMJ, 10 U.S.C. § 933, where a commissioned officer joined a public protest of the Vietnam conflict in civilian attire, carried a placard calling the President a fascist, and was recognized as an officer. *See Howe*, 17 C.M.A. at 167-70, 37 C.M.R. at 431-34.

The Court has also addressed Article 134, UCMJ, in the First Amendment context in "good order and discipline" cases; however, these cases are distinct from those involving service discrediting conduct in at least two ways. First, as a factual matter, the governmental interests at stake are necessarily more granular. That is to say, speech tending to prejudice good order and discipline is more easily identified because it will generally come in the form of words tending to incite riot or mutiny. Second, and more importantly, as a matter of law, speech charged as an offense prejudicial to good order and discipline under Article 134(1), UCMJ, leads logically, if not inexorably, toward the application of the clear and present danger-incitement test. For our Court, this test is drawn from *United States v. Priest*, 21 C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972), which, of course, is drawn from the civilian test for incitement in *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). In both cases the critical question concerns the proximity of a potential immediate and concrete harm:

The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.

*Priest*, 21 C.M.A. at 570, 45 C.M.R. at 345 (citing *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919)).

Further, the case law is susceptible to multiple interpretations and applications. In *United States v. Brown*, 45 **M.J.** 389, 396 (C.A.A.F.1996) (citation omitted), a legitimate interest standard was applied, "Courts will 'not overturn a conviction unless it is clearly apparent that, in the face of a First Amendment claim, the military lacks a legitimate interest in proscribing the defendant's conduct.' " However, in my view, the *Brown* legitimate interest test does not adequately protect the liberty interests involved, for virtually anything might be viewed as a "legitimate interest" when national security is invoked. *Howe* is more analogous to the present case because it involved speech without apparent incitement. However, the Court in the end treated the case under the good order and discipline rubric, focusing on the more immediate of the two charges, that of contemptuous conduct under Article 88, UCMJ, 10 U.S.C. § 880 (2000). The Court concluded that the evil Congress sought to avoid is "the impairment of discipline and the promotion of insubordination by an officer of the military service in using contemptuous words toward the [Commander-in-Chief]." *Howe*, 17 C.M.A. at 173, 37 C.M.R. at 437. "That Article 133 affronts no constitutional concept has seemingly never been in doubt .... The right to free expression is not here curtailed.... In truth, Article 133 concerns only the abuse of that right." *Id.* at 176, 37 C.M.R. at 440 (citation omitted).

In short, this Court's case law does not answer the question as to what constitutional test applies to service discrediting speech *457 prosecuted under Article 134(2), UCMJ. What test should apply?

There are at least five buoys that might help to mark the constitutional channel through the otherwise perilous shoal that skirts the boundary between free speech and national security.

First, there is the text of the amendment itself. "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Free speech is a hallmark of democracy, especially and in particular where that speech

000069

is distasteful. A society that tolerates such speech is a strong society. It is a society that recognizes that the answer to a bad idea is a better idea.5 In a democracy, a better idea is communicated through the exercise of free speech. That is but one reason why we cannot have democracy without free speech. Moreover, citizens cannot effectively safeguard their liberty and their security if they are not free to test, challenge, and question their government.

Second, the exercise of speech is free, but it is not unlimited. The Supreme Court in *Brandenburg* makes this clear, distinguishing between protected speech and speech that might nonetheless create an imminent condition of panic, alarm, or violence:

> [T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.

*Brandenburg*, 395 U.S. at 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (citing *Dennis v. United States*, 341 U.S. 494 (1951); *Yates v. United States*, 354 U.S. 298, 320–24, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957)).

Similarly, for example, one is not free to threaten the President in speech or conduct. *United States v. Ogren*, 54 **M.J.** 481, 482 (C.A.A.F.2001). In the military, as well, a servicemember may be prosecuted for using contemptuous words against the Commander–in–Chief, whether or not those words would be considered "free speech" in civilian society. Article 88, UCMJ; Article 133, UCMJ; *Howe*, 17 C.M.A. at 178, 37 C.M.R. at **442**.

Third, the Supreme Court distinguishes between the content of speech and the time, place, and manner of speech; the Court is more permissive with respect to limitations on the time, place, and manner of speech. *See generally Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). It affords more protection to the content of speech, even if the content restriction applies only within a particular time, place, or manner. *See Boos v. Barry*, 485 U.S. 312, 319–20, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). More generally, and here is the critical point, as this distinction illustrates, the Court applies different First Amendment tests in different contexts. It is not a one-shoe fits-all approach. In *Goldman v. Weinberger*, 475 U.S.

503, 509, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), *superseded by statute on other grounds*, Religious Apparel Amendment, Pub.L. No. 100–180, § 508(a)(2), 101 Stat. 1086 (1987), *as recognized in Cutter v. Wilkinson*, 544 U.S. 709, 722, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), for example, the appellant—an Air Force officer—argued that a regulation restricting his First Amendment right to wear a yarmulke in uniform was unconstitutional "unless the accoutrements create a 'clear danger' of undermining discipline and esprit de corps." However, the Court declined to apply the clear danger test, stating instead, "we hold that those portions of the regulations challenged here reasonably and evenhandedly regulate dress in the interest of the military's perceived need for uniformity." *Id.* at 510, 106 S.Ct. 1310. In *Boos*, a case involving restrictions on the right to protest outside embassies, the Court \*458 applied a strict scrutiny-compelling interest analysis. 485 U.S. at 321, 108 S.Ct. 1157.6

In the context of this Court, it happens that one shoe has generally fit all, because our Article 134, UCMJ, cases have all been disorder cases, involving the risk if not the reality of incitement to disorder or threats to military discipline. Thus, we have not been compelled to explore the potential application of other tests in different factual contexts.

Fourth, the Constitution applies to members of the armed forces except in cases where the express terms of the Constitution make such application inapposite. *United States v. Marcum*, 60 **M.J.** 198, 205 (C.A.A.F.2004). It is axiomatic that those who do so much to defend the Constitution as citizen-soldiers should also receive its benefits. Indeed, it is for the courts to ensure that this principle is not just a truism or slogan, but a meaningful reality. Moreover, the exercise of free speech can directly benefit good order and discipline, providing an important outlet for soldiers to vent and blow steam while operating in difficult circumstances.

Fifth, the Constitution and its safeguards—in particular those contained in the Bill of Rights—may apply differently in the military context. This is evident in the case of the Fourth Amendment, where determinations as to what is reasonable may well differ between the civilian home and the military barracks. It is also evident with respect to the First Amendment, where the Supreme Court has expressly stated:

> While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.

*Parker v. Levy,* 417 U.S. 733, 758, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). As stated in *Priest,* the question becomes one of balance, "[T]he proper balance must be struck between the essential needs of the armed services and the right to speak out as a free American." 21 C.M.A. at 570, 45 C.M.R. at 344. Or, as stated by Chief Judge Learned Hand, " 'In each case (courts) must ask whether the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.' " *Id.* (quoting *Dennis v. United States,* 341 U.S. 494, 510, 71 S.Ct. 857, 95 L.Ed. 1137 (1951)).

Based on the foregoing, I reach the following legal conclusions. First, as the Supreme Court has made clear, different tests may pertain in different factual contexts. This seems especially apparent in the military context. The clear and present danger-incitement test is unworkable in the context of a service discrediting case involving speech. The test does not fit the context presented, neither in terms of describing the governmental and national interests that may be at stake, nor the interest of the servicemembers involved. In addition, the breathless urgency of "clear and present danger" does not fit as a threshold for the more indirect consequences of service discrediting conduct. Whereas threats to good order and discipline can be measured in proximity and scope, if the test is applied in good faith, it is not clear how matters of discredit alone might ever pass constitutional muster. Indeed, to the extent this Court regards the incitement test as the appropriate test for all Article 134, UCMJ, speech cases, it would seem that it is effectively determining that Article 134(2), **459 UCMJ, is generally unconstitutional if applied to exercises in speech.

Second, the most analogous civilian test to the service discrediting context is that pertaining to content-based restrictions—here the content restriction is on service discrediting speech. In the civilian context, content-based restrictions on speech are subject to exacting review in the form of the strict scrutiny test. *Boos,* 485 U.S. at 321, 108 S.Ct. 1157. Strict scrutiny requires the state to show that the " 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.' " *Id.* at 321–22, 108 S.Ct. 1157 (citing *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948; *Board of Airport Comm'rs of Los Angeles v. Jews for Jesus,* 482 U.S. 569, 572–73,

107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)).

Third, as in other contexts, the test must be applied in the military context, balancing "between the essential needs of the armed services and the right to speak out as a free American." *Priest,* 21 C.M.A. at 570, 45 C.M.R. at 344. Here, the distinction between service discrediting conduct and incitement to disorder may make a difference in outcome, not by application of the clear and present danger test, but because the discredit caused may be so diffuse or tangential to the government's interests as to be outweighed by a servicemember's interest in speech.

### *As Applied in This Case*

Applying strict scrutiny analysis to the case at hand, two questions arise. First, what are the Government's compelling interests in regulating Appellant's speech through criminal sanction? Second, is the restriction narrowly tailored to achieve those compelling interests?

### A. *The Compelling Interests*

There are at least three national interests that are at stake in the present case.

First, the Government has a compelling interest in preventing the advent and spread of hate groups within the armed forces. It is well established that the Internet is used as a recruiting mechanism for extremist groups, including racist groups.[7] As a result, it would seem beyond doubt that the Government would have a compelling interest in ensuring that the Army is not a breeding ground for extremist recruitment and potential breeding ground for acts of extremist violence.[8] The Government has a parallel interest in ensuring the Internet is not used by members of the armed forces to self-select for such recruitment or to foster such recruitment. Of course, that is exactly what Appellant was seeking to do in his communications with Investigator Sturm.

Second, the Government has a compelling interest in fostering the perception (and the fact) that the military is race-neutral, politics-neutral,[9] and disciplined. One difference **460 between a member of the public and a member of the military is that the state gives a member of the military permissive sanction to use force in the name of the state. Part of the understanding that comes with that permit is the expectation and responsibility that the threat of state-sanctioned violence will not be wielded for

U.S. v. Wilcox, 66 M.J. 442 (2008)

unlawful purposes. If civil society perceives the military as racist, or its members as racist, civilians will be less willing to tolerate and support the performance of essential military missions at home. These might include the provision of security at special events, homeland defense, and search, rescue, and security missions in the face of natural and man-made disasters beyond the capacity of local responders.10 A military force that is perceived to be racist or undisciplined will be less effective in this myriad of civilian contexts in which they might be deployed at home. They may be neither trusted nor welcomed.11 At which point, they may not be effective.

Third, the Government has a compelling interest, especially during time of conflict, in recruiting and sustaining an all-volunteer force of sufficient strength and quality to provide for the nation's security and to sustain that security over time. As is well documented in the print media, meeting recruiting goals is an annual challenge.12 Where members of the military bring discredit to the armed forces, including, and perhaps in particular, through the advocacy of racist views, the Government will have a more difficult time meeting its recruiting needs. What parents would want their daughter or son to serve in a unit they thought might be infected with white supremacists and closet skinheads? What soldier (other than a white supremacist) would want to have "Wskullhead" on his right or his left in combat? As this Court previously stated in Howe, " 'The Federal Government may punish utterances which obstruct its recruiting or enlistment service....' " Howe, 17 C.M.A. at 173, 37 C.M.R. at 437 (quoting Legislative Reference Service, Library of Congress, Constitution of the United States of America, Revised and Annotated, 1963 895 (Edward S. Corwin, Norman J. Small, & Lester S. Jayson eds., U.S. Government Printing Office 1964)).

Thus, it is evident that public support, recruiting, and the deterrence of extremist groups represent compelling governmental interests. However, a further constitutional *461 question remains. When balanced against Appellant's free speech interests, is the impact of Appellant's words too tangential in potential effect to warrant criminal sanction? This depends in part on whether the Article 134(2), UCMJ, sanction is narrowly tailored to protect the compelling interests at stake.

**B. Article 134(2), UCMJ, is Narrowly Tailored**

If the government's interests, meaning here the Nation's interests, are sufficiently compelling to regulate hate speech, the question becomes is Article 134(2), UCMJ, narrowly tailored to achieve those interests? Applying the

framework presented above, there are three potential limits on the reach of the discrediting service clause into the realm of protected First Amendment speech.

