GE-28

000542

# When Soldiers Speak Out: A Survey of Provisions Limiting Freedom of Speech in the Military

JOHN LORAN KIEL, JR.

© 2007 John Loran Kiel, Jr.

"The war in Iraq violates our democratic system of checks and balances. It usurps international treaties and conventions that by virtue of the Constitution become American law. The wholesale slaughter and mistreatment of the Iraqi people with only limited accountability is not only a terrible moral injustice, but a contradiction to the Army's own Law of Land Warfare. My participation would make me a party to war crimes."
— Lieutenant Ehren Watada[1]

"When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right."
— Justice Oliver Wendell Holmes, Jr.[2]

As America continues surging troops into Baghdad, a number of active-duty service members have publicly condemned President George W. Bush and criticized his handling of the war in Iraq. Remarks against the President have become more prevalent among service members because they communicate through a host of mediums unfathomable to yesterday's generation

000543

of fighting men and women. Soldiers frequently post digital journals, cell phone photos, and music videos on popular Internet sites such as YouTube and MySpace. A few techno-savvy troops even manage their own milblogs, or on-line personal diaries where they can communicate in cyberspace about virtually anything to virtually anyone. In fact, some military blogs and videos have become so popular that they garner tens of thousands of visits each day.

One byproduct of Internet-related technology is the growing number of soldiers, sailors, airmen, and Marines who use these tools as a means to publicly express their disapproval of the President and his foreign policy agenda. For instance, one particularly astute group of active-duty war protesters came to Capitol Hill to formally present a petition titled "Appeal for Redress" to Representatives Dennis Kucinich (D-Ohio) and Jim McGovern (D-Mass.). The group created their own Web site where they explained their purpose and posted a short petition calling for the immediate withdrawal of American military forces from Iraq. Over the course of three months, approximately 1,000 active-duty personnel, reservists, and National Guardsmen signed the online petition.[3]

In addition to Web-based technology, service members continue to rely on traditional methods of communication to vent frustrations. For example, members of the group Appeal for Redress appeared on the CBS program *60 Minutes* to discuss why they oppose the war and support a timeline for redeploying all US forces from Iraq. Army Lieutenant Ehren Watada is scheduled to be courts-martialed later this year for a series of damning statements he made about President Bush at an antiwar convention in Seattle, Washington, last year. Watada also published a series of contemptuous remarks about the President in a number of local newspapers following his refusal to deploy to Iraq.

As service members become more vocal about the war, commanders need to become more familiar with how freedom of speech is applied in a military context. For instance, when a company commander openly questions the futility of serving another tour in Iraq is his conduct heroic or is it conduct unbecoming an officer? When Corporal Smith posts a blog alleging that the war is the result of corporate greed and that none of the troops support it is he simply expressing a personal opinion or does his speech present a threat to the morale and discipline of his unit? Soldiers are citizens in uniform, after all, and the Con-

Major John L. Kiel, Jr., is attending the Army Judge Advocate General's Legal Center and School in Charlottesville, Virginia, where he is a candidate for an L. L. M. degree in Military Law. Major Kiel's last assignment was at the United States Military Academy as an Assistant Professor of Law teaching courses in Constitutional Law and Military Justice. He is a graduate of Brigham Young University and the Florida State University College of Law.

*Parameters*

stitution they swear to defend bestows upon each of them the freedom of speech. But what happens when that speech has a detrimental impact on the good order, discipline, and morale of a particular unit or individual within the unit?

This article will examine the dilemma of dissension in the ranks—a dilemma that has largely remained dormant for more than 40 years. The last time soldiers lashed out against the President in any noticeable degree was during the Vietnam War. More recently, a number of commissioned officers publicly ridiculed President William J. Clinton after his affair with Monica Lewinsky came to light. The article will discuss these examples and a handful of seminal cases that comprise the body of law governing free speech in the military. What the cases and statutes indicate is that the content of the message itself and the nature in which it was delivered will ultimately determine its lawfulness. The more contemptuous and public the remark, the more likely punishment will be prescribed for the messenger.

### DOD Directives

There are two pertinent Department of Defense directives (DODD) that govern political speech in the military. Directive 1325.6 establishes guidelines for dealing with protest and dissident activities, and Directive 1344.10 specifies the types of political activities that may be appropriate for active-duty service members to engage in. The directives establish principles that are intended to help commanders balance the free speech rights of their troops with their own command obligations. For instance, DODD 1325.6 counsels commanders to preserve the service member's right of expression to the utmost extent on the one-hand while on the other they are cautioned not to ignore conduct that could destroy the effectiveness of their units.[4] The directives also presuppose that commanders will exercise calm and prudent judgment when trying to properly reconcile these two interests when they clash.

Although the directives are primarily consulted for the list of activities that they prohibit, they also openly encourage service members to participate in a number of political activities. These activities include voting, contributing money to partisan campaigns and causes, attending rallies, meetings, and conventions as a spectator, joining a political club, and expressing personal opinions on candidates and political issues.[5] Members may also serve as nonpartisan election officials, display a political sticker on their car, and encourage their peers to register and vote.[6] While this list is by no means exhaustive it is representative of the types of civic responsibilities the Department of Defense hopes military members will take advantage of as citizens.

There is, however, one caveat when it comes to engaging in most of these activities. Department of Defense Instruction 1334.01 generally for-

000545

bids wearing a uniform while participating in any personal, professional, or political activity where an inference of official sponsorship may be drawn.[7] Examples include giving an unofficial public speech or interview and participating in a march, picket, or any other form of public demonstration.[8] A good rule of thumb is that members may never wear a uniform while engaging in any activity that would tend to bring discredit upon the armed forces or create an inference of official endorsement on behalf of the military.

It is also important to note that unlike the *Uniform Code of Military Justice* (UCMJ), the directives do not distinguish service members who publicly criticize a President and oppose a war from those who openly support both. The directives were intended to preserve in part the long-standing tradition that the military remain an apolitical body whose duty is to obey the orders of its civilian leaders. Just as soldiers are prohibited from airing their grievances in public, so too should they refrain from delivering speeches, granting interviews, and publishing statements that tend to show partisan support for any cause and political leader.

There are a number of prohibited activities outlined in the provisions of DODD 1325.6 and DODD 1344.10, but for the sake of brevity this article will focus on the three or four that service members are most likely to violate. The first of these provisions deals with speaking in public at a political gathering. Army Lieutenant Ehren Watada was charged in part because of comments he made in a speech last year to an audience at an antiwar convention in Seattle, Washington. Directive 1344.10 specifically prohibits service members from speaking before any political gathering that promotes a partisan party, candidate, or cause. The directive defines a partisan political activity as one that supports issues specifically identified with a national or state political party and associated or ancillary organizations.[9] Veterans for Peace, the national organization that sponsored Watada's speech, arguably qualifies as an ancillary organization as defined by the regulation. Even though Watada was ultimately charged for using contemptuous language toward the President, he could have also been charged with violating a lawful general regulation under Article 92 of the UCMJ for delivering the speech to begin with in violation of Army regulations.

The group Appeal for Redress's online petition was proper in the sense that group members have every right to communicate with their legislators without fear of retribution, but their appearance on the CBS news program *60 Minutes* was another matter. Members of the group appeared on the program to discuss their opposition to the Iraq War. Although most of the interviewees spoke in vague generalities, they still violated the provisions of DODD 1344.10 barring participation in any radio or television program as an advocate for or against a partisan political party or cause. Because the group presented its petition to selected Democratic representatives in Congress in the hopes that

000546

Democrats would deliver on their campaign promise to redeploy forces from Iraq, it was promoting a partisan cause in violation of the directive.

### Contempt Toward Officials

Using contemptuous language against the President or other officials is a unique proscription within the law that is rarely charged by military prosecutors. Article 88 of the UCMJ is rooted in the British Articles of War of 1765.[10] The British Articles of War forbade any officer or soldier from using traitorous or disrespectful words against the King or members of the royal family.[11] The articles also forbade British troops from behaving with contempt or disrespect toward a general or other commander-in-chief of the British forces and from using words tending to hurt or dishonor them.[12]

In June 1775, the Continental Congress adopted this provision and slightly modified the language to make it applicable to the Continental Army during the Revolutionary War.[13] In 1776, Congress amended the provision to prohibit the use of traitorous or disrespectful words against the United States Congress or any state legislature in which a soldier or officer may be quartered.[14] The provision was modified again in 1806 to preclude the President and Vice President from being treated as objects of disrespect.[15] The provision remained unchanged until Congress incorporated it into Article 88 of the UCMJ in 1950.

In order to secure an Article 88 conviction, the government must prove that the accused was a commissioned officer; that he or she used certain words against the official or legislature specified in the article; that a third party became aware of these words because of an act attributed to the accused; and that the words were contemptuous in themselves or by virtue of the circumstances in which they were used.[16] The government may not charge expressions of opinion made during the course of a private conversation or adverse criticism of a protected official or legislature if it was not personally contemptuous and was done during the course of a political discussion. Punishment for this offense includes dismissal from the service, forfeiture of all pay and allowances, and confinement for one year.