First, the Government has not sought to proscribe Appellant's free speech generally. It has sought to proscribe his speech while in uniform, which is to say: (1) while he is identifying himself or otherwise holding himself out as an Army paratrooper, and (2) doing so in a public forum. Moreover, it is not Appellant's distasteful words that are the source of sanction; it is the discrediting nature of those words in the context of the Government's compelling interests. Merely distasteful words would not have the same effect on the Government's interests. Nor would the failure by the Army to penalize merely distasteful words have the same effect on the military institution in public esteem.

Second, as noted above, the legal test in the military context involves two steps. The Government must have a compelling interest(s) to protect and the Article 134(2), UCMJ, sanction must be narrowly tailored in application to protect that compelling interest(s). Then, in accordance with Priest, military judges and this Court must balance that interest against the servicemember's speech interest in the context presented. Given the potential for a broad and uncertain application of the General Article, this balancing remains an essential additional safeguard on the protection of appropriate military speech.

Finally, Article 134(2), UCMJ, like Article 133, UCMJ, does not operate in a constitutional vacuum. To the contrary, military custom and practice as interpreted by this Court inform and delimit the potential reach of Article 134(2), UCMJ. Parker, 417 U.S. at 752–53, 94 S.Ct. 2547. As the Supreme Court noted in Parker with respect to Article 133, UCMJ, citing to history and tradition:

The Court of Military Appeals has likewise limited the scope of Art. 133. Quoting from W. Winthrop, Military Law and Precedents 711–712 (2d ed.1920), that court has stated:

" ' "... To constitute therefore the conduct here denounced, the act which forms the basis of the charge must have a double significance and effect. Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents." ' "

Id. at 753–54, 94 S.Ct. 2547 (quoting Howe, 17 C.M.A. at

000072

U.S. v. Wilcox, 66 M.J. 442 (2008)

177–78, 37 C.M.R. at 441–42).

For these reasons, I would find that the Government's interests are compelling in this case. Of course, here, part of the problem in applying a First Amendment test to Appellant's words is that it is hard to imagine that anything so absurd could present anything but a tangential threat to a compelling governmental interest. But, if Appellant's speech contained on his profiles is protected speech, it is not hard to imagine the cascading effect on the military institution of additional members of the military took up this perceived mantle of free speech.

I would further conclude that Article 134(2), UCMJ, as applied in this case, is narrowly tailored to protect those compelling interests, provided the Article is limited in application to Appellant's profiles. These profiles were public, racist, and identified Appellant as an Army paratrooper. Appellant also relied on his military identity to *462 advertise and advance his racist message and agenda.13

The fact that Appellant's words appeared on the Internet on a profile does not transform this case from one of public conduct to one of private conduct. The Internet profile is the modern equivalent of standing on a street corner in uniform with a sign saying "I'm in the Army and I am a racist and Aryan extremist." This may not be a busy corner—we should hope that it is not—but it is a public corner nonetheless. Indeed, where the Internet is concerned, the impact of the metaphorical back alley protest may be magnified in time and distance in a manner distinct from that taking place in an actual back road or alley. Persons from all over the world may see it, and at a time when the street protester in uniform has long ago put the placard away, the racist message on the Internet lingers.

As one professional military observer noted:

> We cannot put the Internet genie back in the bottle. The World Wide Web is pervasive, unregulated, and a powerful molder of opinion. The average lance corporal ... today does not remember a time when there was no Internet, no camera cell phone, and no text messaging. In that context he/she is a "digital native." This means of communication is as natural to him/her as a letter home was to ... previous generations. The status symbol today for the "wired generation" is how many friends you have on your MySpace or Facebook page. The difficult task for leaders ... is to convince them that once they put on the [uniform] everyone who sees them, even if it is through social media, sees them as representatives of the United States [military].14

We cannot put the Internet genie back in the bottle. Nor should we hope or wish to. The genie is a source of morale in the field. It is a means of familial communication. And, it is a ubiquitous instrument that allows each bad idea to be met by a better idea. What we can do is ensure that it is not used to discredit the armed forces and undermine compelling national interests. This is done through education, appropriate and lawful regulation, and where necessary, criminal sanction; and, where speech is involved, through application of an exacting constitutional review.

Footnotes

1   The granted issue was:

WHETHER THE EVIDENCE WAS LEGALLY SUFFICIENT TO SUPPORT A DETERMINATION THAT APPELLANT'S STATEMENTS TO AN UNDERCOVER [CID] AGENT ON THE INTERNET WERE EITHER DETRIMENTAL TO GOOD ORDER AND DISCIPLINE OR OF A NATURE TO BRING DISCREDIT UPON THE ARMED FORCES WHEN THE MILITARY NEXUS REFLECTED IN THE RECORD CONSISTED OF APPELLANT'S REFERENCE TO BEING A "US ARMY PARATROOPER," AND HIS STATEMENTS RAISE A SIGNIFICANT ISSUE UNDER THE FIRST AMENDMENT.

65 **M.J.** 335 (C.A.A.F.2007).

2   We heard oral argument in this case at Malmstrom Air Force Base, Montana, as part of the Court's "Project Outreach." *See United States v. Mahoney*, 58 **M.J.** 346, 347 n. 1 (C.A.A.F.2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

3   In addition, the Supreme Court and this Court have made it clear that additional burdens may be placed on First Amendment rights in the context of the military, given the different character of the military community and mission. *Parker*, 417 U.S. at 758, 94 S.Ct. 2547; *Priest*, 21 C.M.A. at 570–72, 45 C.M.A. at 344–46; *Gray*, 20 C.M.A. 63, 42 C.M.R. 255. Thus, no one questions that deference must be given to military authorities' determination that military needs justify particular restrictions on the First Amendment, and that military commanders may enact regulations and take administrative actions that place burdens on, or exact administrative consequences for, speech, expression, and the exercise of religion that would not pass constitutional muster in the

000073

civilian context. *See, e.g., Goldman v. Weinberger,* 475 U.S. 503, 510, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (holding that a letter of reprimand issued for failure to obey a lawful order forbidding the wearing of a yarmulke while in uniform did not violate the First Amendment based on deference to military authorities' determination of military need for uniformity); *Brown v. Glines,* 444 U.S. 348, 354–58, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (holding that an Air Force regulation prohibiting distribution of petitions on base without permission did not violate the First Amendment). The instant case involves criminal liability rather than administrative action, however, and the Government has not argued that any regulation prohibits the particular speech at issue in the single specification under Article 134, UCMJ, before us. Rather, Appellant was found not guilty of violating the very regulation enacted to prohibit extremist activity.

4     *See Miller v. California,* 413 U.S. 15, 18 n. 2, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (noting that the dictionary definition of "obscene" includes those things which are " 'grossly repugnant to the generally accepted notions of what is appropriate' " or " 'offensive or revolting as countering or violating some ideal or principle' ") (citation omitted).

5     We note that the prosecution elected not to charge Appellant with the specifically detailed offense of "Disloyal Statements" as articulated in the *MCM* pt. IV, para. 72. The disloyal statements offense specifically requires the government to prove "[t]hat the statement was made with the intent to promote disloyalty or disaffection toward the United States by any member of the armed forces or to interfere with or impair the loyalty to the United States or good order and discipline of any member of the armed forces ...." *MCM* pt. IV, para. 72.b.(4). As the President has specifically stated elements of an Article 134, UCMJ, offense relating to disloyal statements, we cannot consider "disloyal statements" as a general Article 134, UCMJ, offense without the Government pleading and proving those elements. *Cf. United States v. Harvey,* 19 C.M.A. 539, 541, 42 C.M.R. 141, 143 (1970) (noting that "[t]he preemption doctrine prohibits the armed services from eliminating one or more vital elements of a particular offense in order to charge the remaining elements as conduct to the prejudice of good order and discipline").

6     Members of the public are not generally able to view e-mails and instant messenger conversations between individuals, and there is no evidence in the record to suggest that the e-mails and conversations between Appellant and Sturm either were or could be accessed by the public.

7     For example, if the Government had introduced evidence focused on the service discrediting nature of the conduct, such as the extra-record material described by the dissent, *see* **66 M.J.** at 459–61 (Baker, J., dissenting), this would be a very different case.

1     Lane, a founder of the white supremacist organization, The Order, died in prison while serving a life sentence for, among other things, the 1984 murder of radio talk show host Alan Berg. Anti–Defamation League, David Lane, White Supremacist Terrorist Ideologue, Dies in Prison, http://www.adl.org/main_Extremism/david_lane_dies.htm.

2     Hereinafter referred to as Article 134(2), UCMJ.

3     As an aside, I also believe that most military judges would have a common understanding, after the Alfred P. Murrah Federal Building bombing—commonly referred to as the Oklahoma City Bombing—and the spate of domestic terrorism by white supremacists in the 1990s, of who David Lane was and what he and his "14 Words" stood for. But that is not the basis on which I would find legal sufficiency. In my view, any rational trier of fact would understand these profiles as racist. The words speak for themselves.

4     The majority asserts that the dissent's discredit analysis is based on extra-record material and concludes that "this would be a very different case" were this material part of the record. However, the material that demonstrates discredit is part of the record. The profiles were admitted into evidence and are part of the record, as is testimony regarding their public availability, as well, of course, as any reasonable inferences drawn from both sets of evidentiary facts.

5     Alfred Whitney Griswold, historian and president of Yale University, 1950–1963, in *Essays on Education* (1954), and quoted in N.Y. Times, Feb. 25, 1959, said "Books won't stay banned. They won't burn. Ideas won't go to jail. In the long run of history, the censor and the inquisitor have always lost. The only sure weapon against bad ideas is better ideas. The source of better ideas is wisdom. The surest path to wisdom is a liberal education."

6     Also, it is interesting to note that the Supreme Court has applied varied tests in the context of First Amendment challenges to regulations intended to preserve order through the regulation of speech. *See, e.g., Cutter,* 544 U.S. at 723 n. 11, 125 S.Ct. 2113 (discussing standard contained in the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) to penal context, "Courts ... may be expected to recognize the government's countervailing compelling interest in not facilitating inflammatory racist activity that could imperil prison security and order"); *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), *superseded by statute on other grounds,* Religious Freedom Restoration Act of 1993, Pub.L. No. 103–141, § 2, 107 Stat. 1488, *as recognized in Jolly v. Coughlin,* 76 F.3d 468 (2d Cir.1996) (applying rational basis test).

000074

7    *See, e.g.,* Staff of the S. Comm. on Homeland Security and Governmental Affairs, 110th Cong., Violent Islamist Extremism, the Internet, and the Homegrown Terrorist Threat (Comm. Print 2008); Stephan Talty, *The Method of a Neo–Nazi Mogul,* N.Y. Times, Feb. 25, 1996 (Magazine); *Hate on the Internet: Before the S. Comm. on the Judiciary,* 106th Cong. (1999) (statement of the Anti–Defamation League on hate on the Internet), *available at* http://judiciary.senate.gov/oldsite/91499ad.htm; Beverly Ray & George E. Marsh II, *Recruitment by Extremist Groups on the Internet,* First Monday (2001) (unpaginated), *available at* http://www. firstmonday.org/issues/issue6_2/ray/index.html; David Capitanchik & Michael Whine, Institute for Jewish Policy Research, *The Governance of Cyberspace: Racism on the Internet,* Policy Paper No. 2 (1996), *available at* http://www.jpr.org.uk/Reports/CS_Reports/PP_2_1996/main.htm.

8    *See* John Kifner, *Hate Groups Are Infiltrating the Military, Group Asserts,* N.Y. Times, July 7, 2006. The United States Department of Defense reported that in a survey of 17,080 Army personnel, 3.5 percent were "approached to join extremist organizations since joining the Army." News Release, Dep't of Defense, Assistant Secretary (Public Affairs), Army Task Force Report on Extremist Activity (Mar. 21, 1996).