One reason why prosecutions under this article are extremely rare is because of the "you know it when you see it" approach Congress adopted in attempting to define the term "contemptuous." The *Manual for Courts-Martial* asserts that contemptuous language is either so obvious that it amounts to contempt per se or it may be inferred by examining the circumstances surrounding the making of the accused's statement. The *Military Judges' Benchbook* (Department of the Army Pamphlet 27-9) is a companion text to the *Manual for Courts-Martial*, and it provides limited definitions for certain enumerated offenses under the UCMJ. The *Benchbook* defines contemptuous as "insulting,

rude, disdainful, or otherwise disrespectfully attributing to another qualities of meanness, disreputableness, or worthlessness."[17] Besides the limited guidance these two references provide, the best examples of this offense can be gleaned from cases where officers were either courts-martialed or administratively punished for using contemptuous language toward the President.

Approximately 115 general courts-martial were convened during the Civil War and the two World Wars to punish perceived Article 88 violations.[18] During the Civil War, soldiers were convicted for calling President Abraham Lincoln "'a loafer,' 'a thief,' 'a damned tyrant,' and a 'damned black republican abolitionist.'"[19] Soldiers who mockingly referred to President Woodrow Wilson as "the laughing stock of Germany" and "a God damn fool" were also tried and convicted during the First World War.[20] Officers who referred to President Franklin D. Roosevelt during World War II as "the biggest gangster in the world next to Stalin," "Deceiving Delano," and "a crooked, lying hypocrite" were also courts-martialed for using contemptuous language against the Commander-in-Chief.[21]

Since the UCMJ was enacted in 1950 the military has prosecuted only one officer for violating the provisions of Article 88.[22] On 6 November 1965, Lieutenant Henry Howe, Jr., marched in a peaceful war protest in El Paso, Texas, where he joined a group of professors and students who had organized a demonstration against the Vietnam War. On the day of the protest, Howe slipped into the back of a picket line wearing his civilian clothes and carrying a sign that read: "Let's Have More Than a 'Choice' Between Petty, Ignorant, Facists (sic) in 1968" on one side and "End Johnson's Facist (sic) Aggression in Vietnam" on the other.[23] Howe was convicted of using contemptuous words against the President and for conduct unbecoming an officer.

Lieutenant Howe contested his conviction on a number of legal grounds, including an argument that the antiwar rally where he carried his sign constituted a political discussion. The *Manual for Courts-Martial* specifically states that officers may not be prosecuted for adversely criticizing a designated official or legislature if the criticism itself was not personally contemptuous and it was done during the course of a political discussion.[24] The United States Court of Military Appeals rejected this argument on the grounds that adverse criticism could never equate to the kind of contemptuous language prohibited by the article.[25] Furthermore, the court noted that the provision also made perfectly clear, "Giving broad circulation to a written publication containing contemptuous words of the kind made punishable by this article, or the utterance of contemptuous words of this kind in the presence of military subordinates, aggravates the offense."[26]

Howe also argued that the charges violated his free speech rights under the First Amendment. After considering the fact that the prohibition

000548

against using contemptuous language predated the Revolutionary War, the Constitution, and the Bill of Rights, the Court rejected this argument outright. The Court also analyzed Howe's free speech argument in the context of the clear and present danger test set forth in *Schenk v. United States.* The *Schenk* court held, "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent."[27] The Court ultimately determined that the language Howe publicly displayed on his sign constituted such an evil and was therefore afforded no protection under the First Amendment.

Lieutenant Watada is the only other officer to be charged for violating Article 88 since Howe's conviction in 1967. Watada was charged with two specifications of using contemptuous language toward President Bush for making the following remarks in an interview he gave on 7 June 2006:

> As I read about the level of deception the Bush Administration used to initiate and process this war, I was shocked. I became ashamed of wearing the uniform. How can we wear something with such time-honored tradition, knowing we waged war based on a misrepresentation and lies?[28]

Watada has thus far vigorously defended his comments on the grounds that he was merely expressing his personal opinion which is considered protected speech under the First Amendment. If Watada is ultimately convicted of this charge, the appellate court may reject this argument given the Supreme Court's holding in the *Howe* case—that punishing Watada for publicly displaying his contempt for the President furthers the government's compelling interest of maintaining good order and discipline in the armed forces. The appellate court may also conclude that Watada's adverse criticism was exactly the kind proscribed by the article and that the public manner in which he delivered his comments aggravates his offense.

In most of these cases, however, officers who unwisely air their grievances in public risk receiving career-ending reprimands in their personnel files. At the height of Kenneth Starr's investigation into the Monica Lewinsky affair, public criticism of President Clinton became so frequent and blatant among the officer corps that both the Air Force and Marine Corps delivered stern warnings about using contemptuous language against the President.[29] Shortly after the Marine Corps issued its warning, Major Shane Sellers, a 20-year Marine veteran, published an article in *The Navy Times* where he said among other things "what Clinton and Monica did as consenting adults boils down to adultery. And one should call an adulterous liar exactly what he is—a criminal."[30] After several readers complained about Sellers' comments, the Marine Corps issued him a letter of concern and placed it in his personnel file.

000549

The most notorious case involving criticism of President Clinton took place in 1993 shortly after his election. Air Force Major General Harold Campbell delivered a speech at a NATO banquet where he called Clinton a "dope smoking," "skirt chasing," and "draft dodging" Commander-in-Chief.[31] For that, General Campbell was reprimanded, fined $7,000, and forced to retire.[32] Lieutenant Colonel Steve Butler called President Bush's decision to invade Iraq "sleazy and contemptible" and asserted, "Of course Bush knew about the impending attacks on America. He did nothing to warn the American people because he needed this war on terrorism. His daddy had Saddam and he needed Osama."[33] Lieutenant Colonel Butler was immediately reprimanded and relieved of his position as Vice Chancellor of the Defense Language Institute, forcing him into retirement after a distinguished 24-year career.[34]

### Conduct Unbecoming an Officer and a Gentleman

Article 133 of the *Uniform Code of Military Justice* proscribes officers from engaging in unbecoming conduct. It too was adopted from the British Articles of War of 1765.[35] The British version provided: "Whatsoever commissioned officer shall be convicted before a general courts-martial of behaving in a scandalous, infamous manner, such as is unbecoming the character of an officer and gentleman, shall be discharged from the service."[36] The Continental Congress adopted this provision in 1775, 1776, and once again in 1786 without making any modifications to the text.[37] In 1806, Congress revised the language by omitting the terms "scandalous" and "infamous," leaving the provision to read: "Any commissioned officer convicted before a general courts-martial of conduct unbecoming an officer and a gentleman, shall be dismissed [from] the service."[38] Congress ultimately incorporated the provision into the UCMJ in 1951 and enacted it as Article 133.[39] The current version of the article renders the provision applicable to officers, cadets, and midshipmen and authorizes any punishment that a courts-martial may direct including but not limited to dismissal from the service.[40]

There are literally dozens of activities that may comprise the conduct prohibited by the provisions of Article 133. Some of these activities include making false official statements or reports to superior officers; insulting or defaming another officer in the presence of other military members; giving false testimony before a courts-martial or board; neglecting to discharge pecuniary obligations; cruelty toward or maltreatment of subordinates; getting drunk in the presence of military inferiors; commission of a felony or crime; and gross disrespect or defiance of civil authorities, to name a few.[41] Much like Article 88, prosecutions for political speech under Article 133 are extremely rare. The last known trial involved an Army doctor who publicly opposed the Vietnam War and openly encouraged enlisted soldiers to disobey their deployment orders.

000550

Captain Howard Levy refused to set up a program for training Special Forces medics in simple dermatology procedures in preparation for their deployment to Vietnam. Upset that Levy had disobeyed his original order, the hospital commander ordered Levy a second time to conduct the training. Levy refused and then began making public statements denouncing the Vietnam War and Special Forces personnel in front of several enlistees assigned to Fort Jackson, S. C., for basic training. Levy was prosecuted for violating his commander's orders and for making intemperate, defamatory, disloyal, and provoking statements in violation of Articles 133 and 134 of the UCMJ.[42]

Levy's commander originally considered issuing him an Article 15 but decided to courts-martial him instead largely because of the public nature and circumstances surrounding his statements.[43] Levy stood in front of a group of black enlisted personnel and openly encouraged them to refuse to deploy to Vietnam because of perceived racial discrimination.[44] He also told a group of enlisted soldiers that he would not train Special Forces personnel because he considered them "liars and thieves," "killers of peasants," and "murderers of women and children."[45] On another occasion, Levy unapologetically told a group of soldiers, "I hope when you get to Vietnam something happens to you and you are injured."[46]

The United States Supreme Court ultimately reviewed Levy's conviction in 1974. Levy argued to the Court that the provisions of Articles 133 and 134 were unconstitutionally vague in the sense that he could not reasonably be expected to realize that his conduct was proscribed by law. The Court rejected this argument on the grounds, "His conduct, that of a commissioned officer publicly urging enlisted personnel to refuse to obey orders which might send them into combat, was unprotected under the most expansive notions of the First Amendment."[47]

Levy also argued that the provisions were overly broad to the extent that they violated his First Amendment rights. In the process of rejecting this assertion, the Court made a series of statements that indicated its willingness to give great deference to the military when it comes to First Amendment protections. Justice William H. Rehnquist, writing for the majority, stated that the unique nature of the military requires a different application of free speech protections than civilians generally enjoy.[48] The Court held, "The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it."[49] The military must rely on a command structure that is crucial to commanding troops in combat and affects overall national security, Rehnquist reasoned.[50] He also noted that while disrespectful and contemptuous speech may be tolerated in the civilian community, it may undermine the effectiveness of response to command in

000551

the military.[51] The Court concluded that the free speech protections contemplated by the Constitution did not extend to Captain Levy's conduct.