9    As a result, restrictions on political speech in the military and in the national security context are permitted that would not be permitted in other contexts. *See* 18 U.S.C. § 61h (upheld in *United Public Workers of America (C.I.O.) v. Mitchell,* 330 U.S. 75, 93, 67 S.Ct. 556, 91 L.Ed. 754 (1947)); *United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 556, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). Although the Hatch Act was later modified to allow increased political participation on behalf of regular government employees, this amendment does not apply to servicemembers. 5 U.S.C. §§ 7321, 7322; Hatch Act Reform Amendments of 1993, Pub.L. No. 103–94 § 2(a), 107 Stat. 1001 (1993).

10   *See* Office of Homeland Security, *The National Strategy for Homeland Security* (Oct.2007).

11   President Eisenhower deployed the 101st Airborne to Little Rock, Arkansas, to help integrate the public schools following *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). NAACP Legal Defense and Educational Fund, Inc., The Little Rock Nine 50th Anniversary: A page from LDF History (2007), http://www.naacpldf. org/content.aspx?article=1209 (last visited July 14, 2008). Over 75,000 service personnel were deployed to New Orleans and the Gulf Coast following Hurricane Katrina, including for the purpose of civil law enforcement on the streets of New Orleans. Pam Zubeck, *NorthCom Official Lists Katrina Lessons,* Colo. Springs Gazette, Oct. 22, 2005. For other examples involving the deployment of the armed forces in the domestic civil context, *see* Center for Law and Military Operations (CLAMO), *Domestic Operational Law (DOPLAW) Handbook for Judge Advocates* 55 (2001); *see also* Dep't of Homeland Security, *The National Response Framework* (Mar. 22, 2008).

12   Consider the 2008 observation of the commanding general of the United States Army Training and Doctrine Command, General William S. Wallace:
     Many young Americans are willing to serve, but too little is made of the declining number of young people who are qualified to serve. This is the real story and it's a shocking one. Only 28 percent of the 17– to 24–year–old population qualifies to wear a military uniform. The other 72 percent fail to meet minimum standards on education, character and health. Of those eligible to serve, many choose not to for a variety of reasons.
     Gen. William S. Wallace, Editorial, *Army General Admits U.S. Lacks Qualified New Recruits,* Charlotte Observer (North Carolina), June 16, 2008, *available at* http://www.veteransforcommonsense.org/index. cfm/Page/Article/ID/10393.

13   By point of constitutional comparison, I would reach a different result with respect to those portions of the charge that related to Appellant's e-mail exchanges with Investigator Sturm posing as "Country Bumpkin," a feigned fellow traveler on the path of racist extremism, if these e-mails were still in legal play. While the e-mails were entered into evidence and may serve to inform judgments about the meaning and intent of the AOL profiles, they cannot serve as independent basis for an Article 134(2), UCMJ, conviction. Distasteful as their content may be, the messages do not cross the line into incitement, conspiracy, or attempt. Nor are they service discrediting. These e-mails were private communications between two apparently like-minded individuals, engaged in conversation.

14   John Keenan, Editorial, *The Image of Marines,* Marine Corps Gazette, May 2008, at 3.

**End of Document**                    © 2012 Thomson Reuters. No claim to original U.S. Government Works.

# GE-3H



**UNITED STATES MARINE CORPS**
WEAPONS AND FIELD TRAINING BATTALION
MARINE CORPS RECRUIT DEPOT SAN DIEGO
EDSON RANGE, BOX 555181
CAMP PENDLETON, CALIFORNIA 92055-5181

IN REPLY REFER TO:
1900
S-1
31 Mar 12

FIRST ENDORSEMENT on Defense Counsel ltrs of 27 Mar 12 and 31
                    Mar 12

From:  Convening Authority
To:    Detailed Defense Counsel

Subj:  REQUESTS TO WITHDRAW

Ref:   (a) MCO 1900.16F (MARCORSEPMAN)

1.  Pursuant to the reference, your multiple requests for withdrawal
of the adminstrative separation proceedings in this matter, or,
alternatively, continuance of the subject administrative separation
board are denied. The board for Sgt Stein will proceed on 5 April 2012
as scheduled.

C. S. DOWLING

GE-3I



P.O. Box 87131
San Diego, CA 92138-7131
T/ 619-232-2121
F/ 619-232-0036
e-mail: info@aclusandiego.org

March 30, 2012

Col. C. S. Dowling, USMC
Commanding Officer, Weapons and Field Training Battalion
Marine Corps Recruit Depot
San Diego, CA 92140

Lt. Col. Sean M. Sullivan, USMCR
Staff Judge Advocate, MCRD
3700 Chosin Ave., Building 12
San Diego, CA 92140

Capt. John W. Torresala, USMCR
Assistant Staff Judge Advocate, MCRD
3700 Chosin Ave., Building 12
San Diego, CA 92140

   Re: AdSep Hearing, Sergeant Gary A. Stein

Dear Sirs:

I understand Colonel Dowling issued a Notification of Administrative Separation Proceedings to Sergeant Stein on March 21, 2012 and initially scheduled the hearing for March 31 and that the hearing has now been postponed only 5 days, to April 5.

The alleged grounds for separation appear to be based solely on Sergeant Stein's speech on matters of public concern. The Notice therefore raises serious First Amendment issues, including but not limited to the constitutionality of DOD Directive 1344.10 as applied to Sergeant Stein's speech. In light of the serious constitutional issues at stake, the ACLU strongly believes that 15 days is far less than sufficient time for Sergeant Stein and his counsel to prepare for the hearing and ensure the board is fully informed of all relevant matters.

Because of the significant First Amendment issues at stake, the ACLU is seriously considering becoming involved in this case. In the meantime, I write to discuss relevant legal principles. Above all else, the First Amendment protects speech that discusses the government's policies and conduct. Speech "on issues of social and political concern ... has been recognized as 'the core of what the First Amendment is designed to protect.'" *United States v. Wilcox*, 66 M.J. 442, 446-47 (C.A.A.F. 2008). As a result,

Case 3:12-cv-00816-H-BGS   Document 23-1   Filed 04/12/12   Page 80 of 125

"members of the military are not excluded from the protection granted by the First Amendment." *Parker v. Levy*, 417 U.S. 733, 758 (1974). As the Army has recognized, "The right to express opinions on matters of public and personal concern is secured to soldier and civilian...." *Committee for GI Rights v. Callaway*, 518 F.2d 466, 470 (D.C. Cir. 1975) (quoting "Guidance on Dissent," AGAM-P, Headquarters, Department of the Army, 23 June 1969).

The First Amendment therefore protects speech in the military unless it "interferes with or prevents the orderly accomplishment of the mission or presents a clear danger to loyalty, discipline, mission, or morale of the troops." *Wilcox*, 66 M.J. at 448. To violate Article 134, the government must show a "direct and palpable connection" between the "statements and the military mission." *Id.* The statements must be taken in their full context. *Id.* at 447.

It is far from certain that Sergeant Stein's speech, which I understand in its full context amounted to a declaration that he would not follow unlawful orders, violated Article 134 as it has been interpreted and limited in light of the First Amendment. Indeed, Article 90 itself requires obedience only to a "lawful command." 10 U.S.C. § 890.

For example, in *Wilcox*, the Court of Appeals for the Armed Forces struck down the Article 134 conviction of a servicemember who posted "an online profile containing ... views in which the author identified himself as a 'US Army Paratrooper'" and expressed racist political views, as well as stating, "This government is not worth supporting in any of its components." 66 M.J. at 445. According to the court, the First Amendment prohibited a conviction based on the message "expressed in his online profiles," without any evidence that "the communications either 'interfere[d] with or prevent[ed] the orderly accomplishment of the mission,' or 'present[ed] a clear danger to loyalty, discipline, mission, or morale of the troops.'" *Id.* at 446, 449.

Moreover, here as in *Wilcox*, "it is pure speculation that the ... views propounded on the Internet by a single person purporting to be a [Marine] either were viewed or would be viewed by other servicemembers or would be perceived by the public or a servicemember as an expression of [Marine Corps] or military policy." *Id.* at 450.

*Wilcox* thus raises substantial questions whether Sergeant Stein's speech is protected by the First Amendment. In light of these concerns, it is respectfully requested that you postpone the hearing for sufficient time to enable counsel to develop these issues for the board's full and informed consideration.

Sincerely,

David Loy
Legal Director

GE-3J



**UNITED STATES MARINE CORPS**
DEFENSE SERVICES ORGANIZATION
MARINE CORPS RECRUIT DEPOT
3700 CHOSIN AVENUE
SAN DIEGO, CALIFORNIA 92140-5197

IN REPLY REFER TO:
5800
9D
30 Mar 2012

From:  Capt N.R. Grey, Counsel for Respondent
To:    Naval Civil Law Support Activity, Code 132
Via:   Civil Law Officer, MCRD San Diego

Subj:  ETHICS ADVISEMENT REQUEST ICO POLITICAL ACTIVITIES OF SGT GARY STEIN, USMC, 0101/6842

1.  I have been assigned as defense counsel to represent eight-year veteran Marine Sgt. Gary A. Stein before an Administrative Separation Board which has been scheduled to convene on 5 April 2012 to hear charges against Sgt. Stein for alleged inappropriate use of a social media website in violation of Department of Defense ("DoD") Directive Number 1344.10.  Based on my examination of that Directive and other guidance, I believe that Sgt. Stein is unable to have fair notice of the charges against him, is unable to defend against those charges, and is unable to receive a fair hearing because the charge is based on an ambiguous and conflicting set of policies which have never been clarified by implementing regulations, as required by DoD Directive 1344.10.5.2.  The ambiguity and confusion in the DoD Directive, which implicates First Amendment rights to speech, press, religion, assembly and petition, could be resolved by the issuance of a Legal Ethics Opinion by your office to ensure that the DoD directive is being interpreted consistent with an injunction against DoD and the United States Navy by the United States District Court for the District of Columbia that was never appealed.  *See Rigdon v. Perry*, 962 F. Supp. 150 (D.D.C. 1997).  Therefore, on behalf of Sgt. Gary Stein, I submit this request for a Legal Ethics Opinion on the following three issues:

**Questions Presented**

2.  **Question One:**  Have the Defense Department's Directive Number 1344.10 and other interpretative documents been modified to fully comply with the Order of United States District Court Judge Stanley Sporkin against the Department of Defense, et al., in *Rigdon v. Perry*, 962 F. Supp. 150, 166 (D.D.C. 1997), "that the defendants' interpretation of DoD Directive 1344.10 and similar regulations as barring the plaintiff chaplains from urging their military congregants to communicate with Congress on passage of the Partial Birth Abortion Ban Act violates the plaintiffs' rights under the First Amendment" and that "the defendants, the defendants' officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with the defendants who receive actual notice of this order are hereby ENJOINED from interpreting DoD Directive 1344.10, or any similar law or regulation, in a manner that prohibits the plaintiffs from exercising their free speech ... rights under the First Amendment of the Constitution...."

Subj:  ETHICS ADVISEMENT REQUEST ICO POLITICAL ACTIVITIES OF SGT GARY STEIN,
       USMC, 0101/6842

3.  **Question Two:**  May an active duty, non-commissioned U.S. Marine
maintaining a Facebook web page bearing a clear disclaimer that all
statements are personal views, not made in an official capacity and not
representing the views of the Marine Corps, make statements thereon
supporting or opposing either (i) a political party or (ii) a candidate for
federal, state or local office or (iii) both?

4.  **Question Three:**  May such a Marine make statements critical of a
candidate for political office when that candidate is also currently serving
in office?  Does a separate rule apply to criticisms of a candidate for
political office serving as President of the United States?

**Ambiguities and Confusion in DOD Directive 1344.10.4**

5.  The restrictions against (a) speaking before a partisan political
gathering, including any gathering that promotes a cause; and (b)
participating in any "discussion" as an advocate for or against a cause
appear to be content- and viewpoint-discriminatory.  See *Rigdon v. Perry*, 962
F. Supp. 150, 164 (D.D.C. 1997).  This is because, while the promotion or
discussion as an advocate of the incumbent president is *permitted*, a member
is *prohibited* from engaging in such speech with regard to opposing the
incumbent as well as supporting the non-incumbent candidate for president.
Likewise, the restrictions prohibit advocacy of causes deemed to be *contrary*
to existing policy, while permitting members to promote or discuss views in
*support* of existing policy.  Thus, speech in support of the incumbent
president, existing legislation, or public policy would comply with these
restrictions.  On the other hand, speech *not* in support of the incumbent
president, existing legislation, or public policy would violate these
restrictions.  Can these restrictions be used to subject a member to punitive
action under the UCMJ or be used to involuntarily separate a member from the
armed forces?