Lieutenant Watada was also charged for conduct unbecoming an officer and gentleman for publicly disparaging President Bush in the statement he issued 7 June 2006, the same comments that formed the basis of his Article 88 charge. If convicted of this charge, Watada will likely appeal on the ground that his comments are protected speech because they simply reflect his personal opinion. Considering the extreme deference the Supreme Court gave the military in *Parker v. Levy*, the appellate court may reject this argument after taking into account that Watada is a commissioned officer, that he had command responsibility for a platoon of soldiers, and that his conduct undermined the fundamental necessity of discipline, obedience, and the effectiveness of response to command in his unit.

### Conduct Prejudicial to Good Order and Discipline

Although Congress limited the application of Articles 88 and 133 to commissioned officers, enlisted personnel who publicly attack the Commander-in-Chief, the United States, or its policy aims are also subject to prosecution under the UCMJ. It would make little sense to allow a first sergeant or squad leader to make statements that have a detrimental impact upon the morale and discipline of the soldiers serving around them. For instance, what should become of the staff sergeant who calls the President a war criminal in a sermon he delivers at the local parish while home on leave from Iraq? How should the command handle the corporal who claims on a major newspaper's Web site that the soldiers fighting in Iraq no longer support the war and urges readers to put pressure on their elected representatives to bring the troops home? What should happen to the group of privates who don their uniforms and march in an antiwar rally on the National Mall?

One possible course of action is to punish these troops for violating the provisions of the Department of Defense directives discussed earlier as they have been incorporated by their respective services' regulations. Another is to punish them for violating the tenets of Article 134 of the UCMJ. Article 134 is commonly known as the "general article" in that it typically serves as a "catch-all" provision for charging a wide array of criminal offenses. Military prosecutors will typically rely on Article 134 to charge crimes that are not otherwise covered in other provisions of the UCMJ. In order to secure a conviction under the article, prosecutors must prove that the accused's conduct under the circumstances "was to the prejudice of good order and discipline in the armed forces" or "was of a nature to bring discredit upon the armed forces."[52] The prosecutor may literally bring charges against an accused for engaging in any political activity or speech that he can prove

amounted to either one of those two things. Arguably, the sermon, speech, and antiwar rally discussed above could qualify as service-discrediting conduct and under certain circumstances may also amount to conduct prejudicial to good order and discipline in the armed forces.

One of the provisions of Article 134 is the offense of making disloyal statements. An accused may generally commit this offense by making a statement disloyal to the United States with the intent to promote disloyalty or disaffection by any member of the armed forces. For instance, praising the enemy, denouncing America's form of government with the intent to promote disaffection or disloyalty among military members, and attacking the war aims of the United States are types of disloyal statements specifically contemplated by the provision.[53] The following two cases illustrate this provision.

The first case involves a soldier who was opposed to the idea of waging a "cold war" against the Soviet Union. Private First Class Allen McQuaid was assigned to Elmendorf Air Force Base, Alaska, in October 1952 when he made a series of damning statements about the United States and its foreign policy objectives. McQuaid claimed among other things that the war was waged by the banking industry to make money at his expense and to protect an economic system that he considered unfair and unjust.[54] McQuaid also inferred that service members who excelled in the military did so not by merit but by compromising their integrity while pandering to the "capitalists and their henchmen" who stood to gain the most from the war.[55] He then actively encouraged members who were disaffected with the service to "follow the dictates of their own consciences."[56] McQuaid uttered these statements vocally on a number of occasions and later posted them in writing on the front door of the officers' club and on the bulletin board of the Air Base Group headquarters.

The Air Force Board of Review concluded that McQuaid's statement about the banking industry profiting from the war was disloyal and disaffecting because it falsely portrayed the aims and objectives of the defense effort, it unjustly maligned the American economic system, and it tended to discourage faithful service to the United States by members of the armed forces.[57] The court held that the comment about certain service members compromising their ideals and oaths to further their careers was disloyal in that it undermined confidence by members of the armed forces in some of its other members.[58] Lastly, the court held that McQuaid's statement urging members to follow the dictates of their consciences was self evidently disloyal as it openly fostered disobedience.[59] The court ultimately concluded that none of the statements were protected by the First Amendment because of their seditious nature.

Another case involved two Army privates who authored a manifesto outlining their reasons for protesting the Vietnam War. Privates Daniel Amick and Kenneth Stolte published some 200 leaflets in the base library and

000553

then posted them in various locations around Fort Ord, California. The leaflets contained a number of statements alleging among other things that the war was stupid, illegal, and foolish. The privates wrote, "We are tired of all the lies about the war, the false ideals, the empty reasoning. We see the reality of war; it is pointless, meaningless, and [a] tragic battle between two differing factions of human beings."[60] The manifesto concluded by urging those who wanted to work for peace and freedom to join them in their opposition to the war. The two signed the statement identifying themselves by name, rank, unit, and serial number.

The trial court sentenced both soldiers to confinement for four years and to be dishonorably discharged from the service.[61] On appeal, the Army Board of Review held that soldiers have to expect that there are certain free speech restrictions that must be imposed on them because of the unique nature of the military. The court observed, "An Army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier."[62] The court concluded that the duo specifically intended to undermine the war effort by fostering dissent and by jeopardizing the discipline required of an effective fighting force.[63]

### Conclusion

As President Bush and the Congress continue jousting over the decision to withdraw US forces from Iraq, some service members will continue to publicly voice their disdain for the President and opposition to the war. In light of such events, commanders need to have a better understanding of the free speech restrictions imposed upon service members by the UCMJ. Senior leaders rarely courts-martial service members for voicing their political views in public for any number of reasons. Perhaps the most important reason is that commanders understand that their soldiers enjoy, for the most part, the same free speech rights that civilians are afforded under the Constitution.

Major Sellers, Colonel Butler, and General Campbell never spent a day behind bars for the things that they said about Presidents Clinton and Bush, but their commanders sent a clear message that such conduct will not be tolerated by commissioned officers serving on active duty. The private, corporal, and sergeant who publicly refer to the President as a liar, a war criminal, or worse should also be punished appropriately for their inappropriate conduct.

Much like any other criminal matter, commanders have a host of options when it comes to disposing of these types of cases. Options range from doing nothing to recommending a general courts-martial. The proper response likely lies somewhere in between. Commanders can always resort to

000554

letters of reprimand and poor evaluation reports to get the desired response without the crippling stigma of jail time or a federal conviction. Of course, administrative measures like these may also be used in conjunction with a courts-martial or an Article 15. Article 15s would be appropriate where the accused's comments were flagrant enough to warrant loss of pay, rank, or other privileges, including confinement up to 30 days. Officers may also receive Article 15s, usually, from a general officer whereby they may be fined or placed under house arrest.

Harsher measures like a courts-martial should be reserved for egregious offenders who take their criminal conduct to greater heights. Lieutenant Watada, for example, would likely have received a formal reprimand for expressing his contempt for the war and for President Bush had he gotten on a plane and deployed to Iraq. Instead, he opted to intentionally miss movement with the rest of his brigade and thus risks the possibility of a conviction at a general courts-martial. Because Captain Levy's comments presented a clear and present danger to the morale and readiness of black soldiers preparing to deploy to Vietnam, his commander appropriately chose to prosecute rather than give him the Article 15 originally intended.

Regardless of the form of punishment a particular commander may choose to impose on a service member for unlawfully expressing political views, all commanders should remember to prudently balance and preserve the free speech rights of their soldiers with their own professional command obligations, ensuring one never jeopardizes the other. When a commander does determine that certain speech or behavior is having a detrimental impact on unit discipline, readiness, and morale, the UCMJ provides plenty of tools to ensure that timely, fair, and appropriate discipline is administered in the best interests of justice.

**NOTES**

1. Ehren Watada, "Statement of Lt. Ehren Watada," 7 June 2006, http://www.couragetoresist.org/x/content/view/82/39/.

2. *Schenk v. United States*, 249 U.S. 47, 52 (1919).

3. Noam N. Levey, "Military Members Make an Antiwar Plea on Capitol Hill," *Los Angeles Times*, 17 January 2007, A8.

4. Department of Defense Directive 1325.6, *Guidelines for Handling Dissident and Protest Activities Among Members of the Armed Forces*, 1 October 1996, 2.