6.  According to DoD Directive 1344.10.4, it is DoD policy "to encourage
members of the Armed Forces ... to carry out the **obligations of citizenship.**"
The obligations of citizenship include the exercise of the voting franchise
and the selection of elected officials to represent the people in our
Constitutional Republic.  To that end, according to sections 4.1.1.1 and
4.1.1.6 of the directive, a service member may express his "personal opinion
on **political candidates** and issues," including writing a "letter to the
editor of a newspaper expressing the member's personal views on public issues
or **political** candidates."  However, he is also told that he may not engage in
any activity that could be construed as **partisan advocacy or endorsement** on
behalf of any specific **political candidate or issue.**  *See* sections 4.1.1.6
and 4.1.2.3.  (Emphasis added.)  The distinction between expressing an
opinion publicly on political candidates, which is permitted, as opposed to
partisan advocacy and endorsements, which is prohibited, is not explained in
such a way as to ensure that the service members would know what they can and
cannot say.  Without providing a careful distinction between expressing one's
opinion and partisan advocacy or endorsement, it appears that the rights of a
service member under this policy depend upon the zeal, or lack thereof, in
the expression of one's opinion, or the subjective opinion of whoever might
be deciding the question.

7.  The DoD Directive encourages a service member "to carry out the
obligations of citizenship," but could be read to imply that he must act

000083

Subj:  ETHICS ADVISEMENT REQUEST ICO POLITICAL ACTIVITIES OF SGT GARY STEIN,
       USMC, 0101/6842

alone, not in cooperation or concert with others.  *See, e.g.,* sections
4.1.1.1, 4.1.1.6, 4.1.1.8, 4.1.2.1, and 4.1.2.3.  Indeed, section 4.1.2.3
prohibits a service member from even "allow[ing]" others to use any
expression of a service member's political opinion to "solicit votes."
Additionally, although section 4.1.1.2 permits a service member to "promote
and encourage others to exercise their voting franchise," could such action
be construed as an impermissible effort to solicit a vote on behalf of the
candidate that he supports and, thus, be in violation of section 4.1.1.3?

8.   The DoD Directive is unclear as to its application to a public figure
wearing two hats as a candidate for election and as an incumbent office
holder. While section 4.1.1.1 states that a service member may express "a
personal opinion on political candidates and issues," how would this
provision be construed if an opinion expressed relates to actions taken by a
candidate for President who happens also to be an incumbent office holder?
Would there be a different rule that applies to an incumbent office holder
who happens to be President of the United States?

9.   DoD Directive 1344.10 at 4.1.2.3 prohibits the publication of "partisan
political articles, letters, or endorsements signed or written by the member
that solicits votes for or against a []cause." Section 4.1.2.5 states that a
member of the Armed Forces shall not "Speak before a partisan political
gathering, including any gathering that promotes a []cause."  Finally,
4.1.2.6 prohibits "Participat[ion] in any radio, television, or other program
or group discussion as an advocate for or against a []cause."  The term
"cause" is used in several other places in DoD Directive 1344.10; however,
the term is nowhere defined.  The term "cause" would seem to be capable of
encompassing all public policy issues, thereby undermining the very duty of
citizenship which is the stated policy objective of the Directive. Examples
include questions of religion, "Don't Ask – Don't Tell," pro-choice vs. pro-
life, gun rights, or virtually any policy issue being widely discussed in the
nation.  In light of the important constitutional guarantees of the freedoms
of speech, press, assembly and petition, it appears that a clearly stated,
working definition of this term would best forward the aims of the directive
rather than the punitive enforcement or administrative discharge proceedings
under Article 134, UCMJ, resulting in involuntary separation.

10.  DoD Directive 1344.10, while specifically designed to "encourage members
of the Armed Forces ... to carry out the obligations of citizenship," fails
to provide for a safe harbor wherein such citizenship would be encouraged.
Instead, it appears that the only procedures are punitive in the nature of
either a threatened court martial or an involuntary separation.  In light of
the important constitutional guarantees of the freedoms of speech, press,
assembly and petition, it appears that procedures that would facilitate
correction, modification and mediation would best forward the aims of the
directive rather than the punitive enforcement or administrative discharge
proceedings under Article 134, UCMJ, resulting in involuntary separation.

11.  DoD Directive 1344.10 at 4.1.1.6 permits a Member to "Write a letter to
the editor of a newspaper expressing the member's personal views on public
issues."  May a soldier state the truism that he would not obey an
unconstitutional or illegal order?

12.  Section 4.1.3 states that "commissioned officers shall not use
contemptuous words," as prohibited by law.  This is consistent with Article

Subj:  ETHICS ADVISEMENT REQUEST ICO POLITICAL ACTIVITIES OF SGT GARY STEIN,
       USMC, 0101/6842

88, UCMJ.  Under the rule of construction *expressio unius est exclusio
alterius,* this Guidance document exempts non-commissioned officers and
enlisted men from this restriction.  Can this section be used as the basis
for the punitive action against an enlisted man?

**Lack of Clarifying Implementing Guidance**

13.  Regulations and procedures are regularly produced by the secretaries of
the various military forces to implement and clarify such directives, but we
have identified only one that appears to be relevant — a Department of the
Navy Guidance for Unofficial Internet Posts and "Social Media Guidance"
released on June 2010 (hereinafter "DON Internet Guidance").  However, even
that Guidance reflects the complexity and ambiguity of DoD Directive
1344.10.5.2 in that it gives persons like Sgt. Stein conflicting signals,
simultaneously advising "You can express your **political** opinion within DoD
guidelines," but then warning "Don't Get **Political**."  (Emphasis added.)  The
DON Unofficial Internet Posts and Social Media Guidance fails to provide the
necessary clarification for what is and what is not permitted.  Instead, it
restates in simple language what is set forth in DOD Directive 1344.10,
bringing no clarification to the ambiguities in that document.

**Conclusion**

14.  The members of the board who have been appointed by the convening
authority to hear the case of Sgt. Stein are not lawyers, or otherwise
legally trained, but they nevertheless will be required to interpret and to
apply the complex and conflicting policy standards which limit First
Amendment rights to free speech, press, religion, assembly and petition
discussed above.  Issuance of a Legal Advisory Opinion would provide those
members with necessary guidance to fulfill their role relating to the
Administrative Discharge hearing.  Clear legal guidance is also needed by
Sgt. Stein well before the hearing so he can know the rules which govern his
behavior, have understanding of the charges against him, and be able to make
a proper defense of his actions.  Further, there is a need for clear guidance
for Members of the Armed Forces as to what they may or may not do, and what
communications and personal expressions are permitted with respect to the new
area of social media.  Such guidance should, of course, be consistent with
established First Amendment law.

N. R. GREY

000085

UNITED STATES MARINE CORPS
OFFICE OF THE STAFF JUDGE ADVOCATE
MARINE CORPS RECRUIT DEPOT/WESTERN RECRUITING REGION
3700 CHOSIN AVENUE
SAN DIEGO, CALIFORNIA 92140-5001

IN REPLY REFER TO:
1900
S-1
2 Apr 12

FIRST ENDORSEMENT on Defense Counsel ltr 5800 9D of 30 Mar 12

From:  Civil Law Officer, MCRD San Diego
To:    Judge Advocate Division, Research and Civil Law Branch
       (JAR)

Subj:  ETHICS ADVISEMENT REQUEST ICO POLITICAL ACTIVITIES OF SGT
       GARY STEIN, USMC, 0101/6842

Ref:   (a) MCO 5800.16A (LEGADMINMAN), Chapter 11

1.  In accordance with the reference, the request is readdressed
and forwarded.

C. P. HUR

000086



**DEPARTMENT OF THE NAVY**
HEADQUARTERS UNITED STATES MARINE CORPS
3000 MARINE CORPS PENTAGON
WASHINGTON, DC 20350-3000

IN REPLY REFER TO:
5800
JAR1
4 April 2012

SECOND ENDORSEMENT on Defense Counsel ltr 5800 9D of 30 Mar 12

From: Judge Advocate Research & Civil Law, Judge Advocate Division
To:   Civil Law Officer, Office of the Staff Judge Advocate, Marine
      Corps Recruit Depot, San Diego

Subj: ETHICS ADVISEMENT REQUEST ICO POLITICAL ACTIVITIES OF SGT GARY
      STEIN, USMC, 0101/5842

Ref:  (b) MCO P1900.16F Ch 2, Marine Corps Separation and Retirement
          Manual
      (c) Mtg OJAG (Code 13) CAPT Horrigan/HQMC (JAR) LtCol Harlow of
          31 Mar 12
      (d) Mtg OJAG (Code 132) LCDR Pohanka/HQMC (JAR) LtCol Harlow of
          3 April 12

1.  Readdressed and returned for action as appropriate by either the Legal
Advisor to the Administrative Separation Board (Board) for matters of law,
procedure, and evidence or the Board members for findings and
recommendations pursuant to their authorities in paragraphs 6315(2)(a) and
6319 of reference (b).

2.  During references (c) and (d), this office met with the Director,
Administrative Law Division, Office of the Judge Advocate General (OJAG
Code 13), and the Branch Head, Standards of Conduct and Government Ethics
Branch within Code 13 (OJAG Code 132).  After review of the subject
request for an ethics opinion, all officers determined that reference (b)
does not authorize higher headquarters to decide upon matters that are
appropriately under the purview of the Board Members or the Board's Legal
Advisor.  This determination was based upon paragraphs 6315(2)(a) and
6315(4) of reference (b), which state that the Board's Legal Advisor, who
is a judge advocate certified by the Judge Advocate General in accordance
with Article 27(b) of the Uniform Code of Military Justice, "shall rule
finally" on all matters of procedure, evidence, and challenges before the
board.

3.  I am the point of contact on this matter.  I may be reached at 703-
693-8164 or john.harlow@usmc.mil.

J. P. HARLOW
Lieutenant Colonel
U.S. Marine Corps

000087

# GE-3K



**UNITED STATES MARINE CORPS**
DEFENSE SERVICES ORGANIZATION
MARINE CORPS RECRUIT DEPOT
3700 CHOSIN AVENUE
SAN DIEGO, CALIFORNIA 92140-5197

IN REPLY REFER TO:
5800
9D
2 April 2012

From: Capt N.R. Grey, Counsel for Respondent
To:   Commanding Officer, Weapons Field Training Battalion
Via:  Staff Judge Advocate, MCRD San Diego

Subj: ADMINISTRATIVE SEPARATION OF SGT GARY STEIN

Ref:  MCO P1900.16F (MARCORSEPMAN)

1.  In order to intelligently exercise prospective challenges in accordance with paragraph 6316.7 of the reference, the Respondent requests the following information:

   a. Was the selection of the members of the board and the legal advisor to the board made by the convening authority or by an individual exercising delegated power?  If delegated, who was the individual(s) who made the selection?

   b. Which potential members were considered for appointment to the board and ultimately rejected?

   c. The President of an administrative separation board convened to hear the case of a sergeant is ordinarily a major.  What selection process led the convening authority to appoint a lieutenant colonel?

   d. The enlisted member of an administrative separation board convened to hear the case of a sergeant is ordinarily a gunnery sergeant or master sergeant.  What selection process led the convening authority to appoint a sergeant major?

   e. The third member of an administrative separation board convened to hear the case of sergeant is ordinarily a company grade commissioned officer or warrant officer.  What selection process led the convening authority to appoint a major?

   f. Ordinarily all three members of an administrative separation board are members of the Convening Authority's command.  What selection process was used or what necessity arose that led to the appointment of two members who are assigned to the Recruit Training Regiment? Were any other units approached (e.g. Headquarters and Service Battalion) for assistance in providing members for the board?

   g. Were any other criteria used to select members of the board beyond those criteria of paragraph 6315.1 and answers to c. through f. above?

000089

Subj:  ADMINISTRATIVE SEPARATION OF SGT GARY STEIN

     h. What role, if any, did the legal adviser, Major Houtz, take in recommending or appointing the members of the board?

     i. Did the legal adviser assist either the SJA or the Convening Authority in making a recommendation on how to proceed in the case of Sgt Stein (i.e. whether to proceed with NJP, court-martial, or administrative board)?

     j. Has the legal advisor prepared or directed any research in this case, whether factual or legal?