5. Department of Defense Directive 1344.10, *Political Activities by Members of the Armed Forces on Active Duty*, 2 August 2004, 2, 10.

6. Ibid., 10–11.

7. Department of Defense Instruction 1334.01, *Wearing of the Uniform*, 26 October 2005, 2.

8. Ibid.

9. DODD 1344.10, 9.

10. *United States v. Howe*, 37 C.M.R. 429, 434 (U.S.C.M.A 1967).

11. Ibid., 434.

12. Ibid.

13. Ibid.

000555

14. Ibid., 434-35.

15. Ibid., 435.

16. Joint Service Committee on Military Justice, *Manual for Courts-Martial United States* (Washington: US Government Printing Office, 2005), IV-17.

17. Department of the Army, *Military Judges' Benchbook*, Pamphlet 27-9, 15 September 2002, para. 3-12-1(d).

18. John G. Kester, "Soldiers Who Insult the President: An Uneasy Look at Article 88 of the Uniform Code of Military Justice," *Harvard Law Review*, 81 (June 1968), 1720-21.

19. Ibid., 1722.

20. Ibid., 1724-25.

21. Ibid., 1730-31.

22. See *United States v. Howe*, 37 C.M.R. 429 (1967).

23. Ibid.

24. Ibid., 444. Citing the *Manual for Courts-Martial*.

25. Ibid.

26. Ibid.

27. *Schenk v. United States*, 52.

28. Department of the Army Form 458, *Charge Sheet*, http://seattletimes.nwsource.com/news/local/charge_sheet.pdf.

29. Steven Lee Myers, "Military Warns Soldiers of Failure to Hail Chief," *The New York Times*, 21 October 1998, A22.

30. Ibid.

31. Ibid.

32. Ibid.

33. Kevin Howe, "DLI Official Removed for Criticizing Bush," *Monterey County Herald*, 3 June 2002, http://www.mindfully.org/Reform/2002/Bush-Critic-Suspended5jun02.htm.

34. Ibid.

35. William Winthrop, *Military Law* (Washington: Press of Thomas McGill & Co., 1886), 1020.

36. Ibid.

37. *Parker v. Levy*, 417 U.S. 733, 745 (1974).

38. Ibid., 746.

39. Ibid.

40. *Manual for Courts-Martial United States*, IV-94, 95. The maximum punishment authorized for this offense is a dismissal from the service; total forfeiture of all pay and allowances; and confinement for one year or for a period not in excess of that authorized for the most analogous offense punishable by the UCMJ.

41. Ibid., 1025-32.

42. *Parker v. Levy*, 739.

43. Ibid., 737.

44. Ibid., 739.

45. Ibid.

46. Ibid.

47. Ibid., 761.

48. Ibid., 758.

49. Ibid.

50. Ibid., 759.

51. Ibid.

52. *Manual for Courts-Martial United States*, IV-95.

53. Ibid., IV-104. The *Manual* provides that the disloyalty involved must be to the United States as a political entity and not to one of its departments or agencies that are part of its administration.

54. *United States v. McQuaid*, 5 C.M.R. 525, 528 (A.F.B.R. 1952).

55. Ibid., 530.

56. Ibid.

57. Ibid.

58. Ibid.

59. Ibid.

60. *United States v. Amick*, 40 C.M.R. 720, 722 (A.B.R. 1969).

61. Ibid., 721.

62. Ibid., 723. Citing to *In re Grimley*, 137 U.S. 147, 153 (1890).

63. Ibid.

000556

GE-29

000557



DEPARTMENT OF THE NAVY
HEADQUARTERS UNITED STATES MARINE CORPS
3000 MARINE CORPS PENTAGON
WASHINGTON, DC 20350-3000

IN REPLY REFER TO:
CMC
23 Mar 12

WHITE LETTER NO. 1-12

From:   Commandant of the Marine Corps
To:     All General Officers
        All Commanding Officers
        All Officers in Charge
        All Sergeants Major

Subj:   LEADERSHIP AND CONDUCT

1.  From the earliest days of our history, Marines have always distinguished themselves by disciplined adherence to orders. This has been especially true in austere and challenging expeditionary combat environments.  This discipline is at the heart of our ethos, it sets us apart from other fighting forces, and it has made our reputation.

2.  Overall, our efforts in Afghanistan have been fought and conducted in accordance with our own high standards and traditions - in a way that meets the high, almost lofty expectations of the American people.  By unhinging and beating back a determined enemy, Marines and their partners have forced a fundamental change of conditions and brought us to the point of success in Helmand Province.  The cost in blood and treasure has been high.

3.  Yet, despite this extraordinary effort, a number of recent, widely-publicized incidents have brought discredit on the Marine Corps and reverberated at the strategic level.  The undisciplined conduct represented in these incidents threatens to overshadow all our good work and sacrifice.

4.  Aside from the undisciplined and embarrassing conduct, I am particularly concerned with the blatant disregard for the unambiguous direction contained within United States Central Command General Order 1B (USCENTCOM GO 1B).  This conduct is particularly troubling in that it portends a lack of discipline and accountability by Marines and leadership; we are allowing our standards to erode.

5.  I direct each of you to maintain utmost familiarity with the details and spirit of all applicable orders and directives that govern our conduct in specific geographic areas and combat

000558

Subj:  LEADERSHIP AND CONDUCT

zones.  In particular, I draw your attention to USCENTCOM GO 1B, and the requirement that Commanders and Officers-in-Charge ensure that all of their personnel are thoroughly briefed on the prohibitions and requirements of the general order.

6.  The indispensable condition of Marine Corps leadership is action and attitude, not words.  We lead by example, and provide continual and close supervision to those we have the privilege to lead.  I expect each of you to hold yourselves and your Marines to the highest standards…nothing else is acceptable.

7.  During ten years of war, many hundreds of thousands of Marines have gone back and forth to combat in Iraq and Afghanistan, all while conducting themselves credibly and keeping their honor clean.  *That is what we do - that is who we are.*  The recent missteps indicate that there is complacency by some in the enforcement of our own high standards.  This requires your full and immediate attention.  The high regard of our fellow citizens and our own self-image are at stake.  Get after it!

JAMES F. AMOS

*Marines… I need your focused attention and your personal fingerprints on this matter now!*

2

# GE-30

| | | |
|---|---|---|
| UNITED STATES | ) | ADMINISTRATIVE SEPARATION |
| | ) | |
| v. | ) | |
| | ) | GOVERNMENT SUMMATION |
| Gary A. STEIN | ) | |
| Sergeant, USMC | ) | |
| XXX-XX-0101 | ) | 27 March 2012 |
| | ) | |

Sergeant Gary A. Stein, USMC, made contemptuous statements regarding the President of the United States and has violated Department of Defense Directive ("DoDD") 1344.10 (19 February 2008) in a variety of ways since at least November 2010. For the reasons set forth below, the Government respectfully requests that Sergeant Stein be discharged with an Other Than Honorable characterization.

## **Background**

Sergeant Stein is an active duty Marine currently assigned to Headquarters Company, Weapons and Field Training Battalion as the S-3 Range Chief. Sergeant Stein has been on active duty since 1 October 2002. Prior to Weapons and Field Training Battalion, Sergeant Stein was assigned to 1st Intelligence Battalion, I MEF, from 13 October 2008 to 20 June 2011. Sergeant Stein's military occupational specialty is 6842, Meteorology and Oceanography Analyst/Forecaster, but Sergeant Stein does not and cannot work in a 6842 billet or any billet that requires a security clearance. Sergeant Stein's top security clearance was revoked in 2010 after an investigation revealed that Sergeant Stein failed to report a pattern of financial mismanagement that included over $25,000 in bad debts, judgments, and repossessions.

Sergeant Stein has actively contributed to social media internet sites since 2010 and is a self-described conservative blogger. Since July 2011, Sergeant Stein has contributed seven articles under his own name in which he identifies himself as an active duty Marine and the

1

founder of the Armed Forces Tea Party.  Sergeant Stein also included links to his own Facebook

page and to another Facebook page that he created under the title, "Armed Forces Tea Party."

Sergeant Stein maintains and contributes to his personal Facebook page, in which he describes

himself as a "public figure," a "speaker," an "active duty 8 year Marine Corps veteran," and "the

founder of the Armed Forces Tea Party."  Sergeant Stein created the Facebook page entitled

"Armed Forces Tea Party" in November 2010 and he has been its administrator ever since.  The

Armed Forces Tea Party page is publicly accessible and is self-described as "a simple fan page

that is set up to allow active, inactive, or retired members of the United States Armed Forces to

stand with the Tea Party movement."  The page has a banner that mimics President Obama's

2008 campaign logo except altered to read "NOBAMA."