2.   The respondent requests any available documentation (to include emails) having bearing on the above questions.

                                    N. R. GREY



**UNITED STATES MARINE CORPS**
WEAPONS AND FIELD TRAINING BATTALION
MARINE CORPS RECRUIT DEPOT SAN DIEGO
EDSON RANGE, BOX 555181
CAMP PENDLETON, CALIFORNIA 92055-5181

IN REPLY REFER TO:
1900
csd
3 Apr 12

FIRST ENDORSEMENT on Defense Counsel ltr 5800 9D of 2 Apr 12

From:   Commanding Officer, Weapons and Field Training Battalion
To:     Counsel for Respondent

Subj:   ADMINISTRATIVE SEPARATION OF SGT GARY STEIN

1.   Pursuant to section 6316.7 of the reference, your request for information is denied.

2.   Section 6316.7, in pertinent part, clearly states: "The respondent may challenge any voting member or legal advisor for cause only."  The basis for such challenge is that the challenged person cannot approach the case "with impartiality and an open mind."  Section 6316.7 goes on to state that "after disclosing the alleged grounds for challenge, the respondent may examine the challenged person as to matters relating to their competency to sit in that particular case."

3.   Sections 6316.4, 6316.7(a), and 6316.7(c) of the reference also establish procedures for inquiring as to any alleged basis for challenge for cause with regard to the legal advisor.

4.   The reference clearly establishes procedures for conducting examination of Board members and the legal advisor with regard to inquiring as to any alleged basis for challenges for cause. Therefore, your 2 April 12 request for information is denied.

C. S. DOWLING

GE-3L

**UNITED STATES MARINE CORPS**
OFFICE OF THE STAFF JUDGE ADVOCATE
MARINE CORPS RECRUIT DEPOT/WESTERN RECRUITING REGION
3700 CHOSIN AVENUE
SAN DIEGO, CALIFORNIA 92140-5001

IN REPLY REFER TO:
5810
9D
4 Apr 12

From:   Recorder
To:     Legal Advisor, Administrative Separation Board
Via:    President, Administrative Separation Board

Subj:   GOVERNMENT REBUTTAL ARGUMENTS ICO SERGEANT GARY A. STEIN, USMC

Ref:    (a) Def Ltr RE: Request to Withdraw, dtd 27 Mar 12
        (b) *Rigdon v. Perry*, 962 F.Supp. 150 (D.C. 1997)
        (c) DoD Directive 1344.10, dtd 15 Jun 1990
        (d) DoD Directive 1344.10, dtd 19 Feb 2008
        (e) Def Ltr RE: Ethics Advisement Request, dtd 30 Mar 12
        (f) ACLU Ltr RE: AdSep Hearing, dtd 30 Mar 12
        (g) Def Ltr RE: Request to Withdraw, dtd 31 Mar 12
        (h) *United States v. Wilcox*, 66 M.J. 442 (C.A.A.F. 2008)
        (i) MCO 1900.16F (MARCORSEPMAN)

Encl:   (1) DoD Directive 1344.10, dtd 15 Jun 1990
        (2) Office of Special Counsel info page RE: Hatch Act
        (3) Office of Special Counsel ltr, dtd 5 Apr 11

1. Reference (a) cites a "permanent injunction" issued by the Honorable Stanley Sporkin, United States District Judge for the District of Columbia, issued on or about 7 April 1997 (see reference (b)), and claims this "permanent injunction" is somehow applicable to the administrative separation board for Sgt Stein.

    a. First, the injunction provided in reference (b) applies only to interpretation of DoD Directive 1344.10 against the particular plaintiffs of that case.[1]  As Sgt Stein was not a plaintiff to the action in reference (b), the Government fails to see how a district court's injunction, issued nearly 15 years ago, in a completely different judicial circuit, could in any way be applicable to an administrative hearing based on totally different facts.

---

[1] "[Defendants] are hereby ENJOINED from interpreting DoD Directive 1344.10, or any similar law or regulation, in a manner that prohibits the ***plaintiffs*** from exercising their free speech and free exercise rights…" *Rigdon*, 962 F.Supp. at 166 (*emphasis added*).

Subj:   GOVERNMENT REBUTTAL ARGUMENTS ICO SERGEANT GARY A. STEIN,
        USMC

b.   Second, it is important to note that the version of DoD Directive 1344.10 at issue in reference (b) is substantially different to the current version of the order.  The order at issue in *Rigdon* was dated 15 June 1990, and merely provided that a member on active duty may not "use his or her official authority or influence for interfering with an election; affecting the course or outcome of an election; soliciting votes for a particular candidate or issue; or requiring or soliciting political contributions from others" (see section 4.1.2.1 of reference (c) and enclosure (1)).

Reference (d), in comparison, provides for several other prohibitions that apply to the conduct of Sgt Stein. Specifically, section 4.1.2.3 of reference (d) provides that a member on active duty shall not "[a]llow or cause to be published partisan political articles, letters, or endorsements signed or written by the member that solicits votes for or against a partisan political party, candidate, or cause…"; section 4.1.2.5 states a member on active duty shall not "[s]peak before a partisan political gathering, including any gathering that promotes a partisan political party, candidate, or cause"; and section 4.1.2.6 states a member on active duty shall not "[p]articipate in any radio, television, or other program or group discussion as an advocate for or against a partisan political party, candidate, or cause."

The conduct of Sgt Stein falls within the specific prohibitions contained in reference (d), not those contained in reference (c).

c.   Third, the factual circumstances in reference (b) have absolutely no similarity to the current bases against Sgt Stein. Reference (b) involved military chaplains who wanted to encourage their congregants to contact Congress on pending legislation that would outlaw a particular abortion procedure. The plaintiffs in reference (b) primarily sought relief through the Religious Freedom Restoration Act (RFRA), as well as the free exercise and free speech provisions of the First Amendment.

The court in reference (b) held the plaintiffs were not in violation of reference (c), as they were not "soliciting votes for a particular candidate or issue" (as they were merely encouraging their congregants to contact Congress). *Ridgon*, 962 F.Supp. at 157.  The court also held the chaplains were not

2

000094

Subj:   GOVERNMENT REBUTTAL ARGUMENTS ICO SERGEANT GARY A. STEIN, USMC

using their "official authority", but rather religious/spiritual influence.  *Id.*[2]

The court's analysis, in dicta, regarding the First Amendment free speech concerns with reference (c) also does not apply to the present case.

i.  The potential speech at issue in reference (b) (i.e., the chaplains' address to their congregation) was to be made on government property, thereby implicating the "public forum doctrine" (with the court finding that chapels are dedicated for the free exercise of its members and are therefore "public forums").  *Id.* at 163.

ii.  The court next found the military's restriction on the plaintiffs' proposed statements to their congregants was "content-based" and "viewpoint-based", as the U.S. Navy had permitted a Catholic chaplain (Captain Friel) to make similar statements a year prior.  *Id.* at 163-164.

iii.  The court then found that because the restriction in section 4.1.2.1 of reference (c) was both "content-based" and "viewpoint-based", as applied to the plaintiffs, the Government could only overcome the "presumption of impermissibility" by showing the restriction was "necessary to serve a compelling…interest and that it is narrowly drawn to achieve that end."  *Id.* at 164 (internal citations omitted).

iv.  Finally, the court held that while "[a] politically-disinterested military, good order and discipline, and the protection of service members' rights to participate in the political process are compelling government interests", the restriction in 4.1.2.1 of reference (c) was not "narrowly drawn" to achieve those ends (as the Government "failed to submit any evidence showing how Rabbi Kaye's or Father Rigdon's contemplated speech would in any way enhance a potential for 'political conflicts'…").  *Id.* at 162.

---

[2] However, the court specifically stated: "Initially, it does not appear that this Directive applies to the speech contemplated by Father Rigdon and Rabbi Kaye. It is reasonably clear that if they were to urge their congregants to vote for Congressmen or Congresswomen with anti-abortionist views, that they would be soliciting votes for particular candidates in contravention of the Directive. The same is true if they were to encourage their congregants to vote in favor of a state ballot initiative imposing a parental consent requirement on minors seeking abortions; they would be directly soliciting the votes of their congregants for a particular issue."  *Id.*

3

Subj:  GOVERNMENT REBUTTAL ARGUMENTS ICO SERGEANT GARY A. STEIN,
       USMC

     v.  No such "content" or "viewpoint" discrimination is at issue in the current proceedings against Sgt Stein. Reference (d) prohibits partisan political activities in general (regardless of ideology or agenda).

     Assuming, *arguendo*, the restrictions in reference (d) were content and/or viewpoint based as applied to Sgt Stein, the restrictions in reference (d) are narrowly drawn to achieve the compelling interest in maintaining a politically-disinterested military and preserving good order and discipline.  Unlike the facts in reference (b), the Government has documented several breaches of good order and discipline that have occurred as a result of Sgt Stein's speech – the METOC postings made by Sgt Stein on 1 Mar 12 were made on a forum designed for active duty Marines and were in fact discovered by an active duty Marine who believed those postings to be inconsistent with good order and discipline (who thereafter reported Sgt Stein's comments to his chain of command for action); Sgt Stein's comments have led to internal conflicts within Weapons and Field Training Battalion (as evidenced by an altercation between Sgt Stein and Sgt Zachary Barnhart over Sgt Stein's comments in the media); and the Marine Corps Times article uncovered several Marines that questioned why Sgt Stein had not been appropriately disciplined for his conduct.  Because Sgt Stein's speech is directly associated with his supreme commander (the President of the United States as Commander-in-Chief), there is a very real and palpable connection to good order and discipline and a compelling justification for the restrictions imposed by reference (d).

2.  "Question One" posed in reference (e) has been addressed above.  "Question Two" is answered best by section 4.1.2.6 of reference (d) – if the statements are made through a "radio, television, or other program or group discussion", such comments would be in violation of reference (d).[3]  "Question Three" is similarly answered by section 4.1.2.6 of reference (d) – reference (d) does not distinguish between mere candidates and candidates that are currently serving in office (i.e., incumbents).

    a.  Paragraph 5 of reference (e) incorrectly claims that reference (d) is both content and viewpoint-discriminatory,

---

[3] Additionally, there is no "disclaimer" provision applicable to section 4.1.2 or any of its subsections; reference (d) only discusses disclaimers in regards to "[m]embers not on active duty who are nominees or candidates for the offices described in subparagraph 4.2.1…" (see section 4.3.1 of reference (d)).

4

Subj:  GOVERNMENT REBUTTAL ARGUMENTS ICO SERGEANT GARY A. STEIN,
       USMC

stating: "while the promotion or discussion as an advocate of
the incumbent president is permitted, a member is prohibited
from engaging in such speech with regard to opposing the
incumbent as well as supporting the non-incumbent candidate for
president."  The Government is unaware of any section in
reference (d) that says a member on active duty can publically
support the incumbent president, but not oppose him/her.
Section 4.1.2.6 of reference (d) applies to any advocacy "for or
against a partisan political party, candidate, or cause."

     b.  Paragraphs 6 through 13 of reference (e) set forth no
legal basis for challenge of reference (d) and are merely
arguments the Defense is free to make in support of Sgt Stein at
his administrative separation hearing.

     It is also important to note that reference (d) is
analogous to 5 U.S.C. § 7321-7326 (Hatch Act - initially enacted
by Congress in 1939), which prohibits partisan political
activities by civilian employees of the federal government (see
enclosures (2) and (3)).  The Hatch Act has been challenged
before the United States Supreme Court on two separate occasions
for alleged violations of the Free Speech Clause of the First
Amendment and upheld by the Court both times.  See *United Public
Workers of America v. Mitchell*, 330 U.S. 75 (1947) and *United
States Civil Service Commission v. National Association of
Letter Carriers*, 413 U.S. 548 (1973).