In 2010, Sergeant Stein was counseled by his chain of command and the IMEF Public

Affairs Officer regarding posts he made on the AFTP page.  Sergeant Stein enlisted the

assistance of the American Civil Liberties Union (ACLU) who sent a letter to the Commanding

Officer, MCB Camp Pendleton, "expressing their concerns about freedom of speech."  Sergeant

Stein expressed his intention at the time to appear on the MSNBC talk show Hardball to discuss

his posts.  Sergeant Stein subsequently removed the posts and declined to appear on the show.  In

2011, as part of his initial counseling with his company commander and first sergeant, Sergeant

Stein was again counseled and reminded of the Marine Corps' policy.  In January 2012, when the

Commandant of the Marine Corps released the latest memorandum of the Marine Corps policy

on political activities, Sergeant Stein was directed by his first sergeant to read the memorandum.

Sergeant Stein acknowledged via email that he read and understood the memorandum.  On 5

March 2012, Captain Kobyra, S-3A and Sergeant Stein's OIC, verbally counseled Sergeant Stein

000562

to be aware of his social media commentaries and his obligations as an active duty service member.

On or about 1 March 2012, Sergeant Stein navigated to the Facebook page entitled "Marine Corps Meteorology and Oceanography (METOC) Services," which is an open-forum discussion of political issues between members of the METOC community.  On the METOC page, Sergeant Stein posted, "As an Active Duty Marine I say 'Screw Obama' and I will not follow all orders from him . . . Will do my job better then [sic] the next guy . . . But as for saluting Obama as commander-in-chief . . . I will not," and, "You [sic] right it said to defend the 'I will support and defense [sic] the Constitution of the United States against all enemies, foreign and domestic' Obama is the economic enemy . . . He is the religious enemy . . . he is the 'Fundamentally change' America enemy . . . he IS the Domestic Enemy."  The post was discovered by a SNCO assigned to Marine Air Control Group-38 who forwarded a one-page screen shot of the post to Sergeant Major T. V. Jackson, Weapons and Field Training Battalion. The Weapons and Field Training Battalion command element directed Sergeant Stein's command-level chain of command to investigate the matter.  Thereafter, Sergeant Stein initiated a vigorous media campaign on his own behalf, including radio and television interviews with major networks and newspaper articles.

On 21 March 2012, Sergeant Stein was notified that he would be facing administrative separation proceedings based on the following conduct: "(1) that on or about 1 March 2012, you allegedly made statements regarding the President of the United States that are prejudicial to good order and discipline, as well as service discrediting in violation of Article 134, UCMJ; (2) from on or about November 2010 to the present you allegedly created, administered, and

3

provided content to a Facebook page, as well as other online media sources, in violation of DoD Directive 1344.10."

### Proof of the Charged Offenses

Sergeant Stein's statements were made in disobedience to a lawful general order in violation of Article 92 and were prejudicial to good order and discipline in violation of Article 134. While Sergeant Stein's statements qualify as protected political speech, the Government has a substantial interest in preserving discipline in the armed forces that both outweighs Sergeant Stein's interest in making political statements and limits Sergeant Stein's freedom of speech no greater than reasonably necessary.

1. *Sergeant Stein violated Article 92, UCMJ, by making political statements in violation of Department of Defense Directive 1344.10 (19 Feb 08).*

To prove that Sergeant Stein violated Article 92, the Government must prove that (1) there was in effect a certain lawful general order or regulation, (2) Sergeant Stein had a duty to obey that order or regulation, and (3) Sergeant Stein violated or failed to obey the order or regulation. MANUAL FOR COURTS-MARTIAL, UNITED STATES pt. IV, ¶ 16b(1) (2008) [hereinafter MCM]. As to the first element, DoDD 1344.10 is a general order because it is generally applicable to the armed forces and properly published by the Department of Defense. *See* DoDD 1344.10 ¶ 4.6.4. As to the second element, Sergeant Stein had a duty to obey DoDD 1344.10 because it applies to all active duty members of the armed forces. *See* DoDD 1344.10 ¶¶ 2, 4.1.1, 4.1.2. The only remaining element has to do with whether Sergeant Stein violated the specific provisions of DoDD 1344.10.

Paragraph 4.1.2.6 of DoDD 1344.10 states: "A member of the Armed Forces on active duty shall not . . . [p]articipate in any radio, television, or other program or group discussion as an advocate for or against a partisan political party, candidate, or cause." The Facebook page in

4

question is entitled "Marine Corps Meteorology and Oceanography (METOC) Services" and encourages open-forum discussion of political issues between members of the METOC community.  Sergeant Stein violated DoDD 1344.10 when he posted to the METOC page, "As an Active Duty Marine I say 'Screw Obama' and I will not follow all orders from him . . . Will do my job better then [sic] the next guy . . . But as for saluting Obama as commander-in-chief . . . I will not," and, "You [sic] right it said to defend the 'I will support and defense [sic] the Constitution of the United States against all enemies, foreign and domestic' Obama is the economic enemy . . . He is the religious enemy . . . he is the 'Fundamentally change' America enemy . . . he IS the Domestic Enemy."  Sergeant Stein also violated this provision of DoDD 1344.10 when he posted articles to RedState.com and appeared on radio and television interviews after his command began to investigate him for his "Screw Obama" comment.

Sergeant Stein violated DoDD 1344.10 in creating and administering the Facebook page "Armed Forces Tea Party."  Paragraph 4.1.2.4 of DoDD 1344.10 states that a servicemember may not "[s]erve in any official capacity with or be listed as a sponsor of a partisan political club."  Finally, Sergeant Stein violated DoDD 1344.10 when he spoke before the Fallbrook Tea Party on 22 March 2012.  Such behavior violates paragraph 4.1.2.5 of DoDD 1344.10, which states that no servicemember may "[s]peak before a partisan political gathering, including any gathering that promotes a partisan political party, candidate, or cause."

2. *Sergeant Stein violated Article 134, UCMJ, by making contemptuous statements regarding the President of the United States, which is prejudicial to good order and discipline in the armed forces.*

To prove that Sergeant Stein violated Article 134, the Government must prove that (1) Sergeant Stein did or failed to do certain acts, and under the circumstances, Sergeant Stein's

5

conduct was either (2a) to the prejudice of good order and discipline in the armed forces or (2b) of a nature to bring discredit upon the armed forces.  MCM ¶ 60b.

Sergeant Stein did or failed to do certain acts.  Sergeant Stein posted to a public Facebook page, "As an Active Duty Marine I say 'Screw Obama' and I will not follow all orders from him . . . Will do my job better then [sic] the next guy . . . But as for saluting Obama as commander-in-chief . . . I will not."  Sergeant Stein also posted, "You [sic] right it said to defend the 'I will support and defense [sic] the Constitution of the United States against all enemies, foreign and domestic' Obama is the economic enemy . . . He is the religious enemy . . . he is the 'Fundamentally change' America enemy . . . he IS the Domestic Enemy."

Sergeant Stein's conduct was to the prejudice of good order and discipline in the armed forces as well as of a nature to bring discredit upon the armed forces.  In order to be prejudicial to good order and discipline, there must be "reasonably direct and palpable" prejudicial connection between Sergeant Stein's statements and the military mission.  MCM ¶ 60c(2); *United States v. Wilcox*, 66 M.J. 442, 448 (C.A.A.F. 2008).  In order to be service discrediting, Sergeant Stein's conduct must have a reasonably direct tendency to bring the service into disrepute or to lower it in public esteem.  MCM ¶ 60(c)(1).  Sergeant Stein's comments were posted on a public Facebook site established for members of the METOC community and were in fact discovered by an active duty Marine at MACG-38.  The fact that an active duty Marine is publically disparaging the Commander-in-Chief in front of other active duty servicemembers has the potential to not only undermine good order and discipline within the Marine Corps, but also to cause doubt in minds of the civilian populace as to the professionalism and unity of the military chain of command.

000566

3. *The Government does not violate the First Amendment when it administratively separates Sergeant Stein for political and contemptuous speech.*

Speech constituting substantive political and social ideas is "the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365 (2003); *see also United States v. Brown*, 45 M.J. 389, 398 (C.A.A.F. 1996) (recognizing the same). Servicemembers enjoy some measure of First Amendment protection with respect to speech, but it is less comprehensive in the military context than in the civilian context. *Wilcox*, 66 M.J. at 446 (citing *Parker v. Levy*, 417 U.S. 733, 758 (1974); *United States v. Priest*, 45 C.M.R. 338, 344-46 (C.M.A. 1972); *United States v. Gray*, 42 C.M.R. 255, 258 (C.M.A. 1970)).

To determine the constitutionality of an administrative separation for commission of a serious offense involving speech, we apply the following two-part test: (1) Does the regulation protect a substantial governmental interest unrelated to the suppression of expression? (2) Is the limitation on Sergeant Stein's freedom of speech no greater than is reasonably necessary to the protection of that governmental interest? *Brown v. Glines*, 444 U.S. 348, 354 (1980) (citing *Procunier v. Martinez*, 416 U.S. 396, 413 (1974)). Two threshold issues must first be addressed: whether the speech involved is otherwise protected under the First Amendment, and whether the Government can prove the elements of the offenses charged. Because the Government can prove the elements of Articles 92 and 134, as discussed above, the remaining threshold issue is whether the speech involved is otherwise protected.