3.  Reference (f) mistakenly states: "Sergeant Stein's speech,
which I understand in its full context amounted to a declaration
that he would not follow unlawful orders, violated Article 134
as it has been interpreted and limited in light of the First
Amendment.  Indeed, Article 90 itself requires obedience only to
a 'lawful command.'  10 U.S.C. § 890."

     a.  First, Sgt Stein's comments on the METOC Facebook page
that he will not follow orders from the Commander-in-Chief do
not form the primary bases for the current proceedings against
Sgt Stein.  Sgt Stein's insulting and disrespectful statements
(i.e., "Screw Obama" and "Obama is the economic enemy…the
religious enemy…the Domestic Enemy") are what form the primary
basis for the Article 134 charge (conduct prejudicial to good
order and discipline and service discrediting).

     Sgt Stein has engaged in an all-out media campaign since 1
Mar 12 to re-characterize his statements and explain that what
he meant to say was that he would not follow illegal orders -
that has never been the primary issue and is further evidence of

5

000097

Subj:   GOVERNMENT REBUTTAL ARGUMENTS ICO SERGEANT GARY A. STEIN,
        USMC

Sgt Stein's failure to comprehend the inappropriate nature of
his comments.  Likewise, reference (f) illuminates how little
the ACLU knows about the current charges facing Sgt Stein and
how they have been influenced by the slanted media campaign that
Sgt Stein has created.

    b.  Second, Sgt Stein's continued partisan political
comments on various media, as well as his speaking before a
partisan political gathering on or about 22 March 2012, are
completely separate and distinct violations of reference (d) and
form the bases for the Article 92 charge against Sgt Stein.  The
ACLU's letter fails to account for this misconduct as sufficient
bases for discharge.

4.  Reference (g) mistakenly relies on reference (h) as a basis
to challenge the current Article 134 charge supporting the
administrative separation of Sgt Stein.

    a.  At issue in reference (h) was a U.S. Army paratrooper
who made several racist and supremacist comments to an
undercover CID agent during a private online chat session, as
well as on his AOL profile.  *Wilcox*, 66 M.J. at 445-446.

    b.  The court in reference (h) held that initially, two
threshold determinations must be made: "First, the speech
involved must be examined to determine whether it is otherwise
protected under the First Amendment.  Second, the Government
must have proved the elements of an Article 134, UCMJ, offense."
*Id*. at 447.  If the speech is otherwise protected under the
First Amendment and the Government has proved the elements of
the offense, a balance must be struck "between the essential
needs of the armed forces and the right to speak out as a free
American." *Id*.

    c.  However, the court in reference (h) never reached the
balancing test, as it found the Government had failed to
establish the elements of Article 134 (specifically, that
insufficient evidence was produced to establish the accused's
speech was prejudicial to good order and discipline).  The court
held "[t]here is no evidence that any of Appellant's statements
were directed at military members or ever reached his unit. And
it is pure speculation that the racist views propounded on the
Internet by a single person purporting to be a paratrooper
either were viewed or would be viewed by other service-members
or would be perceived by the public or a service-member as an
expression of Army or military policy." *Id*. at 450.  Put
another way, the court held the Government could not show a

6

Subj:   GOVERNMENT REBUTTAL ARGUMENTS ICO SERGEANT GARY A. STEIN, USMC

"reasonably 'direct and palpable' connection between [the] appellant's statements and the military mission." *Id.* at 448 (internal citations omitted).

The court in reference (h) specifically noted: "The leading cases involving the intersection of Article 134, UCMJ, and the First Amendment have involved facts adduced at trial that showed that the appellant at least attempted to direct his speech to service-members…Because in those cases the speech was directed to service-members, the effect of the speech on the military mission was both palpable and obvious." *Id.* (internal citations omitted).

In the present case, the METOC postings in question were made on a public forum specifically established for members of the METOC community.  They were in fact viewed by Marines and were brought to the attention of the chain of command by the Marines associated with that Facebook page.  Specifically, MSgt David Rose, himself a METOC Marine, saw those posts and immediately informed his SgtMaj, as he believed those comments to be prejudicial to good order and discipline within the Marine Corps.  Additionally, Sgt Stein himself has publicized those posts, which have become the subject of a Marine Corps Times article available in every post exchange across the Marine Corps.  The Government will have no problem establishing the elements of Article 134, thereby taking the issue outside the holding of *Wilcox*.

5.  Taken together, references (a), (e), (f) and (g) are misguided attempts to confuse the current administrative proceedings against Sgt Stein.  The Government recommends these arguments be noted for the record in accordance with reference (i), and be considered by the Separation Authority after the Board has issued its recommendations.

6.  The point of contact for questions regarding this memorandum is the undersigned at (619) 524-4089.

J. W. TORRESALA

7



# Department of Defense
# DIRECTIVE

NUMBER 1344.10

June 15, 1990

Administrative Reissuance Incorporating Through Change 2, February 17, 2000

ASD(*FMP*)

SUBJECT: Political Activities by Members of the Armed Forces on Active Duty

References: (a) DoD Directive 1344.10, "Political Activities by Members of the
     Armed Forces," September 25, 1986 (hereby canceled)
 (b) Title 10, United States Code
 (c) DoD Directive 5200.2, "DoD Personnel Security Program," *April 9,
     1999*
 (d) DoD Directive 1325.6, "Guidelines for Handling Dissident and
     Protest Activities Among Members of the Armed Forces," *October 1,
     1996*
 (e) through (h), see enclosure 1

## 1. REISSUANCE AND PURPOSE

This *Directive:*

1.1.  Reissues reference (a) to update DoD policies on political activities of members of the Armed Forces on active duty (AD).

1.2.  Implements Section 973(b) of reference (b).

## 2. APPLICABILITY

*This Directive applies to the Office of the Secretary of Defense, the Military Departments (including the Coast Guard when it is not operating as a Military Service in the Department of the Navy by agreement with the Department of Transportation), the Office of the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies,*

1

the DoD Field Activities, and all other organizational entities within the Department of Defense (hereafter referred to collectively as the "DoD Components").

## 3. DEFINITIONS

The terms used in this Directive are defined in enclosure 2.

## 4. POLICY

It is DoD policy that a member of the Armed Forces (hereafter referred to as "member") is encouraged to carry out the obligations of a citizen.   While on AD, however, members are prohibited from engaging in certain political activities.   Subject to the guidelines in enclosure 3, the following DoD policy shall apply:

4.1.  General

4.1.1.  A member on AD may:

4.1.1.1.  Register, vote, and express his or her personal opinion on political candidates and issues, but not as a representative of the Armed Forces.

4.1.1.2.  Make monetary contributions to a political organization.

4.1.1.3.  Attend partisan and nonpartisan political meetings or rallies as a spectator when not in uniform.

4.1.2.  A member on AD shall not:

4.1.2.1.  Use his or her official authority or influence for interfering with an election; affecting the course or outcome of an election; soliciting votes for a particular candidate or issue; or requiring or soliciting political contributions from others.

4.1.2.2.  Be a candidate for, or hold, civil office except as authorized in *paragraphs* 4.2. and 4.3., below.

4.1.2.3.  Participate in partisan political management, campaigns, or conventions.

000101

4.1.2.4.  Make campaign contributions to another member of the Armed Forces or an employee of the Federal Government.

4.1.3.  To assist in applying *sub*paragraphs 4.1.1. and 4.1.2., above, to particular situations, enclosure 3 provides guidelines and examples of permissible and prohibited political activities.   The guidelines in enclosure 3 do not supersede other specific requirements and policies, such as those established in DoD Directives 5200.2 and 1325.6 (references (c) and (d)).

4.1.4.  Enclosure 4 provides a summary of Federal statutes restricting certain types of political activities by members of the Armed Forces.

4.2.  <u>Candidacy for Elective Office.</u>   A member on AD may not:

4.2.1.  Campaign as a nominee, or as a candidate for nomination, for civil office, except as authorized in *sub*paragraph 4.3.3., below.   When circumstances warrant, the Secretary concerned or the Secretary's designee may permit a member to file such evidence of nomination or candidacy for nomination, as may be required by law.   Such permission shall not authorize activity while on AD that is otherwise prohibited in *sub*paragraph 4.1.2., above, or enclosure 3 or 4.

4.2.2.  Become a candidate for any civil office while serving an initial tour of extended active duty (EAD) or a tour of EAD that the member agreed to perform as a condition of receiving schooling or other training wholly or partly at U.S. Government expense.

4.3.  <u>Election or Appointment to Civil Office</u>

4.3.1.  Except as authorized by paragraph 4.3.3., below, or otherwise provided for by law, no member on AD may hold or exercise the functions of civil office:

4.3.1.1.  In the U.S. Government that:

4.3.1.1.1.  Is an elective office.

4.3.1.1.2.  Requires an appointment by the President by and with the advice and consent of the Senate.

3

4.3.1.1.3.  Is a position on the executive schedule under sections 5312 through 5317 of reference (e).

4.3.1.2.  In the government of a State; the District of Columbia; a territory, possession, or commonwealth of the United States; or in any political subdivision thereof.

4.3.2.  A member may hold or exercise the functions of a civil office in the U.S. Government that is not described in subparagraph 4.3.1.1., above, when assigned or detailed to such office or to perform such functions.

4.3.3.  As long as they are not serving on EAD, enlisted members and Reserve officers may hold partisan or nonpartisan civil office if such office is held in a private capacity and does not interfere with the performance of military duties. Additionally, enlisted members on EAD may seek and hold nonpartisan civil office as a notary public or member of a school board, neighborhood planning commission, or similar local agency, as long as such office is held in a private capacity and does not interfere with the performance of military duties.   Officers on active duty may seek and hold nonpartisan civil office on an independent school board that is located exclusively on a military reservation.

4.3.4.  Unless prohibited by Service regulations, a member on AD may serve as a regular or reserve civilian law enforcement officer or as a member of a civilian fire or rescue squad.   Such service shall be in a private capacity, shall not involve the exercise of military authority, and shall not interfere with the performance of military duties.

4.3.5.  A member elected or appointed to a prohibited civil office may request retirement and shall be retired if eligible for retirement.   If such member does not request or is not eligible for retirement, the member shall be discharged or released from AD, as determined by the Secretary concerned.

4.3.6.  The separation and retirement requirements of *sub*paragraph 4.3.5., above, do not apply if the member declines to serve in the prohibited office; if the Secretary concerned determines that the member should not be released from active duty based on the needs of the Service; or if the member is:

4.3.6.1.  Obligated to fulfill an AD service commitment.

4

4.3.6.2.  Serving or has been issued orders to serve afloat or in an area that is overseas, remote, a combat zone, or a hostile fire pay area.

4.3.6.3.  Ordered to remain on AD while the subject of an investigation or inquiry.

4.3.6.4.  Accused of an offense under the Uniform Code of Military Justice (UCMJ), 10 U.S.C. chapter 47 (reference (b)), or serving a sentence or punishment for such offense.

4.3.6.5.  Pending administrative separation action or proceedings.

4.3.6.6.  Indebted to the United States.

4.3.6.7.  On AD during a period of declared war, a national emergency, or other period when a unit of the Reserves or National Guard has been called to AD.

4.3.6.8.  In violation of an order or regulation prohibiting such member from assuming or exercising the functions of civil office.

4.3.7.  A member who refuses to decline to serve in a prohibited civil office after being denied separation or retirement in accordance with *sub*paragraph 4.3.6., above, may be subject to disciplinary or adverse administrative action under Service regulations.

4.3.8.  No actions undertaken by a member in carrying out assigned military duties shall be invalidated solely by virtue of such member having assumed or exercised the functions of a civil office in violation of *paragraph* 4.3., above.


5.  RESPONSIBILITIES

5.1.  The Assistant Secretary of Defense (Force Management *Policy*) (ASD(*FMP*))  shall be responsible for the administration of this Directive.

5.2.  The Secretaries of the Military Departments  shall be responsible for issuance of appropriate implementing documents for their respective Departments.

*DODD 1344.10, June 15, 1990*

6. <u>PROCEDURES</u>

All members of the Armed Forces on AD engaging in political activities shall follow the guidelines in enclosure 3.

7. <u>EFFECTIVE *DATE*</u>

This Directive is effective *immediately*.