Sergeant Stein's speech is otherwise protected speech under the First Amendment. His words do not fall into the unprotected class of obscenity, *see Roth v. United States*, 354 U.S. 476 (1957), or fighting words, *see Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). Nor do his words fall under the unprotected class of "dangerous speech," which in the military context is speech that "interferes with the mission or presents a clear danger to loyalty, discipline, or

7

morale of the troops." *Brown*, 45 M.J. at 395 (citing *United State v. Hartwig*, 39 M.J. 125, 128

(C.M.A. 1994); *Priest*, 45 C.M.R. at 344).  An example of dangerous speech is urging fellow

servicemembers to abandon their units and return home during wartime.  *Brown*, 45 M.J. at 398.

While Sergeant Stein's speech may present some danger to loyalty or discipline, the danger is

too attenuated to qualify as a "clear" danger, especially in light of the fact that "'our national

reluctance to inhibit free expression dictates that the connection between statements . . . involved

and their effect on military discipline be closely examined.'" *Id.* at 396 (quoting *Priest*, 45

C.M.R. at 343-44).  Thus, the threshold issue is met.

  The test is now whether administrative separation of Sergeant Stein protects a substantial

governmental interest unrelated to the suppression of expression and whether the limitation on

Sergeant Stein's freedom of speech is no greater than is reasonably necessary to the protection of

that governmental interest.  *See Glines*, 444 U.S. at 354 (citing *Martinez*, 416 U.S. at 413)

  Administrative separation due to commission of a serious offense, namely violation of

Articles 92 and 134, protects a substantial governmental interest unrelated to the suppression of

expression: discipline in the armed forces.  "[T]he military services 'must insist upon a respect

for duty and a discipline without counterpart in civilian life.'" *Glines*, 444 U.S. at 354 (quoting

*Schlesinger v. Councilman*, 420 U.S. 738, 757 (1975)).  "'Speech that is protected in the civil

population may . . . undermine the effectiveness of response to command.'" *Levy*, 417 U.S. at

759 (quoting *Priest*, 45 C.M.R. at 344).  "The rights of military men must yield somewhat 'to

meet certain overriding demands of discipline and duty.'" *Parker*, 417 U.S. at 744 (quoting

*Burns v. Wilson*, 346 U.S. 137, 140 (1953)).

  The limitation of Sergeant Stein's freedom of speech is no greater than reasonably

necessary to the protection of discipline in the armed forces.  DoDD 1344.10 encourages

000568

servicemembers "to carry out the obligations of citizenship" to the maximum extent possible consistent with good order and discipline.  DoDD 1344.10 ¶ 4.  The restriction on a servicemember's political speech or participation is "[i]n keeping with the traditional concept that members on active duty should not engage in partisan political activity, and that members not on active duty should avoid inferences that their political activities imply or appear to imply official sponsorship, approval, or endorsement."  DoDD 1344.10 ¶ 4.  The Department of Defense permits active duty servicemembers to join partisan political clubs, serve as election officials, sign petitions, write letters to the editor, make monetary contributions, display political bumper stickers, and attend partisan political fundraising activities, subject to certain restrictions.  DoDD 1344.10 ¶ 4.1.1.  Under this rubric, the Department of Defense's limitation of Sergeant Stein's freedom of speech is no greater than reasonably necessary to the protection of discipline in the armed forces.  *Cf. Glines*, 444 U.S. at 355 (finding Department of Defense policies on base commanders' abilities to limit circulation of publications to be no more than reasonably necessary under similar conditions).

Because the governmental regulation at issue protects a substantial governmental interest unrelated to the suppression of expression and is no greater than reasonably necessary to the protection of that governmental interest, administrative separation of Sergeant Stein for commission of a serious offense relating to his speech is valid under First Amendment scrutiny.

000569

# GE-31

GARY G. KREEP (CA Bar No. 066482)
NATHANIEL J. OLESON (CA Bar No. 276695)
UNITED STATES JUSTICE FOUNDATION
932 "D" Street, Suite 3
Ramona, California 92065
Tel: (760) 788-6624
Fax: (760) 788-6414
usjf@usjf.net
njoleson@gmail.com

Attorneys for Plaintiff,
Gary A. Stein

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGEANT GARY A. STEIN, United States Marine Corps, Camp Pendleton, California 92055; ) )<br><br>Plaintiff,) )<br><br>v. )<br><br>COLONEL C.S. DOWLING, Commander, Weapons and Field Training Battalion, Camp Pendleton, California 92055; RAY MABUS, SECRETARY OF THE UNITED STATES NAVY, The Pentagon, Washington, D.C.; UNITED STATES DEPARTMENT OF DEFENSE, The Pentagon, Washington, D.C.; UNITED STATES OF AMERICA; and BRIGADIER GENERAL DANIEL YOO. )<br><br>Defendants.) | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

000571

Plaintiff, Gary A. Stein ("STEIN"), through his undersigned counsel, brings this action against the above named defendants, in their official capacities, for declaratory and injunctive relief, alleging as follows:

## NATURE OF THIS ACTION

1.     This is an action for declaratory and injunctive relief to enjoin an imminent attempt to discharge a good Marine in retaliation for the proper exercise of his First Amendment rights.  Though the First Amendment may operate differently in the military and civilian contexts, the military must still respect a service member's freedom of speech.  Sergeant Gary Stein has served with honor in the Marine Corps, and he has spoken on matters of public concern in his capacity as a private citizen.  Taken in their full context, his statements are protected by the First Amendment to the United States Constitution, as interpreted and applied by both civilian and military courts.  Nonetheless, Defendants are attempting to railroad him out of the Marine Corps, with an Other Than Honorable discharge, on extremely short notice, depriving Plaintiff of (a) his liberty without due process of law; (b) his right that Defendants comply with their own rules, regulations, and procedures; and (c) his rights of full American citizenship as promised by Department of Defense Directive 1344.10 ("DOD Directive 1344.10").  Defendants have left Plaintiff with no choice but to seek this Court's intervention to prevent a grave injustice.

## JURISDICTION AND VENUE

2.     The Court has jurisdiction over this action under 28 U.S.C. Section 1331.

3.     The Court has power to grant declaratory and injunctive relief pursuant to 5 U.S.C. § 702, Federal Rule of Civil Procedure 65, and 28 U.S.C. § 2201.

4.     The Court has personal jurisdiction over Defendants.

5.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e), because events giving rise to this action occurred within this district.

## PARTIES

6.     STEIN is a member of the Armed Forces of the United States, being an enlisted Marine

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

000572

1    in good standing with the United States Marine Corps, having served for almost nine years in the Marine

2    Corps, since July 15, 2003, and having attained the rank of Sergeant on May 1, 2008. STEIN wishes, and

3    intends, to reenlist in the Marine Corps, when his current term of service expires, on July 28, 2012, and he

4    had previously requested an extension of his current term until June 28, 2013, which is currently pending.

5           7.     Defendant C.S. Dowling ("DOWLING") is a colonel in the United States Marine Corps,

6    and serves as the Commanding Officer of the Weapons and Field Training Battalion, Marine Corps

7    Recruit Depot, San Diego, California. DOWLING is STEIN's commanding officer and the Convening

8    Authority with respect to STEIN and the Administrative Separation Board.

9           8.     Defendant Ray Mabus ("MABUS") is the Secretary of the United States Navy, one of the

10   military branches within the Defense Department in the United States Government, whose office is

11   charged by DOD Directive 1344.10, with the legally enforceable duty to "issue appropriate implementing

12   documents" for the purpose of enforcing DOD Directive 1344.10, with respect to service members of the

13   United States Marine Corps, and whose office has immediate supervision over DOWLING in ensuring

14   compliance with DOD Directive 1344.10..

15          9. Defendant, the United States Department of Defense ("DOD"), is a department of the

16   Executive Branch of the United States Government, which adopted, and is in charge of enforcing, the

17   UCMJ, and DOD Directive 1344.10.

18          10.    Defendant United States of America ("US") is a government entity supervising the

19   Armed Forces of the United States of America, and is the entity empowered to enforce sanctions for

20   knowing and willful violations of the law, and whose agents are responsible for regulating and enforcing

21   the UCMJ and DOD Directive 1344.10, including their enforcement as challenged herein by STEIN.

22          11.    Defendant Brigadier General Daniel Yoo ("YOO") is the Commanding General of U. S.

23   Marine Corps Depot, San Diego, and he exercises authority, as a result of that position, over the

24   separation of STEIN from service with the Marine Corps.

25          12.    All defendants are sued in their official capacity for declaratory and injunctive relief

3

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

000573

1   pursuant to 5 U.S.C. § 702.

2                                    **RELEVANT FACTS**

3          13.      During the period of 2010-2012, STEIN— through activities unconnected with his duties

4   as a U. S. Marine, and on his own personal time — and three other individuals, spoke, wrote, and

5   otherwise communicated with other private citizens in connection with a variety of matters of public

6   concern, including public policy issues. In so doing, STEIN expressed personal opinions on political

7   candidates and issues, but not as a representative of the Armed Forces of the United States. STEIN, and

8   the three other individuals, maintained an account on the computer social networking site known as

9   "Facebook" (hereinafter "Facebook page").