Donald J. Atwood
Deputy Secretary of Defense

Enclosures - 4
 E1. References, continued
 E2. Definitions
 E3. Guidelines on Political Activities
 E4. Statutory Restrictions Pertaining to Political Activities by Members of the Armed Forces

6

## E1. ENCLOSURE 1

## REFERENCES, continued

(e)  Title 5, United States Code

(f)  DoD Directive 1334.1, "Wearing of the Uniform," August 11, 1969

(g)  Sections 441a, 441f, and 441g of title 2, United States Code

(h)  Sections 592 through 594, 596, 602 through 603, 606 through 607, and 609 of title 18, United States Code

ENCLOSURE 1

000106

*DODD 1344.10, June 15, 1990*

## E2.  ENCLOSURE 2

## DEFINITIONS

E2.1.1.  Active Duty (AD).    Full-time duty in the active Military Service of the United States without regard to duration or purpose, including:

E2.1.1.1.  *Full-time training duty;*

E2.1.1.2.  *Annual training duty;*

E2.1.1.3.  *Attendance, while in the active Military Service, at a school designated as a Service school by law or by the Secretary of the Military Department concerned; and*

E2.1.1.4.  *National Guard duty, as defined in 10 U.S.C. 101(42) (reference (b)).*

E2.1.2.  Armed Forces.    The U.S. Army, Navy, Air Force, Marine Corps, and Coast Guard, including the Reserve components and the National Guard, as defined in 10 U.S.C. 101(9), 101(10), and 101(12) (reference (b)).

E2.1.3.  Civil Office.    A nonmilitary office involving the exercise of the powers or authority of civil government, to include elective and appointive office in the U.S. Government, a U.S. territory or possession, State, county, municipality, or official subdivision thereof.

E2.1.4.  Extended Active Duty (EAD).    AD under a call or order for a period in excess of *270* days.

E2.1.5.  Nonpartisan Political Activity.    Activity supporting or relating to candidates not representing, or issues not specifically identified with, national or State political parties and associated or ancillary organizations.   Issues relating to constitutional amendments, referendums, approval of municipal ordinances, and others of similar character are not considered under this Directive as specifically being identified with national or State political parties.

E2.1.6.  Partisan Political Activity.    Activity supporting or relating to candidates representing, or issues specifically identified with, national or State political parties and associated or ancillary organizations.

*DODD 1344.10, June 15, 1990*

E2.1.7.  <u>Secretary Concerned</u>.   Defined in 10 U.S.C. 101(*9*) (reference (b)).

ENCLOSURE 2

*DODD 1344.10, June 15, 1990*

## E3.  ENCLOSURE 3

## GUIDELINES ON POLITICAL ACTIVITIES

### E3.1.  PURPOSE

This enclosure provides guidance for implementing this Directive.

### E3.2.  EXAMPLES OF PERMISSIBLE POLITICAL ACTIVITIES

A member on *AD* may:

E3.2.1.  Register, vote, and express a personal opinion on political candidates and issues, but not as a representative of the Armed Forces.

E3.2.2.  Promote and encourage other military members to exercise their voting franchise, if such promotion does not constitute an attempt to influence or interfere with the outcome of an election.

E3.2.3.  Join a political club and attend its meetings when not in uniform.  *See* DoD Directive 1334.1 *(*reference (f)*)*.

E3.2.4.  Serve as an election official, if such service is not as a representative of a partisan political party, does not interfere with military duties, is performed while out of uniform, and has the prior approval of the Secretary concerned or the Secretary's designee.

E3.2.5.  Sign a petition for specific legislative action or a petition to place a candidate's name on an official election ballot, if the signing does not obligate the member to engage in partisan political activity and is done as a private citizen and not as a representative of the Armed Forces.

E3.2.6.  Write a letter to the editor of a newspaper expressing the member's personal views on public issues or political candidates, if such action is not part of an organized letter-writing campaign or concerted solicitation of votes for or against a political party or partisan political cause or candidate.

E3.2.7.  Make monetary contributions to a political organization, party, or committee favoring a particular candidate or slate of candidates, subject to the limitations under 2 U.S.C. 441a and 18 U.S.C. 607 (references (g) and (h)).

ENCLOSURE 3

000109

E3.2.8.  Display a political sticker on the member's private vehicle.

## E3.3.  EXAMPLES OF PROHIBITED POLITICAL ACTIVITIES

In accordance with the statutory restrictions in 10 U.S.C. 973(b) (reference (b)) and references (g) and (h), and the policies established in section 4., above, of this Directive, a member on AD shall not:

E3.3.1.  Use official authority or influence to interfere with an election, affect the course or outcome of an election, solicit votes for a particular candidate or issue, or require or solicit political contributions from others.

E3.3.2.  Be a candidate for civil office in Federal, State, or local government, except as authorized in section 4., above, of this Directive, or engage in public or organized soliciting of others to become partisan candidates for nomination or election to civil office.

E3.3.3.  Participate in partisan political management or campaigns, or make public speeches in the course thereof.

E3.3.4.  Make a campaign contribution to another member of the Armed Forces or to a civilian officer or employee of the United States for promoting a political objective or cause.

E3.3.5.  Solicit or receive a campaign contribution from another member of the Armed Forces or from a civilian officer or employee of the United States for promoting a political objective or cause.

E3.3.6.  Allow or cause to be published partisan political articles signed or written by the member that solicits votes for or against a partisan political party or candidate.

E3.3.7.  Serve in any official capacity or be listed as a sponsor of a partisan political club.

E3.3.8.  Speak before a partisan political gathering of any kind for promoting a partisan political party or candidate.

E3.3.9.  Participate in any radio, television, or other program or group discussion as an advocate of a partisan political party or candidate.

ENCLOSURE 3

E3.3.10.  Conduct a political opinion survey under the auspices of a partisan political group or distribute partisan political literature.

E3.3.11.  Use contemptuous words against the officeholders described in 10 U.S.C. 888 (reference (b)), or participate in activities proscribed by DoD Directives 5200.2 and 1325.6 (references (c) and (d)).

E3.3.12.  Perform clerical or other duties for a partisan political committee during a campaign or on an *Election Day*.

E3.3.13.  Solicit or otherwise engage in fundraising activities in Federal offices or facilities, including military reservations, for a partisan political cause or candidate.

E3.3.14.  March or ride in a partisan political parade.

E3.3.15.  Display a large political sign, banner, or poster (as distinguished from a bumper sticker) on the top or side of a private vehicle.

E3.3.16.  Participate in any organized effort to provide voters with transportation to the polls if the effort is organized by, or associated with, a partisan political party or candidate.

E3.3.17.  Sell tickets for, or otherwise actively promote, political dinners and similar fundraising events.

E3.3.18.  Attend partisan political events as an official representative of the Armed Forces.

### E3.4.  POLITICAL ACTIVITIES NOT EXPRESSLY PERMITTED OR PROHIBITED

Some activities not expressly prohibited may be contrary to the spirit and intent of section 4. of *this* Directive or section E3.3. of this enclosure.   In determining whether an activity violates the traditional concept that service members should not engage in partisan political activity, rules of reason and common sense shall apply.   Any activity that may be viewed as associating the Department of Defense or the Department of Transportation, in the case of the Coast Guard, or any components of such Departments directly or indirectly with a partisan political cause or candidate shall be avoided.

*DODD 1344.10, June 15, 1990*

E3.5.  LOCAL NONPARTISAN POLITICAL ACTIVITIES

This Directive does not preclude participation in local nonpartisan political campaigns, initiatives, or referendums.   A member taking part in local nonpartisan political activity, however, shall not:

E3.5.1.  Wear a uniform or use any Government property or facilities while participating.

E3.5.2.  Allow such participation to interfere with, or prejudice, the member's performance of military duties.

E3.5.3.  Engage in conduct that in any way may imply that the Department concerned or any component of such Department has taken an official position on, or is otherwise involved in, the local political campaign or issue.


E3.6.  ADDITIONAL REQUIREMENTS

Members of the Armed Forces on AD engaging in permissible political activities shall:

E3.6.1.  Give full time and attention to the performance of military duties during prescribed duty hours.

E3.6.2.  Avoid any outside activities that may be prejudicial to the performance of military duties or are likely to bring discredit upon the Armed Forces.

E3.6.3.  Refrain from participating in any political activity while in military uniform, as proscribed by DoD Directive 1334.1 (reference (f)), or using Government facilities or resources for furthering political activities.

ENCLOSURE 3

*DODD 1344.10, June 15, 1990*

## E4. ENCLOSURE 4

## STATUTORY RESTRICTIONS PERTAINING TO POLITICAL ACTIVITIES BY MEMBERS OF THE ARMED FORCES

Members of the Armed Forces are prohibited by various provisions of titles 10, 2, and 18, United States Code (references (b), (g), and (h)), from engaging in certain types of political activities.   The statutory provisions most directly applicable to members of the Armed Forces are as follows:

"Title 10 U.S.C. Sec. 973.   Duties:   officers on active duty; performance of civil functions restricted

"(a)   No officer of an Armed Force on active duty may accept employment if that employment requires him to be separated from his organization, branch, or unit, or interferes with the performance of his military duties.

"(b)(1)   This subsection applies--

(A)   to a Regular officer of an Armed Force on the active-duty list (and a Regular officer of the Coast Guard on the active duty promotion list);

(B)   to a retired Regular officer of an Armed Force serving on active duty under a call or order to active duty for a period in excess of *270* days; and

(C)   to a Reserve officer of an Armed Force serving on active duty under a call or order to active duty for a period in excess of *270* days.

(2)(A)   Except as otherwise authorized by law, an officer to whom this subsection applies may not hold, or exercise the functions of, a civil office in the Government of the United States--

(i)   that is an elective office;

(ii)   that requires an appointment by the President by and with the advice and consent of the Senate; or

(iii)   that is a position in the Executive Schedule under sections 5312 through 5317 of title 5.

(B)   An officer to whom this subsection applies may hold or exercise the

ENCLOSURE 4

000113

function of a civil office in the Government of the United States that is not described in subparagraph (A) when assigned or detailed to that office or to perform those functions.

(3)   Except as otherwise authorized by law, an officer to whom this subsection applies may not hold or exercise, by election or appointment, the functions of a civil office in the government of a State, the District of Columbia, or a territory, possession, or commonwealth of the United States (or of any political subdivision of any such government).

(4)   Nothing in this subsection shall be construed to invalidate any action undertaken by an officer in furtherance of assigned official duties.

"(c)   An officer to whom subsection (b) applies may seek and hold nonpartisan civil office on an independent school board that is located exclusively on a military reservation.

"(d)   The Secretary of Defense, and the Secretary of Transportation with respect to the Coast Guard when it is not operating in the Navy, shall prescribe regulations to implement this section."

"Title 2 U.S.C. Sec. 441a.   Limitations on contributions and expenditures

"(a)   Dollar limits on contributions

(1)   No person shall make contributions--

(A)   to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $1,000;

(B)   to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate in any calendar year which, in the aggregate, exceed $20,000; or

(C)   to any other political committee in any calendar year which, in the aggregate, exceed $5,000.

(2)   No multicandidate political committee shall make contributions--

(A)   to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $5,000;

(B)   to the political committees established and maintained by a

ENCLOSURE 4

000114

national political party, which are not the authorized political committees of any candidate, in any calendar year, which, in the aggregate, exceed $15,000; or

(C) to any other political committee in any calendar year which, in the aggregate, exceed $5,000.

No individual shall make contributions aggregating more than $25,000 in any calendar year. For purposes of this paragraph, any contribution made to a candidate in a year other than the calendar year in which the election is held with respect to which such contribution is made is considered to be made during the calendar year in which such election is held.

. . .

For purposes of the limitations imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate. The intermediary or conduit shall report the original source and the intended recipient of such contribution to the Commission and to the intended recipient.

. . . . "

"Title 2 U.S.C. Sec. 441f.  Contributions in the name of another prohibited

"No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such contribution, and no person shall knowingly accept a contribution made by one person in the name of another person."

"Title 2 U.S.C. Sec. 441g.  Limitation on contribution of currency

"No person shall make contributions of currency of the United States or currency of any foreign country to or for the benefit of any candidate which, in the aggregate, exceed $100, with respect to any campaign of such candidate for nomination for election, or for election, to Federal office."

"Title 2 U.S.C. Sec. 592.  Troops at polls

"Whoever, being an officer of the Army or Navy, or other person in the civil, military, or naval service of the United States, orders, brings, keeps, or has under his

authority or control any troops or armed men at any place where a general or special election is held, unless such forces be necessary to repel armed enemies of the United States, shall be fined not more than $5,000 or imprisoned not more than five years, or both; and be disqualified from holding any office of honor, profit, or trust under the United States.