10         14.      In April, 2010, STEIN was approached by a representative of Chris Matthews, host of the

11  HARDBALL television program, about appearing on that show. He obtained permission from his

12  immediate superior, his Gunnery Sergeant, and made travel plans to so appear. On his way to appear on

13  the television program, he received a telephone call from Headquarters, Marine Corps, in Quantico,

14  Virginia, and he was ordered to return to his base. Subsequently, he was approached by his Chief Warrant

15  Officer concerning his Facebook page, because of the possibility that it could be construed as emanating

16  from military sources, rather than from private sources. STEIN took down his Facebook page while he

17  reviewed the matter. STEIN was urged by a Judge Advocate of the First Marine Expeditionary Force to

18  add a disclaimer to his Facebook page that all statements therein are personal views, not made in an

19  official capacity, and not representing the views of the U. S. Marine Corps, if he was going to leave the

20  page up. STEIN thereafter put the Facebook page that he hosted with three other individuals back up on

21  the Internet, adding thereon an appropriate disclaimer consistent with what he had been advised

22  concerning the permissible maintenance of a Facebook page. STEIN was not advised, at that time, nor at

23  any subsequent time, to take down the Facebook page, to remove it from the Internet, or to make any

24  further modifications thereto.

25         15.      From November, 2010, thru March 1, 2012, STEIN is alleged to have posted on his

                                              4

                    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

                                                                                    000574

1    Facebook page various criticisms of Barack Obama, questions concerning the Obama Administration's

2    policies, and critiques of John McCain, Ron Paul, Newt Gingrich, Rick Santorum, Mitt Romney, and

3    others. However, STEIN did not disobey or advocate disobeying any particular order actually issued by

4    any superior officer. Though some of the language he used in discussing certain hypothetical unlawful

5    orders might have been viewed as intemperate, he subsequently clarified, repeatedly, and publicly, that he

6    was only discussing the settled principle of military law that service members should not follow unlawful

7    orders.

8          16.      During the 17-month period, from November, 2010, through March 1, 2012, no attempt

9    was made by any of STEIN's commanding officers, or any other Marine Corps officer, to restrict or

10   correct STEIN's, and his friends', face book activities, including  comments about Barack Obama, and

11   others, as candidates in the 2012 Presidential election, nor was there any effort by any defendant, or any

12   person serving under any defendant, to modify or change the Facebook content, or to counsel or discuss

13   said content in relation to STEIN's duties as a member of the Marine Corps, or otherwise to advise

14   STEIN that his Facebook activities in any way prejudiced the good order and discipline of the Marine

15   Corps.

16          17.      Instead, on March 21, 2012, STEIN was notified by his Commanding Officer,

17   DOWLING, of the institution of Administrative Separation Proceedings, whereby DOWLING was

18   recommending STEIN's discharge from the U.S. Marine Corps, because of alleged misconduct, as set

19   forth in a Notification of Administrative Separation Proceedings dated 21 March 2012 [hereinafter

20   "Notification"]. Attachment "A". As grounds for discharge, the Notification alleged only:

21          The bases for this recommendation are as follows: (1) that on or about 1 March 2012, you

22          allegedly made statements regarding the President of the United States that are prejudicial to good

23          order and discipline, as well as service discrediting in violation of Article 134, UCMJ; (2) from

24          on or about November 2010 to the present you allegedly created, administered, and provided

25          content to a Facebook page, as well as other online media sources, in violation of DOD Directive

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

000575

1344.10. [*Id.*, p.1.]

18.     According to the Notification, DOWLING intended to recommend that STEIN receive a separation from service characterization of "Other Than Honorable Conditions" ("OTH"). An OTH characterization is the worst possible mark on a service member's record that can be imposed without the convening of a Court Martial Board. Moreover, it is the legal equivalent to the ineradicable stigma of a Bad Conduct Discharge, imposed in a sentence of a Court Martial, and divests the separated service member of substantially all veterans' benefits for his, or her, lifetime. Further, such a characterization could follow STEIN for the rest of his life, and impact his future ability to earn a livelihood.

19.     The Notification required STEIN to respond — in default of which his rights would be "waived" — within two working days, the absolute minimum time required by Section 6304.4 of the Marine Corps Separation and Retirement Manual ("MARCORSEPMAN"). Attachment "H." The Notification was served on STEIN during a period that the defendants knew that all Judge Advocates serving as defense counsel at STEIN's base were involved in annual legal training, and, thus, were unavailable to consult with him before his response was required to be filed.

20.     STEIN responded timely to the Notification, and defendants immediately scheduled a hearing for March 30, 2012 — just nine days after the Notification. Attachment "B." Defendants were aware that any members of the Judge Advocate able to serve as defense counsel were at a conference and could not begin work on STEIN's case until March 23, 2012, at the earliest.

21.     On March 23, 2012, STEIN's military attorney notified the hearing officer that he had a scheduling conflict on Friday, March 30, 2012. In response, by letter dated March 26, 2012, the hearing was delayed one day, until Saturday, March 31, 2012. On March 25, 2012, Plaintiff requested an additional one week in order to allow more adequate preparation for the hearing, but that request was summarily denied on March 26, 2012. Attachment "C."

22.     On March 26, 2012, STEIN retained, as civilian counsel, J. Mark Brewer, one of plaintiff's undersigned counsel, pursuant to MARCORSEPMAN, Section 6304.3(c). Attachment "H." On

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

000576

1    March 27, 2012, STEIN's civilian counsel again requested an extension of the hearing date for 10

2   days. Attachment "I." On March 28, 2012, that request was denied, but the hearing date was adjourned to

3   April 5, 2012, which is Maundy Thursday. Attachment "D."

4    23.    On March 30, 2012, STEIN's military attorney submitted to defendants a Request for

5   Legal Ethics Opinion, which would respond to three questions relevant and necessary to the conduct and

6   outcome of the Notification hearing:

7    "1. Has the Defense Department's Directive Number 1344.10 and other interpretative documents

8     been modified to fully comply with the Order ... in *Rigdon v. Perry*, 963 F. Supp. 150, 164

9     (D.D.C. 1997)....

10   "2. May an active duty, non-commissioned, U.S. Marine maintaining a Facebook web page

11    bearing a clear disclaimer that all statements are personal views, not made in an official capacity

12    and not representing the views of the Marine Corps, make statements thereon supporting or

13    opposing either (i) a political party or (ii) a candidate for federal, state or local office or (iii) both?

14   "3. May such a Marine make statements critical of a candidate for political office when that

15    candidate is also currently serving in office? Does a separate rule apply to criticisms of a

16    candidate for political office serving as President of the United States?" [Attachment "E."]

17   24.    To date, there has been no response to the Request for a Legal Ethics Opinion.

18   25.    On March 30, 2012, STEIN, through counsel, reiterated his request to extend the hearing

19   date until at least a date following a substantive response to the Request for a Legal Ethics Opinion.

20   Attachment "F." STEIN's counsel was informed orally on that same day that the request was denied, and

21   that the hearing on the Administrative Separation Proceedings would commence at 8 a.m., on Maundy

22   Thursday, April 5, 2012.

23   26.    STEIN and newly-retained civilian co-counsel have had insufficient time to prepare for

24   the hearing on the Notification, the results of which may severely prejudice STEIN with respect to his

25   continued military career, future employment, and other important aspects of his life.

7

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

000577

27.     STEIN's repeated request for a 10-day extension of the date for a hearing on the Notification was and is reasonable and necessary, such an extension constituting the minimum amount of time necessary for his legal counsel to consult with STEIN, interview witnesses, review documents and Internet pages, gather and prepare hearing exhibits, and assist in STEIN's preparation to testify and present an adequate defense at the administrative separation hearing, which raises significant Constitutional issues far more complex than normally presented at a typical discharge hearing.

28.     The hearing scheduled for April 5, 2012, is premature, and should await a substantive response to STEIN's Request for Legal Ethics Opinion, which poses the very legal questions on which defendants have never provided clear written guidance to enlisted members of the Marine Corps, and yet must be resolved, expressly or implicitly, by the Administrative Separation Board, a Board being entirely comprised of non-lawyers, in ruling on the discharge of STEIN.

29.     Although DOD Directive 1344.10 paragraph 5.2 requires MABUS to issue implementing instructions, to determine the manner in which the DOD Directive will be applied to the Navy and Marine Corps, no such implementing instructions have been issued. ATTACHMENT "G."

30.     Although MARCORSEPMAN requires counseling of a Marine by defendants prior to proceeding to an Administrative Separation Board, no such counseling has occurred. ATTACHMENT "H."

31.     Plaintiff need not exhaust administrative remedies before pursuing this action because (a) those remedies do not provide an opportunity for adequate relief to prevent his imminent discharge; (b) he will suffer irreparable harm if compelled to pursue administrative relief; (c) administrative appeal would be futile; and/or (d) this action presents substantial constitutional questions.