"This section shall not prevent any officer or member of the Armed Forces of the United States from exercising the right of suffrage in any election district to which he may belong, if otherwise qualified according to the laws of the State in which he offers to vote."

"Title 18 U.S.C. Sec. 593.   Interference by Armed Forces

"Whoever, being an officer or member of the Armed Forces of the United States, prescribes or fixes or attempts to prescribe or fix, whether by proclamation, order or otherwise, the qualifications of voters at any election in any State; or

"Whoever, being such officer or member, prevents or attempts to prevent by force, threat, intimidation, advice or otherwise any qualified voter of any State from fully exercising the right of suffrage at any general or special election; or

"Whoever, being such officer or member, orders or compels or attempts to compel any election officer in any State to receive a vote from a person not legally qualified to vote; or

"Whoever, being such officer or member, imposes or attempts to impose any regulations for conducting any general or special election in a State, different from those prescribed by law; or

"Whoever, being such officer or member, interferes in any manner with an election officer's discharge of his duties--

"Shall be fined *under this title* or imprisoned not more than five years, or both; and disqualified from holding any office of honor, profit or trust under the United States.

"This section shall not prevent any officer or member of the Armed Forces from exercising the right of suffrage in any district to which he may belong, if otherwise qualified according to the laws of the State of such district."

"Title 18 U.S.C. Sec. 594.   Intimidation of voters

ENCLOSURE 4

000116

"Whoever intimidates, threatens, coerces, or attempts to intimidate, threaten, or coerce, any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, at any election held solely or in part for the purpose of electing such candidate, shall be fined *under this title* or imprisoned not more than one year, or both."

"Title 18 U.S.C. Sec. 596.   Polling Armed Forces

"Whoever, within or without the Armed Forces of the United States, polls any member of such forces, either within or without the United States, either before or after he executes any ballot under any Federal or State law, with reference to his choice of or his vote for any candidate, or states, publishes, or releases any result of any purported poll taken from or among the members of the Armed Forces of the United States or including within it the statement of choice for such candidate or of such votes cast by any member of the Armed Forces of the United States, shall be fined *under this title* or imprisoned for not more than one year, or both.

"The word 'poll' means any request for information, verbal or written, which by its language or form of expression requires or implies the necessity of an answer, where the request is made with the intent of compiling the result of the answers obtained, either for the personal use of the person making the request, or for the purpose of reporting the same to any other person, persons, political party, unincorporated association or corporation, or for the purpose of publishing the same orally, by radio, or in written or printed form."

"Title 18 U.S.C. Sec. 602.   Solicitation of political contributions

"It shall be unlawful for--

(1)  a candidate for the Congress;

(2)  an individual elected to or serving in the office of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress;

(3)  an officer or employee of the United States or any Department or Agency thereof; or

ENCLOSURE 4

(4)   a person receiving any salary or compensation for services from money derived from the Treasury of the United States to knowingly *solicit* any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 from any other such officer, employee, or person.   Any person who violates this section shall be fined *under this title* or imprisoned not more than three years, or both."

"Title 18 U.S.C. Sec. 603.   Making political contributions

"(a)   It shall be unlawful for an officer or employee of the United States or any Department or Agency thereof, or a person receiving any salary or compensation for service from money derived from the Treasury of the United States, to make any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 to any other such officer, employee or person or to any Senator or Representative in, or Delegate or Resident Commissioner to, the Congress, if the person receiving such contribution is the employer or employing authority of the person making the contribution.   Any person who violates this section shall be fined *under this title* or imprisoned not more than three years, or both.

"(b)   For purposes of this section, a contribution to an authorized committee as defined in section 302(e)(1) of the Federal Election Campaign Act of 1971 shall be considered a contribution to the individual who has authorized such committee."

"Title 18 U.S.C. Sec. 606.   Intimidation to secure political contributions

"Whoever, being one of the officers or employees of the United States mentioned in section 602 of this title, discharges or promotes, or degrades, or in any manner changes the official rank or compensation of any other officer or employee, or promises or threatens so to do, for giving or withholding or neglecting to make any contribution of money or other valuable thing for any political purpose, shall be fined *under this title* or imprisoned not more than three years, or both."

"Title 18 U.S.C. Sec. 607.   Place of solicitation

"(a)   It shall be unlawful for any person to solicit or receive any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 in any room or building occupied in the discharge of official duties by any person mentioned in section 603, or in any navy yard, fort, or arsenal.   Any person who violates this section shall be fined *under this title* or imprisoned not more than three years, or both.

ENCLOSURE 4

000118

"(b)   The prohibition in subsection (a) shall not apply to the receipt of contributions by persons on the staff of a Senator or Representative in, or Delegate or Resident Commissioner to, the Congress, provided, that such contributions have not been solicited in any manner which directs the contributor to mail or deliver a contribution to any room, building, or other facility referred to in subsection (a), and provided that such contributions are transferred within seven days of receipt to a political committee within the meaning of section 302(e) of the Federal Election Campaign Act of 1971."

"Title 18 U.S.C. Sec. 609.   Use of military authority to influence vote of member of Armed Forces

"Whoever, being a commissioned, noncommissioned, warrant, or petty officer of an Armed Force, uses military authority to influence the vote of a member of the Armed Forces or to require a member of the Armed Forces to march to a polling place, or attempts to do so, shall be fined in accordance with this title or imprisoned not more than five years, or both.   Nothing in this section shall prohibit free discussion of political issues or candidates for public office."

ENCLOSURE 4

**Home**   **About▾**   **Filing▾**   **Resources▾**   **News▾**   **Outreach / Training▾**   **Contacts▾**     Search

🖶 Printer Friendly Page

**FURTHER RESTRICTED EMPLOYEES**

## Further Restricted Employees – Political Restrictions and Prohibited Activities

**Further restricted federal employees are prohibited from taking an active part in partisan political management or partisan political campaigns. Specifically, these employees may not campaign for or against candidates or otherwise engage in political activity in concert with a political party, a candidate for partisan political office, or a partisan political group. Such employees:**

- *May not* be a candidate for nomination or election to public office in a partisan election.

- *May not* take an active part in partisan political campaigns. For example:
  - *May not* campaign for or against a candidate or slate of candidates.
  - *May not* make campaign speeches or engage in other campaign activities to elect partisan candidates.
  - *May not* distribute campaign material in partisan elections.
  - *May not* circulate nominating petitions.

- *May not* take an active part in partisan political management. For example:
  - *May not* hold office in political clubs or parties.
  - *May not* organize or manage political rallies or meetings.
  - *May not* assist in partisan voter registration drives.

- *May not* use their official authority or influence to interfere with or affect the result of an election. For example:
  - *May not* use their official titles or positions while engaged in political activity.
  - *May not* invite subordinate employees to political events or otherwise suggest to subordinates that they attend political events or undertake any partisan political activity.

- *May not* solicit, accept or receive a donation or contribution for a partisan political party, candidate for partisan political office, or partisan political group. For example:
  - *May not* host a political fundraiser.
  - *May not* invite others to a political fundraiser.
  - *May not* collect contributions or sell tickets to political fundraising functions.

- *May not* engage in political activity – *i.e.,* activity directed at the success or failure of a political party, candidate for partisan political office, or partisan political group – while the employee is on duty, in any federal room or building, while wearing a uniform or official insignia, or using any federally owned or leased vehicle. For example:
  - *May not* wear or display partisan political buttons, T-shirts, signs, or other items.
  - *May not* make political contributions to a partisan political party, candidate for partisan political office, or partisan political group.
  - *May not* post a comment to a blog or a social media site that advocates for or against a partisan political party, candidate for partisan political office, or partisan political group.
  - *May not* use any e-mail account or social media to distribute, send or forward content that advocates for or against a partisan political party, candidate for partisan political office, or partisan political group.

---

Last Updated: 9/13/11



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505
202-254-3600

April 5, 2011

<u>OSC's Latest Guidance Regarding Pictures of President Obama in the Federal Workplace
Now That He Is Officially a Candidate for Reelection</u>

Question:  Now that President Obama is a candidate for reelection, may federal employees display his picture in their offices?

Answer:  An employee covered by the Hatch Act may not engage in political activity while on duty, in a government room or building, while wearing an official uniform, or using a government vehicle.  5 U.S.C. § 7324.  Political activity is defined as activity directed toward the success or failure of a political party, candidate for a partisan political office or partisan political group.  5 C.F.R. § 734.101.

Thus, the Hatch Act prohibits federal employees from, among other things, displaying pictures of candidates for partisan public office in the federal workplace.  *See* 5 C.F.R. § 734.306, Example 16.  Because President Obama is a candidate for reelection, the Hatch Act prohibits an employee from displaying his photograph in the federal workplace, unless one of the two exceptions discussed below applies.

The first exception applies to official photographs of the President.  The Hatch Act does not prohibit the continued display of official photographs of the President in the federal workplace, to include both public and employee work spaces.  Official photographs include the traditional portrait photo of the President displayed in all federal buildings, as well as photographs of the President conducting official business (*e.g.*, President meeting with heads of state).  However, these official photographs must be displayed in a traditional size and manner and should not be altered in anyway (*e.g.*, the addition of halos or horns).  Pictures that are distributed by the President's campaign or a partisan organization, such as the Democratic National Committee or Organizing for America, are not official, even if they depict the President performing an official act.  Similarly, pictures downloaded from the internet or clipped from magazines or newspapers, screens savers and life-size cutouts are not official photographs for purposes of this exception.

The second exception, which applies to all candidate photographs, concerns employee personal photographs.  An employee would not be prohibited from having a photograph of any candidate in his or her office, if all of the following apply: the photograph was on display in advance of the election season; the employee is in the photograph with the candidate; and the photograph is a personal one (*i.e.*, the employee has a personal relationship with the candidate and the photograph is taken at some kind of personal event or function, for example, a wedding, and not at a campaign event or some other type of partisan political event).  An employee must not have a political purpose for displaying the photograph, namely, promoting or opposing a political party or a candidate for partisan political office.

If you have any questions, please contact our office for additional guidance.

GE-4



**UNITED STATES MARINE CORPS**
DEFENSE SERVICES ORGANIZATION
MARINE CORPS RECRUIT DEPOT
3700 CHOSIN AVENUE
SAN DIEGO, CA 92140

IN REPLY REFER TO:
5800
9D
25 Mar 2012

From:  Respondent's Detailed Military Counsel
To:    President, Administrative Discharge Board

Subj:  REQUEST FOR CHANGE IN HEARING LOCATION

Ref:   MCO P1900.16F (MARCORSEPMAN)

1.   Respondent through counsel requests the administrative discharge board be conducted at Building 12 (law center) aboard MCRD San Diego.

2.   Paragraph 6315.2.a permits the President to "adjourn the board to meet at a time and a place most convenient and proper." Respondent proposes the law center as a more convenient location to conduct the hearing than the conference room at Edson Range.

3.   One board member and the respondent are located at Edson Range.  Two board members, the legal advisor, recorder, counsel for respondent, administrative law chief, and defense NCOIC are located at MCRD. Additionally, civilian counsel is likely to travel through the adjacent airport.  Furthermore, counsels' familiarity with onsite technology resources (A/V equipment, computers, recording equipment, copiers, etc.) lessens the likelihood of unforeseeable technical issues.

N.R. Grey

CC: Legal Advisor
    Recorder

000124



**UNITED STATES MARINE CORPS**
WEAPONS AND FIELD TRAINING BATTALION
MARINE CORPS RECRUIT DEPOT SAN DIEGO
EDSON RANGE, BOX 555181
CAMP PENDLETON, CALIFORNIA 92055-5181

IN REPLY REFER TO:
1900
S-1
26 Mar 12

FIRST ENDORSEMENT on Defense Counsel ltr 5800 9D of 25 Mar 12

From:   President, Administrative Discharge Board
To:     Detailed Defense Counsel

Subj:   REQUEST FOR CHANGE IN HEARING LOCATION

1.  Pursuant to paragraph 6315.2a of the reference, your request
is denied.

R. L. HAIRSTON

2

000125