## CLAIMS FOR RELIEF

## COUNT I

### (Failure Of Defendant Secretary Of Navy To Issue Required Implementing Instructions)

32.     Plaintiff hereby re-alleges and incorporates by reference each of the foregoing allegations

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

000578

1   in paragraphs 1-31, as if set forth fully herein.

2         33.    DOD Directive 1344.5.2 requires that "the Secretaries of the military departments shall

3   issue appropriate implementing documents for their respective departments." Such implementing

4   documents are issued as Secretary of the Navy Instructions ("SecNavInstruct) or Operation Navy

5   Instructions ("OpNavInstruct"), but a diligent search has failed to reveal any such instructions. These

6   instructions are required so that each different military department tailors the application of the DOD

7   Directive to that specific military department. MABUS having failed to carry out his duty to apply this

8   DOD Directive to the particular needs of the Navy and the Marine Corps, means that this regulation may

9   not be used as the basis for discipline against enlisted members of the U.S. Marine Corps.

10   COUNT II

11   (Violation Of MARCORSEPMAN Requirement To Counsel Plaintiff)

12         34. Plaintiff hereby re-alleges and incorporates by reference each of the foregoing allegations in

13   paragraphs 1-33, as if set forth fully herein.

14         35.    MARCORSEPMAN states "When a Marine's performance or conduct falls within any of

15   the reasons within section 2 [which includes the charge of misconduct brought against Plaintiff] and all

16   required command attempts at leadership and rehabilitation of the Marine have been unsuccessful, the

17   commanding officer should initiate separation processing, subject to the specific requirements found in

18   this chapter." MARCORSEPMAN, Section 6302.

19         36.    MARCORSEPMAN Section 6105.1 states "that reasonable efforts at rehabilitation

20   should be made before initiation of separation proceedings." No such reasonable efforts having been

21   made, it is a violation of MARCORSEPMAN, and its policy and procedures, to have proceeded directly

22   to involuntary separation procedures against STEIN. Such violation of Marine Corps policy and

23   procedures violates Plaintiff's Constitutional right to due process under the Fifth Amendment to the

24   United States Constitution.

25   //

9

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

000579

## COUNT III

### (Violation of MARCORSEPMAN Requirement To Specify Basis For Proposed Separation, Violation of MARCORSEPMAN Right to Effective Assistance Of Civilian Counsel, Denial of Due Process And Right To Effective Assistance Of Counsel Under the Fifth Amendment To The U. S. Constitution)

37.     Plaintiff hereby re-alleges and incorporates by reference each of the foregoing allegations in paragraphs 1-36, as if set forth fully herein.

38.     Defendants have failed to provide STEIN with a statement of the basis for separation as required by MARCORSEPMAN, Section 6304, and have refused to postpone the Notification hearing date to afford STEIN a reasonable period of time to consult with his military and newly-engaged civilian legal co-counsel, in accordance with MARCORSEPMAN Section 6303, to prepare an adequate case and defense in response to the charges set forth in the Notification, such failure and refusal constituting an unreasonable and unconstitutional deprivation of STEIN's right to due process under the Fifth Amendment to the U.S. Constitution, causing irreparable harm and injury to him.

## COUNT IV

### (Denial Of First Amendment Rights)

39.     Plaintiff hereby re-alleges and incorporates each of the foregoing allegations in paragraphs 1-38, above as if set forth fully herein.

40.     STEIN's activities, complained of in the Notification, did not violate Article 134, UCMJ, as construed by civilian and military courts in light of the First Amendment.

41.     STEIN's activities, complained of in the Notification, did not violate DOD Directive 1344.10. Even if they did, DOD Directive 1344.10 violates the First Amendment as applied to Plaintiff, because it is vague and/or overbroad, unconstitutionally restricts core political speech, and/or unlawfully discriminates, based on content or viewpoint of speech

42.     The statements made, and the activities conducted, by STEIN, which defendants contend

10

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

violate Article 134, UCMJ, and DOD Directive 1344.10, constitute statements and activities protected under the First Amendment to the United States Constitution, including, but not limited to, the freedom of speech, the freedom of the press, the freedom of assembly, and the right to petition the government for a redress of grievances.

43.    The United States District Court for the District of Columbia has determined that ambiguity and confusion in the DOD Directive implicates First Amendment rights. Defendants have failed to ensure that the DOD directive, as written, complies with, and is in this case is being interpreted consistent with, an injunction against DOD and the United States Navy by the United States District Court for the District of Columbia that was never appealed. See *Rigdon v. Perry*, 962 F. Supp. 150 (D.D.C. 1997).

44.    The restrictions against (a) speaking before a partisan political gathering, including any gathering that promotes a cause; and (b) participating in any "discussion" as an advocate for or against a cause, appear, to be content- and viewpoint-discriminatory. *See Rigdon v. Perry*, 962 F. Supp. 150, 164 (D.D.C. 1997).

45.    The Administrative Separation Board, which consists of three non-lawyers, is scheduled to decide novel and complex issues, concerning the application of existing DOD regulations to new modalities of social media, having a chilling effect on STEIN's First Amendment rights. Established written guidance being relied on by the government is ambiguous and contradictory. Accordingly, STEIN sought a Legal Ethics Opinion on March 30, 2012, which is now pending. Allowing the hearing to proceed on April 5, 2012, would deprive STEIN of the opportunity to seek such an Ethics Opinion to clarify his obligations, and to allow him an opportunity to follow that guidance, if it requires changes in the Facebook page, or other actions. Further, if the guidance from competent military authority demonstrates that STEIN's actions are permissible, it would allow for the termination of the Administrative Separation Board prior to hearing this case, and the withdrawal of any contemplated adverse action against STEIN.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

000581

46.     Defendants' interpretation of Article 134, UCMJ, and DOD Directive 1344.10, together with their threatened discharge proceedings against STEIN, constitute an unlawful infringement and threatened abridgement of STEINs First Amendment rights, causing irreparable harm and injury to him.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff respectfully prays that this Court:

1.     Declare that the Defendant Secretary of the Navy has failed to issue required implementing regulations with respect to DOD Directive 1344.10.

2.     Declare that the threatened Notification procedure by defendants violates the Plaintiff's right to due process under military regulations, and under the Fifth Amendment to the United States Constitution.

3.     Declare that the provisions of Article 134, UCMJ, and DOD Directive 1344.10, as interpreted by defendants, violate the Plaintiff's rights under the First Amendment to the United States Constitution, and, when interpreted consistent with the First Amendment, were not violated by Plaintiff.

4.     Enter an order enjoining the defendants from proceeding with administrative separation proceedings against Plaintiff.

5.     In the alternative, enter an order enjoining the defendants from proceeding against plaintiff on the Notification until at least thirty (30) days after issuance of a written response to the requested Legal Ethics Opinion, until after the Secretary of the Navy has issued implementing regulations, and until after defendants have counseled with Plaintiff.

6.     Permanently enjoin and restrain defendants, their agents, and assistants from enforcing, executing, and otherwise applying the challenged provisions against Plaintiff in any respects in which the same may be found to violate the freedom of speech, freedom of the press, freedom of association, and freedom of petition guarantees of the United States Constitution;

7.     Award plaintiff costs and reasonable attorney's fees against defendants; and

8.     Grant and order such further relief as the Court may deem just and proper.

12

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Dated: April 2, 2012

      Respectfully submitted,

GARY G. KREEP (CA Bar No. 066482)
NATHANIEL J. OLESON (CA Bar No. 276695)
UNITED STATES JUSTICE FOUNDATION
932 "D" Street, Suite 3
Ramona, California 92065
Tel: (760) 788-6624
Fax: (760) 788-6414
usjf@usjf.net
njoleson@gmail.com

Attorneys for Plaintiff, Gary A. Stein

**Of Counsel:**

J. MARK BREWER (TX Bar No. 02965010)
Brewer & Pritchard
Three Riverway, 18th Floor
Houston, TX 77056
Tel: (713) 209-2910
Fax: (713) 659-5302
brewer@bplaw.com

STEWART RHODES
OATHKEEPERS
5130 S. Fort Apache Road. Suite 215-160
Las Vegas, NV 89148
Tel: (702) 353-0627
rhodeslegalwriting@gmail.com

WILLIAM J. OLSON (VA Bar No. 15841)
HERBERT W. TITUS (VA Bar No. 41126)
JOHN S. MILES
JEREMIAH L. MORGAN
William J. Olson, P.C.
370 Maple Avenue, West, #4
Vienna, Virginia 22180-5615
Tel: (703) 356-5070
Fax: (703) 356-5085
wjo@mindspring.com
johnsmiles@hotmail.com

13

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

000583

DAVID LOY (CA Bar No. 229235)
ACLU Foundation of San Diego & Imperial Counties
P.O. Box 87131
San Diego, CA 92138-7131
Tel: 619-232-2121
davidloy@aclusandiego.org

14

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

000584