```
-----------------------------
                            )
UNITED STATES               )
                            )
            vs.             )     ADMINISTRATIVE SEPARATION
                            )              BOARD
                            )
Gary A. Stein               )
SGT, USMC                   )
XXX XX 0101                 )
WFTBn, MCRD San Diego       )
-----------------------------
```

The board in the aforementioned case was opened on 5 April 2012, at 0833.

### PERSONS PRESENT

| | |
|---|---|
| SENIOR MEMBER: | LtCol R. L. Hairston, USMC |
| MEMBER: | Maj T. D. Wardinski, USMC |
| MEMBER: | SgtMaj M. D. Brookman, USMC |
| RECORDER: | Capt J. W. Torresala, USMC |
| ASSISTANT RECORDER: | 1stLt S. Gwartney, USMC |
| COUNSEL FOR THE RESPONDENT: | Capt N. R. Grey, USMC |
| COUNSEL FOR THE RESPONDENT: | Capt J. S. Baehr, USMC |
| CIVILIAN COUNSEL: | Mr. M. Brewer |
| CIVILIAN COUNSEL: | Mr. G. Kreep |
| CIVILIAN COUNSEL: | Mr. S. Rhodes |
| RESPONDENT: | Sgt G. S. Stein, USMC |
| LEGAL ADVISOR: | Maj P. D. Houtz, USMC |
| COURT REPORTER: | SSgt K. C. Myers, USMC |

**TESTIMONY**

**GOVERNMENT WITNESSES**                          **PAGE**

1stSgt J. Rocha

    Direct Examination                      123

    Cross-Examination                       130

    Redirect Examination                    138

Capt A. McKillop

    Direct Examination                      140

    Cross-Examination                       145

    Redirect Examination                    150

    Recross-Examination                     151

Maj R. Nichols

    Direct Examination                      152

    Cross-Examination                       155

Sgt Z. T. Barnhart

    Direct Examination                      163

    Cross-Examination                       167

    Examination by the Board                171

    Recross-Examination                     172

CWO4 D. J. Burns

    Direct Examination                      174

    Cross-Examination                       180

    Examination by the Board                186

MSgt D. Rose

    Direct Examination                           188

    Cross-Examination                          192

    Examination by the Board          199

CWO2 G. W. Mills

    Direct Examination                           200

    Cross-Examination                          203

Capt G. Logan

    Direct Examination                           208

    Cross-Examination                          212

    Examination by the Board           216

    Redirect Examination                    217

**TESTIMONY**

**DEFENSE WITNESSES**                              **PAGE**

GySgt E. D. Lisonbee

     Direct Examination                         196

     Recross-Examination                        217

Mr. J. Stein

     Direct Examination                         219

Mr. J. Smith

     Direct Examination                         228

Mr. J. E. Dismore

     Direct Examination                         235

     Cross-Examination                          238

     Redirect Examination                       239

SMBR:      This board will come to order.  The recorder will note
           the time and date for the record.

RCD:       Time on deck is 0833, 5 April 2012.

           This is the administrative separations board for
           Sergeant Gary A. Stein, United States Marine Corps.
           This board has been convened for the purpose of
           considering pertinent facts in the case of Sergeant Gary
           A. Stein, United States Marine Corps, who is being
           considered for administrative separation from the United
           States Marine Corps by reason of misconduct due to
           commission of serious offenses.

           This board is convened by order of the Commanding
           Officer, Weapons and Field Training Battalion, by his
           appointing order, dated 29 March 2012; copies of which
           have been furnished to each member, the recorder, and
           counsel for the respondent for inclusion in the record
           as Government Exhibit 1.

           The following persons named in the appointing order are
           present:

           **Lieutenant Colonel R. L. Hairston, United States Marine
           Corps, Senior Member;
           Major T. D. Wardinski, United States Marine Corps,
           Member;
           And Sergeant Major M. D. Brookman, United States Marine
           Corps, Member;
           Captain J. W. Torresala, United States Marine Corps,
           Recorder, a lawyer certified in accordance with
           Article 27(b), Uniform Code of Military Justice;
           Captain N. R. Grey, a lawyer certified in accordance
           with Article 27(b), Uniform Code of Military Justice, is
           detailed as Counsel for Respondent;
           Sergeant Gary A. Stein, United States Marine Corps;
           Major P. D. Houtz, United States Marine Corps, a lawyer
           certified in accordance with Article 27(b), Uniform Code
           of Military Justice, is detailed as Legal Adviser for
           the board.**

           And this is off script, but I would like to ask Sergeant
           Stein's other counsel that are not listed on the
           appointing order to go ahead and state their names and
           qualifications.

1

CR (Capt Baehr):  My name is Captain James S. Baehr.  I've been
                  detailed to this court-martial by Lieutenant Colonel
                  Paul Atterbury, the Regional Defense Counsel of the
                  Western Region.  I'm qualified, certified, and sworn
                  under Article 27(b) and 42(a) of the Uniform Code of
                  Military Justice.  I have not acted in any disqualifying
                  manner.

CC (Mr. Brewer):  Good morning, I'm Mark Brewer.  I'm a civilian
                  counsel, former judge advocate.  I'm here to represent
                  Sergeant Stein and assisting his military defense
                  counsel.

CC (Mr. Kreep):  Good morning, I'm Gary Kreep.  I'm an attorney
                 admitted to all courts of the State of California and
                 numerous other courts -- federal courts around the
                 country.  And I'm here to assist Mr. Brewer and the
                 military defense counsel.

CC (Mr. Rhodes):  Good morning, I'm Stewart Rhodes, attorney also
                  a founder of Oath Keepers.  I'm of counsel for this
                  case.

SMBR:      Okay.  Thank you.

           Has the respondent been advised of his rights before
           this board?

CR (Capt Baehr):  He has, sir.  And he waives the reading of those
                  rights at this time.

SMBR:      Okay.  Do you have any questions about your rights?

RSP:       No, sir.

SMBR:      This board will make findings of fact and shall
           recommend either retention or separation.  If separation
           is recommended, the reasons will be listed along with
           the type of separation recommended.  The board may also
           recommend that separation, if applicable, be suspended.
           In appropriate cases, the board shall recommend whether
           or not the respondent should be transferred to the
           Individual Ready Reserve.  The recommendations of this
           board are advisory in nature.

           The board functions as an administrative rather than a
           judicial body.  The strict rules of evidence are,
           therefore, not applicable.  Article 31(b), Uniform Code

2

of Military Justice, will be adhered to, however.  You are, therefore, advised that no military person on active duty may be compelled to testify or produce evidence that will tend to incriminate him or be required to answer questions not material to the issue which might tend to degrade him.

This board will consider any matter presented which is relevant to the issue, whether written or oral, sworn or unsworn.  Real evidence as to state from testimonial evidence may be exhibited to the board and should be accurately described or reproduced for the record.  The board may refuse to consider or to consider further any oral or written matter presented if it is irrelevant, immaterial, or unnecessarily repetitive or cumulative. But no such matter will be rejected or withheld from consideration on the grounds that it would be inadmissible in court-martial proceedings.  If evidence is classified, the provisions on information security in the JAG Manual, Section 0140, and OPNAV Instruction 5510.1B shall be observed.

This board shall rely on its own judgment and experience in determining the weight and credibility to be given material received in evidence.  Board proceedings will not be in the nature of a formal fact-finding tribunal or judicial trial but will be formalized to the extent of assuring full opportunity for presentation of the respondent's case.  If any evidentiary objection is made at any stage during the proceedings, I, as senior member, will ensure that the objection is noted for the record.

This hearing shall be conducted in an atmosphere of decorum and dignity.  Witnesses appearing before this board shall be treated with respect and shall be protected from questions which go beyond the bounds of proper examination, made to harass, annoy, or humiliate.

Do you have any questions about this board or these proceedings?

RSP:        No, sir.

SMBR:       Does the recorder, counsel for the respondent, or respondent wish to question any member of this board in relation to any matter regarding possible grounds for challenge for cause?

3

RCD:        Not from the recorder, sir.

CR (Capt Baehr):  Sir, we do have a few -- a few voir dire
            questions for the panel.

LA:         And may I suggest, is it -- the legal adviser, do you
            have a -- before we get into the panel voir dire, if you
            have voir dire for me, let's do it first because if
            I'm --

CR (Capt Baehr):  Yes, sir.

LA:         I'm --

CR (Capt Baehr):  Yes, sir.

            Gentlemen -- exactly as you said, sir.  We'd first like
            to direct some voir dire questions to you --

LA:         Absolutely.

CR (Capt Baehr):  -- outside of the presence of the panel.

LA:         And another note, sir, with your permission, I think we
            can refrain from standing up every time a question's
            asked.

SMBR:       Yes.

LA:         The room's too small.  The chairs are moving awkwardly,
            so you can feel free to advise your client doesn't have
            to stand up to respond.

CC (Mr. Brewer):  Thank you, sir.

LA:         Just stay seated.  I'm comfortable with that.

CR (Capt Baehr):  Sir, we request to voir dire you outside the
            presence of the members.

LA:         Okay.

SMBR:       May I take my script?

CR (Capt Baehr):  Yes, sir.

SMBR:       No problem?

4

CR (Capt Baehr):  No problem, sir.

[The members departed the conference room.]

CR (Capt Grey):  Sir, what are your duties as the legal adviser to
          this board?

LA:       Nick, as far as I'm concerned and my understanding of
          the MARCORSEP Manual, my duties as the legal adviser to
          the board -- I'm sorry.  My duties as a legal adviser to
          the board include just advising the President of the
          Board on any legal issues that come up, any objections,
          any motions, anything of that nature, and just to ensure
          he's complying with the law.

CR (Capt Grey):  Does that include -- would you say that your
          advice is limited to regulations in the Marine Corps
          Separations Manual or does that extend to federal
          statutes, Constitution, and the like?

LA:       Okay.  Before I answer that, let's -- if this is leading
          up to a challenge for cause, we're going to -- going to
          focus on -- I'd ask you to focus on questions that bring
          into question my impartiality and that sort of thing.

          My job as the legal adviser is to advise the president
          on any legal issues that come up whether it's -- and
          that's my understanding -- of whether it's procedural or
          whether it's legal involving case law.  Things like
          that.

CR (Capt Grey):  Yes, sir.  Then to focus on particular potential
          bias, you've previously served as the military justice
          officer before you took your current duties as the
          deputy staff judge advocate?

LA:       I did.

CR (Capt Grey):  Sir, currently your billet is the deputy staff
          judge advocate?

LA:       It is.

CR (Capt Grey):  And part of your duties, then, are any time the
          staff judge advocate, Lieutenant Colonel Sullivan, is
          unavailable, you fill in for his position, correct?

LA:       I do.

5

000803

CR (Capt Grey):  And that would be involving all battalion level
          and depot level commands with regards to legal issues
          that come up?

LA:       That's right.

CR (Capt Grey):  Including disciplinary issues?

LA:       That's right.

CR (Capt Grey):  Disposition of potential criminal matters?

LA:       Absolutely.

CR (Capt Grey):  And before we took that break, we were talking
          about your previous billet which you held until -- was
          it mid-last year?

LA:       I think it was about this time last year.

CR (Capt Grey):  Okay.  So about one year ago.  Prior to that, you
          were the military justice officer --

LA:       I was.

CR (Capt Grey):  -- for Recruit Depot San Diego?

LA:       Yes.

CR (Capt Grey):  And that's essentially the head prosecutor for
          the installation?

LA:       It is and the Western Recruiting Region.

CR (Capt Grey):  Okay.  And in that capacity, your task was
          supervising the prosecution of all Marines that are in
          the Recruit Depot and Western Recruiting Region?

LA:       That's right.

CR (Capt Grey):  Okay.  In that capacity, you and I have been on
          opposite sides of at least one case, the *Staff Sergeant
          Hargraves*[ph] case, wasn't it?

6

LA:         I don't -- I don't recall -- Nick, I think we were on
            opposite sides on every case with regard to me being the
            military justice officer and you being a defense counsel
            and in my role as a supervisor.  But I don't -- I don't
            recall being involved in the *Hargraves* case, no.

CR (Capt Grey):  Okay, sir.  And Captain Torresala was one of your
            prosecutors at the time?

LA:         He worked for me, yes.

CR (Capt Grey):  You were his supervising attorney?

LA:         Yes, that's correct.

CR (Capt Grey):  And so at the time, you and Captain Torresala
            were on the same team pushing for the same --

LA:         We are.  And I'd like to mention right now I am -- I am
            Captain Torresala's supervisor.  I write his fitness
            report if that's what -- that's what you're getting
            toward.

CR (Capt Grey):  Yes, sir.

LA:         Again, though, in an effort to keep this somewhat
            streamlined, I'd ask you to focus the questions on
            something that brings into question my impartiality or
            ability to advise the president of the board in a fair
            manner.

CR (Capt Grey):  And, sir, we received a -- we had submitted a
            letter to the Commanding Officer of this battalion,
            Weapons Field Training Battalion --

LA:         Right.

CR (Capt Grey):  -- with regards to how the members were appointed
            and your previous activity on the case.  And we
            essentially were directed to put those questions to you.
            I'd like to ask you those questions.

LA:         Okay.  That's fine, Nick.

CR (Capt Grey):  These are the -- included in the e-mail that I
            sent you last night.

LA:         I didn't receive that.

7

000805

CR (Capt Grey):  Okay.  I'm sorry, sir.  I know you probably came
                 up here right away this morning.  Essentially the same
                 questions, have you had a chance to review that letter
                 to Colonel Dowling?

LA:              I think I've seen it.  I haven't had a chance to review
                 it, no.

CR (Capt Grey):  Okay, sir.  Well, to your knowledge, was your
                 selection made by the convening authority, Colonel
                 Dowling, or did another individual select you for your
                 position as legal adviser?

LA:              I believe Colonel Dowling appointed me as legal adviser.

CR (Capt Grey):  Who informed you that you were the legal adviser?

LA:              Lieutenant Colonel Sullivan.

CR (Capt Grey):  And do you know why you were selected?

LA:              No.  I'm the -- I'm the legal adviser on 99 percent of
                 the administrative separation boards run at MCRD San
                 Diego.  I'm just the default legal adviser, because I --
                 and then I -- I would remove myself from acting further
                 on that case if it -- if it ended up in a discharge of
                 some sort.

CR (Capt Grey):  Yes.

LA:              But, no.  I'm the default legal adviser, I think, for
                 most of these boards and BOIs and things like that.

CR (Capt Grey):  And what about with regards to the members of the
                 board, did you have any -- who selected the members of
                 the board?

LA:              I don't -- I don't know who selected the members of the
                 board.  I wasn't involved in that selection of the
                 members of the board.  But I would imagine that the --
                 Colonel Dowling selected them.

CR (Capt Grey):  That's your understanding, that Colonel Dowling
                 selected the members of the board?

LA:              I don't know.  I'd just have to say I don't know, Nick.

8

CR (Capt Grey):  Do you know any potential members that were
                considered for appointment to the board but were
                ultimately not selected?

LA:             Do I know any members of the board who were initially
                selected and then not -- or initially --

CR (Capt Grey):  Who was potentially considered for the board?

LA:             I don't know, Nick.

CR (Capt Grey):  Do you know what criteria was used to select the
                board members?

LA:             I couldn't answer that question, no.

CR (Capt Grey):  Have you had interaction with Colonel Dowling as
                your capacity as the deputy staff judge advocate?

LA:             Outside of the -- outside of this case?

CR (Capt Grey):  Yes, sir.

LA:             Limited, yes.  I don't talk -- he -- Colonel Dowling is
                one of the convening authorities.  I -- out of all the
                convening authorities we interact with, I'd say I have
                the least interaction with him.  But occasionally we
                talk on the phone, I'd say maybe -- maybe once every
                couple of months.

CR (Capt Grey):  And has he ever discussed with you or questioned
                with you how he should appoint members to this board?

LA:             No.

CR (Capt Grey):  Sir, how many administrative boards have you
                participated in either as counsel for respondent,
                counsel for the government, or as a legal adviser?
                Rough estimate of course is fine.

LA:             In my career?

CR (Capt Grey):  Yes, sir.

LA:             I'd say under a hundred.

9

000807

CR (Capt Grey):  You would agree with me that the appointment of
                 the lieutenant colonel for the senior member is a little
                 unusual?  It's typically a major, correct?

LA:              I would not agree with that, no.

CR (Capt Grey):  The senior member -- the senior enlisted member
                 as a sergeant major, that's a little bit unusual as
                 well.  Isn't it usually an E-8 or an E-7, gunnery
                 sergeant or a master sergeant?

LA:              I'd say -- I can't -- typically, it's a -- you'd see a
                 gunnery sergeant, a major, and a captain, typically.
                 The -- but we run boards here all the time.  Just last
                 week you were a defense counsel on a board with a
                 lieutenant colonel, I believe.

CR (Capt Grey):  Correct, sir.

LA:              And I wasn't involved in the selection of him either and
                 nobody noted that as unusual.  I certainly didn't.
                 Because the MARCORSEP Manual says the minimum grade the
                 president should be is a major.  So if -- if there's a
                 lieutenant colonel, while not normal, I wouldn't call
                 it -- call it drastically unusual, no.

CR (Capt Grey):  Yes, sir.  You stated that you had not really had
                 a chance to review our request for information as far as
                 how the members were detailed --

LA:              No --

CR (Capt Grey):  -- to courts in time --

LA:              -- no, Nick, I haven't.  I went -- I went home yesterday
                 about 1600.  So any e-mails you sent me after that, I
                 didn't receive.

CR (Capt Grey):  Yes, sir.

LA:              If that's what you're referring to.

CR (Capt Grey):  Well, our initial 3 April request to Colonel
                 Dowling, you were -- were you notified of that?

LA:              I believe it's -- I believe I was sent a copy of it.  I
                 haven't had a chance to read it.

10

000808

CR (Capt Grey):  Okay.

LA:       You're talking about the -- what you referred to earlier
          with questions?

CR (Capt Grey):  Yes, sir.

LA:       I've glanced at it, yes.

CR (Capt Grey):  Okay.  But did you offer any advice to Colonel
          Dowling on how he should proceed on that?

LA:       No.  And I only talked to Colonel Dowling once in --
          with regards to Sergeant Stein's administrative
          separation board.

CR (Capt Grey):  And what was the context of that conversation,
          sir?

LA:       That was -- that was a scheduling -- I think when the
          initial request came in from -- from counsel to continue
          or change the venue of the hearing, Colonel Dowling had
          to make a decision with regard to granting a continuance
          or moving the venue.  And I called him up and told him
          to get ahold of Colonel Sullivan to discuss the issue.

CR (Capt Grey):  So you didn't discuss the substance of any advice
          one way or the other as to how he should act on that?

LA:       No.

CR (Capt Grey):  Just that he needed to talk to Colonel Sullivan
          about that?

LA:       Right.  Right.  I think -- Colonel Sullivan is his SJA.
          I'm the legal adviser to the president.  So I would
          refrain from giving Colonel Dowling any legal advice if
          he asked -- asked me to do that.

CR (Capt Grey):  What steps or precautions do you and Colonel
          Sullivan take to make sure that you, as his deputy, are
          not overly involved in his role in advising Colonel
          Dowling?

11

000809

LA:          I can't answer that question, Nick.  I don't know.  I
             mean, just common sense, you know.  I don't listen in on
             his phone calls.  I don't go into his office when he's
             talking to the convening authority.  And certainly, on
             this case, I wouldn't be brought into his conversations.

CR (Capt Grey):  Ordinarily though, sir, you would be briefed up
             on Colonel Sullivan's activities that way you could fill
             in for him --

LA:          Ordinarily, yeah, that's -- that's right, Nick.

CR (Capt Grey):  Sir, last week did you overhear the commanding
             general, Brigadier Yoo's remarks about individual
             discipline at his professional --

LA:          I hate to admit this on the record, but I didn't attend
             that PME and General Yoo does not know that, so.

CR (Capt Grey):  Have you given an opinion to anyone about whether
             or not Sergeant Stein's alleged conduct was lawful?

LA:          A legal opinion on it, no.  No.  In fact, I have not
             formed an opinion on whether it is -- is lawful or not.

CR (Capt Grey):  Have you discussed a personal opinion with
             anyone?

LA:          I've discussed it with my wife yesterday.

             Again, I'd say my personal opinion, if you're asking
             what that is, I don't -- I don't have a personal opinion
             with regard to Sergeant Stein.  And for that matter,
             I've never -- I don't -- I believe this is the first
             time I've ever met Sergeant Stein.  I've never served
             with Sergeant Stein.  I was never aware of Sergeant
             Stein outside of the context of this.  And I certainly
             don't have any feeling one way or another towards
             Sergeant Stein or -- or what he's here before this
             administrative separation board for.

             Again, though, if you have a question with regard to my
             ability to impartially -- impartially advise the
             president, please ask it.

CR (Capt Grey):  Yes, sir.  I thought that was a relevant
             question.

                                    12

LA:        Okay.

CR (Capt Grey):  If you've ventured an opinion -- your -- what
           your opinion might influence --

LA:        No.  My opinion is -- my opinion -- and my opinion is
           irrelevant.  And I would not be offering any personal
           opinion to the president of the board.  If I'm asked by
           the attorneys or by the president to take a look at a
           legal issue that comes up, I would advise him on that.
           My personal opinion is -- is -- is -- wouldn't --
           wouldn't matter.

CR (Capt Grey):  Yes, sir.  Are you aware that the counsel for
           respondent submitted a request for an ethics opinion
           last week?

LA:        I do -- I do.  Because I -- that was forwarded to me as
           the president -- as the legal adviser.

CR (Capt Grey):  Yes, sir.  Did you take any role in that -- the
           routing of that or response to that request?

LA:        No, no.  I have looked at the request and then I've
           looked at the government's response in preparation for
           today.

CR (Capt Grey):  And, sir, yesterday, did you have a chance to
           speak to Lieutenant Colonel Hairston about potentially
           moving this administrative separation board back by 24
           hours?

LA:        We talked yesterday.  We had ongoing discussions about
           continuance requests in this, yes.

CR (Capt Grey):  And what was that discussion, sir?

LA:        Between me and the president of the board?  I'm not
           going to answer that question, Nick.  We talked about --
           my discussions with Colonel Hairston, you're free to ask
           him what they are.  It involved scheduling, any -- any
           action he may take on the continuance request, and
           procedural questions.  I don't -- I don't know what
           you're asking there, but I can't recite the details of
           every conversation we've had.

CR (Capt Grey):  About how long were you speaking to him
           yesterday?

13

000811

LA:        I think we talked for 10 to 15 minutes, maybe -- maybe a
           bit longer last night.

CR (Capt Grey):  And it was about potential delay in this case?

LA:        No, no.  We were going over the script to make sure that
           he didn't -- he didn't fumble through his words in the
           script and make sure he understood what was in the
           script, how the interplay with the MARCORSEP Manual,
           that sort of thing.  Just in an effort to make this go
           smooth today.

CR (Capt Grey):  Okay.  But did you have some discussion with him
           yesterday about delaying this board by 24 hours?

LA:        No, no.  I don't believe we talked about it yesterday,
           no.

CR (Capt Grey):  Did you receive a call from Tom Stahl, the
           assistant U.S. attorney?

LA:        I did.  I did.  Or I talked to him.

CR (Capt Grey):  Okay.  And you were aware that he indicated to
           you that Judge Marilyn Huff strongly recommended a
           24-hour delay of the hearing --

LA:        He -- he mentioned that to me.  And I -- and I can
           pretty much tell you precisely what I said is that
           the -- I've been advised by the president of the board
           there will be no more continuances in this.  That was a
           standing -- standing -- we had that discussion the last
           time a continuance was granted.  He was not going to
           permit any more continuances because, in his opinion, it
           would cause undue delay.

CR (Capt Grey):  And did you explain to Lieutenant Colonel
           Hairston that an Article 3 federal judge --

LA:        I didn't know.

CR (Capt Grey):  -- appointed by George H. W. Bush and confirmed
           by the Senate had strongly advised a 24-hour delay?

LA:        I don't -- I didn't -- I haven't been involved in
           anything with -- in federal court.  I have very limited
           knowledge about what happened yesterday.  And he is the
           president of administrative -- administrative separation

14

000812

board.  If the federal court issued an order telling him to not hold this board, he'd be advised of it and more than likely wouldn't be here today if that was the only outcome of that hearing that was -- we saw as pertinent to my role as a legal adviser, whether -- whether we were going to be going forward with the board or not.

CR (Capt Grey):  Well, what I'm hearing, sir, is you did not explain this to -- to Lieutenant Colonel Hairston then?

LA:  I did not discuss -- no, I did not.  I didn't explain it.

CR (Capt Grey):  Well, the assistant attorney yesterday in court represented to Marilyn Huff, the federal judge, that the person in charge of the proceedings now is the president of the board.  I talked with his lawyer who consulted with him and he is not inclined to continue.  He believes there is enough time for the parties to prepare.

LA:  Right, Nick.

CR (Capt Grey):  From what I was hearing from the assistant U.S. attorney was that he spoke with you and that you had spoken with the president of the board and the president of the board decided regardless --

LA:  Okay.  I'm going to -- I'll restate what I was -- my conversation with the U.S. attorney was -- was a few moments.  The -- I was told by the president of the board he is not going to continue this case -- this administrative separation board unless ordered to by a judge or a higher authority.  No more continuances were going to be granted.  Again --

CR (Capt Grey):  So, sir, that decision was made before you heard from Mr. Stahl?

LA:  No more continuances?

CR (Capt Grey):  Yes.

LA:  Yeah.  Unless -- unless there was good cause and any kind of -- some underlying thing.  If the U.S. attorney asked, Is he going to continue the board?  No.  The answer I gave him was no.  I've been advised there'd be no more continuances.

15

CR (Capt Grey):  All right.  And just so we're clear, you never communicated to Colonel Hairston what Judge Huff said from the bench was that she strongly recommended a 24-hour continuance?  You never communicated --

LA:      I -- I don't believe I did, no.

CR (Capt Grey):  Okay.  Did you communicate to Mr. Stahl that you had indicated that you had communicated those words to Lieutenant Colonel Hairston?

LA:      I don't know, Nick.  But I am going to tell you this: The -- I think we've covered it.  If you have questions about my impartiality or ability to advise the president, please go down that path.  We're not going to sit here and build up a record for federal court. That's not what this hearing is about.

CR (Capt Grey):  Was it your opinion that a 24-hour delay would be undue delay or was that Lieutenant Colonel Hairston's opinion?

LA:      You have to put that in -- in a frame of reference. The -- any further continuances would cause undue delay. That's what I was told.

CR (Capt Grey):  Okay.

LA:      And my understanding of the continuances which I have dealt with early on was there was a continuance granted for ten days.  At that point, there were to be no more continuances, because it was -- would cause undue delay in the case.

CR (Capt Grey):  Did you have an opinion one way or the other as to --

LA:      I don't -- I don't have an opinion about undue delay.  I haven't analyzed it.  I haven't thought about it.

CR (Capt Grey):  Okay.

LA:      It makes no difference to me whether it went today or it goes in two weeks.

CR (Capt Grey):  Okay.  Judge Huff issued an order last night in regards to the federal suit.  Have you read that or been briefed on it?

16

000814

LA:        I haven't seen it, no.

CR (Capt Grey):  Have you briefed the members about a potential
           issue with an injunction -- a residual injunction from
           the *Rigdon* case with an enforcement of --

LA:        We haven't gone into it yet.  I've reviewed the --
           again, I've reviewed the letter from Mr. Brewer and
           yourself and then the government's response.  I -- I
           don't believe the president is -- is aware of those
           issues yet.  When they come -- I've reviewed them in
           anticipation of them coming up in this board.

CR (Capt Grey):  Sir, how are you going to be able to advise the
           members on the law if you haven't read Judge Huff's
           opinion on this case?

LA:        Well, when you give me the opinion, I'll read it and
           advise them, Nick.

CR (Capt Grey):  Yes, sir.

[Captain Grey handed the legal adviser the opinion.]

LA:        Thanks.

CR (Capt Grey):  Okay, sir.  I have no further questions.

           The Marine Corps Separation Manual states any challenge
           of the legal adviser has to be made to the convening
           authority, Colonel Dowling?

LA:        I believe you're correct.

CR (Capt Grey):  We would like to move to challenge you to Colonel
           Dowling.  Is he available?

LA:        Okay.  I don't know.

CR (Capt Grey):  Okay, sir.  Well --

LA:        Recorder?

RCD:       Let's recess and then we'll see where Colonel Dowling's
           at.

[The administrative separation board recessed at 0906,
5 April 2012.]

000815

[The administrative separation board was called to order at 0919, 5 April 2012.]

RCD:        Time on deck is now 0919, 5 April 2012.  Resuming administrative separations board for Sergeant Gary A. Stein, United States Marine Corps.

CR (Capt Baehr):  Good morning, gentlemen.  My name is Captain Baehr.  I'm one of the --

CR (Capt Grey):  Just quickly summarize for the record, Captain Torresala.

RCD:        Yeah.

            And we neglected to mention the time on deck at the last recess but I believe the court reporter picked it up.

            We had an off-record conversation with the convening authority regarding challenges to the legal adviser. Defense has challenged the legal adviser and Colonel Dowling has denied that.

            Major Houtz will remain as your legal adviser, sir.

SMBR:       Okay.

RCD:        And we're ready to proceed with challenges for the members.

SMBR:       Okay.

CR (Capt Baehr):  Good morning, gentlemen.

            As I mentioned, my name is Captain James Baehr.  I'm a defense counsel here at Camp Pendleton.  I've been a counsel out here for about two years in defense.  I'm a first tour judge advocate but have done a number of boards and cases.

            Gentlemen, the purpose of these questions is not to intrude, it's not to be rude, it's not to be annoying. It's merely to make sure that the board can be fair and impartial.

            And the nature of the questions -- we're going to first go through the -- the nature of an adsep board and what an adsep board is and some of the legal standards and

18

000816

things that we use.  And then we'll get into some of
your past experiences, your biographies, and things of
that nature, gentlemen.

SMBR:     Okay.

CR (Capt Baehr):  First off, gentlemen.  We're here in an
administrative separation board.  Have all members
served on an administrative separation board before?

SMBR:     No.

CR (Capt Baehr):  Okay, sir.  Negative response from Lieutenant
Colonel Hairston.

          And, sir?

MBR (Maj Wardinski):  I began initial process and it was a little
while ago, so I don't know what the outcome was though.

CR (Capt Baehr):  Okay, sir.  So your memory is that you had --
you did serve on one board?

MBR (Maj Wardinski):  The initial process of it, yes.

CR (Capt Baehr):  Okay.

MBR (Maj Wardinski):  And I think they put a stop to it or
something like that.

CR (Capt Baehr):  Alright, sir.  So did you make it to the point
where you would be making findings and decisions on that
board?

MBR (Maj Wardinski):  I don't think we got to that point.

CR (Capt Baehr):  Yes, sir.

          And Sergeant Major?

MBR (SgtMaj Brookman):  No, I have not.

CR (Capt Baehr):  Thank you.

          Gentlemen, kind of before we -- before we begin, it's
sometimes helpful for us to know who are the members of
the board.

19

During the course of the proceeding today, you're going to learn a lot about who Sergeant Gary Stein is, his background. You're going to learn a little bit about the counsel on this case. Sometimes just to -- helpful for us to understand your background in the Marine Corps, where you're coming from, so we're not speaking to you as a drowned expert on something that you know everything about. If you're willing to share just a brief background here of your time in the Marine Corps.

SMBR:    Okay. I enlisted in the Marine Corps in 1989; went to Parris Island. My first two years I served as an administrator overseas with 3d Combat Engineer Battalion. Became an officer in 1991; received my commission as an adjutant so as an 01, an administrator. I spent my whole time in the Marine Corps as an administrator. I've been a commanding officer -- this is my third time. So commanding officer of H&S Company up at CSSG, renamed COC-36. And now at 2d Recruit Training Battalion. I've been a legal officer in three units as a captain. Married; children.

CR (Capt Baehr):  Thank you very much, sir. Really appreciate it.

MBR (Maj Wardinski):  Enlisted in the Marine Corps in 1993. Went through boot camp. I was with 2d Battalion, 6th Marines. I put in a package to become an officer. And went through OCS. And basically I've been a platoon commander, company commander, and battalion XO and I've also done a stint as a supply officer.

CR (Capt Baehr):  Yes, sir. And, sir, your current -- your current billet?

MBR (Maj Wardinski):  I'm currently the Field and Weapons Company Commander.

CR (Capt Baehr):  Yes, sir. Thank you, sir.

Sergeant Major Brookman?

MBR (Maj Wardinski):  My name is Sergeant Major Brookman. I joined the Marine Corps in 1985. Went to boot camp at MCRD San Diego for Aviation Ground Support Equipment Mechanic. A variety of units all over the -- all over the world for aviation. Let's see here, I've got a drill instructor duty under my belt. Was promoted to first sergeant in 2003. Sergeant major in 2006. I've

20

000818

been through three separate commands as a Battalion Sergeant Major.  And I am currently the Battalion Sergeant Major of Headquarters and Service Battalion at MCRD.

CR (Capt Baehr):  Thank you very much, Sergeant Major.  I appreciate it.

Gentlemen, an administrative board essentially has three essential questions.  And those questions are:

Number one, basis.  Is there a basis to separate a particular Marine?

Number two, even if there is a basis, we can choose to retain a Marine.  So the second question's retention.

And the third question is characterization.  Should you choose to separate a particular Marine, you have to determine a characterization.

Do all members understand that each of these determinations is independent?  That is, you might find that there is no basis -- we're going to argue that today.  But you might find there's a basis.

If you do find a basis, it doesn't mean you have to separate them.  If you do find a basis, it doesn't mean you have to separate at any particular characterization.

Are all members comfortable that these independent questions?

Okay.  Positive response from all members.

And, gentlemen, the decision today is going to be an extremely important one.  This is the most important day of Sergeant Stein's career as a United States Marine.  And the vote that will be taken by this board, even though there are differences in rank, will be a vote of conscience.

Are all members willing to take a stand for conscience if you disagree with the other members of the board?

Positive response from all members.

21

000819

The first question that will be addressed by the board
is the question of basis, whether or not Sergeant Stein
has actually done anything wrong according to the law
that we have before us here today.  And there's going to
be a standard here.  And that standard will be on the
government.

And that's -- are all members comfortable holding that
the government has the burden of proving to you that
Sergeant Stein is guilty of some wrongdoing and that
it's not the defense's burden to prove to you that he's
innocent but the government's burden under the
MARCORSEPMAN?  Is everybody comfortable with the
government having the burden here today?

Positive response from all members.

And, gentlemen, that burden is a preponderance of the
evidence.  And that standard means that if there's some
kind of tie in your mind, that the tie goes to the
Marine and not to the government.

Is everyone comfortable giving the tie to the Marine
under a preponderance of the evidence standard?

Okay.  Positive response from all members.

The second question that will come up to the board, if
it's even reached by the board -- and it may not be --
but it's the question of retention.  The MARCORSEPMAN
outlines some factors that would be considered by a
board for retention in Section 6309.

And you gentlemen are going to be provided with copies
of this so you can refer to it as you're making your
decisions and determinations.  Those factors are
essentially past conduct, positive contribution, and
rehabilitative potential.

And will all members fairly evaluate Section 6309 of the
MARCORSEPMAN?

Positive response from all members.

The third question we've talked about is the question of
characterization.  And characterizations of service at
an administrative board can either be honorable,
general, or other-than-honorable.

22

Are all members roughly aware of these particular
characterizations of service?

[Positive response from all members.]

CR (Capt Baehr):  Okay.  And, gentlemen, are all members aware
that if a Marine EAS's -- if he EAS's with conduct marks
above 4.0, that they EAS with an honorable discharge?
All members aware of that?

Positive response from the members.

The second characterization is a general
characterization.  Are all members aware that if a -- if
a Marine receives a general characterization, they lose
the GI Bill as a benefit of service?  Are all members
aware of that?

Positive response from all members.

And, gentlemen, the third characterization is
other-than-honorable.  And an other-than-honorable
characterization of service is a characterization of
service -- and you're going to be provided with these
documents so you can review it carefully -- but that
essentially takes away all benefits of military service.
An individual who receives an other-than-honorable
cannot come onto a military base, they cannot take
advantage of military benefits such as the commissary.

Are all members aware of that?

Positive response from all members.

And are all the members aware that a Marine who leaves
the Marine Corps, receives a DD 214 with a
characterization that will be with them for the rest of
their life?

Positive response from all members.

I mentioned three questions here.  They're listed as,
quote/unquote, recommendations in the MARCORSEPMAN.
However, are all members aware that the decision that's
made here today, the separation authority cannot do
anything that's harsher than this decision?  Are all
members aware of that?

23

[Positive response from all members.]

CR (Capt Baehr):  So in a sense that those first -- on those first
          three issues, it's almost binding on the separation
          authority because they're not going to -- they're not
          going to be able to do anything harsh.

          Is everyone comfortable with that and understand that?

[Positive response from all members.]

CR (Capt Baehr):  The -- there's a fourth question as well and
          that's the question of suspension.  Are all members
          familiar with the concept of suspension at NJP or
          other -- or other things like that?

[Positive response from all members.]

CR (Capt Baehr):  Okay.  And that says that a Marine, you know,
          maybe they'll -- maybe they'll make a mistake in the
          future, will suspend -- will suspend the separation.
          This particular suspension decision is not binding on
          the separation authority.  So the separation authority
          can decide tomorrow that he's going to separate even if
          the board decides, you know, hey, we want to see what
          happens with this particular Marine.

          Does everyone understand that this particular -- that
          particular recommendation is actually just a
          recommendation, it is not binding in any way?

[Positive response from all members.]

CR (Capt Baehr):  Okay.  During the course of the proceeding
          today, gentlemen, there is going to be a lot of evidence
          that's introduced.  There's these huge binders and
          binders that we're putting in.

          The evidence at the -- at this board is also going to
          consist of testimonial evidence.  Witnesses are going to
          come in and speak or they're going to speak on the
          phone.  During the -- some of the evidence that's
          included here -- as you all know at a separation board,
          we do not go by the rules of evidence -- the strict
          military rules of evidence.  So we -- the government
          will be able to introduce hearsay statements in this
          proceeding that they would never be able to get into a
          court.

24

Does everybody understand that?

Positive response from all members.

And, gentlemen, although the government can get that in, does everyone understand the reasons why a military court might want to keep out hearsay?  For example, hey, you were just reading a statement.  You can't question the witness.  You can't develop with them, hey, explain what you meant by that.

Does everyone kind of understand the rough reason why we have those -- a hearsay rule in federal court?

Okay.  Positive response from all members.

Okay.  Gentlemen, the next series of questions is pertinent to the particular provisions and issues that we're discussing here today.  And these are a little broader and we might get into a tiny bit of discussion about them and your thoughts on them.

Are you aware of whether the prohibition on contemptuous words against the President applies to enlisted men?  Are members aware of that one way or the other?

[Positive response from all members.]

CR (Capt Baehr):  Okay.  And, sir, your belief is that -- is your belief that it does apply to enlisted or that it doesn't?

SMBR:     It does apply.

CR (Capt Baehr):  Okay.  Gentlemen, during the course --

LA:       Let me ask you something, Captain Baehr -- and the MARCORSEP Manual doesn't give us any guidance on the extent of voir dire, the detail of voir dire, anything like that.  But -- but let's keep it somewhat relevant.  I've read the notice.  And contemptuous words toward an official, it's in there.  I mean, we've got the 134 and we've got the 92 that he was given notice of.

CR (Capt Baehr):  Sir, we would -- we would ask to be able to give the voir dire that we -- it's relatively brief.

25

LA:          If you're getting toward something that's going to,
             again, bring in their ability to impartially and
             thoroughly evaluate the -- both sides of this case,
             let's get moving in that direction.

CR (Capt Baehr):  Well, sir --

LA:          If you're giving an opening statement or a closing
             statement where you're going through those sorts of
             things, you're going to have an opportunity to do it.

CR (Capt Baehr):  And we agree, sir.  But we also -- we have an
             opportunity to establish voir dire.  And if the legal
             adviser -- it's very uncommon for the legal adviser to
             interrupt the counsel's voir dire.

LA:          It may be uncommon, but it's going to happen.

CR (Capt Baehr):  Sir, would you mind if the voir dire speaks for
             itself?

LA:          What's that?

CR (Capt Baehr):  Would you mind if we request that the voir dire
             speaks for itself?

LA:          No.  I'm going to deny that request and I'm going to ask
             you to keep the voir dire relevant so we can get to
             challenges for cause.

CR (Capt Baehr):  If you could give me a moment, sir.

[The counsels for the respondent conferred.]

CR (Capt Baehr):  Sir, I'm going to ask that my fellow counsel --

LA:          What I'm telling you, Captain Baehr, let me be clear for
             the record here, is keep going.  Please keep it narrow.
             Please head toward a challenge for cause of some sort.
             We're here to determine whether they're going to be
             impartial.

CR (Capt Baehr):  Sir, we believe these questions are extremely
             important to them.

LA:          Okay.  Well -- okay.  Keep going.

CR (Capt Baehr):  Yes, sir.

26

LA:        Or, counsel, keep going.

LtCol Atterbury:  Frankly, this line of questioning is not
           uncommon for adsep boards.  And these gentlemen have not
           had the experience of serving on a board before and
           you're creating an impression that --

LA:        Yes, sir.  My concern -- I'm not going to address this
           on the record.  I'll address this with counsel or
           anybody else, but we -- we are at an admin separation
           board here.

           Again, voir dire is supposed to lead up toward a
           challenge for impartiality.  I just want to make it
           clear that they're leading up to that.

LtCol Atterbury:  But the practice under this region is to give
           counsel for both sides an opportunity to conduct voir
           dire.  You're creating the impression that the --

LA:        I'm -- again, I'm -- I backed off that, sir.

LtCol Atterbury:  -- counsel for respondent is doing is
           inappropriate or untoward.

LA:        I agree.

LtCol Atterbury:  This line of questioning occurs in every single
           ad board.  So I think for the integrity of the process,
           we should give leeway to both sides.

LA:        I'm just merely -- merely suggesting just to reevaluate
           and keep it -- keep it as relevant as possible so as not
           to confuse the board members or going down rabbit holes.

RCD:       Respectfully, sir --

LA:        Would you like to have a decision on that?

RCD:       Sir, respectfully -- and I -- I don't know if there's a
           polite way to say this, but if we're going to have
           questions and things mentioned from the gallery, if it's
           an attorney representing Sergeant Stein, I understand.
           But having challenges from members of the gallery, I'm
           going to -- I'm going to say that's out of line.

           Colonel Dowling can shut this hearing if he wants to.
           I'm not recommending that happen.  I'm just saying the

27

000825

counsel -- there's five different counsel in here for Sergeant Stein.  I think they can handle it.  And if -- if there's a question as to impartiality --

LA:        Okay.  Okay.  Captain Torresala, got it.

           Please let's reframe the questions.

           Captain Baehr, keep going.  I've reevaluated my concern to the board.  Go as far as you want with the voir dire and keep on with the questioning.

CR (Capt Baehr):  Sir, those questions actually were more Mr. Brewer's and --

LA:        Okay.  That's fine.  That's fine.  My concern was that -- that we're going down --

CR (Capt Baehr):  Yes, sir.

LA:        -- down rabbit holes here.  The notice onto commissions of a serious offense type --

CR (Capt Baehr):  Yes, sir.

LA:        -- issues and we wanted to make sure -- I was concerned about us getting off track from that.

CR (Capt Baehr):  Yes, sir.

CC (Mr. Brewer):  May I proceed?

[Affirmative response from the legal adviser.]

CC (Mr. Brewer):  Gentlemen, again, Mark Brewer.  30 years in the law practice; four of which were in the JAG.  Usually -- well, always on the other side, on his side or on the prosecution side.  Never as a defense attorney.

           So I want to just follow up where Captain Baehr left off and ask you a couple of questions that relate to the bases and circumstances that are being cited in the notice of separation letter, 21 March, again, Sergeant Stein.  So that's what these questions are intended to go to.

28

First of all, I think the last question -- I wasn't really clear on the answer.

Can I just start with you, Colonel?

SMBR:    Yes.

CC (Mr. Brewer):  Are you aware of whether the prohibition on contemptuous words against the President of the United States applies to enlisted men?

SMBR:    I know it's specific to all --

RCD:    Sir, I apologize.  I'm going to object to these questions.  These are legal questions.  These are questions as to the applicability of the UCMJ to the bases that we're having here.  He's actually -- he's asking the senior member to opine on whether or not --

LA:    Right.  And --

RCD:    -- an article applies here.

LA:    -- we're getting -- and Captain Torresala, you can take a seat.

And we're getting back to my concern.  It's not to inhibit your ability to voir dire.  Please do that.  But we have legal issues and we have factual issues and I'm sure there's going to be some overlap during this hearing of those.  And then we have voir dire.

CR (Capt Baehr):  Yes, sir.

LA:    Ask the questions you want.  But we're not going to ask them to render their version of legal opinions on provisions of the UCMJ.

CC (Mr. Brewer):  I'm not -- I agree.  I'm not doing that --

LA:    That's what I am here to advise on.  And please refrain from -- they will be advised on the law impartially and fairly by me.  And if you have something to add at that point when we do that in this public forum, at that point let's do it.

But to sua sponte us and for -- for what their version of a UCMJ article is, I please ask you to limit that to

29

some degree.  Getting back to what's this tailored to.
They give the wrong answer -- he gives the wrong answer.
Well, I'm going to advise them on the -- on the right
answer.  So it's kind of overlapping into what -- what
my role is.  If you have a concern about my knowledge of
that, we can discuss that later on if you don't think my
advice to the president is fair or accurate.  I'm more
than willing to discuss that with you.

But right now legal opinions from them on the impact of
these articles is just not heading down that voir dire
type road that I think the MARCORSEP Manual envisions
this process --

CC (Mr. Brewer):  Sir, it wasn't my intention to ask for a legal
          opinion.  May I continue, please?

LA:       Yes.

CC (Mr. Brewer):  Okay.  Sir, can I ask you, have you ever --
          you're familiar with 1344.10 I assume?

SMBR:     Thirteen -- DoD?

CC (Mr. Brewer):  Yes, sir.

SMBR:     Yes.

CC (Mr. Brewer):  And is that the sort of regulation that in
          your -- in your career in the Marines you had occasion
          to brief or counsel your subordinates on?

SMBR:     Not the actual instruction itself, no.  So when I
          counsel my Marines as to political activities --

CC (Mr. Brewer):  Yes, sir.

SMBR:     -- I didn't reference the DoD itself.

CC (Mr. Brewer):  Okay.  But apart from the 1344.10, you have had
          occasion in your -- in your career to counsel --

SMBR:     Yes.

CC (Mr. Brewer):  -- and advise your subordinates, your troops, on
          what the limits of free speech in the military are?

SMBR:     Yes.

30

000828

CC (Mr. Brewer):  Okay.  What about you, Sergeant Major?

MBR (SgtMaj Brookman):  The way we counsel our Marines as
          enlisted, we follow the orders.  If the commander --
          depending on what we're doing, mission, noncombat or
          combat, you know, we have a set of orders to follow.

          Where it comes to disparaging remarks to a commissioned
          officer or a political affiliate, we just don't -- we
          don't do it.  That is un-Marine like.  You know, what we
          teach the Marines about the UCMJ is that is our
          guideline to follow.  If an officer gives me an order,
          that's a lawful order I must follow unless it's going to
          cause myself undue harm or harm to others.  That's the
          only time we question orders.  So how I expect my
          Marines to react is in a professional means.

CC (Mr. Brewer):  Of course.

MBR (SgtMaj Brookman):  That's what we preach as senior enlisted.
          We tell our junior Marines to be professional.

CC (Mr. Brewer):  Of course.  Thank you.

          And Sergeant Major, are you familiar with DoD Directive
          1344.10?

MBR (SgtMaj Brookman):  I've seen it before.

CC (Mr. Brewer):  How recently have you seen it?

MBR (SgtMaj Brookman):  Right before we went to Iraq.

CC (Mr. Brewer):  And when was that?

MBR (SgtMaj Brookman):  So that was in 2005.  We have to -- we
          looked at it again when we went to Afghanistan in 2010.

CC (Mr. Brewer):  Okay.  And since 2005, more or less, you hadn't
          had occasion to look at it; is that true?

MBR (SgtMaj Brookman):  No, sir.

CC (Mr. Brewer):  Okay.  Have you seen any implementing
          instructions or any directives that were issued under
          1344.10 since 2005?

000829

MBR (SgtMaj Brookman):  The only thing that we would have is
          talking about when there's political reelections coming
          and what -- you know, for it -- the rules that we have
          for endorsing or not endorsing a public official.  While
          we're in uniform, we cannot.

CC (Mr. Brewer):  While you're in uniform, you cannot endorse a
          public official.  What about whether you're not in
          uniform?

MBR (SgtMaj Brookman):  Never really addressed.  The main -- the
          main parting line is -- well, not the parting line.  But
          the main guidance we're getting is if a Marine is
          endorsing a political party in uniform, then he's saying
          that the Marine Corps is endorsing.

CC (Mr. Brewer):  Okay.  Do you -- have you had occasion, Sergeant
          Major, to -- to counsel any of your subordinates as to
          participating in group discussions as an advocate for or
          against a cause?

MBR (SgtMaj Brookman):  I haven't had the opportunity nor the
          means.

CC (Mr. Brewer):  You haven't seen that come up?

MBR (SgtMaj Brookman):  No, sir.

CC (Mr. Brewer):  Do you -- do you know whether that's something
          that's permitted to your understanding of 1344.10?

RCD:      Again, sir, I object to that question; same grounds.

LA:       The -- again, Mr. Brewer, I think we're going beyond
          that intent here.

CC (Mr. Brewer):  I just wanted to ask him if he --

LA:       If we have a --

CC (Mr. Brewer):  The only thing I'm asking him is this:  Does he
          have an understanding of whether or not the regulation
          permits participation in group discussions, an advocate
          for or against a cause.

LA:       Well, that's -- that's called --

32

CC (Mr. Brewer):  I mean, if he doesn't have to tell me what his
          understanding is --

LA:       -- contested in issues in this case --

CC (Mr. Brewer):  -- start by his -- he doesn't even have to tell
          me what his understanding is.  I just want to know if he
          has one for purposes of that question.

LA:       Okay.  I -- I think that's a fair question.

CC (Mr. Brewer):  Thank you, sir.

          Do you have an understanding of whether or not
          participating in any group discussion is an advocate for
          or against a cause is permitted or prohibited?

MBR (SgtMaj Brookman):  No, sir.  I'd have to look at the order,
          the DoD.

CC (Mr. Brewer):  And the same question to you, sir.

SMBR:     One more time, please.

CC (Mr. Brewer):  Do you -- do you know whether or not -- do you
          have an understanding whether or not DoD Directive
          1344.10 prohibits or permits participating in any group
          discussion as an advocate for or against a cause?

SMBR:     Political cause, yes.

CC (Mr. Brewer):  You -- do you have an understanding?

SMBR:     Yes, I do.

CC (Mr. Brewer):  What's your understanding?

RCD:      Objection, sir.

LA:       Okay.  And I think we -- we've gone far enough with
          that.  That, again, is a legal issue we're going to
          resolve here with the board.  If we're going to argue
          that, I would assume both sides are going to argue this
          at some point.

CC (Mr. Brewer):  But, sir --

33

000831

LA:        If you want to submit your briefs to the president of
           the board for consideration --

CC (Mr. Brewer):  Yes, sir.  But, sir, isn't it relevant -- I
           mean, if the members have -- already have an
           understanding of whether the understanding is --

LA:        It is.  It -- it's relevant.  That's his understanding
           and he answered the question.  At that point, the
           question becomes does that make him unable to
           impartially and fairly hear the evidence of this board.
           I can tell you right now my advice to him is going to
           be, Well, look, this is what the directive actually
           says.  This is what the law is once we come to a
           consensus on that.  And he's going to be able to say or
           not be able to say he can impartially and fairly look at
           that.  What his opinion is right now is interesting.
           But if you dig any deeper into that, I think you got
           your answer on that.

CC (Mr. Brewer):  Now I'm not asking him his opinion, sir.  I'm
           asking him to tell us what his understanding is.  He
           said he had an understanding of whether or not that
           conduct was permitted or prohibited.  I'm just asking
           the lieutenant colonel to tell us what his understanding
           is.  Not his opinion, but what his understanding of
           the -- pardon me -- what his understanding of the DoD
           reg is.

LA:        And how does that get to this -- a challenge for cause?

CR (Capt Baehr):  Sir, we believe this question would be
           appropriate even in a court-martial.  We ask --

LA:        It probably would be permissible in a court-martial.

CR (Capt Baehr):  Because the purpose of establishing the fairness
           and impartiality of the members also includes their
           prior experiences, also includes their understanding as
           to the law as it is, you know, before the proceeding.
           Obviously, the legal adviser and the lawyers will argue
           about what the law is in this particular proceeding.
           But assessing is a predicate for fairness and
           impartiality will also involve the understanding of
           legal things from before.

LA:        John?

34

000832

RCD:       I object to it, sir.  I know what we're doing here.
           We're building a record so they can go back in federal
           court and say that their due process rights were
           violated.  That's what it is.

CC (Mr. Brewer):  Well, I object.  That's not appropriate to talk
           that way in front of the board.

RCD:       All I'm saying is that there's an obvious reason for
           these questions.  If it's a -- it's a legal question,
           we're going to resolve that anyway.  This is
           counterproductive.

CC (Mr. Brewer):  No, sir.  The purpose of answering -- asking the
           question is normal voir dire to determine and to ensure
           that these gentlemen can and will fairly --

LA:        What's the precise question you want to ask right now?

CC (Mr. Brewer):  What is his understanding of whether or not a
           member of the Marines may participate in a group
           discussion as an advocate for or against a cause?

LA:        Yes.

RCD:       I would say if the question is can you follow the advice
           of the legal adviser on what the definitions and
           policies in 1344.10, that's legit.  That's a legitimate
           question.

LA:        And I think that's -- that's the only issue here,
           Mr. Brewer.  The legal issues, fortunately for
           Lieutenant Colonel Hairston, are in the -- squarely in
           the realm of the legal adviser right now to decide
           finally the -- if he can fairly follow the law, he
           should be able to do his job.  To get him to render an
           opinion when he's not -- right now he's coming in
           probably very uneducated about this as he should.

CC (Mr. Brewer):  Sir, he said he has an understanding.  I'm just
           asking him to tell us what the understanding is.

LA:        Okay.  Lieutenant Colonel Hairston --

CC (Mr. Brewer):  I'm not asking him to formulate an opinion he
           doesn't already have.

LA:        -- what is your understanding of that?

35

000833

SMBR:        Okay.  My understanding is a Marine --

CC (Mr. Brewer):  Yes, sir.

SMBR:        -- in general can participate -- can you give me the
             question again exactly before I answer.

CC (Mr. Brewer):  Does DoD 1344.10 prohibit participating in any
             group discussion as an advocate for or against a cause?

SMBR:        You can participate as long as it does not imply an
             endorsement by the military, in this case the Marine
             Corps.

CC (Mr. Brewer):  Okay.  Thank you, sir.

LA:          And Lieutenant Colonel Hairston, if you were advised by
             the legal adviser that the law -- that the law supported
             a different conclusion, would you be able to follow that
             conclusion?

SMBR:        Yes.

LA:          Okay.  And I think that's a pertinent question, can he
             follow the law.

             Well, again, keep going, Mr. Brewer.

LtCol Atterbury:  If I may, I'm going to -- I'm going to object to
             this.  I'm the Regional Defense Counsel for the Western
             Region.  Defense counsels under my charge represent
             respondents at adsep boards as a normal part of their
             duties.

LA:          Sir, with all due respect, sir, I'm going to --

LtCol Atterbury:  I have never seen a legal adviser -- I've never
             seen a legal adviser, Pete, inject himself in a manner
             that's comparable to a military judge during voir dire.
             The point here of an adsep board, members --

LA:          This is very early -- sir, we're not going to --

LtCol Atterbury:  -- is have an open dialogue between counsel for
             the respondent and also government recorders.  You're
             making this unnecessarily legalistic and it's casting
             some doubt onto the integrity of this process.

36

000834

These gentlemen should have an opportunity to engage these members to see what their responses are to see if that leads to a question that may result in a challenge for cause.  Rarely do you ever see a legal adviser present at an adsep board.

LA:        Yes, sir.

LtCol Atterbury:  To include boards of inquiry, Pete.

LA:        Yes, sir.

LtCol Atterbury:  I'm objecting to this and thank you, gentlemen, to note it for the record as you see fit, but this is not the practice we normally have with regards to involuntary enlisted administrative separation proceedings pursuant to Chapter 6 of the MARCORSEPs Manual.

LA:        Okay, sir.  The -- with all due respect, the detailed counsel can -- is -- will be able to argue any point they want.

LtCol Atterbury:  With all due respect, Pete, I can detail myself to this case right now.  What I'm concerned about is the integrity of the process.

LA:        And I'm concerned right now, sir -- and I'm sure the president and everybody else in here -- that we're going to have disruptive type interjections in this hearing.  And if you can't do that, I'm going to ask Colonel Dowling to have you removed from the room.  And at that point --

LtCol Atterbury:  We're not going to get to that point, Pete.

LA:        -- you can go back and detail yourself to the case.

LtCol Atterbury:  Let's -- I recommend we go into a recess.

CC (Mr. Brewer):  Can we have a recess, sir?

RCD:       Time on deck, 0947, 5 April 2012.  Going off record.  Administrative separation board for Sergeant Gary Stein, United States Marine Corps.

[The administrative separation board recessed at 0947, 5 April 2012.]

37

000835

[The administrative separation board was called to order at 1000, 5 April 2012.]

RCD:        Time on deck is now 1000, 5 April 2012.  Resuming administrative separation board for Sergeant Gary A. Stein, United States Marine Corps.

SMBR:       Okay.  Before we get started, let me make a comment.

CC (Mr. Brewer):  Yes, sir.

SMBR:       Now, recognizing that we are not in a court-martial, I've allowed some things to go on.  But from this point on, one person speaking at a time.

            Is that clear?

[Positive response from all parties.]

SMBR:       No talking over each other.  And I expect to hear comments coming from the table or you when you're at the table.

CC (Mr. Brewer):  Yes, sir.

SMBR:       If at any other time anyone else needs to speak, you need to get permission to recess and we'll go out.  But other than that, we need to control what's going on inside this room.  If we start getting out of hand, I will stop it, okay?

CC (Mr. Brewer):  Thank you, sir.

            If I could just pick up where I think we left off.  I apologize.  I'll try not to repeat myself.

            I think I had asked my question -- my last question to you, Major, no?

MBR (Maj Wardinski):  No.

SMBR:       I think you were still --

CC (Mr. Brewer):  I was still on you.  Okay.

            So I think my last question, sir, was to -- I had asked you to tell us your understanding of whether there is a prohibition and you had answered that question.

38

000836

I had a follow-on couple of questions.  Do you have an understanding of whether or not a Marine is permitted to express a personal opinion about a political candidate or issue?

SMBR:      As long -- yes.

CC (Mr. Brewer):  And what is that, sir?

SMBR:      As long as it is not offensive, contemptuous, or implies an endorsement by the Marine Corps.

CC (Mr. Brewer):  So, okay.  And does it matter whether or not the member's in uniform?

SMBR:      No.

CC (Mr. Brewer):  And do you -- do you have an understanding, Lieutenant Colonel, as to whether a Marine is permitted to join into a partisan or a nonpartisan political club?

SMBR:      As an individual, he can as long as he doesn't represent the Marine Corps either.

CC (Mr. Brewer):  Alright, sir.

And, Major, I'm going to ask you those same questions real quickly.  Do you have an understanding about whether 1344.10 allows a member to participate in any group discussion as an advocate for or against a cause?

MBR (Maj Wardinski):  I'm -- I understand the wave tops of the directive that you're talking about.  And it's my understanding that -- you know, got to use caution when talking about such items such as politics.  So, one, that you're not representing the Marine Corps and that's basically my understanding.

CC (Mr. Brewer):  Okay.  Do you have an understanding of whether or not you're permitted to express a personal opinion about a political candidate or issue?

MBR (Maj Wardinski):  I don't know the -- you know, the verbatim of the actual directive, but I just caution my Marines, you know, be wise, err on caution vice going out and making such statements and stuff like that.

000837

CC (Mr. Brewer):  Okay.  Do you gentlemen understand that the Marine -- members of the Marine Corps generally are encouraged to engage in what the Marines call citizenship?  Are you aware of that, sir?

MBR (Maj Wardinski):  Can you define that a little bit?

CC (Mr. Brewer):  Are you aware that the policy -- the written policy that's actually in DoD 1344.10 encourages all the members of the Marines to engage in what it calls citizenship?

MBR (Maj Wardinski):  Okay.

CC (Mr. Brewer):  Is that something that you're aware of?

MBR (Maj Wardinski):  Not in detail, no.

CC (Mr. Brewer):  Okay.  How about you, Sergeant Major?

MBR (SgtMaj Brookman):  I don't understand how the context of citizenship is being used in the DoD.  If it -- if it refers to hearing your voice and voting, then yes, we do promote voting.  But as for citizenship, I don't understand how that would be used in the DoD.

CC (Mr. Brewer):  Okay.  Walking in here today, did any of you members -- have you formulated any opinions with regard to the basis for this discharge proceeding?

[Negative response from all members.]

CC (Mr. Brewer):  Okay.  And do any of you gentlemen feel like a Marine should be permitted to speak his mind even if it's negatively speaking about a political candidate for a political office if he does so in his own time out of uniform?

SMBR:     Yes, as long as it doesn't imply endorsement or others who are hearing his conversation do not infer because of the service he's in, it implies endorsement.

CC (Mr. Brewer):  Thank you, Colonel Hairston.

          How about you, Major?

MBR (Maj Wardinski):  Same along the lines of the lieutenant colonel.

                              40

000838

CC (Mr. Brewer):  Sergeant Major, do you have the same
            understanding or different?

MBR (SgtMaj Brookman):  Same understand.

CC (Mr. Brewer):  All right.  So let me follow up with this
            question:  What if that political candidate is an
            incumbent officer in either the White House, the Vice
            Presidency, a governor, the state legislature of a state
            where you serve -- so he's both a candidate and he's an
            office holder.  May the Marine in his own time out of
            uniform express an opinion for or against such a
            candidate?

SMBR:       Excuse us for going so slow.

CC (Mr. Brewer):  It's okay.

SMBR:       I'm thinking about the question.

            My answer will not change.  As long as it doesn't imply
            endorsement.

            Now you have to be careful who the individual is, in
            that -- if it's the chain of command, it becomes a
            little different I believe.  But my answer is pretty
            much the same as it was before.  As long as it doesn't
            imply endorsement by the Marine Corps.

CC (Mr. Brewer):  Okay, sir.

            You gentlemen feel the same way?

MBR (Maj Wardinski):  I do, but I know we have the right to
            express ourself via voting.

CC (Mr. Brewer):  Yes.  But I was specifically asking whether you
            could -- you could speak out for or against a political
            candidate who happens to also be the sitting President,
            the sitting Vice President, or the governor or
            legislator in the state where you serve.

MBR (Maj Wardinski):  No.  I'm in line with what the lieutenant
            colonel is saying.  As long as it's not actively seeing
            that the Marine Corps is endorsing such a thing.

CC (Mr. Brewer):  All right.  So if I understand you members
            correctly, it shouldn't make any difference whether the

                                    41

person being criticized -- let's go with that for a
second -- is an office holder if, in fact, the criticism
is towards him as a candidate for political office.

Would you agree with that?

SMBR:      It would also depend on the comments being made.  If it
causes dissention anywhere within the ranks, then I
think it becomes an issue.  The question is does it
cause dissention.  I would have to hear the actual
comment.

CC (Mr. Brewer):  And --

SMBR:      Either I see it --

CC (Mr. Brewer):  I'm sorry to interrupt.

So in that regard, sir, and just to follow up, you would
want to see what the whole context of the comments were;
is that true?

SMBR:      Yes.

CC (Mr. Brewer):  Okay.  Now, some of the evidence that we're
going to submit today includes a letter from a sitting
member of the United States Congress.  Is that something
that you members are willing to receive along with all
the other evidence in the case and give it whatever
consideration you think is appropriate?

[Positive response from all members.]

CC (Mr. Brewer):  Have all of you members heard of a thing called
the Tea Party?

[Positive response from all members.]

CC (Mr. Brewer):  Okay.  I've got a question for you:  Do you
consider -- and under your -- with your understanding
that you've already given us here today -- and I'll
start with you, Colonel, is -- is the Tea Party, in your
view, a political party under DoD 1344.10?

SMBR:      Yes, it is.

CC (Mr. Brewer):  It is?

000840

SMBR:      Yes.

CC (Mr. Brewer):  What about you, Sergeant Major?  Do you believe
          the Tea Party is a political party as that phrase is
          used in DoD 1344.10?

MBR (SgtMaj Brookman):  Yes.

CC (Mr. Brewer):  Major?

MBR (Maj Wardinski):  I guess.  I'd have to ask advice from legal
          counsel on, you know, is it technically seen as a
          political party or not.  I don't know.

CC (Mr. Brewer):  All right.  And when you gentlemen are briefing
          your subordinates on what they may or may not do in this
          context, do you understand that -- well, let me back up
          a second.

          Do you have any understanding of what the word "cause"
          means?  When I say it's a -- you can't speak out in
          support of or you can't speak out against a cause, does
          that have any significance to you, Colonel?

SMBR:      I believe so, but could you explain it?

CC (Mr. Brewer):  Well, I'd like to but the reg doesn't explain
          it.  It's not defined.  And that's why I wanted to ask
          you whether you come into the room today with any -- any
          sort of preconceived notion of what a cause is.  I mean,
          I think a cause could be a lot of things, personally,
          but that's just my opinion.

SMBR:      Well, when I think of a cause, I think of taking a
          position, taking up an issue, whatever the issue may be,
          and speaking out against it or for it.

CC (Mr. Brewer):  So, for example, a cause can be something like
          pending legislation in Congress; would you agree?

SMBR:      Yes.

CC (Mr. Brewer):  So should a Marine be allowed to speak for or
          against pending legislation in Congress?

SMBR:      It comes back to how he or she does it.  As long as it
          doesn't imply any -- that would be my parting line.  As
          long as it doesn't imply endorsement, our Marines have

43

000841

the freedom to speak.  The moment it becomes a case where it implies endorsement, whether in uniform or not in uniform, and we step over the line in my opinion.

CC (Mr. Brewer):  So if we're talking about something that somebody is doing a Facebook page posting, like Sergeant Stein here is accused of doing, can you -- can you see an instance where that would ever be considered to be in uniform or in -- on behalf of the Marines?

SMBR:  Well, first, I haven't seen the Facebook postings.  Now, on a Facebook posting, if the sergeant or any other Marine identified themselves as a Marine in any way in uniform or not, you've been identified as a Marine.

CC (Mr. Brewer):  Right.  So just to carry that further, are you saying that if I put up a Facebook page and I say, Hey, I'm a Marine but this is my own personal opinion, I think Congress should vote for or against this particular legislation, is that permissible to your understanding?

SMBR:  No.

CC (Mr. Brewer):  No.

What about you, Sergeant Major?  Do you think it's permissible?

MBR (SgtMaj Brookman):  No.

CC (Mr. Brewer):  Major?

MBR (Maj Wardinski):  I don't think it is.  And I would advise my Marines, you know -- you know, it's something you probably don't want to do, so I don't know.

CC (Mr. Brewer):  Okay.  Thank you.

And obviously this year is an election year for President and for all members of the House of Representatives and a third of the United States Senate plus a whole bunch of governors and state legislators and so forth.  Do you -- in your experience, do you tend to see these issues, Colonel, more frequently in an election year like this than in a nonelection year?

SMBR:  Yes.

44

CC (Mr. Brewer):  And does it make any difference to you -- well,
          let me ask you a question -- and I don't mean any
          disrespect by this, but I want to ask each one of you
          this question.  And if you don't want to answer it,
          that's your prerogative.  I'd like to go down the row
          and ask you, Do you intend to vote this year in the
          Presidential elections?

RCD:      Sir, I'd object to that question.

LA:       Yeah.  That's -- as the legal adviser, I'd advise you
          that's an inappropriate question to answer, sir.  It's
          immaterial, it's prying into the personal political
          views, and to ask the members to essentially state their
          political views here in a -- or leading down that path
          in whether they exercise their civic rights or not.

CC (Mr. Brewer):  Well, okay.

SMBR:     Is it strictly a yes or no question?

CC (Mr. Brewer):  Yes, sir.

SMBR:     Go ahead.

CC (Mr. Brewer):  Sir, do you plan on voting this year?

MBR (Maj Wardinski):  I am.

CC (Mr. Brewer):  Colonel?

SMBR:     Yes.

CC (Mr. Brewer):  Sergeant Major?

MBR (SgtMaj Brookman):  Yes.

CC (Mr. Brewer):  All right.  Now, does it matter to you whether
          the vote that you contemplate making this year is for a
          candidate that this man says he has a problem with or
          that he's criticized, does that make any difference to
          you what you're going to -- how you're going to decide
          this case?

[Negative response from all members.]

CC (Mr. Brewer):  So even if you find out during the course of
          these hearings that Sergeant Stein supports or strongly

45

000843

opposes a candidate, such as for President of the United States, contrary to your own personally held views of that candidate, do I have your commitment that you will not allow that to in any way affect how you impartially handle this case?

[Positive response from all members.]

CC (Mr. Brewer):  All right.  Thank you.

CR (Capt Grey):  Thank you, gentlemen.

If I may -- just because, sir, you've sat on a court-martial of mine, I just wanted to ask you a few questions about that as well.

SMBR:    Yes.

CR (Capt Grey):  Currently, you're the Battalion Commander for 2d Battalion, Recruit Training Regiment?

SMBR:    That's correct.

CR (Capt Grey):  And in that -- let's see.  It was about this year or last year at this time that you were the senior member on *U.S. v. Boyer*.  Do you recall that, sir?

SMBR:    Yeah, I do.

CR (Capt Grey):  And that was about an 8-day court-martial, sir?

SMBR:    Yes.

CR (Capt Grey):  So you've then seen way too much of me, I'm sure.  Did anything about that court-martial, my -- any witnesses, cross-examination, closing arguments, anything like that.  Did any of that reflect on my representation to Marines in the future in your mind?

SMBR:    No, it doesn't.

CR (Capt Grey):  Okay.  So my representing that Marine in the way that I did is going to have no bearing on how you perceive the merits in Sergeant Stein's case?

SMBR:    Absolutely not.

46

CR (Capt Grey):  Thank you, sir.

        Now, you're a CO from an adjacent unit to Weapons Field
        Training Battalion.  Do you know how it was that you
        ended up being selected for this board for a Weapons
        Field Training Battalion Marine?

SMBR:      I don't consider myself adjacent.  It's schematics.
        It's a full bird colonel command.  I'm a lieutenant
        colonel command.

        Now, how was I selected?  I have no idea.  I received an
        appointing letter and a phone call.

CR (Capt Grey):  Do any of the other members know how they were
        selected for the board?

MBR (Maj Wardinski):  No.

MBR (SgtMaj Brookman):  We fill out court-martial questionnaires
        when we check aboard the depot and we are made available
        for any adsep boards or courts-martial.

CR (Capt Grey):  Okay.  Do any of you know who selected you?

MBR (SgtMaj Brookman):  Colonel Dowling made the final call.

SMBR:      Correct.  He signed the appointing letter.

CR (Capt Grey):  And, sir, because you're not in Weapons Field
        Training Battalion, a request like that would normally
        be routed to Colonel Lee, your commanding officer,
        correct?

SMBR:      That's my understanding.  But I also make the assumption
        that since Weapons Field falls under General Yoo, he can
        pick the whole broad spectrum of officers and staff NCOs
        under his charge.

CR (Capt Grey):  And, sir, you're a Weapons Field Training
        Battalion Marine, correct?  You're in this unit?

MBR (Maj Wardinski):  I am, yes.

CR (Capt Grey):  Sergeant Major Brookman, you're from Headquarters
        and Service --

MBR (SgtMaj Brookman):  Headquarters and Service Battalion, MCRD.

47

000845

CR (Capt Grey):  And likewise, for you, do you believe that a
            request to have you on a board would ordinarily be
            routed through Colonel Sinclair[ph], your immediate
            supervisor?

MBR (SgtMaj Brookman):  The way -- the way -- my understanding is
            no.  Because the battalion, it does adsep boards too.
            The convening authority for the adsep board is the one
            that picks from the pool of available staff NCOs and
            officers.  So with -- within Western Recruiting Region,
            we are 8th, 9th, 12th and Weapons Field Training
            Battalion, RTR, and Headquarters and Service Battalion.
            We are all available to be standing on the board.

CR (Capt Grey):  Okay.  Do any of the members have a working
            relationship with Colonel Dowling?

MBR (Maj Wardinski):  Obviously, I'm one of his company
            commanders.

CR (Capt Grey):  Yes, sir.

SMBR:    Colonel Dowling is not in my chain of command.  Is that
            what you're asking?  Do I have any kind of --

CR (Capt Grey):  Yes, sir.  I think you kind of clarified that you
            don't -- not necessarily adjacent units as we might
            normally think.

SMBR:    He's not my peer.

CR (Capt Grey):  Yes, sir.

            And, Sergeant Major, likewise for you?

MBR (SgtMaj Brookman):  Yes, sir.

CR (Capt Grey):  Okay.  Sir, Lieutenant Colonel Hairston, for you,
            you're a convening authority yourself just like Colonel
            Dowling is?

SMBR:    Yes.

CR (Capt Grey):  And you've convened several courts-martial
            yourself?

SMBR:    Two.

48

000846

CR (Capt Grey):  Two courts-martial.  And you've convened -- have
          you convened any administrative separation boards?

SMBR:     Yes.

CR (Capt Grey):  How many admin boards have you convened, sir?

SMBR:     One completed; one in the process.

CR (Capt Grey):  And as part of the process of detailing
          courts-martial and separation boards, have you had
          occasion to talk to Captain Torresala in his capacity as
          the military justice officer?

SMBR:     Yes.

CR (Capt Grey):  And about how much do you work with him on these
          cases, sir?

SMBR:     Do you want a percent?

CR (Capt Grey):  Maybe hours per month, if you can --

SMBR:     Per month, very little because we don't have a lot of
          issues in 2d Battalion.

CR (Capt Grey):  Okay.  Sir, you realize I represent Staff
          Sergeant Ratliff[ph], another one of your Marines who's
          being court-martialed?

SMBR:     No, I didn't -- I didn't know that.

CR (Capt Grey):  Does the fact that I represent a Marine that --

SMBR:     No.

CR (Capt Grey):  Okay, sir.

          Going back to Captain Torresala, do you generally have a
          good working relationship with him in his legal advice
          with you?

SMBR:     Yes.

CR (Capt Grey):  Do you think -- do you accept his advice when he
          counsels you about court-martial matters?

SMBR:     I accept his advice if I agree with it.

49

CR (Capt Grey):  Yes, sir.  Do you find his advice to be generally
          credible?

SMBR:     Yes.

CR (Capt Grey):  Given that you have a prior working relationship
          with him and he's assisting you with your scheme and
          maneuver, so to speak, on courts-martial, does that give
          him a bit of credibility that say perhaps myself and my
          cocounsel do not have when presenting arguments to you?

SMBR:     No.

CR (Capt Grey):  And, sir, was there any communication to you
          yesterday from Major Houtz or anyone else with regards
          to what was happening at the federal court and what the
          judge there was saying?  Did anyone communicate anything
          about that to you?

SMBR:     Yes.

CR (Capt Grey):  What was communicated to you, sir?

SMBR:     It was communicated that a -- is it called an
          injunction?  A request to stop the proceedings was put
          forward and it was denied.  I found out once it was
          denied.

CR (Capt Grey):  Did anyone talk to you and say that -- tell you
          that the judge in that case strongly recommended that
          this board hearing be delayed 24 hours?  Did anyone
          communicate the judge's opinion in that matter?

SMBR:     No.

CR (Capt Grey):  Did you talk to the assistant U.S. attorney, Tom
          Stahl, with regards to that matter?

SMBR:     No.

CR (Capt Grey):  What guidance had you given to Major Houtz with
          regards to any further request for continuance or delay
          of this hearing?

SMBR:     I haven't given any guidance.  At this point -- in my
          opinion, when the proceedings start, if they are
          delayed, pushed into the future, whatever, it's beyond
          my control.  So I am in the receive mode from that

                              50

000848

```
                  standpoint.  So I haven't given him any guidance because
                  I think it's beyond my span of control.

CR (Capt Grey):  Did you tell Major Houtz yesterday or the day
                  before that you would not approve?

SMBR:       Approve what?

CR (Capt Grey):  Approve a 24-hour delay or a longer delay?

SMBR:       It was --

LA:         I think you've asked the question; he's given an answer.
            The --

SMBR:       Yeah.  I mean --

LA:         You have -- I mean, you can keep going down the road,
            Nick.  The -- answer the question, sir, if you'd like
            to.

SMBR:       Well, I can -- I think I can answer it to make sure that
            we are absolutely clear.  It may have been a week ago I
            thought I had the authority to deny changing the date,
            because we were going to do it on the 31st.  And after I
            said no we weren't going to delay, then I realized it
            wasn't mine to make.  But since then, I haven't had any
            discussions about delaying or going forward.

CR (Capt Grey):  Okay, sir.  And I guess this goes to all the
                  members of the board:  Did any of you attend general
                  Yoo's PME last week?

SMBR:       Yes.

MBR (Maj Wardinski):  No, sir.

MBR (SgtMaj Brookman):  Was that the one with the --

SMBR:       The one the colonel did individual Marine --

MBR (SgtMaj Brookman):  Yes.

CR (Capt Grey):  For the gentlemen that were there -- Sergeant
                  Major Brookman, Lieutenant Colonel Hairston -- did you
                  hear the general's comments about the need for
                  individual discipline?
```

51

SMBR:      Yes.

CR (Capt Grey):  Did you take those comments to refer to Sergeant
           Stein?

[Negative response from all members.]

SMBR:      Were either -- any of you -- any three of you, what's
           been your kind of awareness of -- of this case prior to
           coming in today as far as maybe what you've seen in the
           news, heard scuttlebutt, things like that?

MBR (Maj Wardinski):  Not a lot.  I mean, obviously I'm aware of
           it, but I haven't been following it by no means.  So I
           don't have Facebook.  I don't have, you know, things
           like that.  So, you know, very little.

CR (Capt Grey):  Yes.  Thank you, sir.

SMBR:      I don't have Facebook neither.  This is upfront.
           Probably never will.

           I found out about Sergeant Stein maybe a month ago
           because I -- it may have been the *Marine Times*, whenever
           it came out.  So my time may be off.  The first time I
           heard his name was about sometime within the last month.
           Once I received the letter which detailed me to the
           admin sep board, then I pretty much isolated myself from
           any type of information coming in.  Things like the
           *Daily News* being sent out by PAO.  I wouldn't even open
           it to read it, because I wanted to ensure, once I knew I
           was going to be a member, I could stay as clean and as
           objective as possible.

CR (Capt Grey):  Yes, sir.

           And Sergeant Major?

MBR (SgtMaj Brookman):  The only thing I know about the case, sir,
           is when the story broke.  Saying a Marine -- didn't note
           what unit, what base, or even the name -- was found to
           have put something on Facebook.  After that, I really
           didn't pay attention.

CR (Capt Grey):  Okay.  And, sir, as the president of the board,
           has the legal adviser given you any consultation as to
           potential issues with the federal court interplay as far
           as the potential injunction and moving this forward?

52

SMBR:      Yes.

CR (Capt Grey):  Did he talk to you about the potential injunction
           that may be standing by Judge Sporkin?

SMBR:      I don't know where it is.  I just heard that name for
           the first time.

CR (Capt Grey):  Okay, sir.

SMBR:      But I understand that we could be stopped.

CR (Capt Grey):  Yes, sir.  We appreciate your time and the
           patience for standing by for questions.

           Sir, if we could, we'd like to take a five-minute recess
           to discuss potential challenges, if we need them, and
           proceed from there, if that's acceptable to you.

RCD:       Sir?

SMBR:      Yes.  Do you have something you want to say?

RCD:       Yes, sir.  Just a couple of quick follow-up questions.
           I didn't get a chance to ask questions as well, sir.

           Just to the whole panel:  Will the panel be able to put
           aside any prior notions they have regarding Sergeant
           Stein's case, what they may think they know about the
           law or the regs applicable here, and follow the advice
           of the legal officer, their own judgment, and their
           professional experience?

[Positive response from all members.]

RCD:       Thank you, gentlemen.

SMBR:      So we're going to take a recess until 1035.  I now have
           1029.

RCD:       Time on deck is now 1029, 5 April 2012.  Going off
           record.

[The administrative separation board recessed at 1029,
5 April 2012.]

53

[The administrative separation board was called to order at 1035, 5 April 2012.]

RCD:        Time on deck is now 1035, 5 April 2012.  Resuming
            administrative separation board for Sergeant Gary A.
            Stein, United States Marine Corps.

SMBR:       Okay.  So I understand that the defense -- what's the
            legal term for you guys?

CR (Capt Grey):  Respondent, sir.

SMBR:       The respondent in the case want to challenge Major
            Houtz.

CR (Capt Grey):  Yes, sir.

            A typical admin sep is about 90 percent facts and
            10 percent legal.  And this one is basically flipping
            that.  So we think the legal adviser in this should be
            challenged and we wish to make an objection to Colonel
            Dowling at this time.

SMBR:       How much time do you think you need?

CR (Capt Grey):  The last one -- we'll take five minutes, sir.

SMBR:       We'll take five minutes.

CR (Capt Grey):  Yes, sir.

RCD:        Time on deck is 1038.  Going off record.

[The administrative separation board recessed at 1038, 5 April 2012.]

[The administrative separation board was called to order at 1050, 5 April 2012.]

RCD:        Time on deck is now 1050, 5 April 2012.  Resuming the
            administrative separations board for Sergeant Gary A.
            Stein, United States Marine Corps.

            Sir, just to recap, a challenge was lodged with the
            convening authority to the legal adviser a second time.
            That's been denied.

54

However, the convening authority directed that the defense pose their continuance request to you again, if you would like to recess for 24 hours or whether you would like to press forward.

SMBR:     Okay.

RCD:      After we answer that, I'd like to just -- if you could, sir, briefly clarify what your understandings are or when you've been asked to be -- about continuances in this case and whether you intend to continue this board past today, sir.

SMBR:     You want to know if I've had a discussion before about continuance?

RCD:      Yes, sir.  I want to know -- I want to know if we can just put on the record what you -- what instructions you've given regarding continuances.

SMBR:     Okay.  Understood.

RCD:      And whether you will grant a continuance in this occasion.

CR (Capt Baehr):  Sir, the defense would ask that the senior member would not make a decision on that second issue until we've had opportunity to be heard as well.

          Later on there's an opportunity in the script for any potential motions, and at that point we would be making a motion for a period of continuance at that time.  And we would request that both sides be heard before the senior member would make any declaration concerning that particular issue.

SMBR:     Okay.

RCD:      So, sir, again, if you could just briefly clarify what your instructions have been regarding continuances and then we'll proceed with the script as we have it.

SMBR:     Okay.  As I said before, the first time I found that I was detailed to this particular board and had a discussion with Major Houtz once -- and the respondent, the respondent's team requested a delay.  I said no.

                                55

At the time, we were a week out.  I thought a week would be enough time.  So I told Major Houtz that my position would be no.

At that particular time, I thought it was within my span of control to make that decision.  As I thought about it, I realized that it wasn't in my control anyway.  Once I realized it wasn't within my control, at that point I went into the wait for someone to tell me when we arrive in the process.

RCD:    And, sir, follow-up question -- and this is probably lost because it's a detail with regards to the Seps Manual -- but do you understand that the -- was it your understanding or did anyone communicate to you that the reason why it wasn't in your control at that point because we were dealing with civilian counsel retention, not a normal recess as -- as, you know, you would normally -- just a garden variety, we want to continue; but that the issue was that Mr. Brewer was coming on the case and, therefore, per the Seps Manual, that decision about delay goes to Colonel Dowling?

Do you understand that now?

SMBR:   My understanding is it's the convening authority who had the say.

RCD:    Okay.  So are you aware -- are you aware now that -- that the defense can ask you for continuances or recesses once the board is --

SMBR:   Right.  Once we're in session.

RCD:    Correct.  Yes, sir.  So do you understand that you have the authority to continue that if you'd like to?

SMBR:   Yes.  Unless I'm advised otherwise, that's my understanding.

RCD:    Okay, sir.

SMBR:   So are we -- recorder, the opening?

RCD:    Yes, sir.

No, we are on Page 5, sir.  And the question is, Does the recorder, counsel for respondent, respondent --

56

well, we've already gone through that.  Is there any
challenges for cause?  So we would like the defense to
offer any -- no challenges from the -- from the
recorder, sir.

CR (Capt Grey):  Sir, since the legal adviser has been detailed to
this case, he would hear and make rulings on the
challenges for cause.  We would like to go into a closed
session with just the legal adviser to make any
challenges to him.  I anticipate perhaps 20 minutes, I
think, for him to hear challenges and make rulings.

SMBR:     Okay.  It is now 1056.  Recess for 20 minutes.

RCD:      Do you guys want to go on the record?

CR (Capt Baehr):  We want to do it on the record.

RCD:      Okay.  So we'll stay in place and we won't recess.
We'll just ask the board members to depart.

[The members of the board departed the conference room.]

LA:       Okay.  Do you have any challenges for cause, defense?

CR (Capt Baehr):  Yes, sir, we do.

LA:       And who would you like to challenge?

CR (Capt Baehr):  Sir, would you -- we would like, for one, a
group challenge concerning the group's understanding of
the DoD directive and some of their explanations that
indicate that there may be some misunderstandings
concerning the directive that would call into question
their -- potentially their ability to be fair and
impartial here aboard this particular proceeding.

LA:       And what are you -- what are you -- specifics on that?

CR (Capt Baehr):  Sir, the members said that -- when asked, that
they thought it would -- that the directive would permit
them to express a personal opinion about a political
candidate at issue.  All of them said that that would be
prohibited in their mind.

LA:       Right.  And I think -- I did hear that and that was my
concern that we discussed going down that road, that
you're essentially forcing them into a position where

57

000855

they're making a comment about a legality in the case
prior to being educated by the attorneys and legal
adviser on those same issues.

That being said, the fact that they had all followed it
up with the statement that they can keep an open mind if
they were told otherwise or instructed otherwise or
instructed that the law demanded otherwise, they would
be able to -- to take that and apply that properly.

I -- and that was a concern going down is you're
trapping them into something then you're going -- but
they all caveated it with but if we're told otherwise by
the lawyers or the legal adviser, we'll follow the law.
That's what I heard.

CR (Capt Baehr):  Okay.

LA:        Did you hear that as well?

CR (Capt Baehr):  And to elaborate a little more on the challenge,
           the other issue was the members all believed that the
           Tea Party is an actual partisan political party.  And
           that was another area of confusion which obviously we'll
           have --

LA:        Yeah.  I -- I'm interested in hearing your comments on
           that.  I don't -- I don't even know the law on that.
           And I haven't been educated on it.  Is it a partisan
           political party?  I don't know.  Apparently that is
           their opinion right now and I did hear all three of them
           answer that in the affirmative.

CR (Capt Baehr):  Well, sir, we would argue that it's not.

LA:        Is the government going to argue that it's not or that
           it is?

RCD:       Yeah.  We're going to argue it is, sir.  And the point
           is is that --

LA:        It's a legal question.

RCD:       It's a question of whether -- I'm sorry.

LA:        You're going to argue that it is?

RCD:       Yes, sir.

58

LA:          You're going to argue that it's not.  The members
             believe that it is.

             Do you want to bring them back in and ask them more
             questions about that?

CR (Capt Baehr):  Sir, that's not --

LA:          I understand your concern.  But, again, as long as they
             can keep that open mind and be fair and impartial and
             open to your legal arguments on that, I would -- I would
             deny the challenge.  If you want to bring them back in
             and ask them more questions and dig a little bit into
             that -- you know, that -- that you're welcome to do.

CR (Capt Baehr):  Okay, sir.  If we could just have one moment.

LA:          Okay.

CR (Capt Grey):  Sir, the last basis for our challenge, towards
             the end of questioning, all three members agree that any
             identification as a Marine, not even saying -- as I
             interpreted it -- not even saying that I speak for the
             Marine Corps but just saying I am a Marine, that
             identification creates an endorsement.  And a
             combination of previous answers, an endorsement in their
             mind is impermissible and that's not the correct
             statement of the law as it comes down from *U.S. v.
             Wilcox*.  And I think having members that start off in
             that position that even identifying as a Marine is
             impermissible endorsement, I think that shows a bias in
             this panel that will be detrimental to Sergeant Stein's
             rights before this board.

LA:          You're asking about the question where -- what was the
             specific question?  I don't recall.  I do recall you
             asking, but what was it?

CR (Capt Grey):  I don't actually believe it was a --

LA:          It was a follow on?

CR (Capt Grey):  Yes, sir.

59

LA:          And the question was -- was if a Marine identified
             himself as a Marine on a -- a website and then rendered
             an opinion on a political issue, would that violate the
             DoD directive.  That was the question.

             And they all answered yes?

CR (Capt Grey):  Well, it went to was that an endorsement.

LA:          Is that --

CR (Capt Grey):  Well, that wasn't necessarily the total response
             to the question, but I think Lieutenant Colonel Hairston
             said that by identifying as a Marine, that creates an
             endorsement.  I believe the other members agreed with
             that position.  And, again, in concert with previous
             answers when they said that you can have perhaps some
             political activity unless it creates an endorsement.  So
             here we're talking about not saying I represent the
             Marines but just saying I am a Marine, these members --
             it appeared from what I heard, they believe that that
             makes an endorsement for the Marine Corps which
             according to previous answers is impermissible.

LA:          Does the government have an --

RCD:         Sir, again, same thing with the Tea Party comment.
             We're never -- no panel -- you're never going to have a
             panel unless every last one of them comes in here and
             says I have no idea about DoD 1344.10.  I have no idea
             what cause, endorsement, partisan mean.  I have zero
             clue about any of that.  And that's just not going to
             happen.  So obviously they're going to have their own
             personal opinions and beliefs prior to coming in here.
             We can't stop that.  We can't change that.

             What we can do is give them the order and have them use
             the definitions supplied.  And I understand that the
             defense is going to argue that the order is vague.
             That's fine.  That's -- but that's what we have to work
             with.  I don't think anyone's going to be able to
             provide a definition that satisfies everybody as to what
             endorsement means, as to what partisan political
             activity means.  We're going to have to use the order
             that we have.  So I would say that there's no way around
             that in any response they give other than I've never
             heard of that in my life is going to be a problem if
             that's what the challenge for cause is for.

60

LA:          Yeah.

CR (Capt Grey):  I did say that was my last one.  I should know
             never to say last one.  But an additional basis for
             challenge is the interworking relationship between
             Captain Torresala and myself and Lieutenant Colonel
             Hairston.  So this would be an individual challenge.

             Since he has worked with Captain Torresala and Captain
             Torresala has directed the courts-martial that
             Lieutenant Colonel Hairston has ordered; and I have been
             opposing those courts-martial, that generally makes a
             situation where my credibility is diminished in his eyes
             compared with Captain Torresala's eyes.  And it makes it
             more difficult --

LA:          Let's first back up.  That first challenge for cause is
             denied, the one with regard to the earlier statements
             about the endorsement.

CR (Capt Grey):  Yes, sir.

LA:          And the second one is that the -- or the last one is the
             challenge regarding the working relationship that
             Captain Torresala has with Lieutenant Colonel Hairston
             and then the working relationship that you have with
             Lieutenant Colonel Hairston.

CR (Capt Grey):  Yes, sir.

LA:          And can you give more details on why that would call
             into question his ability to impartially and fairly
             evaluate the evidence?

CR (Capt Grey):  Yes, sir.

LA:          I did hear the same thing.

CR (Capt Grey):  Yes, sir.  As a convening authority, he convenes
             courts-martial, administrative boards.  Captain
             Torresala, part of his role as the military justice
             officer, is tasked with -- certainly, it's the
             courts-martial, supervising those and carrying out
             Colonel Hairston's orders or scheme and maneuver on
             that.  And it's my job as the defense counsel to
             represent those clients including Staff Sergeant
             Ratliff, the pending case right now.  And it makes it
             challenging, Your Honor, for my point in this case to be

                                    61

working with Colonel Hairston and for Sergeant Stein's case be working against Colonel Hairston in past cases and in future cases.

LA:      Nick, that would mean you would never want an XO or a CO on an administrative separation board for MCRD.

CR (Capt Grey):  In cases where there are pending courts-martial, that would be --

LA:      Yeah.  I -- again, are you asking that, Captain Grey -- and he didn't know the grasp of the case or he didn't even know you were associated with it.  Captain Torresala, he said he -- he believes he's credible but makes his own decision on -- on any issue that comes up based upon his own decision-making matrix.  And, again, I think he adequately caveated that with the -- the ability to set aside any -- any feelings professionally and just be fair and neutral here.

CR (Capt Grey):  Understood, sir.

CC (Mr. Brewer):  One other -- one other thing, if I may, sir.

LA:      Yes, sir.

CC (Mr. Brewer):  The major said towards the end of his answers to my questions that his approach with his subordinates is that he strongly cautions them with regard to any political speech or activity during an election year.  And I would just submit that that is completely inconsistent with the 1344.10 in particular as interpreted by the order of injunction of U.S. District Judge Stanley Sporkin back in 1997 -- from interpreting DoD Directive 1344.10, a similar law or regulation in a matter that prohibits the plaintiffs from exercising their free speech and free exercise rights under the First Amendment of the Constitution.  I would -- I would submit that that answer indicates an inability for him to -- to follow that particular language.

LA:      I don't think he's obligated to follow that language.  He wasn't -- I mean, I don't -- I don't know how -- that -- are you planning on arguing that position?

CC (Mr. Brewer):  Yes, sir.  I mean, that language is specifically directed not only to the United States Marines but also to their officers, agents, servants, employees and

000860

```
              attorneys and those persons who act in concert and
              participation with them.  So it was not limited in scope
              in any way, shape, or form in the plaintiffs in that
              case.  But by his express language, it was extended to
              everybody within the Department of the Navy.

LA:           Right.  I'm going to deny that challenge for cause.
              And -- not -- of course, expecting your legal position
              on that to be put forth in kind of a different context
              to the board.  Because under that -- that theory, I
              think, again, this board shouldn't even be -- being
              held.

CC (Mr. Brewer):  Right.

LA:           I mean, that wouldn't just apply to the major.

CC (Mr. Brewer):  I agree.  I don't think the board should be held
              because this injunction clearly prohibits holding this
              board.  It violates the free speech rights of Sergeant
              Stein --

LA:           Okay.

CC (Mr. Brewer):  -- under 1344.10.  You can't use the DoD reg to
              inhibit the free speech rights of a member.

LA:           I heard -- I heard Major Wardinski say he does take
              it -- and I'm paraphrasing here -- as well as a leader
              to counsel his Marines on appropriate -- Marines on
              appropriate political activities.  I didn't hear many
              details on what he actually did or whether he even got
              it right or got it wrong.  There were not many follow-up
              questions on that one.  All I heard him say was that he
              does do that as a leader.

              And I, again, also heard him say that he could be open
              and fair here with regard to the law if you convinced
              him that the law should preclude him from doing that as
              a legal issue later on.  I heard him say he -- he would
              follow that.

              But we're putting the cart before the horse for that
              legal issue right now.  And I know you're just using it
              in a small context with the major, but I heard him
              say -- that's the law and that's what he's advised on as
              the law, he will -- he will follow it.  Right now --
              but, again, all I heard him say is a leadership tool
```

63

that he advises his Marines on political -- proper political activities without much elaboration.

CC (Mr. Brewer):  Yeah.  I think his words were I would strongly caution them against engaging in such activities.  The word "caution" was what I was really focusing on, because I think that that flies in the face of the injunction.

LA:       Right.  And I guess --

CC (Mr. Brewer):  And the Marine himself -- the Marine himself --

LA:       -- that's going to be argued -- I'm not going to get into a debate with it.  But I would say that you might come closer with the order them not to than cautioning somebody.  I think that's probably a term of art.  Caution.  He didn't say he ordered them to not participate in the activities.  He said he cautioned them, which would imply to me he told them to be careful.

          But, again, if at some point you establish that that is the law and it should be applied in that way, then he would be able to apply it in that manner.  And I think he was clear with regard to that.  So I will deny that challenge.

CR (Capt Grey):  Thank you, sir.

          Where are the members at, sir?

LA:       I'll go get them.

CR (Capt Grey):  Okay.  Thank you, sir.

[The members of the board entered the conference room.]

LA:       That was the challenges for cause of the board members, sir.

SMBR:     Okay.  Recorder, you may proceed.

RCD:      Sir, we've gone through challenges for cause to the members.  Those challenges have been denied.  We are now on Page 6.

64

SMBR:      Okay.  At this point I would like to offer the recorder
           and counsel for the respondent the opportunity to offer
           any special requests or motions.

RCD:       No special requests; no motions, sir.

CR (Capt Grey):  Sir, we would ask that the board be continued for
           a period of two weeks.  And if I could have a moment,
           sir, to explain various reasons for that.

SMBR:      Okay.

CR (Capt Grey):  Currently, there is an injunction issued by a
           federal judge, ordered that the defendants in this case,
           the Secretaries of all the service branches, the
           defendant's officers, agents, servants, employees, and
           attorneys and those persons who act in concert or
           participation with the defendants who received actual
           notice of this order are hereby enjoined from
           interpreting DoD Directive 1344.10 or any similar law or
           regulation in a manner that prohibits the plaintiffs
           from exercising their free speech or free exercise
           rights under the First Amendment of the Constitution.

           And clearly, if you looked in the binder, you've seen
           that the notice of Sergeant Stein's separation
           specifically says that he is being separated for a
           violation of DoD Directive 1344.10.  It's our position
           that there is a federal injunction.  The United States
           federal judge has said that that basis may not be used
           to proceed against any armed forces member for
           separation.

           And as it's been alluded to, there is a U.S. federal
           court case that Sergeant Stein is a plaintiff to asking
           that this basically advised and to make sure that it's
           interpreted to his case as well as it was in this other
           case.  And that case is pending as we've also talked
           about.  That case went before a judge yesterday.  She
           strongly advised an extension of time in this hearing in
           order to allow a briefing in that case so that the
           attorneys in that case, the parties could fully develop
           the legal position of whether or not this injunction
           prevents this board from meeting.

           And, sir, my understanding from Colonel Dowling just a
           few minutes ago is that you do have that power to grant
           an extension at this point.  Per the MARCORSEPMAN, 50

                              65

                                                              000863

working days or I would say 70 calendar days is
essentially turn-around period for an administrative
separation board.

Now, it starts -- day one is the day of notice to the
respondent, the person who's about to be separated.  And
that would be March 21 or 23 -- March 21 I believe.  So
about 15 calendar days ago, 11 or 12 working days ago.
So there's plenty of time on there to meet our priority
deadline of 50 days.  And I would submit that in this
case, there might be some wiggle room on that priority
deadline where there is tremendous implications with
regards to First Amendment issues and how service
members feel that their rights are not enforced in the
Marine Corps.

Additional basis, sir, we're asking for additional time,
you'll note that the binders you have from the
government there are roughly 3 to 4 inches thick.

Sir, this is the material that I received at about
1 inch thick on 23 March.  This is the material -- say
another inch or inch and a half that I received on
Tuesday.  And then so any residual amount, that extra
inch and a half or so is brand new material as of today.
And I think we all agree that Sergeant Stein and his
attorneys should have a chance to review an inch and a
half of paperwork.  And not just because of what the
paper has directly on it, but the papers make
implications to other things.

So for instance, one of the documents I received on just
two days ago is an SF-86, a top secret security
clearance questionnaire.  It has numerous witnesses and
interviews who were conducted as a part of that.  And so
it's not enough just for us to have the time to read
that.  We need to understand what the government is
going to argue based on Sergeant Stein's top secret
examination.  We need to find out what these witnesses
have to say.  And that, of course, takes time to find
witnesses, talk to them, find out what their potential
statements are.

Captain Baehr mentioned before that, you know, there's
this commonsense thing about having statements or
hearsay when you don't actually have the person in the
seat to ask the questions.  So there's always a danger
of having a written statement because you don't know

66

000864

where it's coming from, what their real thought is on
the matter.  Is it taken out of context, et cetera.  So
the more statements that they are coming in from
outsiders, we request more time to be able to at least
confer with them.  It doesn't require that they be here.
We just need to make sure that those statements that are
submitted on their behalf are fair and accurate
representation.

And, sir, we need to get in the specifics of this case
before we subject you gentlemen to the back and forth of
having someone sit here and watch us try and figure out
what's going on and giving us that time to examine and
let us compare it.  It's going to be more expeditious to
the board as a whole.  We're going to take more of our
time, but more expeditiously to the board as a whole.

And the respondent, he needs the specifics and the facts
and the circumstances as to why he's being separated.
It's rather insufficient to say you're being separated
for a violation of 1344 or being violated for
contemptuous remarks.  We actually need what remark it
was on what day and what was said, that way we can go
back and pull up the entire conversation.

In particular, one of the issues, it comes down to a
Facebook posting which was on another Marine's Facebook
site and we have one screen shot of that Facebook
posting.  And, of course, I think any of us could agree
that when we said a comment where if you don't have what
was said five minutes before or five minutes later, it
can be taken out of context.  And we need time to be
able to coordinate with that -- the Marine who has that
site and potentially Facebook if the material's been
deleted in order to get you gentlemen the entire
context.  That way you're not determining Sergeant
Stein's future in the Marine Corps and his discharge
characterization based on -- on one page of a Facebook
post.

So for those reasons, sir, we'd ask that you grant an
additional two weeks of time in order to fully research
the materials given by the government and prepare our
own case to make sure that we have the witnesses as to
Sergeant Stein's past service, if there's any statements
that have been offered by the government that need
clarification, we can offer those.

000865

And, you know, I understand the government position is
that, you know, time is sensitive, that things can get
out of hand while this is going on.  Sergeant Stein
absolutely believes that he's going to have no media
involvement.  We're not going to do any Facebook
activity.  There's no danger to the Marine of delaying
this proceeding.  We can put things on hold while we get
it done properly.  He's been a Marine for nearly nine
years and I think we owe him more than just 15 calendar
days to make a representation as to why he should be
allowed to stay in for an additional four months and why
he should get an honorable discharge at that point
rather than very quickly being dropped on with 4 inches
of material which he has today to respond to.

Do you want to make anything further on that?

[Negative response from the cocounsels.]

CR (Capt Grey):   Thank you, sir.

RCD:        Sir, with regards to that, I would offer a couple
clarifications.  First, with regards to *Rigdon*, in your
binders -- and it's been actually listed as an exhibit
and I'll provide it to the legal officer -- *Rigdon*, in
my -- in my legal opinion, does not apply here.  The
injunction they discussed was for those particular
plaintiffs in that particular case in 1997.  Not a
blanket, the Marine Corps or the Navy or anyone else can
never use DoD Directive 1344 to separate somebody.
That's just plainly stated in the case.  It's a case
from a different circuit 15 years ago with totally
different facts.

And that case was an issue of two Navy chaplains who
were -- who wanted to encourage their congregants to
contact members of Congress regarding their opinions on
pending antiabortion legislation.  The clergy never
actually did that.  They wanted to because they had been
instructed to do so by their -- by the Catholic
bishop -- the civilian Catholic bishop that they served
under.

So it was a completely different issue.  And the court
in *Rigdon* never even reached the issue.  They reached an
in dicta which is a legal term for saying that it didn't
apply in the case because the order was found to not
even have applied to them because they didn't actually

000866

do anything.  It was anticipated they would do
something, so the court never really got to the issue of
whether encouraging their congregants to vote against an
antiabortion legislation would be a violation of that
order.  So they never even reached the issue.

So I would say that's been briefed.  I don't want to
bore you with the legal intricacies of that case.  But
the legal officer has -- will have that for you to
confer with.  So I would ask that you consult with the
legal adviser on the applicability of *Rigdon* in that
supposed injunction in that case before you make any
ruling, sir.

Regarding the thickness of the binders, part of the --
part of the reason for this is I've actually printed out
material that I gave to Captain Grey on CD form.  Most
of that is Facebook page printouts from his personal
Facebook page and the Armed Forces Tea Party Facebook
page.  Captain Grey had everything that was provided
with additions, like he discussed, earlier this week.
All materials have been provided.  They've had plenty of
time.

With regards to the SF-86, that's Sergeant Stein's own
investigation and they're claiming they didn't know
about it.  Sergeant Stein is part of this -- part of
this as well.  He can tell his defense counsel
everything and anything he wants to.  That information
is provided because I can't provide it to you any other
way.  I can't -- unless Sergeant Stein elects to answer
questions, that's the only way I can provide it to you.
They're more than able to speak with their client and
get any information that they have from that -- from
that SF-86 and they've had all the time to do that since
the notification.  So I would say that that is -- that's
also a red herring.

As far as the Facebook posts, that really forms the
basis for the 134 -- and this was going to get into
later on in witness testimony -- that Facebook page has
been deleted by the Facebook page administrator.  And
he's going to testify to that.  He's going to be called
telephonically, Chief Warrant Officer-4 Burns.  He is on
terminal leave now; just retired.

He was the administrator of a Facebook page designed for
people in the METOC community.  METOC is the weather

69

forecaster community, okay?  So it was a page
specifically designed for those Marines and that's where
the postings were put on.  When he -- and again, I'm
speaking a little out of turn because he's going to get
to this -- but he's going to explain to you that when he
saw these postings, he immediately engaged in
conversation over Facebook e-mail with Sergeant Stein,
which is also in your binders, which we haven't gotten
to yet, regarding the appropriateness of those comments
and, thereafter, deleted it because he didn't want
junior Marines to be influenced by inappropriate
comments.

So this will all be -- we'll get into all of this if we
ever get to the actual documents and the witness
testimony.  So I would say that that's premature.

So the continuance, as I understand it, the bases are
the injunction which *Rigdon* -- the case of *Rigdon* in
1997, which the government argues doesn't apply here --
does not apply here.  The time to go over the materials.
Again, this has all been provided well in advance of the
board.

Additionally, I've just now gotten the defense's
materials.  You know, this is part of the administrative
board processes is we work with the time we have.  And
we can go over challenges to all these documents a
little bit later in the script.  So, again, I don't see
that as a sufficient basis either, sir.  Thank you.

CR (Capt Grey):  If I could have two minutes, sir.

I attended the hearing yesterday in the federal court
and the judge strongly advised that additional time be
granted because the United States attorney needed to
brief up whether or not *Rigdon* was applicable, whether
there is a standing injunction preventing the
enforcement of DoD Directive 1344.  That issue isn't
settled.  And it's very likely that if this board goes
today, next week there's a determination that 1344 is
not the basis for a discharge or for court-martial, then
this board then would basically become a nullity.  It
would have been a waste of everyone's time if the
federal court makes a determination that -- that the
injunction in *Rigdon* applies.

70

So, sir, I mean, it comes down to presentation for
Sergeant Stein being able to use evidence and also just
the economy as well.

We also have a lot of witnesses and evidence to be
considered.  There's going to be a lot of time spent
looking through there and that may all be rendered moot
by a federal court ruling.

And, again, I would just -- sir, I put it to you that
these are complex First Amendment issues that are going
to require a lot of legal analysis in a federal court.
And that's the appropriate venue for something like that
to happen of that of a federal judge make the
determination of what it is or is not permissible First
Amendment conduct.  And by waiting two weeks, you allow
the federal court to make a determination on that issue
and get briefed up on that issue.  And I think that
would be the far safer alternative and the more
economical alternative.

RCD:      Nothing further, sir.

SMBR:     Okay.  Okay.  Nothing further.

Okay.  First let me caution what I've heard at least a
couple of times, it almost seems that there's an
assumption that we are already going to make a decision
one way or the other.  That hasn't happened.  So be
careful there.  When we start talking about separation,
it assumes that we have a basis for separation.  We're
not there yet, so let's be careful with that because we
haven't gotten to that.

As far as the injunction, as I understand, there was a
judge who denied an injunction yesterday.  Strongly
recommended delay but denied the injunction.

Is this correct?

CR (Capt Grey):  Yes, sir.  What the federal judge ruled was that
the military -- the Marine Corps would be allowed to
have its hearing today -- could hear this.  But, again,
that's sort of at our own risk.  She's not going to jump
in and tell us at this point -- her consideration in
deciding not to stop this was that essentially she could
fix it up on the back end if she wants to, if she
determines that the case has merit at a later time.  But

71

000869

```
              if she fixes it up on the back end, that doesn't render
              the fact that we maybe wasted our time on the front end
              for her to fix something on the back end.

SMBR:       Well, I'm not going to allow anyone in the back to
            speak.

CC (Mr. Rhodes):   I'm cocounsel, Your Honor.

SMBR:       You are?

CC (Mr. Rhodes):   Yes.

SMBR:       Okay.  Go ahead.

CC (Mr. Rhodes):   I was cocounsel yesterday, Your Honor, at the
            3d Court Case and I'm here as the counsel.

            On three different occasions yesterday, the judge
            requested the U.S. attorney to contact this command to
            ask if this -- whoever was appropriate, forgive me --
            would agree to a continuance because she was urging us
            to take the matter up to the 9th Circuit Court of Appeal
            immediately to seek a bar of this hearing from court.

            This is a matter of record.

SMBR:       I understand.

CC (Mr. Rhodes):   I'm not -- so, but each time she was told
            that -- in one time you had been consulted and twice
            that Colonel Dowling had been personally consulted
            yesterday and that you had said no.  So that was what
            the Deputy U.S. Attorney Stahl told the court.

            And so she expressed her dismay several times and said
            that it was your decision.  But advised us that she
            would anticipate us taking it to the 9th Circuit as soon
            as possible.  And that she essentially said that if
            there are any problems with whatever happens that --
            that the case in federal court will go forward and that
            we could seek appropriate relief in the very near
            future.  So I'm trying to give you an objective
            presentation of what happened yesterday, Your Honor.
```

72

SMBR:      I understand.  Thank you very much.

           Okay.  From my standpoint -- you got something else to
           say?

CR (Capt Grey):  No, no.  Just to hear you, sir.

SMBR:      Okay.  From my standpoint, what the judges are doing, I
           mean, they are doing something that's beyond us at this
           point.  So we're operating within the parameters of the
           box that we live in right now.  So I don't see a reason
           to continue this process to a later time waiting on the
           outcome from someone who's outside our margin, if you
           will.  Because we exist to enforce the rules that we
           have right now.

           As far as time to go over the material, I'm not
           convinced we don't have enough time.  We're seeing this
           for the first time today and we have to muddle through
           it.  So I'm not going to continue this for a later date.

CR (Capt Grey):  Understood, sir.

RCD:       Defense, have any other motions?

CR (Capt Grey):  No.

RCD:       Sir, we are on Page 6 with my line, The recorder's ready
           to proceed.  The recorder has the following documents
           for presentation to the board for consideration in these
           proceedings.

CC (Mr. Brewer):  Could I just add one other thing, Captain?

RCD:       Yes.

CC (Mr. Brewer):  Sir, I just want to point out one other
           provision of yesterday's order by the federal judge.
           This is at Page 16, being line 24.  At the minimum,
           board or plaintiff may reject request for continuance to
           the administrative separation board, which we've done.
           The court questions the government's insistence on
           proceeding so expeditiously after plaintiff's nearly
           nine years of service.  At a minimum, the court strongly
           recommends that the military voluntarily provide
           plaintiff's counsel a continuance of 24 hours or more to
           permit review of this court's order.  Given the fact
           that the court has been presented with this matter late

                              73

yesterday, is in a trial today, the court only had a limited time to review the matter. As a result, the court believes that the plaintiff should be provided the opportunity to have the 9th Circuit review the court's order. And then she went on to deny this restraining order.

And just hear your question earlier, there were actually two injunctions that we've been talking about in the last two minutes. The one is the injunction that was requested per yesterday. But the other one was -- that she's talking about here -- and she specifically admonished the U.S. attorney and asked him to do so by this morning, by 8 o'clock. And then he pled with her until noon. She said okay, noon. By noon, he was supposed to have briefed the federal court on the applicability of the injunction issued in the *Rigdon* case back in 1997. It's an old case. It's 15 years old, but it's never been challenged by the military. So it's good law as we lawyers would say.

She invited the United States attorney to brief her on the ongoing applicability of that injunction to see whether it applies here. That's why she asked this board to standdown and give the government a chance to put its position in front of her, to get Sergeant Stein's position in front of her, and then she could advise the legal issues on 1344.10 and First Amendment rights generally.

Basically saying that -- you know, most of us in this room, myself included, you know, we're not First Amendment lawyers, we're not scholars in the Constitution on how it applies and all the intricacies and how it applies in a military setting. That's something that, you know, we would respectfully submit even if it was just a 24-hour continuance to allow her to do so would be the best interest of the -- of the court.

SMBR:      So if I understood you, she's receiving a briefing by 1200?

CC (Mr. Brewer):  She's supposed to -- that's what she requested. That's what the U.S. attorney promised to do.

SMBR:      Okay.

74

CC (Mr. Brewer):  But I've been sitting here.  I don't know if
           it's happened.

SMBR:      Understand.  And your expectation is she's going to --
           we're going to find out one way or the other when?

CC (Mr. Brewer):  My expectation is today.

SMBR:      Today?

CC (Mr. Brewer):  Yes, sir.

SMBR:      Now, I have no idea how long the proceedings are going
           to last.  Where it's starting now, it looks like it's
           going to be a long day.  And so if we push forward and
           we're stopped, I don't think that's any harm at this
           point.  So we're going to continue.  Thank you for that.

CC (Mr. Brewer):  Yes, sir.

RCD:       Alright, sir.  Going back to the exhibits and then we'll
           give the defense time to challenge the exhibits.  I just
           want to explain what each one of them -- yes, sir.

           In your binders, there should be in there an exhibit
           list that details what each one of these exhibits are in
           the front there.  And I'd like to go through them
           because there -- there are quite a few obviously.

           The appointing letters.  The two original -- the
           original appointing letter and then the revised
           appointing letter.  Those are obvious.

           The administrative separations package.  That Tab 2 is
           where Colonel Dowling specifically notified Sergeant
           Stein of the bases for separation.  And I have to
           apologize ahead of time for all the tabs on the left.
           There was no easy way to kind of break those down.

           But Government Exhibit 2 includes Colonel Dowling's
           recommendation for separation with an OTH
           characterization.  Obviously, we haven't gotten there,
           but at least it's in there.

           Government Exhibit 3 is quite a few documents.  Those
           are all the procedural requests that the defense has
           made as well as the endorsements thereon.  Delay
           requests, civilian counsel's notice of appearance, a

                              75

second delay request, so on and so forth.  I would draw
your attention, sir, to the last one there, the last
bullet.  That's our rebuttal, if you have any questions
regarding our take on the law for *Rigdon* and our First
Amendment concerns.

SMBR:       Last of which?

RCD:        Of Government Exhibit 3, sir.

SMBR:       3B?  3A?

RCD:        It's actually -- I don't have it listed on the exhibit
list, but I believe it is -- should be 3L.  3L, sir.

So that's the government's standpoint on the *Rigdon*
injunction as well as some of the issues raised by
defense with regards to First Amendment and the
applicability of Article 134.  So that's in there.
That's our position on that point.

Defense exhibit -- or excuse me, Government Exhibit 4,
request to change situs, sir.  That's just procedural.
Again, we've already answered that previously.

Number 5 is the one I'd like the members to take a look
at.  It's the METOC Facebook page posting that we all
have been talking about.  Included with that posting is
the transcript.  It's a little Facebook page -- it's a
screen shot, so I've also included a transcript of that
Facebook page for a little bit easier reading for you.
That forms the basis for the Article 134 offense, sir.
Again, Sergeant Stein.  So that's -- that's one of --
probably the most important exhibit that the government
would present to you.

Government Exhibit 6, sir, is a statement that Sergeant
Stein made and posted on RedState.com explaining -- or
actually acknowledging that he had made those statements
on the Facebook page and his explanation therefore.  So
that's also an important document.

Government Exhibit 7 is a printout of the Armed Forces
Tea Party website that Sergeant Stein administered and
created.  On this website, the government has printed
out several -- several of the pages that detail some of
the activities on that site, specifically a tab entitled
"gear" where the government will show that Sergeant

76

Stein has been selling bumper stickers, "Nobama" bumper stickers on his website thereon.  So that's Government Exhibit 7.

Government Exhibit 8 are some additional RedState.com postings.  And I include those, sir, because armed forces -- the organization known as Armed Forces Tea Party actually was run by two individuals initially. Sergeant Stein and another person named Vic -- I'm probably pronouncing this wrong -- Luebker.  And he explains in those postings the split between him and Sergeant Stein and the date that that occurred.  And the government will get into why that's important in our closing.

Government Exhibit 9 is the actual printouts of pictures that are on the Armed Forces Tea Party Facebook page that Sergeant Stein administered and created.  You'll see several -- these are very important pictures, sir. You'll see some characterizations of the Commander in Chief in there that the government will argue forms the basis, in part, for the Article 92 offense that we have alleged against Sergeant Stein.

Those pictures I'll go through them in more detail, but the President's face superimposed on the *Jackass* poster. The President's face superimposed on a political poster with the word "dick" underneath it.  As well as the President's face superimposed on a movie poster for *The Incredibles* and it's relisted as "The Horribles."  And we'll argue to you why we believe those to be violations of the DoD directive, sir.

Government Exhibit 10 is the -- some breakouts of the Facebook page postings -- the Armed Forces Tea Party Facebook page.  And I apologize, sir, there's actually three different Facebook pages we'll be talking about today.  That's one of them.  Again administered and created by Sergeant Stein.

So those statements, particularly the 21 March 2012, which should be Exhibit 10A -- it's the top one there -- discusses the ongoing investigation as well as a call to his supporters to rally together to remove the President from office and elect a GOP candidate.  And the government will argue that that -- that call violates DoD Directive 1344.10.

77

Moving down, sir, Government Exhibit 11 is Sergeant Stein's personal Facebook page.  A lot of which mirrors what's on the Armed Forces Tea Party Facebook page but it is a private page for him.  Well, I say private in that it's his Facebook page.  It's open for public viewing.  I print that out for you for context, so that you know that there is other Facebook pages out there with similar postings and content, sir.

Moving down, sir, Government Exhibit 13 are media report summaries.  And these are summaries provided to you, sir, by the investigating officer, Captain Liu, who instead -- I suppose we could have played the -- the interviews for you.  There have been several.  But those transcripts are provided for you, sir, so you can easily understand the comments that Sergeant Stein has made in the press since the 1 March 2012 initial posting.  And those have screen shots of a location on YouTube where those videos are located.  Again, those summaries are provided to you as a means to more easily take in the content, sir.

SMBR:      Okay.

RCD:       Government Exhibit 14, the DoD directive.  This is obviously very important.  This forms the basis for the Article 92 offense.  We'll be going through that order with you, sir.  And I would ask that when we get to the point where the parties are arguing their positions on definitions and whatnot; that the legal adviser's advice, if he has any, be utilized as well as your own common -- common sense and judgment on the definitions provided.  We don't have definitions for every word in the order.  It's the order that we have to deal with.  And the government will make its arguments; defense will make its arguments on what they believe that says, sir.

SMBR:      Okay.

RCD:       Moving down, sir, Government Exhibit 15, Sergeant Stein's 6105 counseling.  That is dated 23 March 2012, issued by the Battalion Commander.  That covers a synopsis of all the conduct that's basically alleged here today.  It is provided so that Sergeant Stein would have a written notice of the comments that he's made and why the commander believes those to be prejudicial to good order and discipline as well as why the commander believes those -- that the social media content that

78

he's provided violates the DoD directive.  That's
provided to you so you can understand that Sergeant
Stein was given the opportunity to submit a rebuttal,
which he did not.

And it also demonstrates -- and we'll get into this on
additional witness testimony -- that after he was
notified on 21 March that he was in violation of the DoD
reg, he then elected to break it again on 22 March and
the government will demonstrate that; wherein, he spoke
at a partisan political gathering.  And it details that
in 6105.

Moving down, sir, Government Exhibit 16, the SRB,
BIR/BTR, Master Brief Sheet for Sergeant Stein.  That's
provided to you so you can understand his service
history, sir.  The Master Brief Sheet, we will discuss
along with some of the counseling entries -- the 6105 or
Page 11 counseling entries that are already in his
service record.  And we'll be discussing those with some
of the witnesses that -- that have personal knowledge of
those events.

Moving down, sir, Government Exhibit 17 -- and this is
also probably the second most important information that
we'll provide -- Sergeant Stein's security clearance
revocation.

17A are the revocation letters that he received from
DONCAF and OPM and details all the reasons why his
security clearance has been revoked.

The government will demonstrate through those documents
that Sergeant Stein has engaged in significant
mismanagement of his finances to include judgments,
repossessions of vehicles, bad debts, and through other
witness testimony that he has been generally
irresponsible and shows bad judgment with regards to his
finances.  That's provided to you, sir, for
characterization purposes as well as separation or
retention purposes when we get to that point, sir.

17B, sir, is his SF-86 questionnaire and included in
there are the DONCAF investigator's notes about their
conversations with Sergeant Stein about his finances as
well as other matters.

SMBR:      Which one?

79

RCD:      17B, sir.  It's a lengthy document.  I'd ask the members to pay particular -- I know it's a long -- a long document and a long read, but there are a lot of very important statements that Sergeant Stein has made regarding his finances and the investigator's notes kind of detail all -- the -- it's more of an explanation of the actual revocation letter.  So it gives the context behind that revocation.

              Government Exhibit 18 is a bio memo, again, by the investigating officer for Sergeant Stein.  It's basically a condensed version of his SRB, BIR/BTR and Master Brief sheet.  So that's just there for additional information on his background, sir.

SMBR:     Okay.

RCD:      Government Exhibit 19, sir, a court judgment, collection agency dated 24 January 2012.  That's to demonstrate that Sergeant Stein, as of that date, still had outstanding debts that he has not paid that have gone into collection and are, therefore, outstanding and remain to be.

              Government Exhibit 20 is documents surrounding 2010 incident with Sergeant Stein where similar issues were raised as to his political activities.  In Government Exhibit 20, there are three subparts to that.  Government Exhibit 20 includes an interview that Sergeant Stein did on *Fox News* explaining what happened in 2010.  And we'll get into this with witness interviews, obviously, sir.

              And then an affidavit of Lieutenant Colonel Daren Erickson, an affidavit of Major Gabrielle Chapin.  Those are the individuals that had interactions with Sergeant Stein in 2010 regarding his political activities.  And we'll use it to demonstrate the counseling that Sergeant Stein received two years ago regarding the same DoD instruction.

SMBR:     Okay.

RCD:      Government Exhibit 21 are witness affidavits, sir.  And we -- these are witnesses that are relevant but we didn't want to waste the board's time or take up too much time with the testimony here.  Some of them will be telephonic, others are PCSing.  Sergeant Major Jackson

000878

is PCSing and could not be here. He'll describe to you how he received the 1 March Facebook postings at issue and what he did after that.

SMBR: Okay.

RCD: Mr. Brundige is a security manager. His is just to detail the process for security clearance revocations.

And Colonel Shumake is the -- was the judge advocate at OSD policy back when the DoD instruction was revised. His affidavit is important for one reason, sir: He includes, as an exhibit to that affidavit, the staffing memo for DoD Directive 1344.10. It shows all the different agencies, legal departments, and activities that had a hand in reviewing that directive. And the government will argue that -- you know, and counter to the defense's argument that that is fully valid, comports with federal law, and is a -- does not infringe on Sergeant Stein's First Amendment rights.

Chief Warrant Officer Mills, Government Exhibit 22. These are personnel records that Chief Warrant Officer-2 Mills, as the direct OIC of Sergeant Stein provided. Those are his fitreps for Sergeant Stein. The government will show, again, through witness testimony in conjunction with those records, that Chief Warrant Officer Mills has a negative opinion of Sergeant Stein's prior work performance given the result of his security clearance revocation, the issues that that caused for 1st Intelligence Battalion in 2010 and continuing on into 2011.

He was also aware -- directly aware of those Facebook postings on 1 March, because he is also a member of the METOC community. And he'll describe for you that he believes those postings to be prejudicial to good order and discipline, having reviewed them himself, having seen them himself as a METOC Marine.

SMBR: Okay.

RCD: Government Exhibit 23, Chief Warrant Officer-4 Burns, METOC Facebook e-mails. This is another extremely important exhibit. Sir, this is the -- we discussed it earlier but it bears repeating that when Sergeant Stein posted these 1 March postings that we're all discussing, Chief Warrant Officer-4 Burns received an e-mail update

81

from Facebook that somebody had posted on that wall.
That's how Facebook works.  That the administrator gets
notified when somebody makes a post.

Immediately upon seeing those posts, he sent separate
private e-mails via Facebook to Sergeant Stein to
counsel him on his -- on his statements, that those were
inappropriate statements.  And then it will also detail
Sergeant Stein's response to him where he takes
responsibility for being over the line and he actually
admits that in his return e-mails to Chief Warrant
Officer-4 Burns.

Government Exhibit 24 -- and this is really in there for
legal reasons, sir.  President Obama's reelection
campaign announcement.  The government will argue that
President -- and defense has alluded to it -- that
President Obama is a candidate for office in this
election year, has announced his candidacy, and how that
plays into the applicability of the DoD directive.
That's in there for foundational purposes, sir.

Moving down, 25 and 26 are just provided to you from the
UCMJ as well as the Seps Manual, so that you have a
context of the elements that the government has to prove
as well as the MARCORSEP Manual and talks about -- the
defense, I believe, put this in their binder as well --
the characterization considerations and things of that
nature.

SMBR:      Okay.

RCD:       Government Exhibit 27 is the *Marine Corps Times* article
that I'm -- I know we've all heard about.  I offer that
for one reason, which is to show that the Marine Corps
community has viewed the command's lack of action in
this -- in this regard as some kind of knock on good
order and discipline.

There was a call to action by several Marines in that
article, why is this not being dealt with; why is this
Marine not being held accountable for his actions.  That
goes to the service discrediting and good order and
discipline prongs of 134, sir; that our own people are
questioning why this Marine is not being held
accountable.  And we'll also get into that with some of
the witnesses we have planned, sir.

82

000880

Additionally in there, sir -- and this is just for your -- for, if the members desire -- *U.S. Army Quarterly -- Moore College Quarterly* written by a judge advocate.  It's kind of a lay expose on First Amendment in the military.  I would caveat that as this is not to supplant the legal adviser's opinion at all.  I just know sometimes that we have a tendency to get into legal speak and I thought this quarterly was actually a good recitation in more simple terms and a little bit easier to understand.

Government Exhibit 29 is the CMC White Letter, sir, that we all received regarding accountability.  And we'll use that as part of our argument to the board.

Government Exhibit 30 will be our written summation. That's our written argument as to why we've satisfied all the bases for separation, why we've satisfied all the elements under Article 92 and 134, and why there is no violation of Sergeant Stein's First Amendment rights here with regards to those allegations, sir.

SMBR:      Okay.

RCD:       Finally, sir, Government Exhibit 31, which we've alluded to -- I don't know if it's in defense binder or not -- the complaint that was filed Tuesday, I believe, in federal court naming Colonel Dowling and General Yoo as defendants in an attempt to stop this board from occurring.  And I'll use that in my argument as to why -- as to what I think that shows about Sergeant Stein.

SMBR:      Okay.

RCD:       Sir, that's all I have at the moment.  If -- there may be additional stuff that pops up that we may need to put in the record.  I would just say that we make a note to add these things to the list if and when something comes up defense wants to include, so that we have an accurate record of what was actually introduced, sir.

SMBR:      Granted.

RCD:       Thank you, sir.

SMBR:      Does counsel have any objections?

83

CR (Capt Grey):  Yes, sir.

          Sir, we would object to Government Exhibit 5.  It's a
          one-page screen shot and the transcript of a physical
          conversation METOC -- which stands for
          Meteorological/Oceanographic.  It's a MOS community.
          That's only one page in what was a long discussion, sir.
          There's material beforehand and after-hand.  And, sir,
          if it's -- if it doesn't rate additional time in order
          to get the full substance of that conversation, then I
          don't think that one page -- that one portion of a
          conversation should go in by itself.

SMBR:     Let me get to it.

CR (Capt Grey):  Yes, sir.

SMBR:     That's Exhibit 5?

CR (Capt Grey):  Yes, sir.

SMBR:     So as I'm moving toward it, you want to completely
          remove it or you want to get the additional pages?

CR (Capt Grey):  Sir, I'd ask that without the additional pages,
          that it be excluded.  Coming up with the additional --
          that was the basis -- part of the basis for our
          requesting more time is that it will take more time to
          get those, if available.  Or at the very least, other
          witnesses who were part of that conversation could maybe
          describe what happened before and after these remarks
          were made.

SMBR:     I understand.

LA:       How many exhibits are you objecting to, Captain Grey?
          Do you just want to take them one by one or do you want
          to --

CR (Capt Grey):  Yes, sir.  I prefer to go one by one.

LA:       Okay.  Then, John, do you have a position on that?

RCD:      Yes, sir.  There's nothing in the Seps Manual that
          limits the ability of you to consider pieces of
          evidence, sir.

84

Additionally -- and this will be explained through witness testimony -- is the rest of that -- that conversation has been deleted by Chief Warrant Officer-4 Burns as the administrator of that site.  So it's not available anywhere.

And he explains the reason for that is that he didn't want any junior Marines to get ahold of that and see that on the Facebook page and be influenced by that.  So it's not there to obtain, first of all.

Second of all, it forms the basis of the Article 134 offense that we're talking about.  It's necessary to those -- to those offenses.

LA:       Did the -- did the person who deleted it, does he have -- is he aware of the context that it was in?

RCD:      Yes, sir.

LA:       Is he going to be able to testify about that to give the full picture?

RCD:      Yes, sir.

LA:       Do you for any reason think he's not going to be accurately able to do that?

CR (Capt Baehr):  Sir, we would object to -- first of all, I didn't file this before, but we've -- because we've challenged the legal adviser, we would just rate a standing objection for the -- for the record concerning the legal adviser and anything that he might rule on this particular board.  Just noted for the record, sir.

Also, of course, we would object to the legal adviser -- the objection to the board without the president of the board asking the legal adviser for any sort of opinion. It's unprecedented, sir.

SMBR:     Okay.

LA:       Let me add some clarity to that.  Actually, the Separations Manual in 6315 is pretty clear on it and it -- as far as precedent goes, this is really the precedent we have to work with, sir.  If appointed, the legal adviser shall rule finally on all matters of procedure, evidence, and challenges.

85

I'm going to rule on those -- those challenges and the
evidence.  And in order to do that, I am going to ask
follow-up questions, Captain Baehr.

CR (Capt Baehr):  Sir, the defense's understanding of the
                  MARCORSEP Manual is that the president rules.  If the
                  president has a question, the president can ask the
                  legal adviser.  But the legal adviser, sua sponte,
                  engaging in every decision of the president is
                  unprecedented.

SMBR:     You have a response?

LA:       I will limit my interactions.  If I have questions, I
          think it's appropriate that I ask them before I rule on
          it, sir.  But I think the point is that you ask the
          follow-up questions, then I rule on the evidence based
          upon your follow-up questions.  And for me to limit my
          interjecting myself into the process and let you guide
          it along a little more.

SMBR:     Is that okay?

CR (Capt Baehr):  Yes, sir.

SMBR:     Okay.  As it relates to Government Exhibit 5, I'm going
          to keep it.

CR (Capt Grey):  Understood, sir.

          Sir, Government Exhibit 8.  It's designated
          ArmedForcesTeaParty.com home page.  This is --

SMBR:     Is it Alpha?  8A?  Got it.

CR (Capt Grey):  Yes, sir.  This is someone else's post.  This
          isn't Sergeant Stein's post.  This is a different
          individual.  And I'll make a similar objection later on.

          But obviously, it's important to get certain people's
          opinion on here because these people have a lot of
          background and experience.  But this Vic Luebker I don't
          think has sufficient understanding of the facts in this
          case that his opinion ought to be considered just
          because he has one.  It kind of will go along, well,
          what if we read every entered comment after a news story
          about Sergeant Stein?  I guess there's some value to it.
          But without some showing that the person makes the

                              86

                                                            000884

comment or statements is read up on it, it opens the door way too wide for additional information, sir.

SMBR:     I want to be sure.  Government Exhibit 8A?

CR (Capt Grey):  All -- the entirety of 8, sir, Alpha and Bravo.

SMBR:     Okay.

CR (Capt Grey):  I think Alpha is towards the front page, the website.  And Bravo is the substantive text that the government wants to admit.

SMBR:     And so you're saying it doesn't belong to Sergeant Stein; it's someone else?

CR (Capt Grey):  Yes, sir.

SMBR:     Major Houtz?

LA:       Yes, sir.

SMBR:     Your legal advice?

LA:       I haven't seen it, sir.

SMBR:     You haven't seen it?

LA:       No.  But let me take a look at it.

RCD:      And, sir, if I may offer my --

LA:       So you -- this wasn't created by Sergeant Stein?

CR (Capt Grey):  Yes, sir.

LA:       That's the objection?  It's irrelevant?

CR (Capt Grey):  Yes, sir.

LA:       John?

RCD:      Sir, my -- the reason for having this in here is to, one, detail that there's some confusion as to what Armed Forces Tea Party is, who runs it, and who administers that.

87

We will explain that this is a site that was originally
shared by Sergeant Stein and this Mr. Vic Luebker and
then there was a falling out which is contained within
his own -- with the Armed Forces Tea Party Facebook
page.  So it was really preemptive to -- in case there
was any kind of issue about who was running this site
and who made those comments.

I think it's obviously beat over the head with the media
reports that Sergeant Stein did, in fact, make these
comments.  He acknowledges those.  We've already
discussed those in Government Exhibit 6.  So it's really
to ensure that the members understand that there may be
conflicting websites out there but that this site --
that the site alleged to have posted the inappropriate
conduct is just Sergeant Stein's.  That --

LA:         And not -- not -- I mean, the point is that the Armed
Forces Tea Party is not supporting Sergeant Stein's
Armed Forces Tea Party.

RCD:        Yes, sir.  It used to be the same organization, but it's
now not.  And it's a little more complicated than we
probably want to go into.  But there was copyright and
domain name issues between the two of them.  I just want
to ensure that the postings -- that there's -- if
there's going to be an argument that the postings in
question were not made by Sergeant Stein, that's the
purpose for those being in there.

SMBR:       Okay.

LA:         I think I'd like to cross that bridge when we get to it.
They're going to contest that.  Then at that point, the
government wants to put that in to try to somehow show
that it wasn't somebody else who made the statements.
At that point it may be admissible under some loose
theory.  But right now it's just an opinion of -- or a
dot-com type of --

SMBR:       So is there anything within this exhibit stated by
Sergeant Stein?

RCD:        No, sir.  Well, other than quotes that the -- the writer
of this made of what Sergeant Stein said.  So similar
things like -- he quotes what Sergeant Stein has been --
has been saying to the press.

88

LA:        Yeah.  The rules -- as you know, the rules of evidence
           don't apply.  And that's probably stretching it to some
           degree.  I mean, it's --

SMBR:      I'm getting rid of it.

LA:        Yes, sir.

SMBR:      I won't allow it.

CR (Capt Grey):  Next, sir, kind of lumping these together,
           Exhibits 9 and 10.  These are postings on Facebook.
           There may be some portions of this which are
           permissible, but I do wish to relay a caution from the
           judge yesterday.

           From her ruling yesterday, plaintiff was ordered by a
           judge advocate of 1st Marine Expeditionary Force; had
           him sign into his Facebook page, if he was going to
           leave the page up.  But all statements there are
           personal views; not made in an official capacity and not
           representing the views of the U.S. Marine Corps.

           The court agrees that this would be First Amendment
           protected expression.  And so I think there's a danger
           of being -- the pages in there from his Facebook page
           when the judge said that -- the court agrees that this
           would be First Amendment protected expression with that
           disclaimer in there.  And generally, it's easy to look
           and see if the disclaimer is -- if it is honestly
           disclaimed.  But I foresee that as a potential issue
           arising.

RCD:       The -- Government Exhibit 9 is just a photo, sir, from
           the Facebook page.  We're not -- we're not talking about
           disclaimers.  The disclaimer is further down in the
           actual Facebook page posting itself.

SMBR:      Understand.  So the pages in there, I want to keep them.

CR (Capt Grey):  Sir, I would object to the media summaries from
           Exhibit 13.  It makes reference to YouTube clips and
           things online.  I have not had an occasion -- none of
           the cocounsel have had an occasion to actually watch
           these and verify the authenticity of the transcripts.  I
           mean, for no other reason, we challenge just for not
           having had time to -- that we can represent that yes,
           this is accurate.

                                89

SMBR:      So you said 13, correct?

CR (Capt Grey):  Yes, sir.

RCD:       Sir, if I may?

SMBR:      Yes.

RCD:       The media reports -- again, these are interviews that
           Sergeant Stein himself has given to the media.  So to
           claim -- and the defense has taken it as a whole here.
           It's not his counsel and Sergeant Stein.  They're all
           one in the same for these purposes.  Sergeant Stein is
           more than capable of -- of discussing what he has and
           has not said in the media.  If he's got differing views
           on what he said in the media, he can certainly discuss
           those if he chooses.  But these are his words, these are
           his interviews that he gave.  Not what other people are
           saying he said.

CR (Capt Grey):  And that's the contention, sir, is I haven't
           watched those clips to see if the transcript that you've
           been provided is an accurate transcript.

SMBR:      I understand.

           What about the respondent?  It's his words.  Has he had
           a chance to verify or not verify?

CR (Capt Grey):  No, sir.  We haven't had a chance to verify
           those.  We received those documents two days ago.

SMBR:      I'm going to keep it.

CR (Capt Grey):  Yes, sir.

           Sir, moving onto 17.  This is the SF-86 and related
           materials.  While Sergeant Stein was present for the
           interview -- his portion of the interview for the SF-86,
           obviously we don't stop at a top secret security
           clearance with whatever the interviewee has to say.
           They then go out and ask everyone else.  And so I'm not
           sure what the government's intention is in using this.
           But we haven't been able to independently talk to any
           witnesses or confirm whatever the investigator has made
           as an opinion.

90

000888

And also, really what it comes down to is what is the
relevance of him not having a top secret security
clearance.  He works in the S-3 down the hall.  He's
going to be working there for the next three months.  If
you need any additional assistance on this, we can call
in his OIC, Major Nichols.  I don't think he's going to
need a top secret security clearance in the next three
months.

So the relevance to his -- whether or not he committed a
serious offense or whether or not he should be retained
in the Marine Corps, it doesn't answer those questions.
And it certainly adds a sizeable volume of material that
is basically outside the bounds of what we need to
consider here, which is did he do a serious offense and
can he be -- and if so, should he be retained in the
Marine Corps.

RCD:        Sir, these are provided -- the decision on retention or
separation goes to the entire service of the Marine, not
just the bases that we're talking about now.  We can
additionally look at everything this Marine has done
over the course of his career to decide separation or
retention.  Again, the -- Captain Baehr discussed it
during his voir dire is that these are three independent
questions and he's absolutely correct.  Whether there's
a basis doesn't necessarily mean that separation is
going to be warranted.  So the government's required to
show you that not only have we established a basis but
that separation is warranted under the circumstances.

The relevance of his SF-86 and the security clearance
revocation is significant because he can no longer serve
in the MOS that he was -- that he has.  He has no
further for rehabilitative potential in the Marine Corps
and the witnesses will testify to that.  People in the
METOC community that worked with him and he worked under
will say that he's got no future at all and should not
be retained because of this -- in part because of his
lack of judgment, his lack of professionalism, and the
fact that he's now lost his security clearance.  That's
why he's here at Weapons and Field Training Battalion
was because his security clearance had been revoked and
he had to transfer from 1st Intel where they couldn't
use him anymore.  He has to have that clearance to work
in the METOC community.  And he can no longer do that,
so now he's at Weapons.

000889

That's significant and witnesses will testify as to the impact that had on 1st Intel Battalion when his security clearance was revoked.  They were in the middle of workups for deployment.  The command had sent out message traffic to get immediate backfills for Sergeant Stein.  That's a problem when there's only 350 METOC Marines across the entire service.

SMBR:     But it's only relevant if we need to cross the bridge?

RCD:      Correct, sir.  And, again, these are conditionally relevant, I will admit.  But if and when we find -- establish a basis, this establishes the character -- or excuse me, the separation argument that we're going to make.  It also goes to the characterization that we're going to argue for.

CR (Capt Grey):  Sir, if this were a reenlistment board, potentially this would have more of a bearing.  Should we give him another four years with this necessity for MOS.  But it comes down to is this a requirement for the next four months when he reaches his EAS in July.  So I just caution the board to narrow our focus to retention in the Marine Corps for the next four months; is this really relevant to that question.

SMBR:     Okay.  I'm going to keep it.  If we cross the bridge and we will make sure that we keep it in the proper context, keep it compartmentalized.

CR (Capt Grey):  Yes, sir.

SMBR:     Okay.

CR (Capt Grey):  We have a similar objection to Exhibit 19, sir.  It's a court judgment.  I understand the board may have the same ruling on it but may look at it later on.  The defense -- Sergeant Stein has an outstanding debt from a buyer in Vista.  We would ask that that not be considered for whether he should be retained in this board, sir.

SMBR:     Same argument from?

CR (Capt Grey):  From this past one, yes, sir.

SMBR:     Okay.  If we cross the bridge, we'll discuss it.  If we don't get there, it's irrelevant.  So I'm keeping it.

92

CR (Capt Grey):  Understood, sir.  Just wanted to put that on the record, sir.

SMBR:      Got it.

CR (Capt Grey):  Likewise, for the record, in Government Exhibit 21, there's a statement by Mr. Brundige, the security manager, basically explaining how an SF-86 works.  We think that would be tied in on your ruling on the SF-86.

SMBR:      Keep it.

CR (Capt Grey):  And moving onto 27, sir, the *Marine Corps Times* article.  I object to this because it's -- it's cumulative.  Of course a reporter is gathering other facts and it would appear that the recorder for the board has given you the same Facebook postings that the *Times* is reporting on, the same quotes and interviews that the *Times* is reporting on.  And that's not really so bad that it's double-upped with the *Times*.  What concerns me is the opinions offered by other people, opinions made by people who aren't Sergeant Stein.  And again, what is their relevance?  What's the familiarity with the situation that their opinions ought to be considered?

SMBR:      Understand.  The question I have -- I haven't read the article yet.  Are there any direct quotes from Sergeant Stein in here?

CR (Capt Grey):  I think -- I think there probably are posts, cut and paste, from Facebook.

SMBR:      Okay.  And the comments made, are they made by military members junior to Sergeant Stein?

CR (Capt Grey):  That -- that I don't know, sir.  I cannot recall, sir.

RCD:       Sir, there's one particular quote in there.  There may be additional ones.  But there is a senior -- I think he's a gunnery sergeant -- in there that discusses how this has impacted -- or how this -- he believes this will impact seniors' ability to maintain good order and discipline when there are sergeants out there that are -- that are, you know, doing these kind of things.  So that's the relevance of the article.

93

SMBR:      Okay.  Keep it.

CR (Capt Grey):  Yes, sir.

        And lastly, sir, my objection to Government Exhibit 29.
It is the Commandant's White Letter.  If you read
through there, I think it's a reference to the public
case of service members urinating on dead bodies in
Afghanistan.  And it makes specific reference to a U.S.
CENTCOM order.  I think that's out of the field for this
administrative board as well, sir.

SMBR:      As a commanding officer, I have given this to all of my
commanding officers and I will agree that the Commandant
draws our attention to the CENTCOM order.  But what is
further implied in here -- the implier is that we are
all responsible for our actions, each individual.  So
he's charged us to ensure that we are policing
ourselves, policing each other, and doing those things
that are within the expectations of the Marine Corps,
what we expect of each other.  And so I think this is
relevant.  I mean, I've read it before.  It's not going
to have too much bearing on me here.

CR (Capt Grey):  Understood, sir.

SMBR:      But I'm going to keep it.

CR (Capt Grey):  Yes, sir.

        No further objections, sir.

SMBR:      Just so I'm clear, Exhibit 8 is the only one that's not
going to be admitted.

        Now, for the purposes of our binder --

RCD:       We keep it in there, sir.  You just don't consider it.

SMBR:      Okay.  Understand.

        Does counsel for the respondent wish to submit defense
exhibits to the board for consideration at this time?

CR (Capt Baehr):  We do, sir.

        As you'll see, gentlemen, I placed before you a binder
with a number of defense exhibits.  As the recorder has

000892

noted, there may be other defense exhibits that come up
today that become relevant as witnesses mention them.
And at those times, we will introduce those additional
elements into the binder as well.

SMBR:      Okay.

CR (Capt Baehr):  Just for a brief run-through of what's in these
particular -- in the defense's binders, gentlemen, the
first component of the binders and -- are statements.
This is a letter from Duncan Hunter -- Congressman
Duncan Hunter.  A letter from some previous commanders.
A letter from Sergeant Stein's recruiter.  And we've
also got some letters from prior military service
members that we'd like to introduce as well as
statements in this case.  I'm going to put those up in
front of you, gentlemen, as well.

These are letters from colonels -- prior colonels of the
United States Marine Corps.  Majors in the U.S. Army
Special Forces.  Majors in the U.S. Marine Corps.
Sergeants Major in the Marine Corps reflecting their --
their beliefs about the prejudicial -- prejudices to
good order and discipline prong that is so important to
the government's case here.

RCD:       Captain Baehr?

CR (Capt Baehr):  Yes.

RCD:       Are these in here in my original?

CR (Capt Baehr):  No.  I'm going to provide you a copy as well
right now.  I'm sorry.

RCD:       Sir, I'd like to review these prior to any -- any
determination.  I haven't had a chance to review them.

SMBR:      Okay.

RCD:       Thank you, sir.  And if we'd like, sir, if you're going
to -- if it's your intent to break, I can do it during
chow.

SMBR:      Yes.

RCD:       So we don't waste any more time.

95

SMBR:       We're going to break for one hour for lunch.

CR (Capt Baehr):  Sir, does the board want to break right now or
            after opening statements?

SMBR:       How much time do you need to review?

RCD:        This is the first time I've seen this and there's quite
            a few, sir.

SMBR:       So we're going to break right now.

RCD:        Okay, sir.

SMBR:       One hour.

RCD:        Time on deck is now 1217, 5 April 2012.  We're going off
            record.

[The administrative separation board recessed at 1217,
5 April 2012.]

[The administrative separation board was called to order at 1224,
5 April 2012.]

RCD:        Time on deck is now 1224, 5 April 2012.  Resuming
            administrative separation board of Sergeant Gary Stein.

            Sir, after reviewing the binder -- these aren't listed.
            I think they were provided looseleaf to you.  I object
            to all the looseleaf exhibits as third party opinions
            about separation or retention.  Each one of these
            statements states that they've been made aware of the
            facts and circumstances from the defense's attorneys.  I
            don't know what those facts and circumstances are.

            But in any event, the government hasn't presented
            anybody's opinion as to separation or retention.  So I
            think these are invading the purview of the members and
            are -- I mean, I'm assuming just to show you that there
            are people out there that agree with Sergeant Stein.  I
            think that's obvious.  I don't think they're relevant to
            the offenses because none of them have personal
            knowledge or information of -- of these events.  So I
            would object to all the looseleaf --

96

000894

SMBR:        I understand.  And I believe in fairness -- the
             assumption I'm making because I haven't read the *Marine*
             *Times* yet --

RCD:         Yes, sir.

SMBR:        -- is somebody may have an opinion that goes against
             Sergeant Stein.  If that is the case, I'm keeping these.

RCD:         Okay, sir.

CR (Capt Baehr):  Yes, sir.  That would be the defense's position,
             sir.

RCD:         I'd object to the letter from Duncan Hunter on the
             same -- same grounds, sir, as forming an opinion as to
             separation or retention without invading the purview of
             the members.

SMBR:        Keep it.

RCD:         Same thing with the statement from David LaRocque -- I'm
             probably saying that incorrect.  It's dated
             4 April 2012.  Right behind Congressman Hunter's letter.
             Same basis.

SMBR:        Because it's from a third party?

RCD:         Yes, sir, unrelated to the incidents.

SMBR:        Keep it.

RCD:         No other objections for the rest of the documents, sir.

SMBR:        Okay.

CR (Capt Baehr):  Nothing further, sir.

             Excuse me.  I apologize.  The defense was just going to
             walk the members through the defense exhibits, but I
             believe that it's fairly -- it's going to be fairly
             clear to the members what the defense is trying to
             establish.

             You've got here the MCTFS 3270 file for Sergeant Stein
             indicating -- and that includes his pros and cons during
             his almost ten years of service.  We have those
             statements again.  And we have the legal standards here

                              97

000895

that guide and govern this board including, of course,
the requirement to find -- for a finding a basis in
commission of a serious offense, including the DoD
directive, the U.S. Constitution, *Rigdon v. Perry*,
retention characterization and suspension portions of
the MARCORSEPMAN, and then benefits and separation
indicating the lifelong impact a decision made today on
the life of Sergeant Stein.

SMBR:      I understand all this.

CR (Capt Baehr):  Yes, sir.

SMBR:      In the very back in the plastic holder --

CR (Capt Baehr):  Yes, sir.

SMBR:      -- I have a letter from the ACLU.

CR (Capt Baehr):  Yes, sir.  And those are -- those are -- I think
           Captain Torresala is referring to those as some of the
           looseleaf papers, sir.

RCD:       Yes, sir.

CR (Capt Baehr):  Those are some of the legal documents that have
           been filed in the case and that have kind of gone back
           and forth, sir.

RCD:       Yes, sir.

SMBR:      Okay.

RCD:       No, objection.

           I also have in here the order denying the plaintiff's
           motion for injunction that was filed in federal court.
           I don't have a problem with that, sir.

SMBR:      All right.  I understand.

CR (Capt Baehr):  Gentlemen, I apologize.  I really do -- I know
           this is a little bit confusing because it's kind of on
           short notice, but we're also going to provide you a
           portion of the Manual for Courts-Martial, the maximum
           punishment portions for various punishments under the
           UCMJ.

98

000896

SMBR:     Okay.  And you should assume that I've been around long
          enough that you're not going to confuse me.

CR (Capt Baehr):  Thank you, sir.  I confuse everybody.

SMBR:     Okay.  Thank you very much.

LA:       Two-hour break, sir?  You guys want to stay in this --
          use this room?

SMBR:     Yes.  We're going to go leave to go get something to
          eat.

LA:       Yes, sir.

SMBR:     But then we're going to come back and use this room.

LA:       Then we'll clear out of here, sir.

SMBR:     Let me find out where I am on the script.

RCD:      Sir, you should be on --

SMBR:     So you have no objections to --

RCD:      Correct, sir.  Well, aside from the ones we've already
          stated, yes, sir.

SMBR:     Okay.

LA:       How about estimations on each side's times, sir?

SMBR:     When it's time to call your witnesses, about how much
          time do you think it will take?  Just approximately.
          Trying to get a generalization --

RCD:      Yes, sir.

SMBR:     -- as to whether or not we're going to continue today or
          have to come back tomorrow.

RCD:      Sir, I have -- I have ten witnesses.  I think we can get
          through them rather quickly from our end.  I don't know
          what cross-examine may be.  I'd estimate probably two
          hours.

SMBR:     Two hours.  Two-hour break; two hours to go through.

000897

RCD:        Yes, sir.

CR (Capt Baehr):  Sir, so when we return -- the defense witnesses
            will also take at least two to three hours as well, sir.
            These things always last longer than you expect they
            will, though, sir.

SMBR:       If we don't conclude by 1700, we'll continue tomorrow.

CR (Capt Baehr):  Yes, sir.

SMBR:       Okay.  We're going to take a break.

RCD:        Time on deck is now 1229, 5 April 2012.  Going off
            record.

[The administrative separation board recessed at 1229,
5 April 2012.]

[The administrative separation board was called to order at 1442,
5 April 2012.]

SMBR:       This court will come to order.  The recorder will note
            the time and date for the record.

RCD:        Time on deck is now 1442, 5 April 2012.  Resuming
            administrative separation board for Sergeant Gary A.
            Stein, United States Marine Corps.

SMBR:       Do you have an opening statement, recorder?

RCD:        Yes, sir.

            Sir, just a chronology of events going back to Sergeant
            Stein's time as a METOC Marine.  He was assigned to
            1st Intelligence Battalion back in 2010 and prior to
            that -- actually, let me back up further.  Sergeant
            Stein initially submitted his SF-86 questionnaire for
            his top secret as is required as a -- what we call METOC
            Marine, a meteorological -- probably saying that
            incorrectly.  I apologize.  Basically a Marine Corps
            Weather Forecaster.  As a requirement for that
            particular MOS, he requires a top secret clearance to
            view sensitive information intel to be able to discharge
            his duties.

            So as a result of submitting that questionnaire, several
            pieces of information were noted by the investigator as

100

being red flags.  Sergeant Stein in his past has had
significant financial problems.  He's had several
repossessions which I'm sure you've seen in Government
Exhibit 17A and B.  As a result of those financial
issues, sir, his security clearance was revoked in 2010.

The reason why this is significant is that witnesses
will testify that at the time 1st Intel was in workups
for the MEU going off on deployment, it left a manning
shortfall because there's only 350, roughly, METOC
Marines in the Marine Corps and people with his set of
skills are hard to come by.  So there's a significant
training pipeline for these Marines.  And this is a very
small community.

What will be expressed through witness testimony is that
they all know each other.  They all know each other by
name.  They all remember each other.  They all know each
other's backgrounds.  And part of the way that they
maintain contact with each other, a little bit different
from some MOS's, is they've actually established a
Facebook page specifically for METOC Marines.

So back in 2010, he's at 1st Intel Battalion, his
security clearance gets revoked, and he ended up being
transferred to Weapons and Field Training Battalion up
here in June of 2011.

You will hear from several witnesses at 1st Intel,
specifically Chief Warrant Officer Mills and Captain
Kaiser.  Captain Kaiser was the OIC at the time when
Sergeant Stein's security clearance was revoked
initially.  He'll discuss the impact that had on the
command as well as his impressions of Sergeant Stein's
judgment and character at that time.

Chief Warrant Officer Mills was the successor to Captain
Kaiser.  He'll discuss for you the ongoing problems he
had and the need for him to counsel Sergeant Stein on
multiple occasions regarding his ongoing financial
mismanagement, his judgment, his maturity, and his
general -- or lack thereof -- impact on the command.  He
was --

SMBR:       Let me stop you.

RCD:        Yes, sir.

101

000899

SMBR:     Normally I wouldn't, but what I'm trying to understand
          is if our first step is to determine whether or not
          there's a basis --

RCD:      I'm going chronologically, sir.  Just so you can have
          a --

SMBR:     Is it going to be much longer?

RCD:      No, sir.

SMBR:     Okay.

RCD:      So that's 2010.  Transferring forward to 2011.  And I
          bring that up because it's going to be important for --
          if we were at a court-martial, I would call motive for
          some of the actions that have gone on.

          Chief Warrant Officer Mills and Captain Kaiser will also
          describe how Sergeant Stein when he was at 1st Intel
          back then was on limited duty status, he had hurt his
          leg in an off-duty incident.  He made no real attempts
          to get back on full duty.  And this is when all the
          political activities started to really creep its way
          into the workplace.  They'll talk about how he began
          these Facebook pages.  Back then it was called Armed
          Forces Tea Party Patriots.  And how it was his intent at
          that time in 2010 to go on a television program called
          *Hardball* and discuss President Obama's healthcare
          policies on that program.

          When that was discovered by the I MEF SJA and the PAO,
          they immediately brought him in and gave him counseling
          on depot -- or excuse me -- DoD Directive 1344.10.  They
          specifically sat him down, said, Hey, these are the
          provisions.  A judge advocate went through that with him
          in 2010.

          So forwarding to his transfer to weapons in 2011, he got
          here, again, because of his security clearance issue.
          And on 1 March -- actually let me back up.  On
          25 January 2012, First Sergeant Rocha, who is the
          Headquarters Company First Sergeant here at Weapons sent
          out the Commandant's guidance on political activities
          which all the commands have gotten across the Marine
          Corps.  And the intent of that order was to -- in
          advance of the -- the election season, to give Marines
          guidance on what references govern their conduct.

                                102

So that order -- or excuse me -- that guidance was
specifically pushed out by First Sergeant Rocha on
25 January.  And Sergeant Stein responded to First
Sergeant Rocha in writing because First Sergeant Rocha
had known about the 2010 political incident or political
activities of Sergeant Stein.

So he made it his -- a point of effort to make sure
Sergeant Stein got that -- got that Commandant's
guidance and that he reviewed those references and make
sure he understood what those references said.  Sergeant
Stein responded in an e-mail form and says, I
understand, First Sergeant.  I understand the content of
those documents.  So that's 25 January 2012.

On 1 March 2012 -- and it's in there as Government
Exhibit 5, that posting on the METOC Facebook page, sir.
And METOC -- that Facebook page was specifically set up
by Chief Warrant Officer-4 Burns, who himself is also a
METOC Marine, to bring together that small community and
have a common place for them to share the progress of
their career.  This was -- this was a Facebook page
designed for Marines by Marines.

He will tell you that on 1 March, Facebook has a
function where the administrator gets an update when
somebody posts something on that particular page.  He
was informed that -- and he saw the post, the comments
that Sergeant Stein had made to other Marines on that
page regarding conversation of -- I want to say it
was -- I'm not sure if it was the issue in Syria or the
discussion of the National Defense Authorization Act or
the Marine issue of urinating on the Taliban.  But there
was a discussion of a specific incident involving the
Marine Corps that he was opining on.  And during the
course of that discussion, he posted the comment that's
contained in Government Exhibit 5.

And I'd like to -- I know you all have it, but it's
extremely important for our purposes, for the
government's case.  He says, quote, As an active duty
Marine, I say screw Obama and I will not follow all
orders from him; will do my job better than the next
guy.  But as for saluting Obama as Commander in Chief, I
will not.  Exclamation point.

He gets a comment from another Marine, it says, I think
I remember something about an oath we all took

103

somewhere.  Hard to remember exactly what, but it seemed
like it was pretty important at the time.

And Sergeant Stein in response to that says, You're
right.  It said to defend the -- I will support and
defend the Constitution of the United States against all
enemies, foreign and domestic.  Obama is the economic
enemy.  He is the religious enemy.  He is the
fundamentally change America enemy.  He is the domestic
enemy.

These were postings that Sergeant Stein made on a METOC
Facebook page for METOC Marines.  Chief Warrant Officer
Burns will tell you that immediately upon seeing that,
he sent private Facebook e-mails to Sergeant Stein which
you have in your documents and that's included as
Government Exhibit 23.  And in there, Chief Warrant
Officer Burns did what any good leader would do.  He
said, Hey, Sergeant Stein.  This is not Sergeant Stein's
Facebook page.  This is the METOC Facebook page.  Knock
it off.  That's inappropriate.

Sergeant Stein in response agreed that his comments were
over the line and that it wouldn't happen again.  He
acknowledged that what he'd done was wrong and that it
wouldn't happen again.

Chief Warrant Officer Burns, he'll tell you, thereafter
deleted those comments and he'll explain to you, sir and
gentlemen, that the reason why he did that was because
junior Marines are on that site; other METOC Marines.
And they did -- he did not want them to be influenced by
inappropriate comments, because he believed that those
comments were prejudicial to good order and discipline.
He's talking about our Commander in Chief regardless of
what we think about his political policies.

SMBR:     Close that hatch.  Just prop it open with either a chair
          or that sign.  It's a distraction watching other Marines
          walking back and forth.  Thank you.

RCD:      It's also important to note, sir, that the METOC
          Facebook page was also public access.  You could get to
          it.  It was not restricted from the public.  It was
          something that you could search for on Facebook and
          anyone could view it.

104

So he posts this about the Commander in Chief on a METOC
Facebook page on 1 March.  Chief Warrant Officer Burns
deletes that -- those comments as inappropriate and,
thereafter, tells Sergeant Stein no more of that.
That's inappropriate.  If you want to have personal
opinions, that's what private communications are for;
not here, not in front of junior Marines.

So fast-forward, how does this get to the attention of
the command.  1 March, a METOC Marine that was on that
page took a screen shot of it before it was deleted --
of that page, of that specific posting, and sent it to
his sergeant major at the time.  This was Master
Sergeant Rose.  And he's going to testify
telephonically.  He's going to say when he saw it, he
was personally offended by it, he knew it was
inappropriate, and that Marine needed to be counseled
and held accountable for his actions.

So that e-mail gets sent from sergeant major to sergeant
major here, Sergeant Major Jackson, who takes it for
action.  Sergeant Major Jackson directs First Sergeant
Rocha to look into the matter.

On 1 March -- and it'll be discussed by the Weapons and
Field Training Battalion personnel that on 1 March,
what -- they believed the postings were on the Armed
Forces Tea Party page.  They had no idea about the METOC
Facebook page.  They hadn't received a copy of it.  They
looked on the website or on the Facebook page for Armed
Forces Tea Party.  Didn't see the comments that were
mentioned by the sergeant major.  So they didn't know
where it was coming from.  That's over the weekend.  So
over the weekend nothing happens because the command
element here didn't have the specific postings.

On 5 March, the next week, the sergeant major received
the screen shots from Master Sergeant Rose.  Now
everybody knows what the big deal's about.  They see the
postings.  They see the screw Obama comments.  They
immediately bring in Sergeant Stein, read him his
Article 31(b) rights, and advise him that he's suspected
of making contemptuous speech about the President.
Disrespectful, prejudicial to good order and discipline.
So Sergeant Stein elects to seek his right to consult
with counsel and never ends up discussing the matter
with the investigators.

000903

Thereafter, from that point forward, he engages in a media campaign calling that the charges against him are trumped up by his command, that what he meant to say was that he would not obey illegal orders, and that this is all a violation of his First Amendment rights.

Sir, in the Government Exhibit 6, the statement on 5 March on RedState.com, he tries to downplay the severity of his statements.  He tries to classify them as the illegal order thing.  He doesn't want to follow illegal orders.  He acknowledges he made those statements.  He acknowledges that they were probably inappropriate.  He doesn't go so far to say they were -- they were wrong.  But he does say that he's going to stand by the fact that the President's track record over this time verifies that -- that he's the economic enemy and things of that nature.  He will stick by those comments.  But he stands firm that this is -- he was talking about illegal orders.

Now the government will demonstrate, sir, that it does not matter what the context was.  He used the words, "As an active duty Marine, I say screw Obama."  The Commander in Chief.  There is no context that makes up for that.  That that act in and of itself is prejudicial to good order and discipline in the military.

And it's further evidenced by the fact that other Marines are the ones that turned him in.  This isn't a hypothetical situation where it was posted on his Facebook page and Marines might have seen it.  A Marine did see it.  Master Sergeant Rose saw it and turned him in for it.

So going forward, sir, looking at some of the other exhibits the government would like you to consider, we've already discussed them in detail.  The pictures on Sergeant Stein's Facebook page.  Armed Forces Tea Party.  The President's name -- or the President's face superimposed on a political poster with the words "dick" underneath it.  He maintains this page and provides content to it.

And this is what he's putting on his Facebook page.  The President's face superimposed on the *Jackass* poster.  "Jackass No. 1."  The President's face superimposed on a movie poster for *The Incredibles* relisted "The Horribles."  This is what he's putting out there to the

106

public and he's a sergeant of Marines, an active duty
Marine.  How this is not prejudicial to good order and
discipline, I can't say.  It absolutely is and that's
why the METOC Marines reported him immediately when they
found out these comments.

Now looking again at some of the other exhibits, the
actual Armed Forces Tea Party website.  If you look in
there, sir, the Government Exhibit 7, the second page
there at the bottom.  A gear -- it's a tab called
"gear."  Armed Forces Tea Party gear.  This is
Government Exhibit 7.  Selling Nobama 2012 bumper
stickers on his website.  Selling Nobama 2012.  These
are additional acts aside -- completely aside from the
1 March 2012 postings.

He's notified on 21 March 2012 for administrative
separation for two bases:  Article 134, prejudicial to
good order and discipline for the comments about the
President; and Article 92 for violating the DoD reg for
providing this content to his Facebook page and other
online media sources.

And if you look at the Facebook page, Government
Exhibit 8 -- or excuse me, Government Exhibit 10, the
21 March statement, 10A.  It's a little hard to read.

Now is the time we stand together as a Tea Party, put
aside the smaller issues that divide us from within in
order to accomplish the greater good of defeating
President Obama in 2012 and electing a conservative
Senate that will help the GOP candidate repeal Obamacare
and address the Nation's economic spending challenges.
That's a comment he made on his Facebook page -- on
Armed Forces Tea Party Facebook page.

Discussing the bases, sir, that the government's alleged
for separation.  First, Article 134.  Two things that we
have to show:  One, that a certain act was done.  And,
two, that that act was prejudicial to good order and
discipline or service discrediting.  The government's
alleging it's both prejudicial to good order and
discipline and service discrediting.  The prejudicial
piece.  As I said, the comments about the President, our
sitting Commander in Chief, regardless of what you think
of his politics, that is an office that deserves
respect.

000905

You can -- and we'll discuss it in context of the DoD directive.  You can have disagreements about policies.  There's nothing wrong with that.  But you still have to be respectful to the office that the President holds.  Screw Obama, our Commander in Chief.  I will not follow his orders.  He is the economic and religious enemy.  Other Marines saw that, they believed it was prejudicial to good order and discipline, and shut it down.

Service discrediting.  The public finds out about this through all the media interviews that Sergeant Stein's given.  They start to question whether we really do believe in good order and discipline.  They start to question whether the military is on its own program or whether we have respect for our civilian leaders.

There's a reason why the military is run by a civilian leadership, to ensure that the military stays politically disinterested.  We see what happens in other countries when the military takes control of a nation.  And that's the reason why we have the system that we have, the separation of powers.  Sergeant Stein is interjecting himself in the political process and he's advocating against a candidate for office.  And we'll discuss in detail the DoD directive.

Gentlemen, I'm looking at Page 3 of Government Exhibit 14, Section 4.1.2.  A member of the armed forces on active duty shall not, 4.1.2.3, allow or cause to be published partisan political articles, letters, or endorsements signed or written by the member that solicits votes for or against a partisan political party, candidate or cause.

The President of the United States as a candidate for office is covered under that -- under that order in that section.  He's soliciting votes against President Obama's candidacy in wanting to elect a GOP candidate as an active duty Marine.

Moving down to 4.1.2.6, participate in any radio, television or other program or group discussion as an advocate for or against a partisan political party, candidate or cause.  Same -- same issue.  As an active duty Marine, he's advocating against a partisan candidate in violation of that order.  It's clear.

108

So what else did he do?  After being notified that he was suspected of violating this order as well as 134, after being told that, his first thing he did the very next day was go and speak at the Fallbrook Tea Party; identify himself as Sergeant Gary Stein and start discussing the President's policies again and advocating against the President's election.

Looking at 4.1.2.5, speak before a partisan political gathering including any gathering that promotes a partisan political party, candidate or cause.  So a day after being notified that he was suspected of violating this order, he goes out and does it again.

23 March, the commanding officer finally says, Okay. I'm putting this all down in writing and issues a 6105, which you gentlemen have in your binders.  And that brings us to where we are today.

The government will demonstrate -- which already has demonstrated through the voluminous evidence, documentary evidence that Sergeant Stein has violated Article 134, prejudicial conduct, his remarks about the president; and Article 92, violating this order with his conduct and his social media, online media postings. The biggest thing as far as -- so that's the basis.

Going to separation and retention.  Looking at the entire Marine, this is a Marine that has had significant problems in his Marine Corps career.  He's four months from EAS.  These things have come up during an election year.  And if his conduct had happened once, I could understand.  Maybe this isn't that -- maybe it's just a one-time lapse in judgment.  But this is not the first time.  This goes all the way back to 2010.

Everybody, because of the sensitivity of political discussion, has bent over backwards to give Sergeant Stein counseling, to tell him these are the orders and the regs, don't violate them.  Foot stomp.  Don't violate them.  And what does he do time and time again? He goes back and he violates them.  We have to look at the entire scope, not just this one in incident in 1 March.

The record supports separation.  We have to be able to show to junior Marines -- to all Marines that misconduct will not be tolerated and it will be -- you'll be held

109

000907

accountable.  There is no accountability of letting
Sergeant Stein EAS.  Nothing will happen.  There will be
no record of his misconduct aside from that 6105
counseling.  Other Marines will start to question
whether they can get away with the same conduct or
whether we can enforce the rules and regs that are
published by the Department of Defense.

And we're going to make a big issue about the legality
of this order.  This order is in effect per the
Department of Defense.  It has not been repealed.  It
has not been struck down by any court, any judicial
body, any administrative body.  It is still in effect
and we follow orders.

With regards to characterization, I don't want to
discuss that now.  I think we need to go through the
testimony and see how that plays out before we can
decide what the recommendation should be with regards to
characterization if we get to that point.

The government asks the three questions that we have to
answer.  One, is there a basis?  Absolutely.  Has it
been satisfied?  Absolutely.  Two, separation or
retention.  We believe separation is absolutely
100 percent necessary in this case.  And
characterization, we'll leave to you gentlemen's
judgment.  Thank you.

SMBR:      Counsel.

CR (Capt Baehr):  Gentlemen, Captain Baehr.  I'm counsel for the
           respondent.

           Before I begin, gentlemen, I just have to say that I
           didn't sleep particularly well this week.  We've been
           preparing this case for a while and I feel a weight on
           my shoulders, a great weight about this case because
           I've been a defense counsel here for close to two years.
           I've had about 300 cases maybe more than that assigned
           to me of different Marines.  I've argued 60
           administrative boards.  And far and away, this board
           overshadows those.  This board is more important than
           any of those boards that I've ever done before.  This is
           the most important case.

           And it's important because of who Gary Stein is because
           he's a good man and he's a good Marine who's given close

                                110

to ten years of his life to his country.  But it's also
important because of the issues that are being discussed
are profound and they will effect the future of the
Marine Corps, they'll effect the rights of Americans,
they'll effect the rights of Marines, they'll effect the
ability of Marines to exercise the rights of
citizenship.

And for these reasons, this is the most important board.
I ask for this board's patience and attention to these
matters.  I believe that this board will carefully
consider these matters because of the import involved.
This decision that is made by this board today will be
one of the most important decisions you make in your
time in the Marine Corps.

Gentlemen, the government is wrong.  There is no basis
to separate Sergeant Stein.  He has violated no law.  He
has violated no rule.  He has violated no regulation.
And the defense is going to point out bit by bit why
that's the case.  And we're going to bring in our
witnesses and we're going to question the government's
witnesses and we're going to present a closing argument.
But the defense's position is that there is so basis to
separate this Marine and that the government is
absolutely wrong.

The government's wrong because of who Sergeant Stein is.
Again, this is an individual who has served for close to
ten years of his life in this country's uniform.
Joining after -- after the beginning of our wars and our
engagements abroad.  You're going to find out who this
man is.

He's -- he was Gary Stein before he was Sergeant Stein.
He was a young man who grew up in Bullhead City,
Arizona.  Small town Arizona, just like small towns all
of our Marines -- many of our Marines come from.  Grew
up in a -- in a family that supported him and encouraged
him and in which he was a leader.

He, in high school, was involved in student counsel.  He
was heavily involved in his church.  He was so devoted
to his church, he became a youth pastor at his church.
You're going to hear about that too.

And the one thing you're going to hear over and over
again about Sergeant Gary Stein was that he was an

111

individual of convictions, that he held strong beliefs.
They may not have been the beliefs of everybody else,
but he held to strong beliefs and he was unafraid to
express them.  He decided at a young age that he wanted
to serve his country because his grandfathers had served
and other members of his family had worn this uniform
and worn it with honor.  And he decided he wanted to
serve his country.

He was signed up at a young age to come in as early as
he could into the Marine Corps.  He came into the Marine
Corps -- you're going to hear from his recruiter.  Not
only did he come into the Marine Corps, but he
encouraged them -- a lot of other people to come into
the Marine Corps.  Hey, come down with me.  Join up with
me.  Ended up encouraging his younger brother to go into
the military.  Somebody devoted and committed to being a
part of the United States military, to serving his
country, to giving back to his country.

He came into the Marine Corps, he went to MCRD San
Diego, he went to -- he ended up in this very
specialized field, this meteorological field, this
weather field that's so important to getting the job
done that Marines need to do when they can't rely on
some weatherman in the field or elsewhere, but they've
got to rely --

SMBR:      Let me stop you real quick.  Same challenge I had for --
excuse me -- for this side.  Where is this going?
Because right now you're talking about his past.

CR (Capt Baehr):  Absolutely, sir.

SMBR:      We haven't even gotten to the issue.

CR (Capt Baehr):  Yes, sir.  Well, I guess this is a -- this is a
question that we would actually have, whether or not
this board wants to deliberate over the basis first
before going onto getting further testimony later on or
whether the board wants to hear the evidence now
concerning everything.

But just to the president's concern about this
particular strain, I am wrapping it up very soon, sir,
on his personal.

SMBR:      Okay.

112

000910

CR (Capt Baehr):   Okay.  Gentlemen, again, service in -- service
            to his country, service to Iraq, proficiency and conduct
            marks that are good, fitness reports that are good, and
            a family -- a family life too.  Happily married to a
            woman, a four-year-old daughter to care for right now,
            and another daughter that -- another child that will be
            born in three months.  Another child on the way.  This
            Marine's EAS is in four months.  And that's who this
            Marine is.

            The government is wrong because of what happened.  And
            I'll explain -- we'll explain what happened here in this
            case.

            In around 2010, this -- a Facebook group was created for
            the Armed Forces Tea Party.  Sergeant Stein, Gary Stein
            was involved in the formation of this group.  So were a
            variety of other people.  There -- this needs to be kept
            in mind as well:  There are a variety of other people
            who are members, administrators of this page.  And
            comments that are made on the page are not just Gary
            Stein's.  They are a variety of other people's.

            But at any rate, gentlemen, that group was created.  And
            as the government pointed out, Sergeant Stein, at around
            2010, was ultimately called in to discuss the DoD
            directive.  And he talked to Major Plowman, he talked to
            Colonel Erickson, and they discussed with him the DoD
            directive.  And basically, Sergeant Stein, after that
            conversation, his understanding was, Hey, add a
            disclaimer saying it's not my personal -- it's not the
            views of the Department of Defense.  It's not the views
            of the Marine Corps.  And anyone who sees the site is
            going to know it's not the views of the Department of
            Defense or the Marine Corps.

            But, again, he put that disclaimer up.  No problem.  No
            problem.  So he proceeded under the understanding that
            adding that disclaimer satisfied the directive and he's
            speaking as a person not as an active duty Marine, which
            is the essence of that particular -- particular
            directive.

            Again, gentlemen, the Tea Party is going to come up here
            today.  And I think it's very important.  The defense
            can provide for the board people who are experts on what
            the Tea Party is.  But the Tea Party is a combination of
            people who are kind of disaffected with the government.

                                    113

And that includes republicans, democrats, libertarians, independents, declined estates all across the political spectrum, a wide variety of people and some who have never been involved in politics who consider themselves part of a movement.

The Tea Party is not a political party. There are no candidates for President as far as I'm aware of who are running as a Tea Party candidate. We have republicans, we have democrats, perhaps some other candidates. But the Tea Party is not a political party.

But, gentlemen, again, disclaimer was added to the site, discussions were had, everybody was happy, everything was fine. And Sergeant Stein continued his work and Gary Stein continued being a citizen and exercising the requirements of citizenship which we want to encourage.

So, again, no counselings, no paperwork, nothing until 1 March. 1 March when this all explodes on the METOC site, this conversation going back and forth, this heated conversation.

You have the conversation, gentlemen. There are a couple points here. One is that this conversation occurs on the METOC site. Now, I don't believe that a lot of other Americans are getting onto the METOC site. It's a private Facebook group for a variety of Marines in a particular group.

A conversation occurs. There are people participating in this conversation. If you read carefully the conversation, there's another individual, somebody named "Mr. Face," whoever that might be, who is also saying some pretty heated and inflammatory things as well. Is that also an active duty Marine? Where is that person? Why are they not being prosecuted or pursued?

Gentlemen, there's a third party that's in that conversation as well and he's saying calmer things but roughly agreeing with the other two on political matters. Again, why is he not being pursued? Why is he not sitting here at an administrative board if what he's doing is illegal? Because you'll see here that Mr. Face directly calls the President a coward.

But, again, gentlemen, this is -- this is something done in a private capacity. This is an individual

114

identifying himself as Gary Stein not as Sergeant Stein.
Again, this posting was removed immediately.  We don't
have the posting.  It was immediately removed by Master
Sergeant Rose and Chief Warrant Officer Burns.  It went
down immediately.  And then we ended up here at this
administrative board.

And, again, this board is so important because Sergeant
Stein has not had the opportunity to go to a
court-martial.  The government has sent this directly to
a board.  There has never been an investigation in this
case.  This is the investigation and this is the most
important -- you all will make the most important
decision in Sergeant Stein's career and everything about
this particular case.  Again, nothing -- the first
counseling this Marine received is shortly before this
board.

Now, gentlemen, we have in the MARCORSEPMAN policy that
we will attempt to rehabilitate if we can.  And the
government has gone through elaborate lengths to try and
suggest that there was some kind of counseling before.
But the evidence is not going to pan out that way.  The
reality is that -- that there was no counseling until
this board was already a foregone conclusion.

And the government has put -- the government has put
into evidence the defense's letters trying to resolve
this in some other way, some other more reasonable way
than having a board, than having all this hoopla.  We
could have resolved it in a more reasonable way.  But --
but the government wanted to come here and here we are.
But, again, there's no trial and we've had very little
time.  We've had 15 days to prepare on this case and
here we are, one of the most important cases of our
lives.

What the government is proposing here is extreme.  And
what they're asking us to do in terms of an OTH is not
right.  The effects of an OTH are profound.  They're a
lifetime stigma on a particular Marine.  They're
reserved for very serious circumstances and you'll see
that in the MARCORSEPMAN, where severe serious bodily
injury's at stake, where there -- we've endangered the
security of the United States Marine Corps, where drug
abuse is at stake.  Nothing that has been alleged here
comes close to any of those.  Private discussions on
people's Facebook groups about political issues is what

115

000913

is at stake here.  It is not comparable and it does not
rate an other-than-honorable.

But to get specifically into the law because the basis
is the crucial issue here.  The law here today -- there
are a couple different bases that the government can
pursue at an adsep board.  The basis that they are
attempting to pursue is a commission of a serious
offense.  There are two different requirements for a
commission of a serious offense.  One is that the charge
be very serious, right?  And the second be that a
punitive discharge can be given for that crime under the
UCMJ.

Gentlemen, there are two allegations that are made by
the government.  One is the Article 134.  Article 134,
as we know, is the general article.  We can -- we can
prosecute anything that we want to in the United States
military under Article 134 so long as it effects --
prejudices good order and discipline so long as there is
a direct and palpable effect on good order and
discipline.  And the manual for court-martial lays that
out.  A direct and palpable effect.  Not a belief that
it's going to effect good order and discipline.  Not a
hunch that it's going to effect good order and
discipline.  But a direct and palpable evidence that it
did effect good order and discipline.

Gentlemen, of course the government can't prove that.
They can't prove it because this discussion on 1 March
went down immediately.  They haven't been able to find
any junior Marines who actually read this.  They have
provided Master Sergeant Rose and his personal opinion
is interesting but it's not the law.  They got to show a
direct and palpable effect on good order and discipline.
They're not going to be able to show that Sergeant Stein
has not followed all orders because he has.  He's
followed all orders.  He's never told anyone not to
follow an order.  Nobody's not followed an order because
of what Sergeant Stein said or did.  There's been no
effect on prejudice to good order discipline.

The other grounds is service discrediting.  And the
government's evidence for the service discrediting seems
to be the media hoopla that's been built up out of this
case, which I think we all agree is pretty ridiculous.
It's crazy.

116

But, gentlemen, the -- it takes two to tango.  The government, in reacting to private Facebook comments without some counselings, without just taking a measured approach, has created this hoopla.  And it cannot point to that and then say that this is service discrediting on his part because -- because the media is interested in this.  The media's interest in this is primarily because they can't believe the government is doing this.  Eighty-five -- and this'll be in the evidence, but 85 percent of users who were responding to the media comments were saying what?  So, gentlemen, the contention that it is Sergeant Stein who is service discrediting and not the government is wrong.

The most important thing though under this first prong is that Sergeant Stein could not receive a punitive discharge under Article 134 because this is not an enumerated offense under Article 134.

To clarify, there's certain offenses under Article 134 that are enumerated.  Cohabitation, adultery, different things like that.  They're enumerated.  And they are enumerated punishments for each and every one of those.  But this is just a general neglect, general disorder.  And a general disorder is only punishable by four months imprisonment and by no punitive discharge.  Under that prong, the government can't get to the punitive discharge that they need to get commission of a serious offense.  So it doesn't work, gentlemen.  That prong does not work.

And the defense is providing you with *U.S. v. Beaty*, a very serious case.  And really about irrelevant facts that have nothing to do with this -- this particular board.  It's about, you know, child pornography issues.  But they said in that case that if you can't -- if it's just a general neglect, a general disorder, then you can't receive a punitive discharge for it.

The second prong that they've attempted to go down for this is Article 92.  Article 92 for an alleged violation of this Directive 1344.10.  Again, there's no basis to separate Sergeant Stein on this.  Allegedly he violated this on 1 March.  So the discussion that we'll focus in on is did he violate it in that discussion and those private postings among the METOC Marines.

117

First of all, gentlemen, I will point out -- and we have
pointed out -- that there is a hierarchy of law.  And we
will point out that we did take an oath to defend the
Constitution.  And the Constitution says no law -- that
our Congress shall pass no law abridging the freedom of
speech and that that law trumps everything; and that any
other law must be in compliance with that law.  It's a
lesser law than that.  So certainly, there's significant
Constitutional issues at stake.  But even if we think
it's Constitutional, even if you believe that
directive's Constitutional, the directive was not
violated.

And specifically, there are a couple of reasons it
wasn't violated.  One is that there's been no clarifying
orders as to this directive and what this means.  This
is an extremely confusing document.  There's ambiguity
involved.  And we've pointed out some of that already.

What does it mean to advocate for a cause?  I'm
advocating for a cause right now.  The government is
advocating for a cause right now.  Are we in violation
of this directive?  We can't be.  That would be absurd.

Does it mean that you can't have private discussions
among friends?  Does it mean you can't go to the local
republican group and talk to other Marines about -- or
just regular people about what you believe on topics or
local democrat group?  It's ambiguous.

And because of the ambiguity and because it's the
government's burden and the government's standard, we
ask that the tie goes to the Marine.  That if there's
confusion, that lawyers and judges and others don't
understand what's going on with this regulation, then
how can Sergeant Stein be expected to understand it?
And the tie goes to the Marine in an adsep board.

Again, gentlemen, there's a lot in this provision that
is -- that is confusing.  Apparently you can put a
bumper sticker on your car.  Apparently you can put a
bumper sticker on your car but you can't put a yard
sign -- or a large sign.  What is a large sign?  It's
confusing.

But I think the most important part of the directive is
the first part:  An active duty Marine shall not.  And,
gentlemen, that connotes that an individual shall not in

118

uniform or as representing themselves as an active duty
Marine in their job take some of those actions.

And I just want to get to the essence because Captain
Torresala talked on that a little bit.  Why we have this
cultural and custom that the military and the political
spheres be separated.  We have it because other
countries have military dictators and our founding
fathers were concerned and others were concerned that we
would ever have military control of the government.

But on the other hand, we want our Marines to
participate fully in the civic process.  And if our
Marines can't have discussions about politics, about
matters of public concern, we have serious problems.

George Washington said, as you'll see from the Tea Party
site, when we assume the soldier, we do not put off the
citizen and we have a right to express ourselves in our
citizenship and speak as we wish as well.

Again, Sergeant Stein has violated no order.  Nobody who
he has talked to, the government can't point to as
having violated any order because of what he's done.

These are private Facebook communications.  I just think
it's interesting, another issue that comes up in First
Amendment law is viewpoint information.  If Sergeant
Stein's website had been about how much he loved the
President and supported the President, and this shows
you how ridiculous the government's position is.

If I love and I support the President -- in fact,
President Obama has a campaign website for soldiers for
Obama, okay?  And there are members on that who are
posting on that.  Are those individuals -- do they need
to be prosecuted?  Do they need to be pursued?  When we
follow this out to its logical conclusion, it leads to
illogical results.

And that's why the government's position -- in fact, the
government admitted in their -- basically their
responsive brief that they didn't think that Marines
could be advocating for President Obama as a political
candidate.  That's their position on the First Amendment
and that's their position on this directive.  It's a
misunderstanding.  It's obviously wrong if we just think
about common sense of what Marines are doing on a daily

119

basis as American citizens and what they should be doing as American citizens.

Again, gentlemen, the essence of the law is that we don't want a military dictatorship to take over and we want to maintain good order and discipline in the Marine Corps and we've been able to do that.  There's been no allegation that that has not happened.  The government is going to rely a lot on a lot of irrelevant matters that came into this case at the last minute after they already pursued it.

This security questionnaire.  All this dirt about him not being able to pay some debts.  That's -- it's a distraction from the real issue here today.  It shouldn't be considered.  It shouldn't be part of the decision of whether or not he violated the law.

And, again, they can bring in a variety of enemies and they can bring in -- we can bring in a variety of friends.  They're going to bring in people who say, Hey, Sergeant Stein wasn't a very good worker.  We'll bring in people who will say he was a good worker during the same time frame.

And, in fact, you know, Chief Warrant Officer Mills was angry because of the attention he was getting from higher and that higher was upset.  And I would -- I would submit that -- as we think of motive, we also think about motives of higher.  We do not have to do this.  And I ask that this board not do this.  This Marine gets out in four months.  As you've seen from our documents, he's not -- he's willing to stop.  He's willing to proceed.  He -- the counseling he received was after this board was a runaway train.  We don't have to make this decision here today that's going to -- that's going to drag the name of the Marine Corps through the press some more.  We do have a watching world and they're concerned with what the Marine Corps is doing because they believe in the First Amendment.

Gentlemen, I didn't choose to be a defense counsel here at Camp Pendleton.  I asked to be a prosecutor.  And I got out here and the Colonel said you're going to go be defense.  A lot of times when I do my job, I grit my teeth and I do my job.  And I don't really believe in what I -- I may not believe fully in that particular client.  But I can tell you -- I can tell you this:  I

120

am honored -- I am honored and I will remember with
honor defending Sergeant Stein, because in defending his
board, we are defending everything that it means to be
an American, everything that it means to be a Marine,
and every reason that Marines have died on battlefields
across the world to uphold the Constitution, to uphold
the rights of being free people.

I ask that this board not make the mistake that Captain
Torresala is advocating.  I ask that Sergeant Stein be
found to have no basis in violating the law, that he be
retained in the Marine Corps and finish his time.

SMBR:        Recorder.

RCD:         Sir, I have one comment prior to starting off witness
             testimony.  I ask that we confer with the legal adviser
             with regards to the 134 basis.  He made a legal opinion
             as to whether or not a basis is even allowed under the
             Seps Manual.  And we've actually -- we've done research
             on this as well.  Article 134, offensive general
             article, does not have a stated maximum punishment.

             Under the Seps Manual, Captain Baehr is correct.  There
             has to be a punitive discharge authorized.  The reason
             why there isn't one stated for the general article is
             because it's prejudice to good order and discipline.
             It's not an enumerated article under the manual.

             However, there is a rule for court-martial that states
             that for any offense not listed which is included in or
             closely related to an offense listed therein, the
             maximum punishment shall be that of a listed offense.
             Meaning, if there is an analogous article that is
             similar to the one being alleged here, that's the
             maximum punishment we use.  That's the same rationale we
             use in courts-martial and that's the same rationale
             military judges use to determine maximum punishment.

             In this case, the most directly analogous is Article 88,
             contempt towards officials.  And it does rate a punitive
             discharge under the manual.  I'd ask that the legal
             adviser give you an opinion on that, sir, before we
             waste a lot of time talking about something that the
             defense is going to claim doesn't substantiate -- or
             doesn't fit the Seps Manual.

SMBR:        Okay.

000919

CR (Capt Baehr):  Sir, first of all, we'll certainly respond to
                  those.  But we would absolutely ask the court not to ask
                  the legal adviser if there's a basis in this case.  This
                  is the purview of the board.  It is the board's
                  determination of whether there's a basis.  It is not
                  a -- it is also a factual matter.  It's not a legal
                  matter for the legal adviser.

RCD:              I'm not asking whether there's a basis established.  I'm
                  asking whether what we've alleged as an Article 134
                  offense constitutes commission of a serious offense.
                  I'm not asking whether he's actually committed that
                  offense.  I'm asking to determine -- a determination on
                  whether -- as alleged in the notification, it is
                  something that would -- that would qualify as a
                  commission of a serious offense under the Seps Manual.
                  I'm not asking for a determination on whether he
                  actually did it or not.

CR (Capt Baehr):  Sir, to respond, for one, Article 88 -- I guess
                  I'll argue this legally.  Article 88 applies to
                  officers.  It does not apply to Sergeant Stein.  We
                  would argue that the drafters of the UCMJ could have
                  written it to apply to Sergeant Stein and they chose not
                  to.  They chose to limit it.  So it's not appropriate to
                  consider that that would somehow be related to
                  Article 134.  It's not an enumerated basis.

                  Again, we know that the drafters considered Article 88
                  because they wrote Article 88.  But they didn't
                  enumerate in Article 134 anything having to do with
                  Article 88.  This would merely be a general disorder and
                  neglect.  Again, this is the purview of the board and
                  the defense's position is that it's inappropriate to ask
                  the legal adviser whether or not there is a basis.

SMBR:             I only have one question:  Is it legal advice for you or
                  for us?

RCD:              For you, sir.

SMBR:             We don't need it.  Let's move on.

                  Recorder.

RCD:              Yes, sir.  Are we prepared for witness testimony, sir?

SMBR:             Yes.

                                122

RCD:        Okay.

ARCD:       Sir, the government's going to call First Sergeant
            Rocha.

SMBR:       Who's the first witness?

ARCD:       First Sergeant Rocha, sir.

SMBR:       The order you have them listed is the order they're
            going to be called in?

ARCD:       Maybe, sir.  In the interest of time, since we're
            getting late, we actually may not call one or two of
            these witnesses simply because, you know, we'd like to
            get through it today if possible.

SMBR:       Okay.  Don't let me rush you.

ARCD:       Very well, sir.

**First Sergeant Joseph Rocha, U.S. Marine Corps, was called as a
witness by the government, was sworn, and testified as follows:**

<div align="center">DIRECT EXAMINATION</div>

**Questions by the assistant recorder:**

Q.          First Sergeant, will you please state your name,
            spelling your last name for the record?
A.          First Sergeant Joseph Rocha, R-O-C-H-A.

Q.          And what's your present billet and duty station?
A.          I'm the Company First Sergeant for Headquarters Company
            at Weapons Field Training Battalion.

Q.          And can you give the board just kind of the wave tops of
            your career in the Marine Corps?
A.          September will be 24 years that I've been in the Marine
            Corps; started at -- I'm a field wireman by trade.
            Started in Hawaii with Fox Battery, 2d Battalion,
            12th Marines.  Went to Desert Storm while I was with
            them.  Came back from there, went to Bridgeport for a
            few years.  Was a wireman there at Bridgeport.  Did
            various things there.

            Went back to Hawaii, was with 1/12 again.  Did about
            four years there.  Left there, went on recruiting duty

<div align="center">123</div>

for three years.  Came back from there.  Went to MLG.
Did a couple deployments with MLG.  Was promoted to
First Sergeant.  From there, went down to Miramar.  Did
a deployment with a COMM Squadron down in Miramar.  And
I've been here for going on three years now.

Q.        So were you here in June 2011 when Sergeant Stein
          checked in?
A.        I was.

Q.        And how quickly did he contact you when he first checked
          in?  Did he talk to you the first day he checked in?
A.        It was either the first or second day.  I can't remember
          with a hundred percent certainty.  But, you know, every
          Marine that comes through the company, they're required
          to check in with me.  They check in, you know, normally
          in their Alphas because I want to see, you know, how
          they look in their Alphas, make sure they fit.  Just
          things like that.  Get to know them and talk to them.
          Talk about what I expect from them while they're here.

Q.        And do you remember speaking with Sergeant Stein?
A.        I do, yes, sir.

Q.        Do you remember him talking about why he was going to
          your unit?
A.        I remember it coming up, what happened -- you know, what
          had happened at his previous command and he and I
          discussing it.

Q.        Do you recall exactly what he said?
A.        It was to -- he -- it was explained to me that he was
          that Marine who was involved with President -- you know,
          President Obama stuff.  And I remember reading about it
          on *Fox News* -- usually every morning I check *Fox News*
          and I remember seeing something.  Didn't -- it really
          didn't pertain to me specifically, so I really didn't
          get into detail and do a lot of research on it.  But I
          do remember it.

          And then, you know, once he came to us and we started
          talking, he explained to me that he's -- he's spoken to
          PAO about it, he's spoken to the JAG about it, and he
          knows what he can and cannot say, can and cannot do.
          And I just -- at that point I basically confirmed with
          him, Okay.  So you understand what you can and cannot
          do?  He said, Yes, I understand.

124

000922

Q.      So at that point, did you consider it kind of a done
        deal, water under the bridge?
A.      Yeah.  I mean, yeah, for the most part because he told
        he -- he understood what he could and could not do.

Q.      Now do you remember the incidents that kind of -- are
        the bases of this proceeding?  Do you remember when you
        first heard about it?
A.      I do, sir.  It was the 2nd -- 2nd of March.

Q.      And what did you hear?
A.      I got a -- I was on leave.  My anniversary is on the
        4th.  And every year we -- my wife and I, we -- a big
        event happens -- we're into Jeeping.  A big event
        happens, so we go to the desert.  And my wife isn't too
        happy about it, but we were on our way to the desert and
        I get a phone call from my company gunny asking me what
        I told Sergeant Stein when he checked in with us.  I'm
        like, What's this pertaining to?  You know, what do you
        mean what did I tell him?  And so he explained about the
        Facebook post that this master sergeant had discovered
        and I basically told him, Hey, he knew what he -- he
        told me he knew what he could and could not do and we
        pretty much left it at that.

Q.      On 5 March, the next -- after the weekend, what
        happened?
A.      5 March, I got to work.  I saw the -- sergeant major
        e-mailed me the screen print of the -- I guess, what the
        master sergeant had -- the Facebook stuff.  And gave me
        a call, told me, Hey, talk to Stein about it.  You know,
        what's he doing.  Why is he doing this.  You know, talk
        to him about it.  So aye, Sergeant Major.  I printed
        that -- the attachment off and brought Sergeant Stein
        down.

Q.      Just -- sorry.  Just to interrupt you real quick.  Now,
        are you talking about the one that -- the comment that
        says, "As an active duty Marine, I was screw Obama"?
        That one?
A.      It's the one that refers to Obama as the economic enemy,
        the --

Q.      Okay.
A.      All those things.

125

000923

Q.       Okay.  Now -- so the purpose that -- your purpose in bringing him down was just to talk to him; is that right?
A.       Absolutely, yeah.

Q.       But you read him his rights when he first got there, right?
A.       Correct.

Q.       Now, why did you read him his rights?
A.       I was taught early on as I was being groomed, I guess, to be a first sergeant, I've always been taught, you know, hey, you need to ensure that you read someone their rights -- if you suspect them of violating the UCMJ, ensure you read them their rights.  Because if you don't read them their rights, nothing that they tell you is going to be admissible at a court-martial hearing.

So I've kind of always been taught that and even -- it's been my experience also when I do read somebody their rights, they're kind of -- they understand that I'm serious.  We're here to talk, you know, serious business here.  You know, we're not just here just because I want you to come down to my office.  So, you know, I read him his rights.

Q.       And what did he say?
A.       Basically, you know, right after I read him his rights, I always ask, you know, okay; do you understand your rights.  Repeat.  Give me two of your rights.  They'll tell me, you know, right to remain silent, whatever, lawyer.  So then after I ask them do you wish to talk to me about this.  He said, No, I want to talk to a lawyer.  So basically I don't push it again.  You know, I just said, Okay.  Roger that.  You know, we'll make -- a lawyer will be available, head down to base legal.

And then not long after that is when I'm hearing about these Facebook posts, that he's being charged.  You know, I get a call from my CO saying, you know, What did you tell him?  You know, did you tell him he's being charged?  I said, No.  I said -- I read him his suspect 31 -- Article 31 rights.  And I read right off a card so -- again, that was another thing that I've always been taught.  And don't do it by memory, because that way, if you're reading it right off a card, you don't skip nothing.  You know, you get everything.

126

So, again, I read it right off a card and all it says is
you're suspected of violating an Article XX, whatever it
is.

Q.      So after he left your office, to the best of your
        knowledge, did he go down to base legal?
A.      Yes.  I mean, to the best of my knowledge.

Q.      Okay.
A.      That was the plan for him to go to base legal.

Q.      And again, to the best of your knowledge, did he also
        talk to the media at that time?
A.      I -- again, probably an hour or two after he left my
        office is when my CO called me saying that he -- he in
        fact did do an interview.  I don't know if it was
        telephone or what type of interview he did.  But I
        understood that within a couple hours, he had done an
        interview.

Q.      Do you remember on March 9th sitting down with Sergeant
        Stein?
A.      I do.  I do.

Q.      What did you talk to him about?
A.      That was actually right here in this room as a matter of
        fact.  I just wanted to talk to him and find out what
        his plans were.  Why he was kind of doing this.  Just to
        get -- and this one was -- at this point the ball had
        already started rolling.  You know, he -- he had already
        did a bunch of interviews.  We had some training that we
        did with the social media and the DoD Directive.

        So at this point I just wanted to kind of -- it's still
        my job as -- as his first sergeant to lead, guide and
        mentor him.  And so I just wanted to sit down, Hey, what
        are your plans after the Marine Corps whether you're
        able to stay in till your EAS or not.  You know, what
        are you planning at.  You know, he told me about his
        wife trains horses.  They have a horse ranch.  He's a
        realtor.  You know, I asked him about politics.  I think
        his specific words are, you know, at this point he's not
        planning on getting into politics.  But he says, I don't
        know what I'll be doing from five years from now.
        Nobody knows what we'll be doing.  So I mean, just -- it
        was -- it was mainly that type of stuff.

127

000925

Q.      Okay.  Now -- and you mentioned this:  Prior to that
        conversation on March 9th, did he have an opportunity to
        get counseled, PME, about -- about social media?
A.      He did.  All of us had to.  And I was not there when he
        got the class, but from my understanding, Major Nichols
        gave the S-3 that class on social media and the DoD
        Directive.

Q.      Now at that time, did you think about maybe giving him a
        6105, something like that?
A.      I mean, I -- specifically, no.  I mean, I didn't say,
        hey, I'm going to give him a 6105 type thing.  I think
        when I initially talked to him on the 5th, you know,
        once I kind of figured out what he was doing, why he was
        doing these things, you know, that may have been
        something that the CO -- CO and I would have discussed.
        You know, hey, let's -- he understands it's wrong.
        Let's just give him a 6105.  Be done with it.  Or, you
        know, I mean, that was one avenue I guess we could have
        went.  But I didn't get an opportunity to.

Q.      Do you remember giving him a 6105 counseling on 23rd of
        March?
A.      Yes.

Q.      And who was in the room at that time?
A.      Myself, Captain McKillop, and Colonel Dowling.

Q.      And do you remember what exactly transpired; what you
        guys were talking about during that counseling?
A.      Basically that these interviews, things that he has
        done, the violation of the DoD Directive, and I don't
        remember all the specifics -- I mean, it was -- on a
        Page 11, it filled up the entire Page 11.

Q.      Who was talking primarily at that time?
A.      Colonel Dowling.  Colonel Dowling was the who issued it.

Q.      Do you remember at any point Colonel Dowling asking --
        or towards the end of the conversation, Colonel Dowling
        asking if Sergeant Stein had any questions?
A.      Yeah.  As Sergeant Stein was going out the door -- you
        know, the exact words were, Son, do you have any
        questions?  And Sergeant Stein kind of -- he hesitated,
        came back and he said, you know, that in fact he does
        have a question.  And he asked, Sir, are you telling me
        I have to stop my Facebook page?  And that's not what
        I'm telling you.  He basically told him you have to

                                128

            abide by the DoD Directive.  That's what I'm telling
            you.  And then he said aye, sir, and he left.

Q.        And finally, I want to the talk about an incident that
            happened out on the range.  Do you remember an incident
            involving Sergeant Stein?
A.        I -- I got it from Captain McKillop.  Captain McKillop
            told me -- I think it was the 8th maybe.  He told me an
            incident had happened on Delta Range that he was not --
            Marines kicked him off the range.  Again, I was not
            there.  I got it from Captain McKillop.

            And at that point, you know, I said -- I told Captain
            McKillop that's wrong.  He's a Sergeant of Marines.  I
            don't care, you know, what -- he hasn't been convicted
            of anything or he's still a Sergeant in the Marine
            Corps.  I said so that's wrong.  So we got -- actually
            got our company office together and told him, hey, if
            Sergeant Stein has anything -- he's a Sergeant in the
            United States Marine Corps.  He's going to be treated as
            such until he's no longer a Sergeant in the United
            States Marine Corps.

Q.        But there was some issue regarding him and other Marines
            and this whole issue that we're talking about today?
A.        Apparently so.

Q.        Okay.
A.        Apparently so.

ARCD:     One second.  Thank you, First Sergeant.  That's all we
            have.

SMBR:     Counsel?

RCD:      Sir, can I ask for a brief health and comfort recess?

SMBR:     Yes.

RCD:      Thank you, sir.

SMBR:     Note the time.

RCD:      Time on deck is now 1546, 5 April 2012.  Going off
            record.

[The administrative separation board recessed at 1546,
5 April 2012.]

000927

[The administrative separation board was called to order at 1600, 5 April 2012.]

RCD:        Time on deck is now 1600, 5 April 2012.  Resuming
            administrative separations board for Sergeant Gary A.
            Stein, United States Marine Corps.

SMBR:       Counsel.

CC (Mr. Brewer):  Thank you, sir.

### CROSS-EXAMINATION

**Questions by the counsel for the respondent:**

Q.          Sir, again, Mark Brewer.  I'm a civilian attorney
            obviously representing Sergeant Stein.  I wanted to ask
            you a couple questions about your direct testimony.  You
            and I haven't had a chance to meet or speak before just
            now, correct?
A.          That is correct, sir.

Q.          As you understand you testimony, Sergeant Stein, when he
            first came to your unit, you had the conversation with
            him wherein you confirmed what he could and could not
            do; is that right?
A.          At that point I didn't know a lot of specifics about the
            DoD Directive.  I was -- when we had the conversation, I
            asked him are you aware -- you've been briefed.  Because
            he told me he had to talk to the PAO and the JAG as
            well, and they pretty much told him what he could and
            could not say.  So I basically just confirmed with him.
            So you understood -- or you understand what you can and
            cannot say.  He said yes.

Q.          Did you tell --
A.          I never went into, you know, as a active duty Marine,
            you can't do this; you can't do that.  I didn't go into
            that at that time.

Q.          Was that gone into in your presence by the JAG?
A.          No.

Q.          Okay.  You're talking about --
A.          He knew that this was -- what Sergeant Stein told me.

130

000928

Q.      Okay.  Sergeant Stein told you that he had been told
        what he could and couldn't do?
A.      Yes.

Q.      And that was April 2010 that you're referring to?
A.      No.  No.  That was when he checked in here.  June of
        2011.

Q.      Okay.  And I take it there were no problems brought to
        your attention between June 2011 and March of this year;
        is that correct?
A.      That is correct.

Q.      And what was the thing that precipitated you actually
        calling him in in March of this year and reading him his
        rights?
A.      It was the post from Facebook.

Q.      Who brought that to your attention?
A.      Sergeant Major Jackson.  Well, I got a call from Gunny
        Gans[ph] on the 2nd.  And that Monday is when I got a
        call from sergeant major and I got the e-mail from
        sergeant major with the -- the actual screen print of
        the Facebook post.

Q.      And as I understand it, you read him his rights not
        because you suspected him of committing some offense but
        just because that's what you felt was important at that
        time?
A.      No.  No.  I read the posts.  And the things that he said
        about the President, I felt were in violation of the
        UCMJ, Article 134, disloyal statements; good order and
        discipline.  So I actually read him his rights and told
        him he's suspected of violating Article 134 of the UCMJ.

Q.      Okay.  Had you spoken to a JAG before you read him his
        rights?
A.      I did not.

Q.      And the interview of which you spoke after that, was
        that with the JAG?  Is that the interview you were
        talking about?  You said that after you read him his
        rights, you sent him to the judge advocate's office.
A.      Yes.

Q.      And then you referred to an interview?
A.      That was just something that I was -- I was, again, made
        aware by my CO, Captain McKillop, that he had done an

                             131

                                                         000929

interview with some sort of news agency or with
somebody.  Again, I wasn't -- I wasn't specific on -- or
he wasn't specific on -- I'm unsure of who it was with.
But this was within hours of me reading him his rights.
That's what I was referring to.

Q.     The recorder asked you if you had considered a 6105.
       That's a counseling -- a formal counseling?
A.     That is a -- yeah, that is a formal counseling.

Q.     And you said no?
A.     Yeah.  At that point, because I hadn't had an
       opportunity to discuss anything with him.  Normally,
       it's kind of my job -- I talk to the Marines.  I find
       out what -- basically what were they thinking, what was
       going on, and then I sit down with the CO and he and I
       discuss where we go from there.

       And one of our options is always just an official
       counseling, a 6105.  That's always a -- even if they
       violated the UCMJ, you kind of take everything into
       consideration.  You say, you know, sir, I think that a
       6105 is appropriate for -- for this or that.  But I
       didn't have that opportunity.  Sergeant Stein wanted to
       go see a lawyer; wouldn't talk to me.

Q.     So you've never -- you've never done a 6105 on Sergeant
       Stein, correct?
A.     The 23rd, Colonel Dowling did one and I was involved
       with that one.

Q.     That was the one that was two days after Colonel Dowling
       sent Sergeant Stein a notification of separation
       proceedings?
A.     Yes.  I believe it was two -- a couple days later, yes.

Q.     I'm just curious, but have you ever seen a situation
       like that before where the counseling that's based on
       the same facts and circumstances of the admin separation
       occurs after the initiation of the admin separation?
A.     I can't recall, sir.

Q.     You mentioned a minute ago that you weren't familiar
       with the DoD Directive back at what time was that that
       you had referred to?
A.     I'm aware of it, but I wasn't as -- everything that's in
       it, I guess I wasn't as savvy as I am now, back when he
       first checked in.

                          132

Q.          When did you get your savviness?
A.          To be honest with you, recently.  Since all this -- I
            mean, I've always -- you know, we get the classes, what
            you can and cannot say.  And I've always just -- as a
            Marine, I do what I'm told; I follow orders.  But that's
            kind of just been engrained in me for the past almost 24
            years now.  But recently, since the incident with
            Sergeant Stein came up last month, it's really made me
            look at it in great depth and detail.

Q.          Now, I want to ask you about that, but first you
            mentioned in your testimony -- your direct testimony a
            guidance -- a social media guidance.  Let me ask you if
            that's what -- what you're referring to?
A.          This is probably similar.  This isn't the exact -- this
            isn't the exact one that we have, but, I mean, it's from
            the Navy.

CC (Mr. Brewer):  Let me flip you over here to --

ARCD:       Sir, can we get an explanation of what counsel just
            handed for the record?

CC (Mr. Brewer):  That's a fair point.

            Mr. President, this is a Department of the Navy, DoN
            guidance for unofficial internet posts.  It says
            explained social media guidance.  And it is -- it has
            references throughout to 1344.10, but there's no actual
            nomenclature on it.  There's no numbering on it itself.
            I think it would be appropriate to put it into evidence,
            if that's okay.

SMBR:       You have an issue with that?

RCD:        No, sir, that's fine.  I'd ask that it be put in anyway.

CC (Mr. Brewer):  I'll have to get copies of it at break, if
            that's okay.

            What number would that be?

CR (Capt Baehr):  It would be -- it would be Delta, sir.

SMBR:       And you don't wish to see it first?

RCD:        Sir, I can see what he's referring to.  It's a
            PowerPoint presentation.

                              133

CC (Mr. Brewer):  That's right.  Yeah.  It's a printout of a
         PowerPoint that you can get on the Navy's website.

**Questions by the counsel for the respondent (continued):**

Q.      Okay.  So let me draw your attention here to Defense
        Exhibit D to the page that's -- Slide 13.  It says don't
        get political.  Have you seen that before?
A.      No.  Like I said, this -- it's probably fairly similar
        to the PowerPoint that we have, but I don't specifically
        recall this.

Q.      I also came across this one last week on the internet
        Department of the Navy, Guidance for Unofficial Internet
        Posts.  Is that is?
A.      No.  Like I said, this is -- the Marine Corps, we have
        our own PowerPoints and they probably are, like I said,
        similar but not the Navy ones.

Q.      Okay.  Well, believe it or not, I got it from the Marine
        website, so.  But you think there's one -- there's a
        separate one that actually has a U.S. Marines logo on
        the front of it?
A.      It's actually -- it says social media across the front
        real big.  I don't think that there's an eagle, globe
        and anchor.

Q.      Now, the counseling, the 6105 on 23 March which was two
        days after the initiation of these proceedings, as I
        understand your testimony, Colonel Dowling asked
        Sergeant Stein if he had any questions, right?
A.      Right.

Q.      And Sergeant Stein said, Yes, I do, sir.  I want to ask
        you if I should take down my Facebook page.  Is that
        what he said?
A.      He said are you telling me to take down my Facebook
        page.

Q.      And the colonel said, no, I'm not telling you that?
A.      That is correct.

Q.      And then the colonel further stated just follow the
        Directive?
A.      The DoD Directive, yes.

Q.      And you understood that to mean 1344.10, correct?
A.      Yes, sir.  Yes, sir.

134

Q.        So am I correct to say then that neither Colonel Dowling
          in your presence nor you, yourself, ever told Sergeant
          Stein that he couldn't, for example, participate in any
          political meetings?
A.        Again, I don't know if Colonel Dowling gave him that
          class.  In my presence Colonel Dowling never gave him
          that class.  Like I said --

Q.        Did you?
A.        -- Major Nichols did.

Q.        Major Nichols?
A.        Major Nichols did.

Q.        When did that occur?
A.        On the 9th, March 9th.

Q.        Of this year?
A.        Correct.

Q.        And what did Major Nichols tell him as best you recall?
A.        I wasn't there, so I can't even -- I can't even say
          that.  I don't know.

Q.        I'm sorry.  How do you know Major Nichols did this?
A.        We have a -- we had a roster, all hands had to get to
          class.  The majority, probably 75 percent of the company
          received it on the 8th.  And Sergeant Stein wasn't here,
          so the S-3 shop got it on the 9th.  Or I know
          specifically Sergeant Stein got it on the 9th.

Q.        So in conclusion then, as far as you know, no one has
          ever told, in fact, Sergeant Stein said he's not
          ordering -- Colonel Dowling said he was not ordering
          Sergeant Stein to take down his Facebook page, correct?
A.        In my presence he told him that's not what I'm telling
          you; his exacts words.

Q.        All right.  In any of your conversations with Sergeant
          Stein related to his attendance at meetings or whether
          he was wearing a uniform or not wearing a uniform or
          anything like that.  Is that true?
A.        In -- when he and I talked on the 9th that afternoon and
          I asked him specifically I guess -- you know, Major
          Nichols.  I said, you received a class on social media
          and DoD directive.  He said, Yes.

135

And I said, Are you still planning on doing interviews?
He said, Yes.  So I mean I know that that's a violation
of the DoD directive.  So I mean, I pretty much --

Q.      What's a violation of the DoD directive?
A.      To -- well, to attend political meetings, to do
interviews supporting a specific organization or
political organization, something to that effect.

Q.      It's your understanding 1344 prohibits attending a
political meeting?
A.      No, doing interviews.

Q.      Doing interviews?
A.      Yes.

Q.      Is it your understanding that that applies whether or
not the person's in uniform?
A.      I mean, you're not supposed to do it in uniform.

Q.      Right.  So it is --
A.      But if you identify yourself as an active duty Marine --

Q.      Let me just ask the question.
A.      Okay.

Q.      Okay.  So it is your understanding under 1344 as you
understood it that somebody like Sergeant Stein may
conduct an interview about a political subject if he's
not in uniform and he doesn't hold himself out as
speaking on behalf of --
A.      Correct.

Q.      -- or for the Marines?
A.      Just as a -- just as a person, as a Gary Stein, yes, he
could do that.

Q.      Okay.
A.      My understanding.

Q.      That's your understanding?
A.      Yes.

136

Q.          Okay.  And Sergeant Stein never told you, did he, that
            he intended to give an interview either in his uniform
            or he's going to hold himself out as talking as an
            official member of the United States Marines?  He never
            did that, did he?
A.          No.  But I've heard interviews where he said he's
            Sergeant Gary Stein, eight years active duty Marine.  So
            I mean --

Q.          What interviews are those, sir?
A.          One was on -- on the internet.  He's got a machinegun.
            I saw it as -- I saw it through a You Tube.  It's quite
            a long time -- quite a long interview.  And actually he
            and I spoke about that one specifically, because the
            person doing the interview, I want to say if I recall
            correctly at least three times said he was being charged
            and at that point, he had -- he was not being charged
            with anything.  He said being court-martialed.  And
            Sergeant Stein never corrected the guy.

            And I asked Sergeant Stein about that specifically and
            he said he meant to correct him and every time they went
            to break, he said -- or at one point when they were on
            break, when they were not live, he told the producer
            that, Hey, I'm not being convicted of anything and --
            but he never said it when they were back live.  He never
            clarified that I'm not being charged.

Q.          The interview that you're talking about, First Sergeant,
            you never in your hearing of it got the impression that
            Sergeant Stein was purporting to speak on behalf or in
            some official capacity of the Marines, did you?
A.          No.  I mean, but he -- he continued to say he was active
            duty Marine.

Q.          Well, we -- right.  I mean, and I'll stipulate with you
            he's an active duty Marine.  But my point is you
            wouldn't quibble with the fact or the right of a Marine
            to say I happen to be a member of the Marines.  I'm
            speaking on my own behalf on my own time as a civilian.
            You wouldn't have a problem with that, would you?
A.          If that was said, I wouldn't have a problem with it.

CC (Mr. Brewer):  Okay.  That's all I have, sir.

SMBR:    Okay.  Members, anything?

[There were no questions from the members.]

137

ARCD:        Sir, just a brief -- brief redirect.

### REDIRECT EXAMINATION

ARCD:        First Sergeant, excuse me, do you recognize this screen shot right here?

CR (Capt Baehr):  Can we see the shot as well?

ARCD:        Yeah.  It's -- it's Government Exhibit 13A.

WIT:         Yeah.  I remember the war fighter.  That was the --

**Questions by the assistant recorder:**

Q.           Is that the one you're talking about though?
A.           Yes, sir.

Q.           Okay.  Just for the -- for the board's assistance, that's labeled as Government Exhibit 13A, the interview that he's talking about.

             And just to -- one brief question for you, First Sergeant, just to be clear, when you called him into your office on the 5th of March, you read him his rights because you had suspected that he might have violated Article 134; is that right?
A.           Yes.

CC (Mr. Brewer):  Objection.  Leading.

LA:          What was the objection?

CC (Mr. Brewer):  He's leading his own witness.

LA:          Just can you rephrase it, Spencer?

ARCD:        Absolutely.

**Questions by the assistant recorder (continued):**

Q.           Why exactly did you read him his rights again?
A.           I suspected him of violating Article 134.

Q.           And did you think it was prejudicial to good order and discipline?
A.           Yes, I did.

138

000936

ARCD:      Okay.  Thank you.

SMBR:      Counsel?

CC (Mr. Brewer):  Nothing further.

SMBR:      Okay.  Members?

[There were no questions from the members.]

SMBR:      Recorder?

ARCD:      Sir, that's all we have for First Sergeant Rocha.

           Next witness -- First Sergeant, thank you very much.

SMBR:      You want him to be warned?

RCD:       Sir, we don't need him back.  If the defense would like
           him warned.

SMBR:      You need him back?

CR (Capt Baehr):  Sir, we don't know.  Probably not.  We don't
           anticipate calling back the first sergeant.  The typical
           warning of course is just, you know, not to talk about
           the testimony with other witnesses in the case.

SMBR:      So you want him warned?

CR (Capt Baehr):  We would just request that all witnesses be
           warned, sir, just in compliance with the script.

SMBR:      First Sergeant --

WIT:       Yes, sir.

SMBR:      -- you are instructed not to discuss your testimony in
           this hearing with anyone except the recorder, the
           respondent, or counsel for the respondent.  You will not
           allow any witness in this hearing to talk to you about
           the testimony he or she has given or which he or she
           intends to give.  If anyone except the persons I have
           named attempts to talk to you about this case, you
           should make this fact known to the side which called you
           as a witness.

WIT:       Aye, sir.

139

000937

```
SMBR:      You understand?

WIT:       Yes, sir.

SMBR:      You are excused.

WIT:       Yes, sir.
```

[The witness was excused and departed the conference room.]

```
ACRD:      Sir, the government now calls Captain Adam McKillop.
```

**Captain Adam McKillop, U.S. Marine Corps, was called as a witness
by the government, was sworn, and testified as follows:**

### DIRECT EXAMINATION

**Questions by the assistant recorder:**

```
Q.         Sir, will you please state your name -- your full name
           and spelling your last for the record?
A.         Captain Adam McKillop, M-C-K-I-L-L-O-P.

Q.         What's your present billet and duty station?
A.         Headquarters Company Commander at Weapons Field Training
           Battalion, Marine Corps Recruit Depot San Diego.

Q.         Can you give a very brief summary of your career in the
           Marine Corps so far?
A.         For the whole career, I joined in 2001.  Enlisted as a
           Marine bandsman.  Got out, went to college full time.
           Became an officer in 2006.  Military police by trade.
           Went to Marine Wing Support Squadron-372, worked as a
           platoon commander there.  While there, I was TAD to PMO.
           Worked PMO on Pendleton for a year.  Went back with 372.
           And my first -- prior to 372, I deployed to Iraq.
           Second part I went to Afghanistan.  And then transferred
           here to Weapons Field Training Battalion.

Q.         And when'd you transfer here?
A.         When?

Q.         Yes.
A.         2010.

Q.         Okay.  So were you here in June 2011 when Sergeant Stein
           checked in?
A.         I was.
```

140

Q.      And did you meet him at that time when he first checked
        in?
A.      I did.

Q.      Okay.  Was he actually under you?  Was he one of your
        Marines?
A.      Yes.  I took over company command beginning of June, so
        he was mine when he checked in.

Q.      Okay.  Now at any point did you hear about a prior
        history that he had prior to joining the unit,
        Headquarters Company?
A.      I did after our initial brief, after I talked with
        Sergeant Stein.  Like I do with the other Marines, I
        wasn't aware of any previous issues until after I met
        with him that first time.

Q.      And what did you hear, sir?
A.      I remember hearing from a couple years back that there
        was a Marine who's involved with some Facebook postings
        from Intel Battalion.  He's a weather observer.  I
        remember all that stuff.  I didn't remember many of the
        details and didn't look into it.  I just knew that he
        was with us now.  I assumed everything was adjudicated
        and he's just another Marine in my company.

Q.      So would it be fair to say that you gave him a clean
        slate?
A.      Yes.  Very fair.

Q.      Okay.  Now do you recall on March 1st when the
        circumstances surrounding what's going on right now came
        back?
A.      I didn't hear about it until about March 2nd but yes, I
        do recall that.

Q.      Do you remember what you heard?
A.      I received an e-mail -- excuse me.  I didn't receive an
        e-mail.  I had heard from this person on March 2nd that
        Sergeant Stein may have posted some things on Facebook,
        you know, saying false -- or not false but saying things
        against the Commander in Chief, that he wouldn't follow
        orders, something to that effect.

        And I followed up with Captain Kobyra, his OIC, to see
        if he had talked to him and everything, which he did.
        And from what we figured out at that point, it didn't
        seem like there was anything wrong except that there was

                                141

a bio on the Armed Forces Tea Party website that had him listed as an active duty Marine.  But just browsing through myself on March 2nd, I don't recall seeing anything specific.

Q.     And -- and to be clear, at that time you were looking at the Armed Forces Tea Party website?
A.     Yes, correct.

Q.     Okay.  You weren't looking at the METOC website?
A.     Correct.

Q.     Okay.  When did you actually view the METOC website?
A.     I never viewed the actual METOC website.  I got an e-mail with an attachment of a picture from the METOC website on March 5th that Monday.

Q.     Do you remember who you got that from?
A.     I got it from Sergeant Major Jackson.

Q.     And do you remember reading what Sergeant Stein wrote on that?
A.     I do.

Q.     Was it the comment that begins, "As an active duty Marine, I was screw Obama," et cetera, et cetera?
A.     Correct.  That was one of the first statements.  And then later on, it talks about, you know, him being the domestic, economic enemy.  Something to that effect.  I don't recall the exact wording.

Q.     When you read that, did that concern you?
A.     It did.  Very much so.

Q.     How did you react to it?
A.     I think I was more shocked than anything at first.  And first sergeant and I had both discussed this from the previous week, First Sergeant Rocha.  And I realized, you know, this is about to turn into something a little bit more serious and we needed to be sure that we talked with him and made sure that orders and directives were enforced.

Q.     So your aware that First Sergeant Rocha talked to Sergeant Stein?
A.     Correct.  And that's just something that we have an implicit communication with is if there's an issue and we talk about it, he's going to bring in that Marine and

142

talk to him on my behalf and try to figure out from his mouth or her mouth what happened.

Q.     Okay.  And to the best of your knowledge, what happened
a during that conversation?

A.     I wasn't in the room during that conversation.  I was making a head call.  But I knew Sergeant Stein was only in my office -- in that building for about five minutes, so it couldn't have been much.  Then I heard later after the fact, first sergeant read him his rights because there was concern about him violating the Uniform Code of Military Justice, chose not to talk, and was going to see Camp Pendleton lawyers.

Q.     Now, between that time and March 8th, did Sergeant Stein's conduct start -- was it talked about in the command at all?

A.     It was.  It did escalate I think primarily due to the media and, you know, the continuous use of the media.  And the question is if he was continuing to violate this DoD Directive or not and then that's when we started kind of looking at the directive a little bit more closely, trying to see if there was any kind of violations or not.  But during -- before the 8th we were actually looking to do a 6105, formal counseling, until it got to a level where it might have been out of something we needed to do -- we needed to -- the PI was initiated.

Q.     Now, when you said use of the media, are you saying -- are you talking about Sergeant Stein's use of the media?

A.     Correct.  Sergeant Stein, you know, talking to the media, interviewing.  I heard him on the radio myself a couple times just flipping through channels.  Those kinds of things.

Q.     Were you directed on March 8th to brief your Marines on social -- use of social media and political activities?

A.     March 8th sounds right.  Whatever Thursday that was.  I think that was March 8th.

Q.     Okay.  Who directed you to do that?

A.     Colonel Dowling.

Q.     Okay.  And when you briefed that, did that include the Department of Defense Directive 1344.10?

A.     It did.  And I was very specific about the order in what I was talking about, yes.  Correct.

143

Q.      Now when you made that briefing, you didn't actually
        brief Sergeant Stein in that briefing; is that right?
A.      Correct.  Sergeant Stein had a free day off that day, so
        he was gone.  But most of the company I took care of
        myself Thursday afternoon.  Sergeant Stein was briefed
        by his OIC the next day on the 9th.

Q.      And just to move back really quickly, you said that
        you -- the command wanted to give him a 6105 but then
        things started getting more serious.  Then you mentioned
        a PI?
A.      Correct.

Q.      Preliminary investigation?
A.      Correct.

Q.      And who initiated that?
A.      My understanding was it was Colonel Dowling who
        requested that.

Q.      Okay.  So between March 8th and March 23rd, was that
        preliminary investigation ongoing to the best of your
        knowledge?
A.      To the best of my knowledge -- I was on leave the whole
        week of the 12th, but to the best of my knowledge, it
        was ongoing at that time, yes.

Q.      And do you remember on March 23rd Sergeant Stein
        being -- receiving a 6105?
A.      Yes.

Q.      Were you in the room?
A.      I was.

Q.      And to the best of your recollection, what was Sergeant
        Stein told during that counseling?
A.      He was read the counseling verbatim as it was written.
        There's -- it had a lot of the quotes from that METOC
        website about what he had said about President Obama and
        him being the domestic enemy and those kinds of things
        that were said.  He -- he was formally advised that he
        was going to be part of an -- or subject to
        administrative separation and to follow the DoD
        Directive 1344.10.  Those were the three parts that
        popped out specifically for that -- that counseling.

144

000942

Q.        Okay.  Now, the last subject I want to touch on is do
          you remember hearing about Sergeant Stein being kicked
          off the range?
A.        Yes.

Q.        Can you explain that a little bit?
A.        I -- I don't recall the date.  I think it was actually
          just shortly before that -- a day or two before that
          6105 took place.  But I had heard Sergeant Stein, in the
          performance of his duties in the S-3 as a range chief,
          was going to a range where a sustainment detail was
          taking place.  And one of the Marines there told him we
          don't want you here or something to that effect and
          didn't allow him to proceed on the range.

Q.        Was that a little bit surprising to you?
A.        It wasn't surprising.  Obviously, I wish it would have
          handled a little bit differently.  But it did hamper his
          duties.

Q.        To -- in your opinion, was that kind of a breakdown of
          good order and discipline?
A.        Absolutely.  I mean, any time that, you know, there's
          some kind of trust missing with another Marine --
          Marines amongst Marines to the fact where he can't
          perform his duties, there is definitely some kind of
          breakdown.

Q.        Okay.  Thank you.  That's all I have.
A.        Okay.

SMBR:     Counsel?

CR (Capt Grey):  Thank you, sir.

**CROSS-EXAMINATION**

**Questions by the counsel for the respondent:**

Q.        Captain McKillop, it's your understanding that the METOC
          site that the comments that you saw on March 5th, that's
          a smaller community, correct?
A.        My understanding is it is smaller, correct.

Q.        And that it was -- those posts were taken down right
          away?
A.        I can't say for sure, but I have heard third hand that
          it was taken down at a later time.

145

000943

Q.      You've only been able to see a screen shot; you haven't
        actually been able to go in and see it online yourself?
A.      Correct.  I've never tried to go onto the METOC website.

Q.      Okay.  And you only saw one page of that conversation,
        you didn't see the build up to it --
A.      That's correct.

Q.      -- or the fall down from it?
A.      Correct.

Q.      Okay.  Now, you'd agree with me that often not when
        people are posting things online and they're at a
        computer at home and physically they're in private and
        sometimes they may register that it's private where
        they're talking.  Would you understand that sometimes
        people make that mistake?
A.      Yes.

Q.      And sometimes people get in a dynamic political
        conversation and they speak a little too loud?
A.      I can understand that, yes.

Q.      Captain McKillop, you said something interesting that --
        that this was almost disposed of with a 6105 entry
        sometime before March 8th.  Is that -- it was
        potentially going in that direction for a while?
A.      It was.  You know, right away after seeing the screen
        shot, that's where we were initially heading to make
        sure that he understood the DoD Directive and was aware
        of it.

Q.      Okay.  So in your eyes and in the battalion's eyes,
        there was some wrongful comments and the idea was to
        counsel him and make sure that he understood the
        severity of all those comments?
A.      Correct.

Q.      And that he'd understand that there would be
        administrative or legal consequences of those comments?
A.      Correct.

Q.      And that 6105 entry was not done until March 23rd
        Colonel Dowling sat him down, correct?
A.      Correct.  An official counseling was not done until
        then.

146

Q.      Okay.  And normally for discipline, I mean, the Marine
        Corps and Marines like to proceed very quickly, correct?
A.      Yes.

Q.      And this -- were there some -- it sounds like there was
        some deliberation going on for a few days, correct?
A.      Correct.

Q.      And you said that you or others consulted 1344.10?
A.      DoD directive, correct.

Q.      Okay.  Excuse me.  Now, it's just because it wasn't
        immediately clear to you what was or was not permitted,
        correct?
A.      Correct.

Q.      And it just didn't jump out and scream at you, like, say
        an assault or car theft?  Again that's wrong.  You
        actually needed to go do some research to make sure
        that -- that it was, in your mind, improper?
A.      I'm a military police officer.  I always would go back
        to the book and check the research either way.

Q.      Sure.
A.      But what did jump out at me right away, there was a
        black flag was the line that says "as an active duty
        Marine" or something to that effect.  I believe that
        that was the exact wording.  "As an active duty Marine,"
        and then it continues on with his comments.

Q.      Going back to what I was talking about before with the
        media, it sounds like the media really -- the interviews
        is what diverted this from a 6105 entry.  Is that fair
        to say?
A.      Not completely.  You know, because of the question of
        the legality of everything, that preliminary inquiry was
        conducted.  And because there was pending legal
        processes going on, we weren't going to interfere with
        providing any counseling or anything until further
        guidance was sent down to us.

Q.      Were you aware that Sergeant Stein had requested to get
        the contents of that investigation?
A.      No, I was not aware.

Q.      Okay.  Were you aware that he was never provided the
        contents of that investigation?
A.      I was not aware.

                                147

Q.      Okay.
A.      It's my understanding that the actual investigation
        wasn't even complete until yesterday.

Q.      Okay.  And then these media reports, though, you would
        agree that certainly went into the consideration in
        deciding to escalate this from a 6105 entry, though,
        wouldn't you?
A.      It had the potential to.  Again, that's why we wanted to
        look at the legal process behind it and make sure the
        parameters and the legalities were correct before we
        proceeded with any kind of adjudication.

Q.      And these are the media interviews he's talking about
        admitting that he had on the Facebook page, said "screw
        Obama."  But then in these interviews, he also goes on
        to say I respect the office of the President.  If he was
        here, I would salute him.  I would follow all lawful
        orders.  He was saying these things in the interviews,
        correct?
A.      I have seen that in the media, correct.

Q.      Okay.  And he was never encouraging anyone in these
        media interviews to not follow unlawful orders -- or not
        follow lawful orders that you saw, correct?
A.      I mean, most of them said at first he said I will not
        follow lawful orders then softened his statement to say
        I will follow lawful orders.

Q.      Right.  So he was trying to clarify that?
A.      Correct.

Q.      That the first statement is not complete; we need to say
        I am not going to follow unlawful orders?
A.      Yes.

Q.      And that's fine for him to say, I won't follow unlawful
        orders, isn't it?
A.      Yes.

Q.      As far as Sergeant Stein's performance goes as a Marine
        in the company, you had -- you recommended him for
        extension of his enlistment, correct?
A.      Correct.

Q.      You ranked him in the -- recommended with enthusiasm and
        ranked him in the top 25 percent?
A.      Correct.

                            148

Q.      You stated Sergeant Stein is a solid Marine in the S-3
        section.  He's filling a staff NCO billet previously
        held by a gunnery sergeant and was responsible for the
        management of over seven highly active ranges.  He will
        continue to be a valuable contribute to the mission as
        he renders service -- as he reaches service limitations.
        Retain this experienced NCO.  Those were your comments
        on the retention paperwork -- or the --
A.      Right.

Q.      -- the extension paperwork?  And that was mid-February
        of this year.
A.      Okay.

Q.      Does that sound about the right time frame?
A.      It does seem right.

Q.      Okay.  So prior to March 1, your opinion of Sergeant
        Stein is that he was a valuable member of Weapons Field
        Training Battalion.  Is that fair to say?
A.      Yes.

Q.      I want to ask you there was a mention about some discord
        between sergeants at the Delta range.  That was with
        Sergeant Barnhart, correct?
A.      I couldn't tell you who it was.  I don't know who it
        was.

Q.      Okay.  You don't know anything more about that?
A.      I just heard it was a Marine at the range house.

Q.      Okay.  And just lastly on the counseling, nothing
        prevents you from giving a Marine specific written
        counseling to let him know that this is the expectation
        while you still consider whether or not a court-martial
        is coming?  Isn't that possible?
A.      It's possible.  However, 6105 is an administrative
        counseling needing correction.  And it was unclear to me
        at that point if he actually needed correction or not
        until a PI was done and lawyers took a look at the
        legalities of the order.

CR (Capt Grey):  Thank you, Captain McKillop.

SMBR:   Members, any questions?

[There were no questions from the members.]

149

000947

ARCD:      Brief redirect, sir.

### REDIRECT EXAMINATION

**Questions by the assistant recorder:**

Q.      You said that the -- that first sentence kind of jumped
        out at you of that quote, "as an active duty Marine," --
A.      Correct.

Q.      -- yada, yada, yada?  Why did that jump out at you?
A.      Because it clearly identified him as a Marine saying
        statements against our President of the United States.

Q.      You're aware of the phrase "prejudicial to good order
        and discipline," right?
A.      Correct.  Yes, I am.

Q.      And you're also aware of the phrase "service
        discrediting"?
A.      Yes.

Q.      When you read that, did either of those kind of pop into
        your mind?
A.      Prejudicial to good order and discipline popped out
        immensely, yes.

Q.      And once this media stuff started happening, did you
        ever start thinking about maybe the service discrediting
        part?
A.      Not particularly.  I think I was just so focused on what
        I really did know and the background story based -- you
        know, obviously the media has some of the story as well.
        But the other information I knew, I think I was swayed a
        little bit.

Q.      One second.

        Sir, do you recall -- when you looked at the Armed
        Forces Tea Party page, did you see any images that were
        posted on there?
A.      I saw a picture of Sergeant Stein not in uniform and
        there was a picture of him and I think the logo and
        that's about it that I remember.

Q.      Did you see this photo?
A.      I have seen that on the website, yes.

150

Q.          Okay.  Did that strike you as -- did that cause any
            thoughts in your mind?
A.          I think at the time when I saw it, it was my
            understanding somebody else had posted Sergeant Stein's
            bio and he wasn't an administrator.  That was early on
            in March.  So it didn't necessarily strike me right
            away.

ARCD:       Okay.  That's all from the government.  Thank you.

SMBR:       Counsel?

## RECROSS-EXAMINATION

**Questions by the counsel for the respondent:**

Q.          Captain McKillop, you said that you were aware that
            there were other administrators for the Armed Forces Tea
            Party --
A.          It is my understanding that -- correct.  It was my
            understanding he was not an administrator anymore to
            that website.  This was the beginning of March.  That he
            was not an administrator.  Other people were posting his
            information.

Q.          Okay.  And then did you see on the poster there those
            little asterisks at the bottom that made reference to a
            name which were Mark Halprin[ph]?
A.          I did not notice that there.

Q.          Are you -- are you familiar with that news story where
            Mark Halprin was on the news and he called Obama a dick
            and he got suspended for two or three days?
A.          I'm not really familiar with that, no.

CR (Capt Grey):  All right.  Thank you.

SMBR:       Anything further?

ARCD:       No, sir.

SMBR:       Nothing?

[There were no questions from the members.]

SMBR:       You are instructed not to discuss your testimony in this
            hearing with anyone accept the recorder, the respondent,
            or counsel for the respondent.  You will not allow any

000949

witness in this hearing to talk to you about the testimony he or she has given or which she or he intends to give.  If anyone except the persons I have named attempts to talk to you about this case, you should make this fact known to the side which called you as a witness.

You're excused.

WIT:      Aye, sir.

RCD:      I'm sorry, sir.  We don't have anything else for Captain McKillop.

SMBR:     Okay.  You're excused.

WIT:      Thank you, sir.

          Gentlemen.

SMBR:     Good afternoon.

[The witness was excused and departed the conference room.]

ARCD:     Sir, the government next calls Major Rory Nichols.

**Major Rory Nichols, U.S. Marine Corps, was called as a witness by the government, was sworn, and testified as follows:**

### DIRECT EXAMINATION

**Questions by the assistant recorder:**

Q.        Sir, can you please state your rank and name for the record, spelling your last name?
A.        Major Rory Nichols, N-I-C-H-O-L-S.

Q.        And what's your present duty station and billet?
A.        The Operations Officer at Weapons Field Training Battalion, Camp Pendleton, California.

Q.        And what is Sergeant Stein's position beneath you?
A.        Sergeant Stein is the range chief for Weapons Field Training Battalion.

Q.        And are you his reviewing officer at least on fitreps?
A.        Yes.

152

Q.      Okay.  And how long has he been the range chief in your
        command?
A.      Eight or nine months.

Q.      Okay.  Do you give him most of his taskings for his --
        for his work or does he receive it from someone else?
A.      Between me and Captain Kobyra.

Q.      Okay.  Do you recall the incidents that led up to us
        being here today involving Sergeant Stein's postings on
        Facebook?
A.      Yes.

Q.      Do you remember when you first heard about those?
A.      I think it was March 1st is when I got the first e-mail
        concerning it.

Q.      And do you remember what you saw?
A.      It was -- the first e-mail was just forwarded to me from
        the battalion sergeant major, and it was an e-mail from
        somebody in Twentynine Palms.  And they were just
        reiterating what they saw.  There was no -- as far as
        the specifics that was on there, the Facebook postings,
        that wasn't there.  It was probably about a week later I
        received an e-mail with a screen shot of the Facebook
        postings.

Q.      Do you think that would be -- like, 5 March, is that
        about the right date that you saw that?
A.      Sure.  It was -- I mean, it was a few days later.

ARCD:   Okay.  Now when you saw that screen shot, was that the
        screen shot of the page that --

CR (Capt Baehr):  Gentlemen, we would object to any cumulative
        questions.  The government -- if there's additional
        information this particular witness can provide -- but
        the defense would lodge an objection under
        cumulativeness if the witness is just going to go over
        the exact same testimony.  Because we have quite a few
        witnesses as well to do today.  We're going to be here
        at least midnight at this -- at this rate.

SMBR:   I concur.

ARCD:   Yes, sir.

                              153

**Questions by the assistant recorder (continued):**

Q.      Do you recall at some point giving Sergeant Stein some
        advice, sitting him down, talking about what happened?
A.      There was -- and when the specifics were, I don't -- I
        don't recall exactly when that was.  But after the --
        you know, at a couple different times.  Sometime well
        before that.  I think it was January.  You know, the
        social media handbook, you know, that was given out
        saying, Hey, make sure that everybody reads this and
        aware of it.  That was well-previous to this event.  And
        then after that, we were directed to give everybody a --
        everybody in our charge a class on specifically what the
        social media handbook said and -- look, I used that, I
        used the DoD directive and --

Q.      Is that on 9 March, sir?
A.      Roughly, yes.

Q.      Okay.  And was Sergeant Stein in that group that you
        were instructing?
A.      He was.

Q.      And so you explicitly referred to 1344.10 -- DoD
        Instruction 1344.10?
A.      Correct.

Q.      Okay.  And so did you ever sit him down and actually
        kind of give him some advice, just you and him?
A.      The -- you know, the main thing that I talked to him
        about was I wanted to make sure that he understood
        what -- what was going on and essentially what was at
        risk I guess for him.  You know, the fact that he's --
        you know, his wife is pregnant, he's trying to reenlist,
        do an extension to try and reenlist, and those things.
        You know, through further action, I mean, he's
        potentially putting those things in jeopardy or at least
        complicating them.

Q.      Sir, what were the risky things that you saw him as
        doing?
A.      It -- I mean, at least it seemed very clear as far as
        the DoD instruction goes that -- you know, that the
        things that he was saying the way I interpret it -- I
        mean, it was going against those directives.  You know,
        with regard to his -- you know, his statements that he
        was -- that he was making with regard to the President,
        you know, and just his affiliation.  You know, again to

154

me, it seemed clear that he was -- you know, per the DoD directive says for or against a particular candidate, cause, party.  You know, it seems clear that he was against President Obama and that he's advocating for that -- you know, for him not being reelected.

ARCD:      Thank you, sir.

           That's all from the government.

SMBR:      Counsel?

CR (Capt Grey):   Thank you, sir.

### CROSS-EXAMINATION

**Questions by the counsel for the respondent:**

Q.         Sir, I want to talk to you about Sergeant Stein's performance real quickly.  He's done a good job for you in S-3?
A.         Yes.

Q.         And if he were to be retained, do you have any concerns whatsoever with continuing to employ him in the S-3?
A.         No.  I mean, his -- his performance even through this has been -- I mean, he's done a great job as the range chief.  So I mean as long as that performance continues and, you know, he's able to maintain that, I see no objection to employing him in the S-3.

Q.         Yes, sir.  And in February, you had recommended his extension of enlistment with enthusiasm?
A.         Yes.

Q.         And I know you haven't done a fitness report on him because of the period and stuff like that, but generally a favorable impression of his good performance for those purposes?
A.         Yes.

Q.         And, sir, does he require a secret or top secret security clearance for what he'd be doing in S-3 for the next four months?
A.         No.

155

000953

Q.      Okay.  Would that be any limitation whatsoever that he
        doesn't have a security clearance?
A.      No.

Q.      Sir, I want to talk to you briefly about the interviews
        and things like that that occurred later on.  You never
        told Stein to -- to not do interviews, correct?
A.      Correct.  It -- you know, as the -- the preliminary
        inquiry was going, we were, you know, kind of instructed
        not to, you know, discuss it, not get into political
        debates, you know, any of that kind of stuff with him.
        So no, the only thing that I asked of Sergeant Stein was
        that he just, you know, gave me a heads up as to these
        things so I wasn't caught offguard at being asked by my
        CO or anybody else.

Q.      Okay.  So that wasn't necessarily your decision.  It was
        kind of generally understood that we're not going to
        tell Stein not to do interviews?
A.      It -- and I guess that was my interpretation of it.
        Whether that was the intent, I don't know.  But, you
        know, basically we -- you know, we weren't to get into
        political debates, discussions, you know, about it.

Q.      Sure.
A.      I mean, they're accomplishing the mission, doing our
        jobs.

Q.      Okay.  It's a lot of -- the preliminary investigation
        was going on, though.  There was kind of a -- it sounds
        like there was a little bit of a hands-off approach to
        Stein at that time.  Is that fair?
A.      Yeah.  Maybe.  I guess, it's -- I mean, we had -- we
        talked to him and we -- you know, again, talking to him
        about making sure he understood what was at stake but,
        again, going in and telling him -- for one, it just
        seemed futile to say, you know, on your -- on your off
        time.

        I mean, we did tell him during working hours -- I told
        him that he wasn't to be, you know, posting on Facebook,
        things like that, using the government computer to do
        those things.  But as far as, you know, off duty, no, I
        didn't -- didn't specifically say don't do interviews,
        those kind of things.  Nothing like that.

                              156

Q.       Okay.  And did he generally keep you informed about the
         interviews that were scheduled and upcoming?
A.       He did generally, yes.

Q.       Okay.  And, you know, obviously there's sometimes
         communication problems with people being in and out of
         the office, but generally he kept you up to speed on
         those interviews?
A.       Yes.

Q.       You brought up with Lieutenant Gwartney that there was a
         class that you had taught around March 9th about the DoD
         Directive 1344.10.  The DoD directive doesn't define
         things like party or cause, does it?
A.       It doesn't.  I mean, I guess I'd like to tell you how I
         interpreted it as, you know, a particular party,
         candidate or cause.  I mean, a candidate, I mean, I took
         as a political candidate running for office.  A cause,
         you know, any, you know, political cause, so to speak,
         whether that's, you know, the California Air Resources
         Board or, you know, Obamacare or whatever cause it was.
         But, I mean, that's the way I would interpret it as.
         And then party, again, thinking of political party,
         republicans, democrats.

Q.       And I know the Tea Party has the word "party" in it, but
         some people might say that that's not a party in the
         sense of republicans and democrats.  No one is going to
         appear on *CNN* with their name and then parentheses "TP"
         following their name, right?
A.       Right.  I mean, I don't take it as a, you know,
         independent, republican, green, you know, that -- that
         type of stuff.  I mean, but that may be just because of
         the way our system is designed.  But it -- I mean, it's
         more of a grassroots organization I guess.

Q.       Okay.  So I mean, would you agree with me that the
         directive itself, there's a little bit of ambiguity in
         there as far as what a cause is, what a party is.  And
         therefore if it's ambiguous, it's hard to know what you
         can and cannot do with regards to parties and causes
         since you don't know what they are.  Wouldn't you agree,
         sir?
A.       I would say that every person is different, I guess.  To
         me it seems clear that a party, candidate -- you know,
         there are some.  A candidate seems very clear to me.  A
         cause seems clear to me.  And I mean, there could be a
         variety of causes and I don't think you could

                                157

specifically define it.  And again, for party, I take
that as republican, democrat, independent, green, you
know, those -- those established political parties.

Q.        Yes, sir.  And just in summary, the training, usually it
comes away with some general takeaways such as no
appearances in uniform, no representation that you're
speaking on behalf of the armed forces.  Those are kind
of the big takeaways from the class that you taught;
isn't that right, sir?

A.        It -- and -- yes.  I mean, there are -- just general
education about what's in there.

CR (Capt Grey):  Okay.  One moment, sir.

          All right.  Thank you, sir.  I appreciate your time.

SMBR:     Okay.  Recorder?

ARCD:     No other questions from the government, sir.

[There were no questions from the members.]

SMBR:     Major Nichols, I'm going to read you a warning before
you are excused.

          You are instructed not to discuss your testimony in this
hearing with anyone except the recorder, the respondent,
or counsel for the respondent.  You will not allow any
witness in this hearing to talk to you about the
testimony he or she has given or which he or she intends
to give.  If anyone except the persons I have mentioned
attempts to talk to you about this case, you should make
this fact known to the side which called you as a
witness.

          Do you understand?

WIT:      Yes.

SMBR:     You are excused.

WIT:      Thank you.

[The witness was excused and departed the conference room.]

RCD:      Sir, if we can take a quick break?

158

000956

SMBR:        Yes.  Let's take a ten-minute break.

RCD:         Time on deck is now 1650, 5 April 2012.  Going off
             record.

[The administrative separation board recessed at 1650,
5 April 2012.]

[The administrative separation board was called to order at 1700,
5 April 2012.]

RCD:         Time on deck is now 1700, 5 April 2012.  Resuming
             administrative discharge board for Sergeant Gary A.
             Stein, United States Marine Corps.

             Sir, I understand the defense would like to take a
             defense witness now given the lateness and they need to
             have this witness testify now.

             I would object to the witness.  What I understand the
             proffer of testimony to be, Mr. Brahms is a retired
             Marine Corps General, a judge advocate, who is going to
             opine on -- apparently on whether or not this is
             prejudicial to good order and discipline or service
             discrediting.

             Similar to our previous objections, this witness doesn't
             have any personal knowledge of these incidents.
             Everything he has is second hand or third hand.  And I
             don't believe this is -- this is relevant to the actual
             factual issues in this case.  So I would object to the
             taking of his testimony.  We have other witnesses that
             are percipient witnesses that need to testify as well.

SMBR:        Counsel?

CR (Capt Grey):  Sir, part of General Brahms' testimony is going
             to relate to the same subject as Government Exhibit 28.
             It's an article by Major John Kiel or Kiel.  And we
             obviously realize that both sides are trying to throw
             legal authority at you, because this -- it's very much
             like I said before.  It's a 90 percent legal case,
             10 percent factual case.  Given his experience, both in
             the law and as a general officer and his knowledge of
             good order and discipline and consequences, things of
             that nature, could be helpful.

159

Granted, we don't want to take all night with him on the
stand.  But we think that some inquiry from a general
level officer on those matters would be helpful to the
board.

RCD:        Sir, I have one additional objection.  Like I said,
            General Brahms is a retired judge advocate.  He also is
            a defense counsel -- a civilian defense counsel that
            operates in the San Diego area.  I think that kind of
            implies a certain conflict of interest that obviously
            his opinion is going to be from that perspective.  I
            don't think it'll be particularly helpful considering
            that we have the legal adviser to advise you on any
            issues with regards to the law.  I think it's going to
            serve to confuse what the status of the law is and just
            will not be helpful.  It will only create more confusion
            over an already, you know, mirky subject area.

SMBR:       Is his intent to advise us?

CR (Capt Grey):  Sir, I think he will when I question him and we
            go into certain -- particularly about, you know, what
            arises to prejudice to good order and discipline and
            what has an impact on the outside community.  And also
            just in his experience, how do these things tend to be
            viewed by the community.  And on the flip side, how it
            has impacted the Marine Corps.  So that's part of it.
            Sir, if you limit me to -- to not allow him to talk
            about, you know, First Amendment issues or, you know,
            DoD Directive 1344, legal or illegal, I'll accept that
            of course and will limit his testimony appropriately.

SMBR:       But if he's talking as a third-hand party, what can he
            offer?

CR (Capt Grey):  Sir, the -- it will be much like the government
            witnesses who haven't seen the Facebook post and they've
            given their opinion that, Oh, yeah, that would be --
            undercut good order and discipline in my opinion if
            people saw that.  I think General Brahms has the exact
            same perspective.  He's also looking at a Facebook post.
            He's also looking at the media report.

SMBR:       The difference in my mind at this point is the ones
            who've come in so far are part of the chain of command
            so they are not third party, per se.  They had direct
            involvement in this at some level.  The general, I'm not
            sure what his involvement is outside of having an

```
                    opinion which I have a room full of opinions that I
                    don't want to hear.

CR (Capt Grey):     Yes, sir.  We offer his opinion because he
                    certainly has more experience leading troops than --
                    than anyone at this table and that's why we offer his
                    opinion as someone who can, in his experience, talk
                    about how this would impact the Marine Corps.  And then
                    collateral consequences as well to the Marine Corps,
                    potential for harm to morale, retention and recruiting
                    and things like that; a potential message that a board
                    like this might send.  So we want to --

SMBR:               I understand.  Now the board, in and of itself, just
                    makes a recommendation.

CR (Capt Grey):     Yes, sir.

SMBR:               So shouldn't his opinion be going to the general who
                    will make the final decision as to the overall impact?

CR (Capt Grey):     We would certainly like to get his testimony
                    preserved and then send that along with the -- with the
                    general.  And part of what we're doing here is
                    preserving the testimony, so the general will consider
                    it as well, sir.

SMBR:               Okay.  So now you all are objecting to him coming in at
                    all?

RCD:                Yes, sir.  I think it's -- I understand where -- where
                    Captain Grey is going with that now.  I think it's
                    obvious though that, you know, because the general has
                    more experience, that there may be more or less weight
                    given because he's a general officer, formal judge
                    advocate.  I still don't see the difference.

                    I mean, again, I don't want to offend the general at
                    all.  No one in here does.  But it's an issue with
                    relevance.  I mean, can I start going outside and
                    pulling people one by one and saying what's your opinion
                    on good order and discipline?

SMBR:               So -- I understand.

RCD:                Yes, sir.
```

000959

SMBR:        Now, you were saying that the general speaking is the
             equivalent of which exhibit?

CR (Capt Grey):  GE-28, sir.

SMBR:        GE-28.  Have you read it?

MBR (Maj Wardinski):  No, sir.

SMBR:        Have you read it?

MBR (SgtMaj Brookman):  Just skim.

SMBR:        So really a question is if I disallowed the general,
             would I disallow Exhibit 28 also.  And that's what I'm
             going to do.

CR (Capt Grey):  Okay, sir.  We'll explain that to the witness,
             sir, and we'll proceed.

SMBR:        Yes.

CR (Capt Baehr):  Sir, the defense would request that any exhibits
             that the board is not going to consider would be --
             would be also removed from the binders that the board
             considers during deliberation.

SMBR:        Yes, if it's not going to be considered, we will remove
             it.  So in this case --

RCD:         I would say, sir, for your copy -- because you have the
             originals -- that the color copies, I'd ask that -- if
             you just not consider -- or do you want to remove them?
             I mean, he can --

SMBR:        Yeah.  I won't look at it if I'm not supposed to.

RCD:         I just don't want to lose them, because those are the
             original copies.

SMBR:        Okay.  You can trust me.

ARCD:        Sir, are you ready to hear from Sergeant Barnhart, our
             next witness, or do you want to give --

SMBR:        I want to give him a chance to return.

ARCD:        Yes, sir.

162

SMBR:        You can get him in and go through the swearing in and
             we'll just wait.

             Respondent, do I have a copy of your witness list, a
             paper copy?

CR (Capt Baehr):  Sir, I apologize.  We didn't print out a paper
             copy.

SMBR:        Okay.  I got the --

CR (Capt Baehr):  I'll write one up for you right now, sir.

SMBR:        Okay.

**Sergeant Zachary T. Barnhart, U.S. Marine Corps, was called as a
witness by the government, was sworn, and testified as follows:**

### DIRECT EXAMINATION

**Questions by the assistant recorder:**

Q.           And Sergeant, we're just going to wait for a moment
             until defense counsel comes back.

             Sergeant, will you please state your rank and name for
             the record, spelling your last name?
A.           Sergeant Zachary T. Barnhart, B-A-R-N-H-A-R-T.

Q.           And what's your present duty station and billet?
A.           Weapons Field Training Battalion.  I'm on Delta Range.
             And my billet is line staff NCO of Delta Range.

Q.           Okay.  How long have you been in the Marine Corps?
A.           I've been in the Marine Corps for eight years.

Q.           And can you just give us the wave tops of what you've
             done since you've been in the Marine Corps?
A.           I served at 3d LAR in Twentynine Palms.  Did two tours
             with them to Iraq from '04 to '08.  And then I came here
             and I've served in pretty much every billet on the range
             since I've been here since '08.  I'm also the staff
             NCOIC of the MCRD shooting team.

Q.           Okay.  Do you remember the first time you met Sergeant
             Stein?
A.           I do.

163

Q.      Was that out at the range?
A.      No, it was not.  I met him one time prior before that.

Q.      And when did you meet him the first time?
A.      We were shooting the Depot Competition Arms Program and
        I needed a roster and I just had brief contact with him.
        He gave me his e-mail and I e-mailed him the roster.

Q.      Okay.  Now, do you remember in March when Sergeant
        Stein's name came up maybe in the news or, you know, in
        conversations?
A.      Yes, I do, sir.

Q.      And how -- how did you hear his name?
A.      We were at Western Division Matches and it had come
        up -- Gunner Flannery[ph] had told me, you know, about
        what was going on.  And then we started reading it on
        Google and things like that.

Q.      And when you say what was going on, what do you mean?
A.      About the -- the Facebook page and the -- just the
        events that were happening with the comments that were
        made on Facebook and things like that.

Q.      Okay.  Do you know exactly what comments were made?
A.      I know that the comments were -- I think there was a
        comment about not following orders from the President
        and then it was I think, like, retouched to say unlawful
        orders from what I understand.  I don't know the exact
        comments.

Q.      And did that make an impression on you at all?
A.      Yeah.  I thought that it was probably not the right form
        to do it in.

Q.      What do you mean?
A.      I think that if you're going to try and advocate
        something, web blogging is probably not the best -- the
        best form to do it in.  There's probably a better way to
        do it.

Q.      Like what?
A.      Write a letter to the Congressman, vote.

Q.      Okay.  And do you recall at some point him coming out to
        the range?
A.      Yes, we were running a sustainment range.

164

Q.      Do you remember what date that was?
A.      It would have been late March, so the 20-something.

Q.      Okay.  Do you know why he came out?
A.      Yeah.  He was trying to get a roster of the Marines that
        had UNQ'd for that sustainment range.

SMBR:   Sergeant Barnhart.

WIT:    Yes, sir.

SMBR:   Refrain from saying yeah.

WIT:    Yes, sir.

**Questions by the assistant recorder (continued):**

Q.      So he came out to get a roster?
A.      Yes, sir, he did.

Q.      And where were you at that time?
A.      I was in the range house, sir.

Q.      Okay.  What happened when he came into the range hut?
A.      He came into the range hut and I was sitting on the
        couch on my cell phone.  And one of the staff sergeants
        had said that he had heard him on the radio that
        morning, on talk radio.  And they started talking
        about -- about what was said on the radio and things
        like that.  I was on my phone, wasn't really paying
        attention.  And then Sergeant Stein started talking
        about some of the other things that he'd been, you know,
        involved in.

Q.      Like what?
A.      Like some interviews that he had done, sir, and
        different -- the Facebook page and things like that.  I
        don't remember the specifics but something along those
        lines, sir.

Q.      And how did you react to it?
A.      I kind of kept my mouth shut, just kind of left it alone
        for a little bit.  And then when he continued to talk
        about it, we were kind of getting fed up with hearing
        about it.  And I told him that I thought he was an idiot
        and then started talking about how I felt about his
        comments, sir.

165

Q.      What did you feel about his comments?
A.      Well, I believe that he did it in the wrong form.  I
        told him that I believe -- that I believe he's a
        disgrace, that he gave the Marine Corps a black eye.  I
        compared him to the scout snipers with the SS flag.  And
        then he started talking about, you know, the e-mails
        that he had gotten that were, you know, positive
        responses from what he'd been doing, sir.  And then I
        asked him to leave my office.

Q.      And what did he say?
A.      He said that I believe he said you can't kick me out of
        my office -- or out of your office because you don't
        like me.  And I said yes, I can.  And he said how would
        you feel if I -- if you came to my office and I told you
        to leave just because I didn't like you.  And I said
        that I would politely wait in the hallway, sir.

Q.      Okay.  Did he leave after that?
A.      No, sir.  One of my staff sergeants had come in in the
        middle of the discussion and he pulled us both outside
        and he didn't know what was going on.  And he -- he
        asked -- or he said -- he said I don't know what's going
        on but there's junior Marines around so you guys need to
        squash this.  And then Sergeant Stein said, Roger
        that -- well, we both said roger that.  And Sergeant
        Stein said that he would just come back later for the
        roster they needed.  And that was about it, sir.

Q.      Do you think you reacted appropriately in those
        circumstances?
A.      Yes, sir, I do.

Q.      And why do you say that?
A.      Because that's -- that's how I felt about the situation
        and how -- how Sergeant Stein's been handling himself
        and bringing attention to the Marine Corps in a negative
        way, sir.

Q.      Do you think that that was at all a breakdown in good
        order and discipline?
A.      Yes, sir, I do.

Q.      Okay.  Thank you.
A.      Yes, sir.

SMBR:   Counsel?

                              166

CR (Capt Baehr):  Sir, we just object -- standing objection, if the court does not want to hear the legal opinions of the defense's witnesses, we'd ask that the board would not consider the legal opinions from the government's witnesses.

SMBR:     Just for clarification, do you consider what he just said a legal opinion?

CR (Capt Baehr):  Well, the last -- the last question that asked.

SMBR:     What was the last question again?

ARCD:     Whether he thought that that was a breakdown in good order and discipline.

SMBR:     And that's a legal opinion in your mind?

CR (Capt Baehr):  Well, it sounded like it was going to the ultimate issue which is the issue that the board is assessing whether or not this was a breakdown of good order and discipline or not.

SMBR:     Okay.  So it can be a fine line, then, in your mind between a personal opinion and legal opinion.

          Okay.  It's noted.

CR (Capt Baehr):  Yes, sir.

ARCD:     No more questions from the government, sir.

SMBR:     Counsel?

CR (Capt Grey):  Yes.  Thank you, sir.

**CROSS-EXAMINATION**

**Questions by the counsel for the respondent:**

Q.        Sergeant Barnhart, we spoke two or three days ago, correct?
A.        Yes, sir.

167

000965

Q.          And prior to that you said that you believe that Marines
            give up their First Amendment rights when they joined
            the Marine Corps?
A.          Yes, sir.

Q.          Okay.  So it's your opinion that that's something that's
            in our past?
A.          Yes, sir, to an extent.

CR (Capt Grey):  And that belief probably shapes a lot of your
            other beliefs about what Sergeant Stein has done,
            doesn't it?

RCD:        Sir, I'm going to object to that as irrelevant.

CR (Capt Grey):  Sir, it would go to his motive and bias and how
            he viewed the circumstances.  What he believed going in
            there is going to effect what he saw.  It's just how
            things are, sir.

SMBR:       As it relates to good order and discipline, I think it
            is relevant.

RCD:        Yes, sir.

**Questions by the counsel for the respondent (continued):**

Q.          And just so I have the facts right, Sergeant Stein comes
            in to get the roster?
A.          Yes, sir.

Q.          And so he's doing his duty?
A.          Yes, sir.  He came to get a roster.

Q.          And at that time, he didn't say anything to provoke you,
            did he?
A.          No, sir.  He didn't say anything directly to me.

Q.          And he wasn't even talking to you?
A.          No, sir.  He was in my office discussing what was going
            on.

Q.          And that was just -- would just be part of someone in
            his position that would be part of their duties would be
            to go to your office and get the roster, correct?
A.          To get the roster, yes, not to bring up --

168

SMBR:     I understand what the sergeant was doing when he went to
          the office -- Sergeant Stein to Sergeant Barnhart.

CR (Capt Grey):  Yes, sir.

SMBR:     You were going down a trail of trying to establish why
          he thinks the way he thinks I thought, correct?  Did I
          misunderstand you?  What formed his basis, his
          understanding of the First Amendment rights that he says
          he gave up.  I thought that's where you were going.

CR (Capt Grey):  Yes, sir.  I've moved on from that.

SMBR:     You did?

CR (Capt Grey):  Yes, sir.

SMBR:     Okay.  So now trying to figure out why the sergeant was
          there, why is that relevant?

CR (Capt Grey):  It goes to disorder, sir, and whether or not -- I
          want to be absolutely clear for the board what was going
          on in there, because the government is arguing that
          Sergeant Stein has done something that was prejudicial
          to good order and discipline.

SMBR:     Continue.

CR (Capt Grey):  And I would like to just make clear what it was
          that he was doing at that time.

**Questions by the counsel for the respondent (continued):**

Q.        So he wasn't engaging you in conversation, correct,
          sergeant?
A.        No, sir.  He was in my office engaging other people in
          conversation.

Q.        Okay.  And at that time he wasn't making offensive
          remarks about the President, was he?
A.        No, he was not.

Q.        And he was talking about interviews that he had done
          before, correct?
A.        Yes, sir.

000967

Q.       And you understand that in those interviews he said that
         he would -- that he didn't mean to say I won't follow
         all the President's orders, just the unlawful ones,
         correct?
A.       I don't know that, sir.

Q.       Okay.  So he was talking about -- about what he had been
         saying and that got you upset?
A.       Yes, sir.

Q.       And so he didn't provoke you but, in fact, you -- is it
         fair to say you provoked him?
A.       No, sir.  He was already discussing the details of his
         case when he was already talking.

Q.       Okay.  But you're the one who threw him out of your
         office, right?
A.       Yes, sir.

Q.       That's a pretty extraordinary step in polite society,
         isn't it?
A.       I don't believe so, sir.  I didn't, like, physically
         throw him out of the office.  I asked him to leave my
         office.  I think that if anyone has a work area,
         regardless of what they're talking about, if it's
         causing disruption, whether it be noise or anything like
         that, anyone else would have asked that disruption to
         leave their office as well.

Q.       But rather than just say sergeant Stein, would you
         please leave my work area; I need my quiet, you called
         him idiot?
A.       Yes, sir.

Q.       That's ordinarily not proper communication between NCOs,
         correct?
A.       No, sir.

Q.       And he had not called you anything similar to that
         before you called him an idiot?
A.       No, sir.

CR (Capt Grey):   Thank you, Sergeant Barnhart.

         No further questions.

SMBR:    Anything else?

                              170

000968

ARCD:      No redirect, sir.

SMBR:      Anything, Major Wardinsky?

           You have anything, Sergeant Major?

MBR (Maj Wardinski):  I do.  I have a question.

### EXAMINATION BY THE BOARD

**Questions by Major Wardinski:**

Q.         Sergeant Barnhart, do you consider Sergeant Stein a peer
           of yours?
A.         Yes, sir.  He is in the same peer group as I am.

MBR (Maj Wardinski):  That's all I have, sir.

SMBR:      Sergeant Major?

MBR (SgtMaj Brookman):  No, sir.

**Questions by the senior member:**

Q.         Who else works in your office?  What ranks?
A.         I have two staff sergeants and then a few sergeants and
           below, sir.

Q.         How many below?
A.         I'm not sure, sir.  The office -- it's not an office,
           per se.  It's kind of just a work station.  Nobody
           really -- there's only one person who has a job in there
           and he's a staff sergeant.

**Questions by Major Wardinski:**

Q.         Is it a sound cart?
A.         No, sir.

Q.         Or is it a range house?
A.         It's the range house, sir.

**Questions by the senior member:**

Q.         So during the discussion which you objected to, were
           there any Marines of lesser rank than you and Sergeant
           Stein present?
A.         Yes, sir.

171

000969

SMBR:       Anything else?

ARCD:       No, sir.

### RECROSS-EXAMINATION

**Questions by the counsel for the respondent:**

Q.          Who was that that was present?
A.          Staff Sergeant Goodson, Staff Sergeant Vanluven[ph],
            Sergeant Monalongo[ph], I believe -- I believe the only
            other person there was a Lance Corporal Kashar.  I think
            that was the people there.

Q.          How is Kashar spelled?
A.          K-A-S-H-A-R.

Q.          Male or female?
A.          Male.

Q.          Male.  Works for Delta Range?
A.          Yes, sir.

CR (Capt Grey):  Okay.  Thank you.

SMBR:       Anything else?

ARCD:       No, sir.

RCD:        No, sir.

SMBR:       Okay.  Sergeant, I'm going to read you a warning and
            excuse you.

            Will you need to see him again?

RCD:        No, sir.

SMBR:       Okay.  Sergeant, you are instructed not to discuss your
            testimony in this hearing with anyone except the
            recorder, the respondent, or counsel for the respondent.
            You will not allow any witness in this hearing to talk
            to you about the testimony he or she has given or which
            he or she intends to give.  If anyone except the persons
            I have named attempts to talk to you about this case,
            you should make this fact known to the side which called
            you as a witness.

172

```
            Do you understand?

WIT:        Yes, sir.

SMBR:       You are excused.

WIT:        Thank you, sir.

RCD:        Sir, at this time we're going to do a telephonic
            testimony of Chief Warrant Officer-4 David Burns.  If
            you'll permit me a few seconds to get the handheld.

            And if I can ask the counsel or whoever's going to do
            cross-examine, if you'll move up here.  It might be
            easier.

            Sir, we're going to do it up here so we avoid talking
            over the room.

SMBR:       Okay.  I understand.  Sounds good.

            Do you need time to contact the Lance Corporal, is that
            your intention?

CR (Capt Grey):  We may look into that, sir.  I think we can keep
            going.

SMBR:       All right.

RCD:        I'm going to dial out.

MBR (Maj Wardinski):  9-9 then 1.

RCD:        9-9-1.
```

[The recorder established a telephonic connection with the
witness.]

173

000971

**Chief Warrant Officer-4 David J. Burns, U.S. Marine Corps, was called as a witness by the government, was sworn, and testified as follows:**

### DIRECT EXAMINATION

**Questions by the recorder:**

Q.      Now, Chief Warrant Officer, can you please give us your full name, spelling your last name?

A.      Chief Warrant Officer-4 David J. Burns, B-U-R-N-S.

SMBR:   And that's your speaker phone?

RCD:    Yes, sir.

SMBR:   It doesn't go any louder?

RCD:    No, sir.

SMBR:   Okay.

**Questions by the recorder (continued):**

Q.      Chief Warrant Officer Burns, I'm going to ask you to speak up if you can.  We're having a little bit of trouble hearing you.

A.      Okay.  Chief Warrant Officer-4 David J. Burns, spelled B-U-R-N-S.

Q.      And Chief Warrant Officer, can you please tell the board what your current duty status is?

A.      My current duty status is I am on permissive TAD for retirement.

Q.      Okay.  And when did you -- you go on retirement officially?

A.      1 August 2012.

174

Q.          Okay.  Thank you, Chief Warrant Officer.

            If you can, please tell the board what previous billets
            you've had?
A.          My previous billets have been the Officer in Charge --
            METOC Officer in Charge at MWSS-372.  I was currently
            the METOC officer -- Plans and Policy Officers for the
            Intelligence Department, Headquarters Marine Corps.  And
            before that, OIC at MWSS-271 at Beaufort -- I mean at
            Bogue Field.

Q.          Thank you.  Chief Warrant Officer, you said you were in
            the METOC field?
A.          Yes, sir.

Q.          Can you explain for the board, please, what that field
            is and kind of the size and specialty of that MOS?
A.          Okay, sir.  The METOC field is meteorology and
            oceanography.  Our job is to predict the weather
            conditions, current and future, for MAGTAF, for
            commanders, units, war fighters, aviators, and provide
            them the best forecast that we can for them to execute
            their mission to conduct planning for MAGTAF operations.

Q.          Now generally, how many -- how many METOC personnel are
            there Marine Corps wide?
A.          Marine Corps wide, prior to the FSRG, there was 35
            restricted officers and approximately 325 enlisted.

Q.          Okay.  Is it fair to say that's a pretty small MOS as
            far as MOS size goes?
A.          Yes, sir.  I would say it's probably one of the
            smallest.

Q.          Okay.  Thank you.  Do you know Sergeant Gary Stein?
A.          Yes, sir, I do.

Q.          How do you know Sergeant Stein?
A.          I first met Sergeant Stein when I was the officer in
            charge at MWSS-372 and we deployed to Operation Iraqi
            Freedom in 2000 -- let me see -- September -- August
            September time frame of 2005 and returned March of 2006.

Q.          And what was your relationship to Sergeant Stein at the
            time?
A.          I was his Officer in Charge.

175

000973

Q.      Did you have an opportunity to view him in the -- in the
        course of his duties?
A.      Yes, sir.

RCD:    And you were with him the whole time on deployment?

SMBR:   Excuse me for a second.

        Sergeant Stein, can you hear okay?

RSP:    I can, sir.  Yes, sir.

**Questions by the recorder (continued):**

Q.      I'm sorry, Chief Warrant Officer.  Did you have an
        opportunity to view Sergeant Stein in the execution of
        his duties?
A.      Yes, sir.  I was able to view him quite regularly.

Q.      Did you ever have an issue with Sergeant Stein while you
        were on deployment?
A.      The only time we had an issue with Sergeant Stein on
        deployment is when we assigned him to guard duty for a
        month -- two weeks or a month.  I forget how long it
        was.  During that time, it came to our attention that
        while he was standing post that he was caught 20 feet
        away from the guard shack and his weapon and his radio
        and he was stacking rocks.  And we conducted a company
        level office hours where we gave a Page 11 and had him
        write a 1500 word essay on the importance of doing guard
        duty.

Q.      When did you return -- when did you return back from --
        from deployment?
A.      We returned back, I want to say March of 2006.

Q.      Was that the last time you physically saw Sergeant
        Stein?
A.      No.  I seen him off and on again between then and the
        time I left MWSS-372 in July of 2007.

Q.      Okay.  Chief Warrant Officer, can you please tell the
        board your relationship to the METOC Facebook page?
A.      The METOC Facebook page, I created it back in 2009.  I
        know Facebook was kind of a new medium -- social media.
        I looked around to see if there was a METOC page.  I
        didn't see any, so I decided I better choose now so that
        way I could have some level of control over it before a

                            176

young devil dog created it and did things that, you know, may not be appropriate.  So I wanted to make sure that we created that page and had some sort of adult supervision to go with that page.  And then see where we wanted to go with it since it was a new medium, didn't really know where we were going with it.  Just kind of left it.  See how the METOC field and community would accept it and go with it.

Q.   Now, what was the -- you talked about it a little bit -- what was the intent of creating that page?

A.   The intent was for a place for -- a single place on Facebook where METOC personnel, current and past, could meet together and talk about METOC issues, maybe share some funny stories about what they did when they were in METOC, share some of their pictures which has been going on, which is a good thing and then bring some of the young troops to let them ask questions that maybe they have questions about but they're scared to bring up in other forums, and just kind of give it a professional level being that it did have the Marine Corps name.  And just let it go be kind of a professional -- if you want to say, a professional official slash unofficial type of forum for those guys.

Q.   Now, Chief Warrant Officer, you're aware of the postings that occurred on 1 March 2012 by Sergeant Stein?

A.   Yes.  I'm aware of specifically the one that I deleted was the one where -- it looked like he was trying to redact a statement that he said earlier that -- from a posting which I could not find on that Facebook page but apparently was there.  Somebody else saw it and deleted it before I saw it.

Q.   And what was that posting that we're talking about?

A.   One second here.  I'm going to have to get in front of my --

Q.   That's okay.  I don't want you to refer to anything.

If you can, just from memory, what was the general comments that were posted?

A.   Well, the general comments was kind of like he was redacting a statement that he said that he was sorry that he offended some people about referring to the President as the domestic enemy.  That he would go on record saying that he would not follow any unlawful orders, that he would follow lawful orders but -- that

177

another four years of this administration would be
devastating to this country.  Along those lines.

Q.  Now, when -- when -- did you have an opportunity to
discuss this privately with Sergeant Stein outside the
group Facebook page?

A.  Yes.  The private messaging that is in Facebook, I sent
him a posting or a message -- a direct message between
me and him saying that I didn't want that stuff on the
METOC page; that that was not the -- it's not a
political forum.  We don't want it there, you know, to
continue.  Starting off with a comment like that, it
leads other people to believe that, Hey, here's Sergeant
Stein doing this.  You get a Lance Corporal to see it,
next thing you know they're chiming in and now instead
of -- of causing a lot of problems for a lot of younger
devil dogs that may not really even know what's right
and what's wrong.

Q.  Okay.  Was that -- was that your primary concern at the
time?

A.  That was part of it.  The other part of it was because I
understood that Sergeant Stein had some issues or had a
Facebook page called Tea Party lawyers or whatever it
is.  And he was doing some political talking on that
particular Facebook page when he raised concerns with
this command within the Marine Corps as a whole.

Q.  Were these previous issues -- can you remember the date
at all?

A.  I have -- I remember that became an issue when he was at
1st Intel Battalion in 2010.

Q.  Okay.  Did you know any of the specifics about that 2010
or just the general --

A.  Just the general.  I didn't really dive in -- I didn't
dive into the specifics.  I knew that his OIC was
handling that and, you know, that was out -- you know, I
only got the wave top of the issues anyway, so I did not
try to go into the weeds on those particular issues.

Q.  Now concerning -- or going back to your concerns, were
you concerned at all about the image this might -- this
might create for the METOC community?

A.  Yes.  For the Marine Corps and the Marine Corps METOC
community specifically because the Facebook page is
titled Marine Corps Meteorology and Oceanographic
Services, that any type of political speech or comments

178

may be construed as being from the Marine Corps.  Again,
I mean, the title of the page -- Marine Corps
Meteorology and Oceanographic Services kind of lends
itself to say that this is a Marine Corps page.  Whether
it's written, you know, that could be something we could
dispute all day long.  But I think the general audience
that would run across that page and see that would
assume that this is a Marine Corps page.

Q.      Thank you, Chief Warrant Officer.  Additionally, are you
aware of the ongoing issues in the media regarding
Sergeant Stein?
A.      Yes.  The accused is -- this issue -- the fact this
board has been on news throughout the morning.  Today, I
know it was on *Fox News*.  I know the AP had some
different stories out there about this particular
incident or about this particular case, about Sergeant
Stein's case and his First Amendment rights.

Q.      Have you heard or been told about any media interviews
that Sergeant Stein's given with regards to this
incident?
A.      No, I have not.

Q.      Does it give you concern, the tenor of those postings
that were put on your Facebook page?
A.      Yes.  They were concerning just because I knew that
there's a lot of -- a lot of eyes looking and because of
what the issues that kind of had arose -- that arose
during the 2010 incident that his name and any type of
political speech associated with him would be quickly --
quickly monitored and quickly reviewed.

Q.      Now, Chief Warrant Officer, one last question:  Based on
those postings, did you consider them inappropriate?
A.      Yes.  I considered them inappropriate for the METOC
page.  I -- and that's why I deleted the one that I did
see.  The ones that I didn't see that I've since found
out about, someone else deleted.  Yes, those are
concerning.  Those are things that shouldn't be on our
page.  That's not what the basis of that page is about.

There's plenty of other Facebook pages to, you know,
discuss or provide your political viewpoint if that's
what someone chooses to do at their own risk.  But our
page was not developed or set up for that.  And we
didn't want anything -- anything on our page that is
anything political, anything against chain of command,

000977

nothing of that sort.  Just strictly trying to maintain a professional METOC type of page to the best of our abilities using that medium.

Q.        Thank you, Chief Warrant Officer.  Right now the defense may have some questions for you and/or the board members, so please hold fast real quick.
A.        No problem.

SMBR:     Counsel?

**CROSS-EXAMINATION**

**Questions by the counsel for the respondent:**

Q.        Chief Warrant Officer, hi, this is Captain Baehr.  Are you able to hear me?
A.        Yes.  Yes, sir.

Q.        Fantastic.  I just want to touch base for a second.  You talked about -- a little bit about then Lance Corporal Stein's performance in Afghan -- in Iraq; is that correct?
A.        Yes, sir.

Q.        But Stein during that time got good proficiency and conduct marks, didn't he?
A.        That I'd have to review, sir.  I don't have his pros and cons, what I gave him, in front of me right now.  Unless you have them right there and you can tell me what they were, I cannot recall off the top of my head what they were.  They were probably average because we did give him a Page 11, so they probably weren't too below the surface but they were probably below what I would give as an average or right at average.

Q.        Okay, Chief Warrant Officer.  Would you agree with me that lance corporals pretty young in their -- in their Marine Corps career sometimes do some foolish things?
A.        Yes.  That's why he didn't go to squadron level NJP and we handled at a company level.

Q.        Exactly.  And that would not be -- that would not be -- exactly.  And you handled it at an appropriate level.
A.        Yes, sir.  Are you asking did we feel like we handled that an appropriate level, sir?  Was that your question?

180

Q.      Yes.
A.      Yes, sir.  We did.  I mean, lance corporals do do a lot
        of silly things and he may have gotten a little
        complacent out there.  He's trying to pass some time.
        He didn't fall asleep but he tried to pass the time.
        But then that's the reason why we gave him a Page 11 and
        had him write a 1500 word essay on the importance of
        standing your post and not almost -- you know --

Q.      Sure.
A.      -- stray -- not stray away from your post.

Q.      I want to focus in on the Facebook group for a second if
        you would.  You mentioned that you set up the page.
        Now, this is not a page that's set up by the United
        States Marine Corps, correct?
A.      No, this is not set up by -- this is not set up by
        someone that you're talking about, like, at Marine C4I
        or at Quantico at the MCNOT, Marine Corps Network
        Operational Center, no.

Q.      You didn't seek -- you didn't seek approval from higher
        to -- or any higher authorities to create this site?
A.      No.  This was on my own initiative.

Q.      Okay.  And so in that sense it's a -- it was like you
        said an unofficial page?
A.      Yes.  Unofficial slash -- yeah.  Unofficial page as far
        as the Marine Corps itself never came down with any type
        of directive or anything that said, hey, create a METOC
        page.

Q.      Okay.
A.      I did that on my own.  That was my own initiative.

Q.      And, Chief Warrant Officer, just to clarify, members had
        to request to get on that -- on that particular site --
        page, is that -- to become members to post things; is
        that correct?
A.      Yes.

Q.      Okay.  And that request would go through you?
A.      That request -- any member that's a member of that site
        can authorize someone to come onto that site.

Q.      Okay.
A.      But yes, you're going to -- well, go ahead.

181

Q.        Did you have something further?
A.        No.  No, that was it.

Q.        Okay.  And of course somebody else, some other Marine or
          anyone really could have formed another, quote/unquote,
          METOC site as well on Facebook -- another group on
          Facebook?  It's very easy to form, correct?
A.        Yes, they're very easy to form.

Q.        Okay.  You mentioned that -- we have in front of us,
          Chief Warrant Officer, only one page of a -- of a
          lengthy discussion which is -- which is the basis here
          today for these very serious allegations.  Did you get a
          chance to review the remainder of the discussion at one
          point?
A.        No, I did not.  I think that was all tethered to a link
          about NATO giving authorization to pursue -- they were
          talking about the NATO and the crown burning.  I didn't
          see all the -- I did not get to see all the postings
          that went with that particular comment.

Q.        Okay.  Just in your experience on Facebook, it appears
          from the context that we have that another Marine or
          some other individual who had access to the METOC site
          actually kind of instigated this particular discussion.
A.        Okay.

Q.        Is that your memory, that somebody -- right on the line
          before Stein commented, said something very
          disrespectful about the President before Stein had
          anything to do with this conversation?
A.        Again, I didn't see -- I didn't see that string --

Q.        Okay.
A.        -- that went with that comment, so I can't comment on --
          on what was there or not as far as that particular
          string.  All I saw was the main comment that was on
          the -- the page, but I did not drill down into the
          comments.

Q.        Okay.  And you mentioned that you only saw his redaction
          when he tried to apologize and then he, in fact,
          apologized to you later?
A.        Yes.

Q.        Okay.
A.        That's what I saw and that's what kind of threw me.
          That's when I went looking and then I -- for some reason

                                182

I could not find any of those strings or anything that
would the basis for why was he apologizing or why was he
saying this.  I thought for a second there he may have
said something on his Tea Party page, got confused, and
then it got listed on our page.

Q.    Okay.  And did you ever e-mail any other Marines about
the comments that they made about the President on that
particular site?

A.    No, I haven't because that was the only one I saw.
That's the only one I saw about the President and that
was it.

Q.    Okay.  Would you agree with me that sometimes people get
heated in political discourse?

A.    Yes.  And I relate that to Sergeant Stein.  It's going
to be a hot button year.  You can just tell by watching
the news.

Q.    Okay.  And then some of those people say stupid things
on Facebook or post stupid things on Facebook?

A.    They will tend to do that.  Normally, I would say
that -- yes, there is going to be a lot of stupid
postings going on on Facebook.

Q.    Because of that, you oversee the site and are able to
take down anything that is objectionable very quickly,
correct?

A.    Yes.  I have -- I also have a few administrators that
also monitor the site as well, senior staff NCOs.

Q.    And in this case, the post was taken down so quickly
that you didn't even get to see the original post?

A.    That I am not sure because when I went back -- I can say
as the administrator and the way I had it set up for
notifications, I was notified when a comment, when an
initial posting would go onto the page.

Q.    Okay.

A.    Okay.  And so I would not see any other -- so I saw the
one about the NATO, but that was like a -- like a
headline like from a newspaper or something.  It didn't
tell me that any other comments went underneath that
post.  I didn't have -- apparently I didn't have my
administrator rights set up properly to get all activity
on the site.  I was only getting the main comments from
their initial posting.  So anything that went underneath
that comment, I did not see.

183

CR (Capt Baehr):  Okay.  And you talked about how this had become
          something in the media and how you were concerned about
          how this might influence people's perceptions of the
          Marine Corps.  Do you believe people's perceptions of
          the Marine Corps might be negatively influenced by
          the -- by the fact that the government is pursuing
          essentially stupid comments on Facebook?

RCD:      I'm going to object to that -- hold on, Chief Warrant
          Officer.

          Sir, I'm going to object to that.  That question is
          completely irrelevant for where we're at right now.  The
          United States Marine Corps is not -- not being notified
          of a separation hearing.  This is about Sergeant Stein
          and I request that we keep it -- we keep it to what the
          witness has to say about Sergeant Stein.

CR (Capt Baehr):  Sir, if I may, the questions about the service
          discrediting nature or the media explosion and things
          like that -- as the defense has pointed out already, the
          government cannot use the fact that it has sent it to
          this particular forum and the media exposure that has
          blown up to argue that that is somehow service
          discrediting conduct on the part of Sergeant Stein as
          the defense has pointed out.  The defense believes that
          the reason that there is this explosion in the media and
          people are confused is because of the prosecution in
          this case.  But the -- we're content with just finishing
          with that.

SMBR:     Continue.

CR (Capt Baehr):  Chief Warrant Officer, you can offer an
          opinion -- or you can offer a response, excuse me.

WIT:      Okay.  Could you repeat the question, sir?

**Questions by the counsel for the respondent (continued):**

Q.        Do you think that any of that media and the -- and the
          impressions of the service might be impacted by this --
          the decision to continue and prosecute and pursue these
          Facebook posts?
A.        I would say it's on a case by case basis, sir.  I mean,
          it's going to depend on what is said and who's the
          comment directed at.  A general comment about maybe a
          policy, maybe not.  But if it's directed at somebody

                                184

specific, they're going to come at you.  I mean, if you talk about anybody in his chain of command in a way like that, the Marine Corps would want to look into that and possibly pursue actions that are -- that we're undergoing right now depending on the comment, depending on the largeness of it.  It doesn't mean they're going to go after every comment.

Q.      Okay.  And just to clarify, do you think that the Marine Corps regardless could go after someone who made very positive comments about President Obama or wanted President Obama to be reelected?

A.      That I don't know, sir.  I think that anything that's positive on the chain of command, I don't think they would see in a negative light whether it's that.  I would say they would want to take that -- if it's associated with a Marine Corps site, they'd want the post removed.  Because according to orders, you're not suppose to sponsor a specific person or party or anything along those lines.  So even though it is positive, you may want to take that down.  Whether or not they would pursue that person, again, they'd have to look at the overall content.  Is this a pattern?  Is this a one-time thing?  What's going on?

Q.      Do you think that Marines can post --

A.      Depending on the chain -- I don't think they would go after somebody just to go after them.

Q.      Okay.  Do you think people can post political opinions on their own Facebook pages?

A.      If they do, that's on them, sir, as long as they know that they're -- they understand that they are under the UCMJ.  They're a Marine 24/7.  There is no -- you know, they're 24/7.  I think people get wrapped around the atlas with this on duty and off duty thing.  And on duty -- it really comes down to presence.  On duty, your presence is required.  Off duty, your presence is not required.  So when people say that, Well, you're off duty, you can do whatever you want.  Well, the CO can bring you in anytime he needs to.

185

So to say you're off duty, it's kind of not really --
it's true only in the sense of when you look at it from
a present standpoint not from a are you on duty or not.
Because they don't stop paying you.  I mean, if I was in
a combat zone and I'm sitting here and I give you 12
on/12 off, it's your off duty time.  Do you become a
civilian in a war zone.

Q.       Chief Warrant Officer, I didn't mean to get into an
         extended rant, a whole discussion.
A.       I'm sorry.

CR (Capt Baehr):  I don't have any further questions for you.
         Thank you.

SMBR:    Members?

MBR (SgtMaj Brookman):  I have a question.

### EXAMINATION BY THE BOARD

**Questions by Sergeant Major Brookman:**

Q.       Chief Warrant Officer, it's Sergeant Major Brookman.  I
         got one question for you.  How many members do you have
         on the METOC website that can view it?
A.       The last time I checked, sir, today, this morning, was
         355 members, sir.  So it's not really a big site.

Q.       And how many administrators do you have?
A.       I have approximately, say, six to seven.

Q.       And to clarify what the respondent was talking about,
         somebody took down a posting that you did not see?
A.       That is correct, sir.

Q.       Okay.  So somebody else saw a posting that you didn't
         see?
A.       Yes.  Somebody else saw that posting, took it down
         because they saw a political thing in there and they
         just deleted the posting.

MBR (SgtMaj Brookman):  Okay.  Clarifies everything for me.

186

000984

**Questions by the senior member:**

Q.        This is Lieutenant Colonel Hairston, the senior member.
          You stated they saw a political statement, something to
          that effect.  How do you know?  How do you know what
          they saw?

A.        Basically, somebody took a copy and pasted it or someone
          took -- before they deleted it, took a snapshot of it
          and sent if off.

Q.        Okay.

A.        And said that's what was on there.

SMBR:     Okay.  Thank you very much.

          Anything else?

RCD:      No, sir.

SMBR:     You want him required?

RCD:      Yes, sir.

SMBR:     Chief Warrant Officer Burns, I'm going to read you a
          warning, then I'm going to excuse you.

WIT:      Okay, sir.

SMBR:     Can you hear me okay?

WIT:      Yes, sir.

SMBR:     You are instructed not to discuss your testimony in this
          hearing with anyone except the recorder, the respondent,
          or counsel for the respondent.  You will not allow any
          witness in this hearing to talk to you about the
          testimony he or she has given or which he or she intends
          to give.  If anyone except the persons I have named
          attempts to talk to you about this case, you should make
          this fact known to the side calling you as a witness.

          Do you understand what I just read?

WIT:      Yes, sir.

SMBR:     Thank you very much.  You are excused.

WIT:      Thank you, sir.

187

000985

RCD:        Chief Warrant Officer, we're hanging up now.

WIT:        Okay.  Thank you, sir.

RCD:        Thank you.  Out.

[The witness was excused and the telephonic connection was
terminated.]

RCD:        Sir, at this time we're going to call Master Sergeant
            David Rose unless you need a -- anyone needs a recess.

SMBR:       Let's press.

            Is this the last phone call?

RCD:        Yes, sir.  For the government, sir.

CR (Capt Baehr):  Sir, we use our iPhone which has a better
            speaker phone.

[The recorder established a telephonic connection with the
witness.]

**Master Sergeant David Rose, U.S. Marine Corps, was called as a**
**witness by the government, was sworn, and testified as follows:**

**DIRECT EXAMINATION**

**Questions by the recorder:**

Q.          Can you state for the record, please, your full name,
            spelling your last name?
A.          First name David; middle name Lawrence; last name Rose,
            R-O-S-E.

Q.          And, Master Sergeant, what's your current billet and
            duty station?
A.          Current billet is -- I am the METOC chief for Radio
            Control Group-38.

Q.          And how long have you been in that position?
A.          Since September of 2010.

Q.          Have you been in that position continuously?
A.          Yes.

188

Q.        Okay.  Where are you currently located?
A.        I am at MCAS Yuma in the field in support of WGI.

Q.        Okay.  Thank you.  Now, Master Sergeant, do you know
          Sergeant Gary Stein?
A.        I do.

Q.        How do you know Sergeant Stein?
A.        We used to work together in 1st Intel Battalion.

Q.        And what was your relationship with Sergeant Stein at
          1st Intel Battalion?
A.        I was one of his staff NCOICs.

Q.        Did you have regular interaction with Sergeant Stein?
A.        When I was present in Mitchell County I did.

Q.        And over what time period was that specifically?
A.        I joined Intel Battalion December of 2008 and I had
          daily interaction with him until March of 2009.

Q.        Now, Master Sergeant, what was your impression of
          Sergeant Stein professionally?
A.        He was -- when I first met him, I had -- I would say
          less than favorable impression.

Q.        And why would you say that, Master Sergeant?
A.        When I first met him, he -- he had issues with being
          able to -- I would say the best way to put it would be
          he seemed to really enjoy being in the spotlight.

Q.        Now, if you can elaborate a little bit on what you mean
          by that?
A.        He -- give me a minute here.

Q.        Yep.
A.        Well, coming just from forecasting school, he was a
          sergeant when I first met him and he had a kind of
          maturity the Marines in the office were beneath him,
          subordinate to him.  And he seemed to really enjoy being
          somebody that they were -- they would look at.  He was
          boisterous.  He would try to take a step forward and be
          a -- I don't necessarily want to say a role -- I would
          say role model.  Whether it was positive or negative, I
          couldn't really describe that.  But he was definitely
          somebody who enjoyed being in the position he was in.

189

Q.      Now, Master Sergeant, did you have any -- did you have
        any issues with Sergeant Stein professionally?
A.      At that time frame, I did not.

Q.      Okay.  And you said you worked with him up until you left
        in 2010, was that accurate?
A.      I worked with him until I left in 2000 -- well, I worked
        with him until I left for the 11th MEU which was 2009.
        And then I returned from the MEU in 2010 June time
        frame.

Q.      Um-hmm.
A.      Had -- once again, I had daily interaction with him
        until I left September of 2010.

Q.      Now fast-forwarding to 1 March 2012, were you on the
        METOC Facebook page?
A.      I was not a member of the METOC Facebook page and I
        wasn't on the Facebook page on that day.  What happened,
        if I may, I was in a METOC senior conference in Keesler
        Air Force Base in Biloxi, Mississippi.  And we were
        sitting around an office table.  One of the members
        was -- we were going over the T&R in detail as far as
        how to make changes and ways to improve the community.
        And Master Gunnery Sergeant Torofski[ph] was a member of
        the Facebook page and received an update on his cell
        phone.

Q.      And what was that update?
A.      That update was somebody -- or a string of people had
        gone onto the Facebook page and were having
        communicate -- or having a conversation about the
        President.

Q.      Okay.  What did you do at that time?  What action did
        you take?
A.      Well, I didn't took any action.  I -- Master Gunnery
        Sergeant Torofski had stopped what he was doing and
        asked everybody in the room if anyone knew who Sergeant
        Stein was.  And with my interaction and my previously
        working with Sergeant Stein, I pretty much just raised
        my hand and said, Yes, I know him.  Why?  And that's
        when he handed me the cell phone and I read the Facebook
        page -- the conversation that was on Facebook.

000988

Q.          Now --
A.          And at that time, I basically asked for them to create a
            screen capture and they -- somebody went off -- I don't
            recall exactly who.  Somebody went off and they got that
            screen capture.  The next thing I did was I called to
            who I though at the time was his OIC which was Chief
            Warrant Officer Mills and described to him what I had
            read.  What I said to the best of my recollection is
            your Marine's at it again.

Q.          I'm sorry.  I didn't -- I didn't pick that up.
A.          I said your Marine's at it again.

Q.          At it again.  Okay.
A.          Correct.  And then he described or explained to me that
            Sergeant Stein was no longer his Marine; that he had
            been -- lost his security clearance or denied his second
            request to regain his security clearance.  And he was
            reclassed out of weather and now worked for Weapons
            Field Training Battalion.

Q.          Now, Master Sergeant, you said you actually saw the
            Facebook postings that we're talking about here today?
A.          Yes, I did.

RCD:        And those comments were regarding the President, things
            like screw Obama and I will not follow orders and he's
            the economic enemy --

SMBR:       Let him tell you what he saw.

**Questions by the recorder (continued):**

Q.          Master Sergeant, are you there?
A.          I am, yes.

Q.          Do you recall the specific content of that Facebook
            posting was?
A.          I have the actual printout in front of me, yes, I do.

RCD:        Okay.

SMBR:       Just a second.

CR (Capt Baehr):  We would object to that.  Captain Torresala
            knows that the witness can't be consulting any outside
            sources.

191

000989

**Questions by the recorder (continued):**

Q.      Master Sergeant, can you put the paper down, please?
A.      Yes.

Q.      Have you -- have you read that posting before?
A.      Well, I read it on the day that it was posted and then I
carried it from Mississippi and I handed it to my
command leader upon his request.

Q.      Okay.  Why did you do that?
A.      Why I did it?  When Chief Warrant Officer Mills informed
me that he no longer worked for Intel Battalion, I
contacted my Sergeant Major in order to, you know, find
out who Weapons Field Training Battalion sergeant major
was so that they would know what Sergeant Stein was up
to and they could pull him in and talk to him about what
his involvement was.

Q.      Were you concerned with those -- with the text of those
postings?
A.      I thought they were uncalled for, inappropriate, and
against good order and discipline.

RCD:    Thank you, Master Sergeant.  I have no further
questions.  Defense or -- and/or the members may have
questions for you.

SMBR:   Counsel?

CR (Capt Baehr):  Yes, sir.

<div align="center">

**CROSS-EXAMINATION**

</div>

**Questions by the counsel for the respondent:**

Q.      Master Sergeant, hey, it's Captain Baehr.  How's it
going?
A.      I'm doing good, sir.  How are you?

Q.      I'm doing fantastic.  Master Sergeant, you mentioned
that you yourself saw this -- saw this -- the Facebook
post?
A.      Can you repeat that, sir.

Q.      You mentioned that you saw this Facebook conversation or
discussion, correct?
A.      That is correct.

<div align="center">

192

</div>

Q.    And you mentioned that Master Gunnery Sergeant Torofski saw the Facebook conversation?
A.    That is correct.

Q.    And that Chief Warrant Officer Mills saw the conversation or rather that Chief Warrant Officer Burns saw the conversation?
A.    I was informed after the fact that Chief Warrant Officer Burns saw the conversation.

Q.    Okay.  In seeing that conversation, did that conversation make you want to disobey any orders of the President?
A.    Me personally, no.

Q.    You personally.  Do you think it affected Master Gunnery Sergeant Torofski in that fashion?
A.    I would say due to the fact that we both have many years in our career, we would know better than to.

Q.    Did you do anything in violation of good order and discipline after -- after seeing that post because of that post?
A.    Once again, due to the fact that my -- the amount of time that I have in the Marine Corps and my experience I know better than to.

Q.    Okay.  And you mentioned that the -- the postings got taken off the site rather quickly?
A.    Yes.

Q.    And you also mentioned the fact that Chief Warrant Officer Burns, when you and I talked, had barred Stein from accessing the page after that?
A.    That is correct from what I was informed of, yes.

Q.    Okay.  And so Stein couldn't go on and make any more outrageous comments after that particular back and forth?
A.    On that Facebook page, that's correct.

Q.    Do you know of anyone who read that post who decided they wouldn't follow any -- any lawful orders of the President?
A.    I don't think that's a very fair question due to the fact that I don't know exactly who's a member of that Facebook page and who could have seen it.

193

000991

CR (Capt Baehr):  Precisely.  No further questions.

SMBR:      Anything further?

RCD:       No, sir.

SMBR:      Members?

[There were no questions from the members.]

SMBR:      Master Sergeant, I'm going to read you a warning.  I'm
           Lieutenant Colonel Hairston, the senior member.  Can you
           hear me, okay?

WIT:       Yes, sir.

SMBR:      Okay.  You are instructed not to discuss your testimony
           in this hearing with anyone except the recorder, the
           respondent, or counsel for the respondent.  You will not
           allow any witness in this hearing to talk to you about
           the testimony he or she has given or which he or she
           intends to give.  If anyone except the persons I have
           named attempts to talk to you about this case, you
           should make this fact known to the side calling you as a
           witness.

           Do you understand what I read?

WIT:       Yes, I do.

SMBR:      You are excused.  Thank you very much.

WIT:       Thank you.

RCD:       Master Sergeant, I'm going to hang up now.

WIT:       Thank you.

RCD:       Thank you.  Out.

[The witness was excused and the telephonic connection was
terminated.]

RCD:       Sir, may we have a brief recess, sir?

SMBR:      Yes, we may.  We're going to take -- how long does it
           take to drive over to the commissary area to get chow
           and come back?  About 45 minutes?

194

CR (Capt Grey):  Sir, the commissary area over there by the main
                 gate is about ten minutes away.

SMBR:      How much time do you need is what I'm asking.

CR (Capt Grey):  That's fine with the respondent, sir; 45 minutes.

SMBR:      Okay.  45 minutes?

RCD:       Yes, sir.

           Time on deck is now 1805, 5 April 2012.  Going off
           record.

[The administrative separation board recessed at 1805,
5 April 2012.]

[The administrative separation board was called to order at 1850,
5 April 2012.]

RCD:       Time on deck is now 1850, 5 April 2012.  Resuming
           administrative separation board for Sergeant Gary A.
           Stein, United States Marine Corps.

SMBR:      Okay.  So I want to make a comment and I'm directing it
           to both of you equally -- both sides equally.  We've
           heard now, what, six witnesses?

RCD:       Yes, sir.

SMBR:      Around six.  And at some point it seems to me that
           unless there's something else you're trying to
           establish, it just becomes repetitive.  We get it.  So
           if it gets to the point where it is just repetitive, I'm
           going to cut it off.

RCD:       Sir, the only one we're going to have left, chief
           warrant -- well, I was going to call Captain Kaiser and
           Chief Warrant Officer Mills.  For the purpose of
           expediency, I can call just Chief Warrant Officer Mills
           and end with that.  He discusses the personnel -- some
           of the personnel evaluations of Sergeant Stein.  I think
           that's material --

SMBR:      My position is as long as it's relevant --

RCD:       Yes, sir.

195

SMBR:      -- and it brings in something new --

RCD:       Yes, sir.

SMBR:      -- because we're dealing with the Marine's career, I'm
           extremely -- bring it in.  But if it just starts
           repeating and piling on what we've already heard just
           from somebody else, I don't think it adds anything else
           to the proceedings.

RCD:       Understood, sir.

SMBR:      So you know what you're trying to get to.  If you've
           already gotten to it, let's move on.  If you think that
           individual you're going to bring in is going to add
           something more relevant, then I will allow it.

RCD:       Yes, sir.

SMBR:      Okay.  So the next witness is going to come from
           defense?

RCD:       Defense has got telephonic witnesses, sir.

SMBR:      Okay.

[The defense counsel established a telephonic connection with the
witness.]

**Gunnery Sergeant Erin D. Lisonbee, U.S. Marine Corps, was called
as a witness by the respondent, was sworn, and testified as
follows:**

### DIRECT EXAMINATION

**Questions by the recorder:**

Q.         Can you please state for the record your full name,
           spelling your last name?
A.         Erin David Lisonbee.  E-R-I-N.  Middle name David,
           D-A-V-I-D.  Last name Lisonbee, L-I-S-O-N-B-E-E.

RCD:       Okay.  Thank you.

SMBR:      Let's place the phone a little closer to the recorder.

196

CR (Capt Baehr):  Yes, sir.

          Over here, sir?

SMBR:     Yes.

**Questions by the counsel for the respondent:**

Q.        Can you hear me, Gunnery Sergeant?
A.        I can, yes.

Q.        Gunnery Sergeant, could you just give the board members kind of a brief snapshot of your background in the Marine Corps?
A.        A brief snap as far as where I've been, what I've done, and what I do?

Q.        Exactly.  Just a real quick run-through.
A.        Well, I joined in '96.  My first duty station was Camp Pendleton.  I'm an avionics technician.  I've been to Yuma.  I was a recruiter up in Lake Havasu for three years between 2002, 2005.  From there, I went to schoolhouse where I became the advanced electronics -- the directer of the school out there.

Q.        Okay.
A.        And I went to Japan and now I'm here in Cherry Point.

Q.        And in particular, I want to draw your attention to how you know Sergeant Stein?
A.        I recruited him, sir.

Q.        Okay.  You were his recruiter?
A.        Yes, sir.

Q.        And when did you -- when was that?
A.        That was -- think back the best I can.  It was awhile ago.  Probably about 2003.

Q.        Okay.  And --
A.        I want to say -- yes?

Q.        Gunnery Sergeant, just to clarify, right now you are on the East Coast?
A.        Yes, sir.

197

Q.          Okay.  Gunnery Sergeant, what -- what were your
            impressions when you met Gary Stein?
A.          He had a lot of energy.  He was very motivated.  It was
            a decision that he didn't have to think too much about.
            You know, a lot of the poolees I don't really even
            remember their name.  You know, I have to put a face to
            the name.  But he really stood out.  He was in the pool
            for a while.

            And, you know, he was -- he was very intelligent and
            motivated and he would always bring friends of his to
            the functions.  He never missed a pool function and he
            just seemed like one of those kids that -- you know,
            that's not going to require a whole bunch of waivers.
            And, of course, as a recruit, we deal with that a lot.
            He seemed like more one of the genuine guys that is very
            likely to succeed.

Q.          Okay.  And did he actually bring others and try to
            encourage to recruit others into the Marine Corps?
A.          I was trying to think about this and I can't remember.
            I want to say that he was a meritorious PFC for two of
            his friends joining, but I can't really recall.  There's
            a lot of moving parts on that duty and I honestly can't
            recall.

Q.          Okay.  And understanding, obviously, that you interacted
            with Sergeant Stein for just a very brief period of
            time, we just wanted to provide your incite to the board
            though it may be limited and wanted to grab you right
            now since you're on the East Coast.

            Gunnery Sergeant, you don't have to testify.  No one's
            forcing you to testify.  You're staying up late to
            testify.  Why are you testifying for Gary Stein?
A.          I mean, I take care of Marines.  And, you know, that's
            someone that was -- that -- you know, when I recruited
            him that was something that I would do for anyone that I
            put in the -- in the Marine Corps.

Q.          Okay.
A.          And I like taking care of good Marines in the work
            center and he just -- you know, like I said, if it was
            somebody that I didn't really recall -- some of these
            guys I put them in and they have problems so they needed
            to ship off right away.  He was in the pool for quite a
            while, so he did quite a few functions with us.  And one
            of the outings was two, three days long.  So I got to --

                                198

000996

> I got to really know him and he was a really good, solid kid.  So of course, I want to try and help him if I can.

Q.      Okay.  I have no further questions.  The government may have some questions for you.

A.      Okay, sir.  Thank you.

RCD:    Sir, I have no questions.

### EXAMINATION BY THE BOARD

**Questions by the senior member:**

Q.      Gunnery Sergeant, Lieutenant Colonel Hairston, senior member.

A.      Yes, sir.

Q.      Did you have any -- have you ever had any interaction with Sergeant Stein since he has become a Marine?

A.      Negative.  Well, I would say not since recruiting duty.

Q.      Okay.

A.      I had a couple visits after he graduated recruit training.  But since then, it's been seven and a half years, eight years probably.

SMBR:   Understand.

Any questions?

[There were no questions from the members.]

RCD:    No, sir.

SMBR:   Okay.  I'm going to read you a warning.

WIT:    Yes, sir.

SMBR:   Then I'm going to dismiss you.

> You are instructed not to discuss your testimony in this hearing with anyone except the recorder, the respondent, or counsel for the respondent.  You will not allow any witness in this hearing to talk to you about the testimony he or she has given or which he or she intends to give.  If anyone except the persons I have named attempts to talk to you about this case, you should make this fact known to the side calling you as a witness.

199

000997

Do you understand what I just read, Gunny?

WIT:        I do, sir.

SMBR:       You are excused.  Have a good night.

[The witness was excused and the telephonic connection was terminated.]

CR (Capt Baehr):  We can proceed in order now.

RCD:        Sir, at this time we'll call Chief Warrant Officer-2 Mills.

SMBR:       Okay.

**Chief Warrant Officer-2 George W. Mills, U.S. Marine Corps, was called as a witness by the government, was sworn, and testified as follows:**

### DIRECT EXAMINATION

**Questions by the recorder:**

Q.          Can you state for the record, please, your full name, spelling your last name?
A.          My full name is George Walter Mills, M-I-L-L-S.

Q.          And what's your current billet and duty station?
A.          Current duty station:  Marine Corps Base Camp Pendleton. Billet:  Meteorological and Oceanographic Officer.

Q.          And how long have you been a METOC officer?
A.          Been a METOC officer for coming up on 13 years now.

Q.          Do you know Sergeant Stein?
A.          I do.

Q.          How do you know Sergeant Stein?
A.          Sergeant Stein worked for me from July 2010 to roughly June 2011.

Q.          And during that time, what were your impressions of Sergeant Stein's work performance and judgment as a Marine?
A.          Judgment as a Marine, very poor.  Work performance, adequate in most areas.

200

000998

Q.        Now I note that some materials have been provided to the
          board members, specifically a couple of fitreps here.
          Can you -- or explain to the board, please, why you
          ranked Sergeant Stein where you did?
A.        Okay.  I've got a total of 37 observed reports for
          sergeants.  Sergeant Stein came out number 35 of those
          37.  The reason being behind that in all fairness,
          there's a couple things I think he did particularly
          well.  Number one, he's a pretty good trainer of
          Marines.  Taught the basic and intermediate level
          meteorological concepts.  He was also pretty good as far
          as throwing office parties and raising morale in and
          around the office.  So no problems there.  Everything
          else is below average.

Q.        And why would you say that?  What specific examples can
          you provide?
A.        Leadership to name one.  He just didn't have it.

Q.        In what sense?
A.        Set a very poor example.  He was on limited duty pretty
          much the entire time I knew him at 1st Intel Battalion.
          So he couldn't PT.  Went out on his own but that's
          really about it.  Couldn't participate in humps, could
          not deploy unfortunately, and he lost his security
          basically I believe in August of 2009 so that exonerated
          him.  Basically he had to get out of our MOS.

Q.        Do you feel like he made any effort to get himself off
          of limited duty status?
A.        None whatsoever.

Q.        And what makes you say that?
A.        Well, the entire time he worked for me, I kept probing
          him, Hey, you've got to do something about this.  He
          kept going back and forth to the orthopedic surgeon who
          gave him the runaround at the hospital in all fairness.
          But as far as initiative, taking care of business, and
          trying to get back on full duty so he could do something
          around, none whatsoever.

RCD:      Now, are you aware of the Facebook postings on
          1 March 2012 on the METOC Facebook page?

CR (Capt Baehr):  We're going to object to that last remark.  It's
          speculative on the part of this particular witness.  He
          doesn't know everything this particular Marine did
          concerning his limited duty status.

                                201

RCD:        Sir?

SMBR:       Continue.

RCD:        Thank you, sir.

**Questions by the recorder (continued):**

Q.          So, again, are you aware of the postings that Sergeant
            Stein made on the METOC Facebook page on 1 March 2012?
A.          I am.

Q.          Have you seen those postings?
A.          Yes, I have.

Q.          How did you receive those postings?
A.          I received a phone call from Master Sergeant David Rose
            I want to say 29 February if I remember correctly.  He
            said something to the effect of, Hey, do you know what
            your boy is doing?

            I inquired as to who he was talking about.  He said
            Sergeant Stein.  Take a look at this.  And he sent me a
            screen shot.  I took a look and I told him he no longer
            works for me.  He's with Weapons Field Training
            Battalion, but, yeah, thanks for sending it my way.

Q.          What did you think about those Facebook postings?
A.          Disgusting.

Q.          Would you serve with Sergeant Stein again if given the
            opportunity?
A.          I'm sorry.  Could you repeat that?

Q.          Would you serve with Sergeant Stein again if given the
            opportunity, if you had a choice?
A.          No, absolutely not.

RCD:        Thank you, Chief Warrant Officer.

            Sir, that's all I have.

SMBR:       Counsel?

202

001000

## CROSS-EXAMINATION

**Questions by the counsel for the respondent:**

Q.      Chief Warrant Officer, how are you?
A.      I'm well.  Yourself?

Q.      Astonishing.  I'm doing great.  Thank you very much.

        That was awfully quick, so just kind of work with me
        just for a second.
A.      Okay.

Q.      Chief Warrant Officer, you did fill out some fitness
        reports on this particular Marine, didn't you?
A.      Yes.

Q.      And in fact you noted on those fitness reports that you
        had no derogatory information?
A.      Correct.

Q.      You noted that this Marine should be promoted.  And
        there's no paper record whatsoever of any of these
        discrepancies that you're now bringing forward to the
        board?
A.      Are you talking about the financial stuff?

Q.      No.  I'm referring to any kind of counselings, any kind
        of service record book that we would have that would --
        that would back up kind of your assertion that you --
        you don't -- you didn't like Sergeant Stein?
A.      Well, the records are the fitrep itself, so why would I
        have to argue yes, there is something there.

Q.      Well, I mean, Sergeant Stein's been in the Marine Corps
        for close to ten years, Chief Warrant Officer; is that
        correct?
A.      Almost nine.

Q.      And during that time frame, a lot of different Marines
        and a lot of different supervisors have interacted with
        Sergeant Stein?
A.      Yes.

Q.      When was the last time that you were a supervisor of
        Sergeant Stein's?
A.      Of Sergeant Stein?  June 2011.

203

001001

Q.       June of 2011.  And during that time frame, there were
         other people who were also supervisors of Sergeant
         Stein, correct?
A.       Yes.

Q.       Gunnery Sergeant Dinsmore was a supervisor?
A.       Correct.

Q.       Chief Warrant Officer Kaiser or Captain Kaiser was also
         a supervisor?
A.       Um-hmm.

Q.       And a number of people have also had some input and made
         some assessments on Sergeant Stein?
A.       Yes.

Q.       Okay.  Just to kind of understand, I know you've talked
         to the board and you assert that Sergeant Stein is kind
         of near the bottom of the pack.  Do you have before you
         your own master brief sheet or Sergeant Stein's master
         brief sheet?
A.       I do not.

Q.       Okay.  Well, would it surprise you to know that he's
         actually 27 out of 24 according to a brief sheet created
         on the 5th of April, 2012?
A.       Um-hmm.

CR (Capt Baehr):  It would --

SMBR:    Stop.

CR (Capt Baehr):  Yes, sir.

SMBR:    Yes or yes, sir or captain.

WIT:     Yes, sir.

SMBR:    Okay.

WIT:     Actually, no it wouldn't, sir.  I've got three fitreps
         in the cue that are pending.  Once those are posted,
         basically once my boss is done, that's what puts him 35
         out of 37.

204

001002

**Questions by the counsel for the respondent (continued):**

Q.          I see.  So subsequent to this, you've posted some other
            fitreps that are negative about Sergeant Stein that
            lower his performance on the master brief sheet?
A.          Just the one.  He only had one observed report --

Q.          Okay.
A.          -- from me.

Q.          And when did you write that fitness report?
A.          That was written 31 March 2011, sir.

Q.          Okay.  And that particular -- why is that fitness report
            not in the record.
A.          It is in the record.

Q.          Okay.  Why has it not been posted yet, I guess, to the
            master -- the master sheet?
A.          It should have posted, sir.

Q.          Okay.
A.          I've got -- I mean, I'm tracking him.

Q.          All right.  Understood.  And that's 31 March of last
            year or 31 March of this year?
A.          31 March 2011, last year.

Q.          Check.  So, again, that report takes Sergeant Stein from
            27 to 34, down a notch; is that correct?
A.          Yes, sir.

CR (Capt Baehr):  Okay.

SMBR:       Why is -- why is it relevant?

CR (Capt Baehr):  Sir, it's relevant because the government is
            introducing this evidence -- this witness to argue that
            Sergeant Stein's character of service has not been good,
            that he needs to -- other Marines, things like that.
            We're seeking to cross-examine and illuminate a little
            bit more about this -- this witness' understanding of
            the character of service of Sergeant Stein.

SMBR:       Understand.  So what you're trying to determine is
            whether or not his performance is at average, above
            average, or below average, correct?

205

001003

CR (Capt Baehr):  Yes, sir.

SMBR:     Okay.  Has that already been done?

CR (Capt Baehr):  Perhaps, sir.  I would like to provide this to
          the board.  This is the master brief sheet.

SMBR:     Okay.

CR (Capt Baehr):  Is there going to be an objection?

RCD:      It's actually already in the record.

CR (Capt Baehr):  Okay.

RCD:      I believe, if we're talking about the same one.

CR (Capt Baehr):  Okay.

RCD:      That's it right there.

CR (Capt Baehr):  Okay.  So it's already in the record?

RCD:      Yeah.

CR (Capt Baehr):  Great.

RCD:      The fitrep you mentioned is on there.

CR (Capt Baehr):  Fantastic.  Thank you very much.

**Questions by the counsel for the respondent (continued):**

Q.        Chief Warrant Officer, you haven't worked with Sergeant
          Stein for quite awhile now?
A.        Correct, sir.

CR (Capt Baehr):  And his current supervisors approve of his work
          performance?

RCD:      I'm sorry.  Is that a -- is that a question?

CR (Capt Baehr):  Yes.

SMBR:     Would he know what the current supervisors think about
          Sergeant Stein's performance?

CR (Capt Baehr):  One second, sir.  I apologize.

001004

**Questions by the counsel for the respondent (continued):**

Q.      Well, do you know what his -- have you reviewed some of
        the documents that his current supervisors have produced
        concerning Sergeant Stein?
A.      I have not, sir.

Q.      Okay.  And so you haven't -- and you, again, don't
        work -- wouldn't be working with Sergeant Stein if he
        was retained in the Marine Corps?
A.      No, no.

Q.      He wouldn't be serving in your office?
A.      Most likely, no.

CR (Capt Baehr):  I don't have any further questions, gentlemen.

RCD:    No, sir.

SMBR:   Questions?

[There were no questions from the members.]

SMBR:   Chief Warrant Officer Mills, I'm going to read something
        to you and dismiss you.

WIT:    Yes, sir.

SMBR:   It's a warning.

        You are instructed not to discuss your testimony in this
        hearing with anyone except the recorder, the respondent,
        or counsel for the respondent.  You will not allow any
        witness in this hearing to talk to you about the
        testimony he or she has given or which he or she intends
        to give.  If anyone except the persons I have named
        attempts to talk to you about this case, you should make
        this fact known to the side calling you as a witness.

        Do you understand what I read?

WIT:    Yes, I do, sir.

SMBR:   You are excused.

WIT:    Thank you very much, sir.  Good evening, sir.

SMBR:   Good evening.

001005

[The witness was excused and departed the conference room.]

RCD:       Sir, one final witness from the government.  Captain
           Logan.

SMBR:      Captain Logan.

           You need to caution your witnesses when they come in
           here.  Make sure they maintain proper military protocol.
           When they're talking to someone senior, they need to act
           like they're talking to someone senior.  I don't like
           huh, uh-huh.  Yes, sir; no, sir.

           Do you understand?

ARCD:      Yes, sir.  Understood.

SMBR:      I hold you responsible for that.  Make sure they know.

CR (Capt Baehr):  Yes, sir.

**Captain Gavin Logan, U.S. Marine Corps, was called as a witness by
the government, was sworn, and testified as follows:**

                         **DIRECT EXAMINATION**

**Questions by the recorder:**

Q.         And state for the record, please, your full name,
           spelling your last name.
A.         Captain Gavin Logan, L-O-G-A-N.

Q.         And what's your current billet and duty assignment?
A.         Trial counsel, Marine Corps Recruit Depot san Diego.

Q.         Captain Logan, what were you asked to do on 22 March of
           this year?
A.         I was asked to drive up to Bonsall, California, to
           attend a Tea Party rally that Sergeant Stein was
           speaking at.

Q.         And how did you know about that Tea Party rally?
A.         It was posted on a Facebook site or -- yeah.  Facebook
           site.  I believe it was Sergeant Stein's site or the
           Armed Forces Tea Party.  I can't recall which.

                                 208

Q.      And Captain Logan, obviously you work as a trial
        counsel, you work in my section; is that accurate?
A.      That's correct.

Q.      And who asked you to go to that -- to that particular
        rally?
A.      You did.

Q.      Okay.  And why did I ask you to do that?
A.      To see if Sergeant Stein actually spoke at this rally.
        If I recall correctly he had been advised of these
        proceedings that day or the day before.  We saw that it
        was posted on the Facebook site that he was going to
        speak at rally.  We wanted to make sure that was, in
        fact, accurate.  So that's why I was sent up there.

Q.      Okay.  When you got up there, where was it?  What was
        the location?
A.      It's a country club.  It's somewhere south and east of
        Camp Pendleton near Bonsall, Fallbrook Area.  I can't
        recall the exact -- I think it's San Luis Rey.

Q.      Was this like a hotel or was it just a clubhouse or
        what?
A.      It was a clubhouse.  It was a country club.

Q.      Okay.  And what was the -- what was going on there at
        the clubhouse?  You said you were up there to view a
        rally.  So what'd you see when you got up there?
A.      Correct.  It was a rally hosted by the Fallbrook,
        California Tea Party.  When I arrived, it was about this
        time in the evening.  There were several news vans in
        the parking lot.  Walked up, took me a few minutes to
        find where the rally actually was, walked inside, and
        they were probably about a hundred people in the room I
        would say.

        Several ladies at the front door wearing shirts that
        said Fallbrook Tea Party.  TV cameras set up in the
        back.  Several individuals from the media, the local FOX
        affiliate.  I don't particularly remember.  There was a
        table set up at the front with political pamphlets,
        leaflets, fliers that appeared to be political
        candidates of some sort on it.  I didn't look at them or
        retrieve any of them.  I don't know who they were
        specifically.  Walked to the back of the room and stood
        there and watched the proceedings.

                              209

Q.        And what were the proceedings?
A.        When I got there, there was a lady speaking about voting
          or something.  I don't recall specifically what.  After
          she was finished, Sergeant Stein was introduced.  He
          came up and spoke.

Q.        How was he introduced?
A.        He was introduced as I recall as Gary Stein and sort of
          the -- he was the -- from what I could tell, the main
          attraction of the evening.

RCD:      Okay.  And I'm going to show you a quick exhibit here.
          What's been marked as Government Exhibit 13F.  This is a
          media report of that Fallbrook Tea Party -- Fallbrook
          Tea Party meeting.  I'd like to ask you to look at the
          screen shots there and tell me if that's the same
          meeting that you attended?

SMBR:     You said 13F?  13F?

RCD:      Yes, sir.

WIT:      This looks like the same meetings that I attended.

**Questions by the recorder (continued):**

Q.        And, Captain Logan, what was the -- the context of
          Sergeant Stein's speech that night?
A.        Primarily, it was these proceedings, the -- what has
          been going on here.  That was kind of the biggest topic
          that was -- the majority of the questions that he
          received from the audience were regarding what's going
          on with the Marine Corps, this administrative separation
          proceeding.  It was -- politically, it was -- it was
          themed with grievances against President Obama and
          voting out the current administration, issues with the
          current administration's policies, things of that
          nature.

Q.        Did you ask any questions or participate in any way in
          the -- in the speech?
A.        I did not.

Q.        Okay.  Where were you in the room?
A.        I was in the back, right corner of the room.

001008

Q.          Okay.  And you said that part of the tenor of the speech
            was voting out President Obama from office?
A.          Correct.

Q.          Were there any -- describe the room.  You said there
            were some political things going on, leaflets and
            whatnot.  Were there any fundraising activities going on
            at this event?
A.          There was a -- I recall a Manila envelope being passed
            around the room and money was asked to be put in it.
            I'm not sure what the cause or what the donation was for
            in particular.  But yes, some sort of money being taken
            up.

Q.          Okay.  Did you stay for the rest of the rally after
            Sergeant Stein was done speaking?
A.          I did not.

RCD:        Okay.  Do you have anything else to add?

SMBR:       What was your question?

RCD:        Just if he had anything else to add about the evening,
            sir.

WIT:        The only thing I could say is there was a lot of
            discussion about what was happening with Sergeant Stein
            in the Marine Corps.  There were some questions asked
            about why this was going on.  I believe Sergeant Stein
            stated that he thought -- it wasn't necessarily the
            Marine Corps.  It was the Marine Corps -- not
            necessarily forced into doing this, but there was
            direction from higher to execute these proceedings
            against him.

            There were several questions asked by some of the
            participants -- the people that were watching Sergeant
            Stein speak.  The one that sticks out in my mind was
            asking if this was being directed by people from foreign
            shores or something like that.  I never did really
            understand what that meant but that stood out in my
            mind.

RCD:        Okay.  I have no further questions, sir.

SMBR:       Counsel?

CR (Capt Baehr):  Sir.

                              211

                                                              001009

CROSS-EXAMINATION

**Questions by the counsel for the respondent:**

Q.      Captain Logan, how are you?
A.      Good.  How are you?

Q.      Doing great.

        Captain Logan, as you pointed out before, you are
        actually a trial counsel?
A.      I am.

Q.      Okay.  And you actually work against Captain Grey and
        myself on a regular basis?
A.      I've never -- well, I guess I got a case with you now.

Q.      Right.
A.      But I have with Captain Grey in the past.

Q.      And you are actually part of a trial team with Captain
        Torresala?
A.      Yes.  I'm part of the military justice shop.

Q.      Okay.  Is Captain Torresala your superior?
A.      He's the military justice officer.

Q.      Okay.  And it's very uncommon for a prosecutor to
        testify in a proceeding.  Would you agree with me?
A.      I've testified before.

Q.      Have you testified in an adsep board before?
A.      Never in an adsep board, no.

Q.      Okay.  Would you agree that a prosecutor testifying
        might give the impression that they already have a bias
        if they're actually working on the prosecution team?
A.      What was your question again?

Q.      Would you agree with me that if somebody from the
        prosecution team is testifying, it might not -- it might
        appear that that witness is not unbiased?
A.      It could appear that way.

001010

Q.      Okay.  Captain Logan, I want to focus just for a minute
        on the proceedings.  Now, there is actually a videotape
        of everything that was said at that particular Tea Party
        rally, correct?
A.      I assume there would be, yeah.  It was videotaped.

Q.      Have you seen any such videotape?
A.      I have not.

Q.      All right.  And at that particular Tea Party event, you
        heard people say that there were republicans, democrats,
        and independents at that event, didn't you?
A.      I heard discussion of that, yes.

Q.      Okay.  So there were a variety of people there from a
        variety of different political parties?
A.      I don't know that.

Q.      Okay.  Did you talk -- did you talk to anyone there
        about their political beliefs?
A.      No.

Q.      Okay.  You said the people were a little bit confused
        when asking a question of why these proceedings were
        going forward?
A.      Correct.

Q.      Okay.  And did they seem to be more concerned with what
        private -- or excuse me -- Sergeant Stein had done or
        more concerned with the Marine Corps' reaction to what
        Sergeant Stein had done?
A.      I think that the -- probably the drive of their
        questions was in the misunderstanding or not grasping
        what it was.  I mean, because not everybody knows what
        an administrative separation hearing is.  So they were
        kind of bouncing back and forth between court-martial
        punishments and things like that.  Asking what it was
        that could potentially happen to him.  So I would say
        more concerned with the proceedings.

Q.      Did you engage in any conversations with people about
        what was happening to Sergeant Stein?
A.      No.

Q.      Now, of course, Sergeant Stein at that time had already
        been notified of an administrative separation board,
        right?
A.      Yes.

                                213

```
Q.        And he's -- the basis had already been alleged at that
          point, correct?
A.        Yes.

Q.        Okay.  And the basis, obviously, included an Article 134
          and it included this Article 92 up to the point of the
          notification, correct?
A.        I believe so.  I never saw the notification itself.

Q.        All right.  And -- but, of course, the basis in this
          case is related to a Facebook post?
A.        One of them, yes.

Q.        Okay.  And a Facebook post that was on a private Marine
          Corps group?
A.        I don't know that it was private.

Q.        Okay.
A.        It was a Facebook group, yes.

Q.        Are you familiar at all with the privacy settings on
          Facebook?
A.        Not really.

RCD:      Objection.  Irrelevant.

CR (Capt Baehr):  Sir, I'm going to tie it in real quickly.

SMBR:     Okay.  Continue.
```

**Questions by the counsel for the respondent (continued):**

```
Q.        Captain Logan, you yourself have a public Facebook
          profile, don't you?
A.        I do have a Facebook profile, yeah.

Q.        And on that particular profile, other people can access
          it including members of the public, correct?
A.        I sure hope not.  I've got the settings cranked up.
          I've been on there once in like the past three months.

Q.        Are you friends with Lance Corporal Westcott, my clerk?
A.        No.

Q.        Okay.  And yet Lance Corporal Westcott was able to get
          on your Facebook post and find some things on your
          Facebook post.
A.        Okay.
```

001012

CR (Capt Baehr):  And some of the things in your Facebook post, of course, have to do with the fact that you're in the military and you're wearing a uniform suggesting you're in the military, correct?

RCD:      Sir, again, I object.  It's irrelevant.

SMBR:     Continue.

CR (Capt Baehr):  Yes, sir.

**Questions by the counsel for the respondent (continued):**

Q.        For example, you have a picture of yourself in your Marine Corps uniform on Facebook that is obviously accessible to anyone who wants to -- with a comment from you saying, "I look drunk."  Do you remember that?
A.        Yeah.  This is the day I commissioned.  I had kind of a goofy look on my face when they snapped the picture.  I thought I looked like I was drunk.

CR (Capt Baehr):  Okay.  And on your Facebook pictures which are obviously --

RCD:      Sir, this is intended to embarrass Captain Logan and I object again.

SMBR:     Where are you going?

CR (Capt Baehr):  Sir, the government is alleging that Sergeant Stein posted some things on Facebook that embarrassed and dragged the Marine Corps down.  But of course we know that actually all Marines post things on their Facebook posts, some of which have political messages, including some that Captain Logan has posted on his website that have very specific political messages concerning liberals and things like that.  The defense believes it'll make its point fully after just one more question.

SMBR:     Okay.

215

**Questions by the counsel for the respondent (continued):**

Q.        Captain Logan, in fact, you posted on your Facebook site
          a poster that represents somebody in the military
          saying, "You shut the fuck up.  We'll protect America.
          Keep out of our fucking way, liberal pussys."  Is that
          correct?
A.        Yeah, I think it's probably still on there.

CR (Capt Baehr):  No further questions.

RCD:      Nothing, sir.

SMBR:     Members?

### EXAMINATION BY THE BOARD

**Questions by the senior member:**

Q.        At the rally -- the rally occurred after the warning to
          Sergeant Stein?
A.        Yes, sir.

Q.        He obviously understood this was going to take place?
          Did he make any inappropriate comments about his chain
          of command, anyone inside his chain of command?
A.        Other than the comment about this being directed from
          higher, not -- nothing inappropriate.

Q.        Okay.  And when you attended the rally, how were you
          dressed?
A.        I was dressed in civilian attire, sir.

Q.        Did anyone know you were a Marine?
A.        Not to my knowledge, sir.

Q.        Okay.  Do you believe members there understood that he
          was a Marine or is a Marine?
A.        He said that he was a Marine, sir.

Q.        But he didn't talk about, in your estimate, anything
          inappropriate for a Marine to speak about at this type
          of rally, yes or no?
A.        I'm just trying to think through everything that I
          heard, sir.

216

001014

Q.        I understand.  Let me tell you where I'm going.  You
          went to a rally as directed by the head of your trial.
          You went to a rally to observe.  In your observation,
          what did you take from it?  Was -- is there anything
          that you took away which will be useful to us?
A.        Sir, I would say that the majority of the time that he
          was up there -- I mean, the questions were directed
          toward this process, what the Marine Corps was doing,
          and sort of the plight of Sergeant Gary Stein is what I
          took from it, sir.

SMBR:     Understand.  Okay.

RCD:      Sir, just a quick follow-up.

## REDIRECT EXAMINATION

**Questions by the recorder:**

Q.        Captain Logan, are you aware of the prohibition on
          speaking before partisan political gatherings?
A.        I am.

RCD:      Thank you.

SMBR:     Okay.  Anything else?

CR (Capt Baehr):  No, sir.

SMBR:     Captain Logan --

CR (Capt Baehr):  I apologize, sir.  It's just to establish -- I
          thought it was already established.

## RECROSS-EXAMINATION

**Questions by the counsel for the respondent:**

Q.        But Captain Logan, you know there are members of all
          sorts of different political parties were at that
          particular rally?  We discussed that a little bit on
          direct.
A.        Maybe there were.  I mean, I can't testify to that.

Q.        Do you know what parties the people were who were at
          that party?
A.        I would assume the Tea Party.

217

001015

Q.         But were they members of a political party that's
           recognized with a presidential candidate, senate
           candidate, gubernatorial candidates and things like
           that?
A.         There were fliers for political candidates.  I didn't
           look at who they were specifically.

CR (Capt Baehr):  Okay.  Thank you.

RCD:       Nothing further, sir.

SMBR:      Okay.  Captain Logan, you are instructed not to discuss
           your testimony in this hearing with anyone except the
           recorder, the respondent, or counsel for the respondent.
           You will not allow any witness in this hearing to talk
           to you about the testimony he or she has given or which
           he or she intends to give.  If anyone except the persons
           I have mentioned tries to talk to you, you will let the
           side that called you as a witness know.

           Any questions?

WIT:       None, sir.

SMBR:      You are excused.

WIT:       Thank you, sir.

[The witness was excused and departed the conference room.]

RCD:       Sir, we have no further witnesses.

SMBR:      Where are we on the script?

CR (Capt Baehr):  Sir, in light of the last witness, the defense
           would offer into evidence the posts from Captain Gavin
           Logan's Facebook page pulled by Lance Corporal Westcott.

RCD:       I object to that, sir, as irrelevant and unnecessary.

SMBR:      Okay.  I will accept it.

           So, recorder, you're done?

RCD:       Yes, sir.

218

001016

SMBR:      Okay.  Sergeant Stein, you have already indicated an
           understanding of your rights at these proceedings.  I
           would like to remind you at this point about your right
           to testify.  You have the right at your option to submit
           or not submit to by this board.  The provisions of
           Article 31(b), Uniform Code of Military Justice, will
           apply.  You may elect not to testify and your so
           electing cannot be held against you in any way.  If you
           elect to testify, however, you will be considered to
           have waived the protection afforded by Article 31(b) and
           you may be examined by the recorder and this board.

           You may also render unsworn testimony to this board and
           you will not be examined by the recorder or the board
           members on this testimony.  You also have the right to
           submit to this board a written statement, either sworn
           or unsworn.

           Do you understand these rights?

RSP:       Yes, sir.

SMBR:      Okay.  Is the respondent ready to proceed?

CR (Capt Baehr):  We are, sir.

SMBR:      Counsel.

CR (Capt Baehr):  Sir, at this time the defense would call
           Mr. Joel Stein, the father of Sergeant Stein.

[The counsel for the respondent established a telephonic
connection with the witness.]

**Joel Stein, a civilian, was called as a witness by the respondent,
was sworn, and testified as follows:**

### DIRECT EXAMINATION

**Questions by the counsel for the respondent:**

Q.         Sir, this is Captain Baehr again.  Can you hear me?
A.         Yes.

Q.         Okay.  Could you just give the board a brief -- sense in
           what it is that you do now?
A.         I'm a small time entertainer.  I do private parties.

219

Q.          Okay.  And could you tell us a little bit about Gary
            Stein's upbringing?  Where did he grow up?
A.          He grew up in Bullhead City, Arizona.

Q.          And what was the -- what was the situation like for him
            growing up?
A.          It had a pretty typical average family.  My wife and I
            separated when he was nine and I got custody of him and
            his brothers, so it was a single parent family with
            single parent family struggles at the time, myself and
            the two boys.  And, you know, we overcame a lot of
            different adversities.  And that's where, you know, a
            lot of Gary's character comes from, because we struggled
            and we made it.  You know, that was his younger years
            and up until about nine.

Q.          What did you notice about him when he was growing up?
            What were your impressions of him as he grew up?
A.          Well, he was pretty strong-willed, conviction -- beyond
            conviction.  I mean, he -- you know, when he knew
            something was wrong or felt something was right or
            wanted to make a statement or tell it how it is or make
            a change in something, he did it.  That's the way he was
            from a very young age.

Q.          Okay.  And what were some activities he was involved in?
A.          I would say the normal stuff, school.  As he got into
            junior high, 12 to 13, he found the church that was
            close by where we were and went to the church, got
            involved and started a youth -- a youth church with one
            of the pastors there.  And then was counseled into being
            a youth pastor as well and that became very successful
            for many young people in the neighborhood.

            As he got into high school, he got involved with all
            kinds of civic things and student counsel.  And prior to
            that, I was looking for avenues for each of my boys to
            keep busy and, you know, other than school, extra
            activities, and I found a small program called the Young
            Marines Program brand new to our town.  And I brought
            them down and there was about five other young people
            there.  And Gary jumped in and really went all the way
            with this Young Marine Program.  It was brand new.  It
            had, you know, only five kids in it.  Six including
            himself.  And before long, they had well-over 20 -- they
            had well-over 20 kids in there.

                                   220

And Gary mentored many of them.  I mean, he just -- he grabbed onto that program and just made it his own.  And they did the crucible.  They did everything at 14.  And I can remember, you know, as a teen they're supposed to make it through as a group together through the end of the crucible.  And it was along the Colorado River.  It was kind of rough for young people.  And I remember afterwards being told by the instructor that not only did he get himself through the crucible but he encouraged and helped and brought other young people that didn't believe they couldn't make it to the end.

SMBR:      Captain.

CR (Capt Baehr):  Yes, sir.

**Questions by the counsel for the respondent (continued):**

Q.         Sir, we're going to move a little more rapidly.  We've got just a very limited time.  I want to get on the -- just the high spots.

           Was Sergeant Stein when he grew up, was he a -- did his political convictions come from you at all?
A.         I don't believe so, no.  I don't believe so.

Q.         Okay.  I want to talk about his decision to come into the Marine Corps and what you observed as he came in right when he came in.  What did you see when he came into the Marine Corps?
A.         Well, like I said, he'd been through the Young Marine Program.  I think when he got out of that, he was determined -- he was determined to become a Marine.  And I remember having my first conversation with him and telling him, you know, there's a lot of risk here.  I mean, you've got to be very serious about this.  This is a life commitment.  And we sat down, had many conversations about it.  He got a recruiter to come over.  The recruiter sat down with me.  I made -- I agreed with Gary.  I thought it was a good path for him and I made him make me three promises, you know, and that was the three jobs that he would pick on that application.  And I signed the paper and he went in shortly after he graduated.

Q.         Did you see him graduate from boot camp?
A.         Absolutely.  I sent him on the bus.  I took him to the Greyhound bus station in our small town and I watched my

221

001019

son get on the bus as a young man and, yes, I watched him graduate as a man.  I sure did.

Q.    Did you see the Marine Corps make positive changes in his life?

A.    Absolutely.  I think he was a born leader.  He had always been a leader.  And now he was a Marine and he was destined to be a leader.  There was no doubt in my mind.

Q.    Okay.  And, sir, did you talk to him during the deployment?

A.    Yeah.  That was probably the toughest time of my life and I've been through several of them.  And that was the first deployment I've been through with one of my children.  And I'll tell you, it was probably the hardest time of my life.  The first thing I thought about when I went to sleep and the first thing I thought of when I woke up.

Q.    Do you know if -- and Sergeant Stein right now, does he have a family of his own?

A.    Yes, he does.  He has one child, a daughter; and one more on the way.

Q.    Do you know when the other one on the way here is going to be here?

A.    I believe it's going to be July.  June or July.

Q.    Okay.  Just like three months from now or so?

A.    Yes.

Q.    Sir, what are your hopes and dreams for Sergeant Stein going forward from this proceeding today?

A.    I hope that he can stay in the Marine Corps and do out his time.  I believe he's due out in July and will come out honorably.  And I wish the best for my son just fulfill his dream into -- he has a beginning and now he ended.  I believe it'll happen.

Q.    Okay, sir.  Is there anything else you'd like this board to know?  Obviously this has been kind of a trying experience for you as you -- in your last chance to talk with them?

A.    I just want you to know that -- you know, if you could look back in his records, everybody makes mistakes.  I'm not saying this was a mistake.  I'm not saying it is; I'm not saying it isn't.  I'm just saying that you can

222

001020

see he's always been a leader.  And he's always taken
everything he's done in the Marine Corps very seriously.
And he's always been a proud Marine and a strong Marine
and a fighter.  And I think he deserves it.  And I think
he deserves it to be honorable.

Q.          Okay.  Thank you, sir.
A.          Thank you.

RCD:        No questions, sir.

SMBR:       Board members?

[There were no questions for the members.]

SMBR:       Thank you very much, Mr. Stein.  I'm going to read you a
            warning, and then we're going to hang up, okay?

WIT:        Okay.

SMBR:       Can you hear me okay?

WIT:        Yes.

SMBR:       Okay.  You are instructed not to discuss your testimony
            in this hearing with anyone except the recorder, the
            respondent, or the counsel for the respondent.  You will
            not allow any witness in this hearing to talk to you
            about the testimony he or she has given or which he or
            she intends to give.  If anyone except the persons I
            have named attempts to talk to you about this case, you
            should make this fact known to the side calling you as a
            witness.

            Sir, do you understand what I just read?

WIT:        Yes, I do.

SMBR:       Thank you very much.  You are excused.

WIT:        Thank you.

[The witness was excused and the telephonic connection was
terminated.]

001021

CR (Capt Baehr):  Sir, the defense had failed to get in NAVMC
            11537 before.  This is the attempt to reenlist and some
            comments from some of the superiors from Sergeant Stein.

            Have you seen this?

RCD:       No.

CR (Capt Grey):  Do you have all the pages, Captain Baehr?

CR (Capt Baehr):  I don't know.

RCD:       I would object to this, sir.  Our one ground is -- and
            unfortunately the people that could testify about this
            aren't here.  It's my understanding that this
            reenlistment package has now been denied because it
            wasn't specified that Sergeant Stein's security
            clearance had been revoked.  The commanding officer was
            not aware of that when this reenlistment package went
            up.  And subsequent to that, now that he knows the
            security clearance has been revoked, this has been
            pulled.  So I object on that ground.

CR (Capt Baehr):  Sir, the defense's response is that this was
            their opinion just a few short months ago.  Whatever
            happens subsequently, I think it's very important to
            flush out.  The government's tried to depict Sergeant
            Stein as some kind of bad Marine and the defense
            believes this would be helpful for the board to see what
            everyone from Colonel Dowling on down thought about this
            particular Marine.

SMBR:      Okay.

            Counsel?

CR (Capt Baehr):  Sir, at this time the defense would call Jason
            Smith.

SMBR:      Is it another phone call?

CR (Capt Baehr):  Yes, sir.  All of ours will be phone calls, sir.
            Apologize for that.

SMBR:      How many do you have?

CR (Capt Baehr):  Sir, the defense was going to present Mr. Stein,
            Jason Smith, Gunnery Sergeant Lisonbee -- who we've

224

<div style="margin-left:2em">

already heard from -- Sergeant Richard Duran -- so there's -- that's two additional.  Gunnery Sergeant Dismore and we were going to present Lieutenant Colonel Attica[ph] but we can instead just present an exhibit with some of his thoughts on paper rather than delaying this court any further.

</div>

SMBR:     I wouldn't concern myself with the delay.  As I said before, we have a young man's career.

CR (Capt Baehr):  Yes, sir.

SMBR:     So time is really not an issue as it relates to this board.

CR (Capt Baehr):  Yes, sir.

SMBR:     But what I will say, as I said earlier, if this becomes repetitive, there's no need to call him.

LA:     And it's along that line with regard to Mr. Brahms.  I think that needs to be cleared up, sir.

Was there an objection to him not testifying?

RCD:     Yes, sir.

LA:     There was an objection.  And then was it agreed to after the government pulled out that exhibit and the president agreed not to consider it?  What I'm saying is, on the record, do you guys object to not calling Mr. Brahms?

CR (Capt Baehr):  We do object to that, sir.

LA:     Okay.  Do you want to offer them an opportunity to call him on the telephone?

SMBR:     Mr. Brahms is the one --

LA:     He's the lawyer.

SMBR:     -- opinion?

LA:     Yes, sir.  For --

SMBR:     No.  I'm not going to get into that.

<div style="text-align:center">225</div>

LA:         Okay.  So that objection is noted for the record.

            Okay.  And right now, with regard to objections and
            witnesses, what other objections have you -- do you want
            noted for the record.

CR (Capt Baehr):  Sir, I believe -- I can't remember all the
            objections we've noted for the record.

LA:         Right.  Because we haven't been doing it.  I mean, I'm
            trying to make sure they're all --

CR (Capt Baehr):  Yes, sir.

LA:         -- they're all preserved.  I don't think we kept a great
            track of them.  I know there was a Mr. Brahms issue.

CR (Capt Baehr):  Sir, there was a line by line objection to
            various exhibits.  The government -- there were a
            variety of objections to witnesses on cumulative
            grounds, cumulativeness, things like that.

LA:         Okay.  And some of them have been overruled and some of
            them --

CR (Capt Baehr):  Have been sustained, yes, sir.

LA:         -- have been sustained.  And you're happy with the
            status of that on the record right now?

CR (Capt Baehr):  I am, sir.  I believe that Staff Sergeant Myers
            is the best.

LA:         Okay.

SMBR:       Okay.

CR (Capt Grey):  Sir, if we're talking about potential witnesses,
            an issue of the Tea Party and whether or not it's
            political or a party or what has come up, that's been at
            issue so far.  And if that's a live issue in the
            members' mind, we have potential witnesses to call on
            that.

SMBR:       Well -- I'm just going to speak for myself and let them
            speak for themselves.

CR (Capt Grey):  Yes, sir.

001024

SMBR:       I came in thinking the Tea Party was a political party.
            At the very beginning of the proceedings, you cleared it
            up.

CR (Capt Grey):  Okay, sir.

SMBR:       So I'm good now.

LA:         And on the line of witnesses, I think it should be noted
            for the record that I understand an e-mail was sent out
            last night with a witness list.

CR (Capt Baehr):  Yes, sir.

LA:         That is the first witness list that was sent to the
            president of the board or the government was last night,
            the night prior to this board?

CR (Capt Baehr):  We had not received any requests, sir.  And of
            course for administrative boards, we never just give our
            witness list with an absent of request.

RCD:        That's not accurate.  Lieutenant Colonel Sullivan has
            asked for witness lists multiple times.

CR (Capt Baehr):  Okay.  Well, to clarify --

RCD:        I have as well.

CR (Capt Baehr):  I apologize.  That was the first request that I
            had seen.  I apologize.

LA:         The first request to provide a witness list to the
            board?

CR (Capt Baehr):  Yes, sir.  That I had seen.

LA:         So the first thing, did the request last night have the
            Tea Party witnesses on it?

CR (Capt Baehr):  No, sir.  This would be a rebuttal witness
            because, obviously, as we take testimony, if additional
            needs for additional witnesses come up, the board is
            free to call any additional witnesses.

LA:         Okay.  And the president indicated to you his thoughts
            on the Tea Party right now.  Are you --

227

001025

CR (Capt Baehr):  We don't need to call them.

LA:        -- okay with that or do you still want to call Tea Party
           witnesses?

CR (Capt Baehr):  I don't think we need to call that witness, no.

LA:        Okay.

SMBR:      Counsel.

CR (Capt Grey):  Yes, sir.

SMBR:      So we're calling Jason Smith?

CR (Capt Grey):  Yes, sir.

[The counsel for the respondent established a telephonic
connection with the witness.]

CR (Capt Baehr):  Sir, what is it that you do?

WIT:       I'm an operations commander for a security company here
           at the Metro Phoenix Area.

CR (Capt Baehr):  Okay.  And I want to -- I want to just kind of
           hit the really --

RCD:       Captain Baehr.

CR (Capt Baehr):  Yes.  I apologize.  Excuse me.

           Sir, the recorder is going to swear you in -- Captain
           Torresala -- and then I will have some questions for
           you; he will have some questions for you.

WIT:       Go ahead.

**Jason Smith, a civilian, was called as a witness by the
respondent, was sworn, and testified as follows:**

### DIRECT EXAMINATION

SMBR:      Does he need to raise his right hand?

RCD:       He's in the car, sir.

SMBR:      Okay.  He can't raise it sitting down?

228

001026

RCD:       I suppose he could, sir.

**Questions by the counsel for the respondent:**

Q.         Sir, we -- it's very late here; it's very late there.
           We're going just hit the real highlights of your
           testimony here.  How do you know Sergeant Stein?
A.         I've known Sergeant Stein since he was about -- let's
           say 11 or 12 years old.  He was involved with our church
           ministry where I was a youth pastor first with the
           Church of the King in Phoenix, Arizona.

Q.         And what kind of church is that?
A.         Church of the King was a nondenominational spirit
           Pentecostal church.

Q.         Okay.  And that's a Christian church?
A.         Yes, sir, it is.

Q.         Okay.  What -- what did you observe about him?  What
           were your impressions of him as a young man?
A.         I liked Gary from the day that I met him.  One thing
           that I always remember about Gary, I used to go and pick
           him up when he lived in Fort Mohave which is just south
           of Bullhead City and I would go pick him up for just
           about every church service if not every church service
           we had if the doors were open.  And I used to go pick
           him up off of -- off of a house that was off of Hammer
           Lane.  I remember that's the first place that Gary lived
           when I met him.  And the thing that always struck me
           about Gary, he always had something to talk about.
           You'd pick him up and the whole ride to church Gary had
           something to tell you.

SMBR:      Stop him.

CR (Capt Baehr):  One second, sir.

SMBR:      Okay.  What happened prior to the Marine Corps is
           relevant how?

CR (Capt Baehr):  Sir, it's going to be relevant because of issues
           of characterization, rehabilitation.  It's a character
           witness.  And in the military, we are permitted to bring
           in character witnesses both on the merits, as in did he
           commit a crime.  And also --

229

001027

LA:         We can't use preservice conduct to -- for
            characterization.  That's the issue.

SMBR:       He's talking about him as a child.

CR (Capt Baehr):  Yes, sir.  The defense's contention is that we
            absolutely can.  He's a character witness.  He's known
            him now as well.  And he can speak to him from knowing
            him throughout the time --

LA:         You can use preservice for separation.  You can't use it
            for characterization.  It's characterizing the service
            not the --

CR (Capt Baehr):  Right, sir.  Understand.

LA:         -- conduct --

CR (Capt Baehr):  Understood.  But it could be used --

LA:         It can be used for separation, so it could be used for
            you to factor in whether you can separate him or not
            based upon that.

CR (Capt Baehr):  Yes, sir.  Exactly.

SMBR:       Okay.  But we haven't gotten to that degree.

CR (Capt Baehr):  Well, so, sir, did the board -- we're happy if
            the board deliberates just on one -- I don't know if
            it's on mute, sir.

            Sir, we're going to put you on mute for a second, okay?

WIT:        Yeah.

CR (Capt Baehr):  Alright, sir.  So the board is going to go into
            deliberation at some point and they're going to make a
            decision, right?  They have three questions.  If it
            decides in the defense's favor on the basis, we don't
            get to those other questions.  But instead of reopening
            the board for additional evidence after -- which we
            could do -- is that the senior member's --

SMBR:       My concern is as he starts talking about -- or anyone
            you call starts talking about childhood up to now, we're
            dragging it on too long.

230

001028

CR (Capt Baehr):  Okay, sir.

SMBR:     So try to scope it.

CR (Capt Baehr):  I'm going to get through it as quickly as I can.
          I think it's very important because the government's
          witnesses have touched on issues of separation and
          retention already, like Chief Warrant Officer Mills, who
          has nothing to do with the basis of this board.

SMBR:     Understand.  I would be absolutely surprised if you
          called any witness who doesn't think Sergeant Stein is a
          great guy.

CR (Capt Baehr):  Yes, sir.

SMBR:     I accept that already.

CR (Capt Baehr):  Okay, sir.  And if the board is -- has already
          made its decision in favor of Sergeant Stein, obviously
          the defense will stop talking.

SMBR:     He sounds like a great teenager.

CR (Capt Baehr):  However, you know, Sergeant Stein has a right to
          portray his entire character, including the issues of
          separation and characterization.  And, again, if the
          board wants to go into session now and has already kind
          of made --

LA:       Yeah, I agree, sir.  The board hasn't heard much about
          his preservice life.

SMBR:     Right.

LA:       This is one of the witnesses who could shed light on it.
          It's not cumulative right now.

SMBR:     Right.  Not cumulative right now.

LA:       You should probably let them ask a few questions about
          this.

SMBR:     No problem with that.

LA:       If you're going to call 20 witnesses to talk about being
          a great teenager, at that point it might be cumulative.

231

001029

CR (Capt Baehr):  Yes, sir.

LA:        To cover that area of his life in one witness is
           probably -- probably good.

SMBR:      Okay.  And I'm fine with it.

LA:        Yes, sir.

SMBR:      And I just wanted to make sure you control it.

CR (Capt Baehr):  I got it, sir.

SMBR:      Because I don't want to hear from the time he was born.

CR (Capt Baehr):  I got it, sir.  I understand.  I'm going to --
           I'm going to try to rush these witnesses.

SMBR:      Okay.

CR (Capt Baehr):  I'll try to do my best.

           Sir, we're just going to -- we're just going to get into
           this as quickly as possible.  We've got a lot of
           witnesses to hear from.

**Questions by the counsel for the respondent (continued):**

Q.         Do you think that Gary Stein's an honest and truthful
           person and, if so, why?
A.         I do believe he's an honest or truthful person, yes.
           The whole time I've known Gary -- you know, Gary, unlike
           a lot of his peers at the time especially when he was a
           teenager took great lengths to live his life ethically,
           morally pure and, of course, in alliance to his faith.
           When other kids were doing some pretty bad things, Gary
           was committed to being at church and helping out in his
           youth ministry and doing what he could to grow in his
           faith.

Q.         Okay, sir.  And did he actually have a leadership role
           in the church at a point?
A.         Yes.  Gary -- for the remainder of his time in our youth
           ministry, Gary was the leader of our youth church
           service.

232

001030

Q.        Has Gary interacted with you over the course of the last
          couple of years even when he went into the Marine Corps?
A.        Yes.  Our interaction has been interpersonal.  A few
          times where we ran into each other while we were home in
          the Bullhead City Area.  Other than that, most of our
          interaction has been electronically.

Q.        Okay.  And do you see the same Gary today that you saw
          when he was growing up?
A.        I see a better Gary today than I saw when he was growing
          up.

Q.        And why is that?
A.        I see a young man who is grounded in principle.  I see a
          young man who's still grounded in his faith.  I see the
          born leader that he was when he was in my youth mastery.
          I see a very devoted husband, a very devoted father.  I
          see an honorable soldier, an honorable Marine.  I see
          somebody who loves his country and has demonstrated his
          love for his country.  I see somebody who has
          demonstrated his to believe in his commitment to his
          service while still -- you know, with regards to his
          faith now with his military service and his service to
          his fellow Marines.

CR (Capt Baehr):  Sir, I have no further questions.  The
          prosecution might have questions.

RCD:      No questions, sir.

SMBR:     Members?

[There were no questions from the members.]

SMBR:     Thank you very much, sir.  I'm going to read you a
          warning.

          Can you hear me okay?

WIT:      Yes, sir, I can.  Go right ahead.

SMBR:     Okay.  You are instructed not to discuss your testimony
          in this hearing with anyone except the recorder, the
          respondent, or counsel for the respondent.  You will not
          allow any witness in this hearing to talk to you about
          the testimony he or she has given or which he or she
          intends to give.  If anyone except the persons I have
          named attempts to talk to you about this case, you

                              233

                                                              001031

should make this fact known to the side which called you as a witness.

Do you understand what I read, sir?

WIT:      I do understand, sir, and I will comply.

SMBR:     Okay.  Thank you very much.  Drive safe.  You are excused.

WIT:      Thank you, sir.

[The witness was excused and the telephonic connection was terminated.]

CR (Capt Baehr):  Sir, at this time the defense will call Gunnery Sergeant Dismore.

RCD:      Can I use the restroom first, sir?

SMBR:     Well, we'll take a five-minute break.

RCD:      Time on deck is now 1953, 5 April 2012.

[The administrative separation board recessed at 1953, 5 April 2012.]

[The administrative separation board was called to order at 2000, 5 April 2012.]

RCD:      Time on deck is now 2000, 5 April 2012.  Resuming administrative separations board for Sergeant Gary A. Stein, United States Marine Corps.

SMBR:     Who are we calling?

CR (Capt Baehr):  Sir, this is Gunnery Sergeant Dismore.

RCD:      Actually, hold on.  We don't have Sergeant Stein.

[The respondent entered the conference room.]

[The counsel for the respondent established a telephonic connection with the witness.]

234

**James E. Dismore, a civilian, was called as a witness by the respondent, was sworn, and testified as follows:**

### DIRECT EXAMINATION

**Questions by the prosecution:**

Q.      Can you please state for the record -- I apologize.  Can you please state for the record your full name, spelling your last?

A.      My name is James Evan Dismore, D-I-S-M-O-R-E.

Q.      And what's your current billet and duty station?

A.      I actually EAS'd from the Marine Corps at this moment.

RCD:    Okay.  Thank you.

**Questions by the counsel for the respondent:**

Q.      Sir, what -- did you know Sergeant Stein at one point in your career?

A.      Yes, I did, sir.  I've known Sergeant Stein since 2006.

Q.      Okay.  And you've EAS'd out of the Marine Corps?

A.      Yes.  I EAS'd September 25, 2011, sir.

Q.      Okay.  And how did you know Sergeant Stein?

A.      Sergeant Stein, we initially met in 2006, was assigned to my MEU support team from MWSS-372, Camp Pendleton.  And then I had a second chance to work with Sergeant Stein at the 1st Intel Battalion, METOC Platoon, sir, from 2009 to 2011.

Q.      All right.  And during those time frames, did you interact with Sergeant Stein quite a bit?

A.      Yes, sir.

Q.      Did you observe his performance?

A.      Yes, sir.

Q.      Okay.  And specifically I want to also draw your attention to that second portion there in Intel Battalion.  At that time you also worked with a Chief Warrant Officer Mills; is that correct?

A.      Yes, sir.

001033

Q.      And what was your role in comparison to Chief Warrant
        Officer Mills'?
A.      I was the training chief for Intel Battalion during that
        time, sir.  I was responsible for developing and
        implementing the training plans in METOC Platoon.

Q.      All right.  And at that time, did Sergeant Stein work
        for you?
A.      Yes, sir.  He was my training NCO.

Q.      Okay.  And when he was your training NCO, did you work
        with him pretty -- quite a bit?
A.      Yes, sir.  I levied quite a bit of responsibility on
        Sergeant Stein when he worked for me.

Q.      Did you set -- task him and supervise him?
A.      Yes, sir.

Q.      Okay.  And in your opinion, did he exhibit initiative in
        that -- in that job?
A.      Yes, sir.  There was a period from around February 2010
        to January 2011 that I was absent from my billet at the
        battalion when I was attached to the 13th MEU.  And
        Sergeant Stein actually took over the role as training
        chief in my absence.

Q.      Okay.  Did he effectively accomplish the training
        mission?
A.      Yes, sir.

Q.      Was he good at training Marines -- the Marines?
A.      Yes, sir.

Q.      Did he seem to enjoy it?  Is there anything that you
        remember about that?
A.      He was very excited when he had an opportunity to stand
        up in front of a group of Marines and present them with
        a class via PowerPoint.

Q.      Okay.  And did that help those junior means understand
        their -- their jobs and accomplish their missions?
A.      Yes, sir.

Q.      Okay.  And you --
A.      I believe so.

236

001034

Q.        -- mentioned when we spoke the other day that you felt
          he did an outstanding job with some of the training.  Is
          that what that you're talking about -- what you were talking
          about?
A.        I'm sorry, sir.  I didn't hear that.

Q.        I apologize.  You mentioned the other day that he'd done
          an outstanding job with some of the training.  Is that
          what you were talking about?
A.        Yes, sir.  That as well as he was very involved in
          developing schedules in my absence and coming up with
          aids to supplement knowledge that he didn't necessarily
          have that a staff sergeant or a gunnery sergeant would
          have.

Q.        Did he -- was he somebody who was open and up front with
          you about mistakes or shortcomings?
A.        Yes, sir.  Sergeant Stein would always be open with me
          about mistakes.

Q.        Okay.  And did he learn from his mistakes?
A.        While working for me, I can't say that he didn't err.
          He always seemed to learn a valuable lesson when he made
          mistakes, sir.

Q.        Okay.  Now, you know full well that your opinion is not
          shared -- was not shared by others who worked with him
          to include Chief Warrant Officer Mills?
A.        Yes, sir.

Q.        Okay.  But you -- you still -- do you still believe he
          can be an asset to the Marine Corps going forward?
A.        I do, sir.

Q.        And do you know he's got four more months on his
          contract?
A.        Yes, sir.

Q.        And during the time that he worked for you, what do you
          believe was the character of his service?
A.        I believe his character was honorable while working for
          me, sir.

Q.        Thank you.  I don't have any further questions.  I'm
          sure the prosecutors and the board might have questions.
A.        Yes, sir.

SMBR:     Recorder?

001035

CROSS-EXAMINATION

**Questions by the recorder:**

Q.      Gunnery Sergeant, can you hear me?  This is Captain
        Torresala.
A.      Yes, sir.  I hear you loud and clear.

Q.      Okay.  You said you worked at 1st Intel from 2009 to
        2011 but you were on -- on deployment.  When was that?
A.      I actually did not deploy with the 13th MEU, sir.  I was
        absent just during the workup cycle.  I came back to the
        battalion I believe when the 13th MEU deployed due to my
        contract and my EAS not covering the deployment cycle.

Q.      Okay.  So at what point were you gone from the unit
        between 2009, 2011?  What date ranges?
A.      I left over to 13th MEU February 2010 for a few months.
        I returned back to 1st Intel January 24, 2011.

Q.      Okay.  So you were not at 1st Intelligence Battalion in
        April of 2010; is that accurate?
A.      No, sir, I was not.

Q.      Okay.  Were you aware of any incidents that occurred
        with Sergeant Stein at 1st Intel Battalion during that
        time?
A.      I do know some incidents, yes, sir.

Q.      Okay.  What incidents were those?
A.      I do know that during that time period while I was --
        during this thing back and forth between the MEU and
        Intel Battalion that he was questioned about Facebook
        posts that he made and also a Facebook page called Armed
        Forces Tea Party Patriot.

Q.      Okay.  But, again, this was while you were gone from the
        unit -- absent from the unit?
A.      I'm sorry, sir.  Can you repeat that?

Q.      I'm sorry.  But this was during the time that you were
        gone from the unit, correct?
A.      Yes, sir.  I was -- like I said, we didn't chop
        officially in February to the 13th MEU.  We were still
        working out of Intel Battalion workspaces and moving
        back and forth.

238

001036

Q.      Understood.

A.      So --

Q.      Understood.  Moving on, you said you had tasked Sergeant
        Stein with -- you were his direct-line supervisor; is
        that accurate?

A.      Yes, sir.

Q.      Okay.  Now, during that time, 2009, had Sergeant Stein's
        security clearance been revoked when he was working for
        you?

A.      Yes, sir.

Q.      So what kind of tasks were you able to give him at the
        time?

A.      I tasked him with a multitude of things, sir.  One,
        primarily being assisting in the development of training
        plans, the developing of the weekly training schedules
        to be submitted to our company offices at Intel
        Battalion, as well as any unclassified RFIs that could
        be support via NIPRNet, sir.

Q.      Understood.  So you were aware that he was pulled out of
        his METOC duties as a result of his security clearance
        revocation?

A.      Yes, sir.

RCD:    Okay.  That's all I have, Gunnery Sergeant.  Thank you
        for your time.

WIT:    Yes, sir.

SMBR:   Counsel?

CR (Capt Baehr):  Sir, were there any questions from the board?

SMBR:   No.

### REDIRECT EXAMINATION

**Questions by the counsel for the respondent:**

Q.      Okay.  Gunnery Sergeant, this is Captain Baehr.  I just
        have one final question.  Obviously you don't have to
        testify.  You're up real late.  Why are you choosing to
        testify on behalf of Sergeant Stein?

A.      I chose to do this, sir, because I have worked with
        Sergeant Stein and I was made aware of the situation and

239

001037

I believe if given the opportunity to fulfill his term honorably, he would do so.

CR (Capt Baehr):  Thank you.

No further questions.

WIT:      Yes, sir.

SMBR:     Gunnery Sergeant Dismore, this is Lieutenant Colonel Hairston, senior member.  I want to read you a warning.

Can you hear me okay?

WIT:      Yes, sir, I hear you.

SMBR:     I'll try to speak loud enough.

You are instructed not to discuss your testimony at this hearing with anyone except the recorder, the respondent, or counsel for the respondent.  You will not allow any witness in this hearing to talk to you about the testimony he or she has given or which he or she intends to give.  If anyone except the persons I have named attempts to talk to you about this case, you should make this fact known to the side which called you as a witness.

Do you understand?

WIT:      Yes, sir, I do.

SMBR:     Thank you for your service.  You are excused.

WIT:      Thank you, sir.

CR (Capt Baehr):  Sir, if we could just have one moment.

Sir, at this time the defense is going to try to call Sergeant Duran[ph].  I wasn't able to reach him a little while ago, so I might not be able to get through to him.

SMBR:     Okay.

[The counsel for the respondent attempted to establish a telephonic connection with the witness.]

240

001038

CR (Capt Baehr):  Sir, I wasn't able to reach Sergeant Duran.  If
            I could just have a moment.

SMBR:     Okay.

CR (Capt Baehr):  Gentlemen, at this time the defense is -- is not
            going to -- we weren't able to reach him.  We were going
            to call Lieutenant Colonel Attica but are going to
            provide an affidavit that he's written.

SMBR:     Okay.

CR (Capt Baehr):  Lieutenant Colonel Attica is a former judge
            advocate of the United States Army Special Forces for 20
            years and he is a constitutional law professor at Saint
            Mary's College in Texas.

RCD:      Sir, I object to this on the same grounds as General
            Brahms' testimony as being a legal commentary and a
            witness not associated with the facts of this case and
            generally irrelevant given the prior ruling, sir.

SMBR:     Counsel?

CR (Capt Baehr):  Sir, to respond, there are some very complicated
            legal issues here.  The counsel here -- there are some
            confusing legal issues here.  We believe that this
            testimony will help the board understand some of the
            legal issues from a distinguished constitutional law
            professor who has more experience in constitutional law
            than anyone in this room.  And that's for that reason,
            we would offer it to the board.

SMBR:     Wasn't that the same intent --

CR (Capt Baehr):  And, sir, we understand -- we understand, sir,
            if the board decides not to -- not to read this.  But we
            would attempt to put it in and we would just -- we would
            offer it for the record.

SMBR:     What makes it different than the general or Exhibit 28?
            It's still third party, correct?

CR (Capt Baehr):  Yes, sir, correct.  So, again, it doesn't make
            it a whole lot different.  It is expert testimony from
            somebody who's got constitutional law understanding.  If
            it's not -- we understand if the board is not going to
            admit it, but the defense will offer it for the record.

241

001039

SMBR:       Okay.  I'm not going to admit it.

CR (Capt Baehr):  Yes, sir.

CR (Capt Grey):  Sir, the respondent would next like to offer the
        testimony of Major Ringlee, United States Marine Corps,
        Retired.  It's actually similar vane with regards to,
        you know, third-party witnesses like that.

        This specific witness I'm offering because he retired as
        a recruiting station commander and I wanted him to
        address potential consequences to a recruiting mission
        in light of the case, if Sergeant Stein were to get
        discharged with an OTH.

        The reason I ask for it, sir, specifically, is Paragraph
        6210.6 which defines commission of a serious offense.
        We talked a lot about it's going to require -- permits a
        BCD.  But it also is one which the specific
        circumstances of the offense warrant separation.  I
        think that gives the members a little bit of latitude.
        They have to determine if these circumstances warrant
        separation, I'd like to consider that some of these
        circumstances here are how the outside world is going to
        see this administrative board.

SMBR:       Okay.  So in other words, if I understand you correctly,
        he's going to offer an opinion as to what he thinks is
        going to happen based on what happens here?

CR (Capt Grey):  Yes, sir, based on his recruiting experience,
        that there's a certain segment of the population that
        joins for -- because they have strong political beliefs
        and that's important to them; that by having members get
        discharged with an OTH, that that would make it less
        likely that people of that population will be joining
        the Marine Corps.

SMBR:       But isn't he speculating?

CR (Capt Grey):  Yes, sir.  But as an RS commander --

SMBR:       I'm not going to accept him.

CR (Capt Grey):  Understand, sir.

CR (Capt Baehr):  Sir, at this time, Sergeant Stein will make an
        unsworn statement before the board.

242

SMBR:      Unsworn?

CR (Capt Baehr):  Yes, sir.

      Sergeant Stein, please report in to the board.

RSP:      Sergeant Stein reporting as ordered, sir.

**UNSWORN STATEMENT**

**Questions by the counsel for the respondent:**

Q.       Sergeant Stein, you can be at ease.

      One second, gentlemen.  I apologize.

      Sergeant Stein, could you please tell the board members
where it is that you grew up.
A.       I grew up in a small town, about 30,000 people, in
Bullhead City, Arizona.

Q.       And what kinds of activities were you involved in as you
were growing up?
A.       I was very involved in church, school, blood drives, and
student government.

Q.       Okay.  And Sergeant Stein, we talked to your father,
obviously we talked to Pastor Smith.  Were you involved
in your church as well?
A.       Yes.  Very involved in church right before I left when I
was 17, I obtained my associate pastor's license to
Pentecostal Summit of America.

Q.       You actually became a pastor of sorts?
A.       Yes.  I -- when Jason Smith to go off to venture into
Phoenix, I stood up as a, quote/unquote, youth pastor
under the guidance of the senior pastor of the church.

Q.       Sergeant Stein, why did you decide to join the United
States Marine Corps?
A.       I wanted to be a Marine since as early as I can
remember.  As a teenager, it was something that I
believed sets apart anybody else.  You know, you want to
be the best of the best.  It's something I wish I could
be and strive to be in other areas of my life.  And I
just knew that I wanted to be a Marine.

<div align="center">243</div>

001041

Q.          And when did you decide to join?
A.          I decided to join -- I decided to join at a young age
            but I signed the papers September 11, 2002.

Q.          And where did you go -- we heard a little bit from
            Gunnery Sergeant Lisonbee.  Did you encourage some other
            folks to join the Marine Corps as well or the military?
A.          Yes, sir.  I encouraged many friends.  My brother ended
            up joining the Army.  He is now in his sixth year I
            believe.  He's an MP in Germany.

Q.          And so is that your only brother or do you have other
            siblings?
A.          I have a younger brother, a younger sister who are a
            little bit too young to join the military yet.

Q.          Okay.  On -- when did you go to boot camp?
A.          July 15, 2002 -- or 2003.  I'm sorry, gentlemen.  2003,
            about three weeks before I was scheduled to go, because
            I just wanted to go already.

Q.          And tell the board members what that particular
            experience was like.
A.          It was a lot tougher than I thought it was going to be.
            You go in having -- I spend a year in the dep program so
            I had an idea, but there was something that could
            mentally and physically prepare coming out of high
            school to become a Marine.

Q.          Okay.  Sergeant Stein, when -- where did you go after
            recruit training?
A.          I went to MCT about 30 days later.  After that,
            attending Keesler Air Force Base, Biloxi, Mississippi
            for weather observer training.

Q.          And where did you go after that?
A.          After that I came here to Camp Pendleton to MWSS-372.  I
            was immediately chopped to Marine Corps Air Station Camp
            Pendleton where I served as a weather observer.

Q.          And how long did you do that for?
A.          I served there from roughly spring of 2004 till fall of
            2005 when I deployed with 372 to Iraq.

Q.          Where did you -- and where did you go in Iraq?
A.          We stayed at Al Taqaddum Air Base which is about nine
            miles west of Fallujah.

244

```
Q.          How long were you over there, Sergeant Stein?
A.          I was there for 7 months and 14 days.

Q.          Okay.  Could you tell the members a little bit of what
            you did after that?
A.          After that, I came back to the states, served as a
            weather observer again, was attached with Gunnery
            Sergeant Dismore to the 11th MEU, did PSD training,
            protecting the colonel, did a lot of high speed, low
            track type training in Virginia with different CIA
            companies and whatnot in a place called Crucible Kroll.
            When I came back from the MEU, eventually received
            orders after reenlisting and went back to Keesler Air
            Force Base.

Q.          Okay.  And would you tell the members where you went
            after that?
A.          Went to Keesler Air Force Base for approximately a year
            and then I went to 1st Intel Battalion.

Q.          And where did you go after Intel Battalion?
A.          I came here to Weapons Field Training Battalion.

Q.          And is this where you've been since then?
A.          Yes, sir.

Q.          All right.  What have been some of the highlights of
            your time in the United States Marine Corps?
A.          Highlights of my time would probably be the deployment.
            You learn a lot about yourself on deployment and you
            learn a lot and the Marine Corps and camaraderie with
            your fellow Marines.

            And then also being on a PSD.  That was probably the
            most exciting high, where you have to do something
            outside your field especially when you're an office job
            doing something that you kind of thought you were going
            to do in the Marine Corps but never got a chance to.
            And then being here with Weapons Field Training
            Battalion is probably the most rewarding time of my
            career.

Q.          Okay.  And do you also have a family?
A.          Yes, I have a wife and a four-year-old daughter and a
            baby on the way.
```

245

001043

Q.          Okay.  And I think we've heard all that.

            Sergeant Stein, we're here not because of all the great
            things that you've done but because of some allegations
            that have come out against you.  I want to kind of walk
            you through the process of where we got to kind of where
            we are today.

            Do you remember forming a Facebook group of some sort
            with some other friends?
A.          My good friend named Dusty Lundy.  I helped him -- he
            runs a thoroughbred rescue in Temecula.  We're very
            involved with that thoroughbred rescue.  He's a part of
            Tea Party and I kind of tried to see how the movement
            was going.  And I got involved from that point.

Q.          Okay.  And when you got involved, did you end up at some
            point being a part of that Facebook group?
A.          Yes.  Dusty kind of -- he led me to the idea of doing it
            and we started a Facebook group together and started --
            it started very small.  We brought on a couple different
            administrators that are still with us today.

Q.          Did you at some point end up communicating with judge
            advocates about what's appropriate, what's not
            appropriate for that particular website?
A.          Yes, sir.  In the spring of 2010, a blogger found out
            that there was an Armed Forces Tea Party.  He submitted
            some questions to us.  We answered them.  I didn't have
            a part answering those.  The blogger then basically,
            lack of a better term, tore us apart on the blog, called
            us a militant group and whatnot.  With that came an
            interview request from *Hardball with Chris Matthews*
            which I was told by Gunnery Sergeant Dismore that he saw
            no reason for me not to go.  On the way there, I got a
            call from Headquarters Marine Corps telling me --
            ordering me to come back to Camp Pendleton.

Q.          Okay.  When you came back to Camp Pendleton, what
            happened then?
A.          I was read my rights by Chief Warrant Officer -- or now
            Captain Kaiser.  That was really the only time he had
            any interaction during this period.  And then my first
            sergeant, I reserved the right not to say anything.  And
            then the following days I went down to see the SJA.

                                  246

001044

Q.      And then do you remember the conversation that you had
        with the SJA and the other officers who were there?
A.      We had a few conversations with the SJA, just them
        trying to figure out, get a full grasp on the situation,
        where they eventually told me that they didn't know why
        I was being charged under DoD Directive 1344.10 since
        it's not a punitive order according to them and that I
        hadn't done anything wrong as long as I put a disclaimer
        up saying that my views are not the views of the Marine
        Corps nor am I affiliated -- or nor is this Armed Forces
        Tea Party or my views affiliated with the Marine Corps
        and the Department of Defense.

Q.      Okay.  And so there was a disclaimer on that website?
A.      Yes.

Q.      Did you -- did anything really happen with this
        situation until March of this year after that?
A.      Nothing happened.  I wanted it to be known when I
        checked into Weapons Field Training Battalion that this
        is something that I did take part in and I didn't want
        it to be some secret that might have come out and then
        for them to question my integrity later on.  That's why
        the day I checked in, I let them know about it.

Q.      And you talked to them about it on that particular day?
A.      Yes.

Q.      Okay.  Did anyone else ever tell you needed to do
        anything else regarding that particular site?
A.      No, sir.

Q.      Okay.  And to fast-forward a little bit to March --
        March 1st.  On March 1st, did you engage in a heated
        discussion on there?
A.      Yes, sir.  I engaged in a heated discussion with some
        fellow Marines that I knew, approximately three of them
        on a METOC Facebook page.

Q.      Do you recognize that that wasn't the -- you know, the
        appropriate venue or the appropriate language to
        express?
A.      I do recognize it, sir.  I recognize it as not being a
        public venue and that's why I expressed my apologies to
        Chief Warrant Officer-4 Burns right after that.  Right
        when he sent me an e-mail, I expressed my apologies.
        And I said that I would not do that again.

247

001045

Q.      Okay.  And have you posted any other negative things on
        the METOC website after that?
A.      I have not, sir.

Q.      Okay.  And as you've represented -- and the government's
        talked about some Tea Party rallies and some other
        things like that.  Have you -- have you been -- did you
        ever go to any kind of rally in a uniform?
A.      No, sir.

Q.      Okay.  And did you represent yourself as Mr. Gary Stein?
A.      I did everything I could not -- everything I could do to
        not represent myself as Sergeant Gary Stein; only as
        Gary Stein.

Q.      Okay.  Sergeant Stein, we're here today making a very
        important decision.  Do you -- what is your desire, what
        are your hopes going forward from this particular board?
A.      When I came to Weapons Field Training Battalion, I will
        admit that -- that I needed a motivation -- some more
        motivation.  About a month after -- six weeks after I
        checked in here, I saw one of my first EGA ceremonies
        out on the parade deck.  And seeing that kind of lit a
        fire to remind me what it meant to get that EGA back on
        October 20th of 2003.

        Eight weeks after being here, I received orders to the
        drill field and I decided that that's what I wanted to
        do.  Unfortunately, due to my length of service I have
        left, I could not fulfill those orders.  And I fought
        very vigorously with both monitors to do that and I just
        could not fulfill that commitment due that I only have
        this time left.  I wanted to extend for a year; I wanted
        to be looked at for staff sergeant this year.  I believe
        that my fitness reports prove that -- that my work here
        has been the best of my ability at Weapons Field
        Training Battalion that I would attain that rank and I
        would hope so if I can reenlist.

Q.      Because of your clearance issues, you've had some
        difficulty with reenlisting?
A.      Yes, I did have difficulty reenlisting.  I am eligible
        to go in for my clearance now.  I had a year revocation
        and that expired in 2010.  I was actually working with
        the XO here to start my process of getting my clearance
        back.

248

001046

Q.          And if that's not able to work out, you'll EAS when?
A.          In about three months and 24 days, sir.

Q.          Okay.  We've talked about -- I think we've talked
            through -- well, actually, this SF-86 stuff has come up
            as well.  Did you make some financial mistakes when you
            were a younger man?
A.          I do -- I do admit, sir, that I made financial mistakes
            and that comes from financial immaturity.  And, you
            know, the one person that has to live with that burden
            is myself.  And my family has been greatly affected by
            it.  And I've recognized the mistakes and I have taken
            corrective action with those mistakes.  And the one
            thing, it takes time to make up for mistakes when you're
            a young man.

Q.          Okay.  Is there anything else you'd like to tell the
            members or anyone else here in your chance to speak
            before this particular board?
A.          I hope that the members of the board especially looking
            at my last nine years, I hope that over my nine years, I
            have gained some credit to at least finish out my tour
            here with the Marine Corps and walk out those doors on
            July 28th with an honorable discharge and knowing that I
            did my country its due service as it has done to me.

Q.          Okay.  Sergeant Stein, are you willing to take questions
            from the board?
A.          I am willing.

SMBR:       You have a question?

LA:         Technically, sir, the Rule 6317.2a says that the
            respondent may not be cross-examined on an unsworn
            statement.

SMBR:       Correct.

LA:         And that's -- if he's willing to take questions from the
            board -- the reason for that, as you understand, Captain
            Baehr --

CR (Capt Baehr):  Sir, I --

LA:         -- is the government doesn't have a chance to ask any
            questions even to further clarify anything.

CR (Capt Baehr):  Yes, sir.

249

001047

LA:         If he wants to be sworn, they can ask him questions and
            the recorder can ask him questions.

CR (Capt Baehr):  Sir, I'm going to direct my comments to you
            about Sergeant Stein's -- essentially Sergeant Stein is
            making an unsworn statement because we have this pending
            case.  I would love to be able to swear Sergeant Stein
            in and have him take sworn testimony, but there is
            another case out there and I can't give him that
            particular legal advice.

            The counsel for respondent want to open him up for
            potential questions if it's -- if the government opposes
            that, you know, we're willing to ask questions.  If the
            board has any questions for him, you can write it on a
            piece of paper and give it to myself, and I will ask him
            those questions.  But our desire is to open -- open it
            up for the members of the board.

SMBR:       I understand.  And I will tell you that even before the
            legal adviser spoke, the fact that it's unsworn, I --
            it's an uncomfortable area for me.

CR (Capt Baehr):  Yes, sir.

SMBR:       The unsworn statement affords him a protection that the
            sworn statement wouldn't, correct?  So no.  No
            questions.

CR (Capt Baehr):  Okay, sir.

RSP:        Good evening, gentlemen.

CR (Capt Baehr):  One second, sir.

            Sir, that is all the evidence from the defense.  The
            defense would request a very brief recess before closing
            arguments to kind of get our hands around some of the
            documents and things.

SMBR:       Do you intend to recall anyone?

CR (Capt Baehr):  No, sir.

SMBR:       Do you?

RCD:        No, sir.

001048

SMBR:      Do you need anyone recalled?

MBR (SgtMaj Brookman):  No, sir.

MBR (Maj Wardinski):  No, sir.

SMBR:      The board does not desire to have any witnesses
           recalled.

           How long do you need?

CR (Capt Grey):  Sir, if I could have ten minutes to prepare the
           documents so that way I can roll through much more
           quickly once I'm actually speaking to you.

SMBR:      Ten-minute recess prior to arguments.

RCD:       Time on deck is now 2028, 5 April 2012.  Going off
           record.

[The administrative separation board recessed at 2028,
5 April 2012.]

[The administrative separation board was called to order at 2039,
5 April 2012.]

RCD:       Time on deck is now 2039, 5 April 2012.  Resuming
           administrative separation board for Sergeant Gary Stein,
           United States Marine Corps.

SMBR:      Okay.  You needed more time?

CR (Capt Grey):  I'm good now.  Thank you, sir.

SMBR:      Okay.  So we're now ready for argument unless recorder
           or counsel have anything further to offer?

RCD:       No, sir, nothing further.

SMBR:      Okay.  Recorder.

RCD:       Sir, and I'll keep my opening -- closing since I get two
           chance to speak to the gentlemen.  After the defense
           speaks, I have a rebuttal closing.

           The government's summation that's in your materials as
           Government Exhibit 30, I'd ask that you gentlemen read
           than when you deliberate.  That'll cover most of what

251

I'm going to go over very briefly here.  I don't want to take up too much of your time for the opening portion.

The three questions that we asked you to consider, sir, gentlemen, is -- first one, whether a basis has been established.  And we talked about the Article 134 offense.  Two elements for that, sir.  One, is that a certain act was done.  And the second, that that act was prejudicial to good order and discipline.

And what's been lost a little bit -- and/or service discrediting where we're alleging both.  And what's gotten a little bit lost in that, sir, is -- again, you can confer with the legal officer for clarification, but it has to be of a nature to be service discrediting, have the potential for prejudicial impact.  We've been talking about whether or not there's actually been any breaches of good order and discipline.  We've actually demonstrated that there have been.  The incident that occurred on Delta Range is an example of the breakdown in good order and discipline that's a result of Sergeant Stein's comments.

However, your -- gentlemen, your experience, your time in the Marine Corps, your common sense is also a factor that you can use in determining whether or not these comments on 1 March were prejudicial to good order and discipline as -- sir, yourself, as a commander, Sergeant Major, Major Wardinsky, you all had experience leading troops, leading Marines, and you can -- you can tell when something has the potential to effect good order and discipline.

A Marine going onto a Marine Facebook page in front of other Marines and saying screw President Obama, screw Obama, he's the domestic enemy, our sitting Commander in Chief and talks about how he will not salute President Obama either; that has serious implications for good order and discipline regardless of whatever unit you're in across the Marine Corps, in the Army and the Navy, Air Force, it has the same -- you are talking about the Commander in Chief.  Regardless of what we think of his politics or his policies, this is the sitting President who's our Commander in Chief and that has a huge effect.  He is our chain of command and he is the highest in our chain of command.  That's obvious.  Prejudicial to good order and discipline is obvious as well.

252

As far as the service discrediting piece, gentlemen, I would say that Sergeant Stein has taken it upon himself to use the media to publicize this event. He's claiming that it's because the Marine Corps has attacked him and that's what's causing publicity and that was argued -- or insinuated by the defense at times. That is not true. No one from the Marine Corps or any other official has gone on the news and discussed these incidents. Sergeant Stein has. And those are part of the media summaries that we prepared for you.

No one has gone back and shot back and said this is what actually happened. That's what this process is for. We decided to keep this within the purview of the commander and this board. Sergeant Stein is the one that has taken this outside our walls and into the public. He is the one that has put our dirty laundry out there for everyone to see and comment on. And there has been comments ever since 1 March 2012 at all levels.

The impact, the service discrediting nature, again, of a nature to bring discredit upon the armed forces. I think that's obvious as well. We have people questioning our ability to enforce good order and discipline. That's evidenced by the *Marine Corps Times* article. Our own people are doing that. Everybody reads that. It's at every post exchange. Junior Marines, lance corporals, PFCs are hearing this and wondering how a noncommissioned officer can go on a Marine Corps Facebook page -- and I say "Marine Corps" because that was what Chief Warrant Officer Burns said.

This was designed by me as a METOC Marine for other Marines. It was entitled Marine Corps, METOC Facebook. They're seeing that a noncommissioned officer is going on a page for Marines and saying screw the Commander in Chief. I will not follow his orders. I will not salute him.

And he prefaces, sir, by very specific words, "As an active duty Marine, I say this." Those were his words. "As an active duty Marine." What is the purpose in saying that? The purpose in saying that is to draw attention to the fact that he is an active duty Marine advocating this agenda. It's obviously prejudicial to good order and discipline when we have our own service members disparaging the President of the United States.

253

And I'm not just talking about saying he disagrees with his policies. There's a lot of ways, tactful ways you can say I disagree with somebody. But he said "screw Obama." That's unacceptable regardless of the context. Regardless of the context, that's unacceptable. That's like saying I'm going into Colonel Dowling's office, Sir, screw you. I'm not going to follow your orders because I believe them to be illegal. Sergeant Stein's going to decide what's illegal and what isn't and that's how he's going to qualify.

So how do you qualify the "screw Obama" language? How do you qualify that? There is no qualification for that. How do you qualify calling the Commander in Chief the domestic enemy, the religious enemy? How do you qualify that? You can't. The only thing he's been able to qualify in the media is the illegal orders. He's really hones in on that one but has not discussed any of the other comments.

So with regards to 134, sir, those are obvious. That is absolutely obvious. The more difficult one that we've been struggling with is the application of this, the DoD directive, whether or not it applies, whether the definitions are sufficient.

And I would say, sir, in the absence of every single word on this page being defined for you ahead of time, again, we have to use our common sense, our experience, our training, our education to determine what the intent of this is. The intent of this is to prohibit partisan political activities. That's stated in the purpose.

And clearly under what an active duty member shall not do is allow or cause to be published partisan political articles, letters or endorsements signed or written by the member that solicits votes for or against a partisan political candidate, party or cause. That's what the President of the United States is in this election year. He's a partisan candidate for office.

And Sergeant Stein all over his Facebook page in his 5 March 2012 statement which is in your exhibits as Government Exhibit 6, what's at the bottom of that Government Exhibit 6? Noboma 2012. What's on his Armed Forces Tea Party website under the gear section? Nobama bumper stickers that he sells on this website.

254

His statement from 21 March, which is also in your
materials, advocating for the -- to elect a GOP
candidate and elect Obama out of office.  Now coming
from a civilian, would there be any cause for concern?
There's a million people out there especially in
election years that have an opinion about who should be
elected.  They're blogging, they're posting, they're not
active duty U.S. Marine Sergeants.  Everybody else plays
by these rules but Sergeant Stein has exempted himself
because he knows about the Constitution.  He believes
this is his Constitutional right to do.  Well, this
order says otherwise.

This order says you can't do that and he did it any way.
He was advised on this order in 2010.  And in his
unsworn statement, he says that the SJA advised him that
this was nonpunitive?  That is absolutely impossible.
Section 4.6.4 of that order on Page 10, this is a lawful
general regulation.  Violations of Paragraphs 4.1
through 4.5 of this directive by persons subject to the
Uniform Code are punishable under Article 92, failure to
obey order or regulation.  Chapter 47 of Reference (b).
That's the UCMJ.  He doesn't -- so now the argument is
this isn't even punitive?  He didn't believe it was
punitive?

Discussing for a moment what's gone on since then.  And
we had talked about this partisan -- or this Tea Party
rally in Fallbrook.  And there's an issue about whether
the Tea Party is a partisan political party.  I refer
you gentlemen to 4.1.2.5, speak before a partisan
political gathering including any gathering that
promotes a partisan political party candidate or cause.

He doesn't have -- it doesn't have to be a candidate for
office.  It can be anything -- it can be anything
partisan.  The whole point is to avoid official
sponsorship of any kind of partisan activity.  The
entire room was filled with "nobama" people advocating
to get Obama out of office.  That's entirely partisan.
And that's not part of the notification.

CR (Capt Baehr):  Objection.  Facts not in evidence.  The
          testimony of Logan was that he didn't know what the
          political parties were of the people who were at that
          Tea Party rally.

RCD:      I said what they were discussing.

001053

LA:       Note it for the record, sir, and just move on.

SMBR:     Okay.  Move on.

RCD:      So again this wasn't even part of the notification.
          This occurred the next day.  And I bring it up because
          it shows Sergeant Stein's mentality.  It shows -- it
          shows how he regards these orders.  It shows what he
          regards his commanding officer's notification.

          He has been told -- about the longest 6105 I've ever
          seen -- not to violate DoD Directive 1344.10.  He's been
          sat down on multiple occasions.  He's notified -- and
          granted, this occurred afterwards.  The counsel -- he's
          notified on 21 March and what does he do the very next
          day?  He goes and speaks at a partisan political
          gathering.

          Now if we were even close, if this was an issue, if this
          was on the line, wouldn't your common sense tell you
          that the definitions are not clear?  Let me not do that.
          Let me not put myself in further jeopardy.  I'm already
          recommended for separation.  And instead, his common
          sense tells him, you know what?  Let's go out to a
          partisan political gathering and speak.  It just wreaks
          of bad judgment.

          And that's followed Sergeant Stein throughout his entire
          career.  Bad judgment going all the way back to 1st
          Intel Battalion.  Bad judgment in his security clearance
          revocation.  Bad debts, upwards of $20,000.  Multiple
          counselings.  I also noticed that on his master brief
          sheet in his SRB there are no -- there's no
          commendatory -- there's no awards.  No citations on the
          master brief sheet.  None listed.

CR (Capt Baehr):  We object to that, gentlemen.  We do have
          awards.

SMBR:     Okay.  Noted.  You can bring it up in your argument.

CR (Capt Baehr):  Yes, sir.

RCD:      We had Chief Warrant Officer Mills' fitreps calling him
          below average, 35 of 37.  His service has not been
          honorable.  His service has been anything but.  And
          these comments on 1 March just amplify it.  He's got an
          agenda and he's pushing it here.  He's pushing in the

                              256

media.  The Marine Corps' response, Colonel Dowling's response has been measured.  No one has fought back in the media.  They've allowed Sergeant Stein to say whatever it is that he wants to say.  They've took a measured response.  They've counseled him.  They've discussed these orders with him multiple times.

And his -- what he does, he sues his commanding officer in federal court and his commanding general in an attempt to stop this board.  That's his right.  I bring it up to show you that this is not a Marine who thinks about the institution.  This is not a Marine concerned with the institution.

This order is clear.  I understand there will be First Amendment arguments as to whether or not this article or this directive is valid.  I would say, gentlemen, use your common sense, use your reading of the order.  It's pretty clear.  All the rest of this is him trying to characterize what he's done.  And there is no way you can recharacterize "screw Obama."  There is no way, no context.  The bases -- both bases have been satisfied.

Moving onto separation and retention.  And we have to consider is this the first instance with Sergeant Stein?  Is this the first time anything has happened with him?  No, this is not the first time.  Now understanding that things that happened -- the stacking rocks in Iraq, that happens to Marines.  That happens.

But in 2010 when these issues were brought to bare, he was given specific guidance and warned.  He was given that order and Lieutenant Colonel Erickson's affidavit shows you what he was provided.  They actually provided him a short form of that DoD directive.  They set a PME up for him, the I MEF SJA, to make sure he understood.  This happened in 2010.  This is not the first time.  We have to look at the entirety of these events.

As far as the separation and retention, these statements in and of themselves warrant separation.  In and of themselves.  But considering this has gone on over time, I think the issue of separation is foregone.  He needs to go.  He has an agenda.  Let him do it on the outside.  Let him not disparage the Marine Corps any further and make us look any worse than we already have.

001055

Sergeant Barnhart, one of his peers, believes this is a
black eye on the Marine Corps.  Prejudice to good order
and discipline.  Kicks him out of the range -- and we'll
be the first to admit sergeant Barnhart probably didn't
deal with that in a proper manner.  But that just goes
to show you the breakdown in good order and discipline
that's already occurred.  And it may seem small, it may
seem petty but not for Marines.  Good order and
discipline's all we have.  Those comments in and of
themselves and his actions since warrant separation.

So we get to characterization.  What should the
characterization be?  I'm not going to offer that to
you, gentlemen, my recommendation.  The commanding
officer has already done that.  He has recommended in
his professional judgment that Sergeant Stein be
separated with an OTH.

And that recommendation is important, gentlemen, because
we're not here to disregard the commanding officer's
recommendation.  We have to consider that's serious
weight.  That's his opinion based on his review.  You
know, us lawyers, we can stand here and say anything we
want.  He's the one that's in charge of Sergeant Stein
ultimately.  He's recommending an other-than-honorable
discharge for Sergeant Stein.  That needs to carry
significant weight with the board.  We respectfully ask
that you consider that recommendation when you
deliberate.

Thank you, sir.

SMBR:     Counsel for the respondent, your final argument.

CR (Capt Grey):  Yes, sir.

Let's begin with Colonel Dowling's recommendation.
2012 February 22nd.

Sergeant Stein is a must for reenlistment and I
recommend with great enthusiasm for retention.  This
mature NCO exhibits great maturity in the execution of
his day-to-day duties.  This intelligent young man has a
strong desire to remain in our Corps.  I request with
zeal that he be approved for extension to allow this
competitive Marine to reach service limits.  Sergeant
Stein -- excuse me, gentlemen.  It's handwritten at the
bottom -- Sergeant Stein is assigned to the Ops section

258

where he is filling the billet of a staff NCO.  Reenlist
now.  Exclamation point.

That was the battalion commander's recommendation about
45 days ago, maybe a little longer than that.  So I
would say we start from there and we just abandon
everything else that Captain Torresala has advocated
about Sergeant Stein's past career, his follies, his
failures, and everything else.  Let's start from this
day.  And let's just assume going back before that day
that Sergeant Stein was the good Marine that Colonel
Dowling says that he was.  That he was a must enlist
Marine and let's focus on that day forward.

Gentlemen, generally I close every one of my cases just
asking that you consider the presentation that I have
made, the other lawyers have made.  We make the tactical
calls not our client.  And anything that we've done that
you disliked, please take that out on us and not
Sergeant Stein.  Sergeant Stein is not telling captains
and 30-year lawyers what to do.  We make those tactical
calls.  And we fight for our clients.

We may never have a battlefield command but Sergeant
Stein is our hill.  We have an oath to hold it and we
fight for it.  And Sergeant Stein fights for himself.
He fights in U.S. federal court if that's what it takes,
because the Marine Corps and being a Marine is worth
fighting for.  And I hope you don't take it as a black
eye on him that he's fighting to remain in the Marine
Corps.

I want to start -- before I get into the legalese -- and
we're going to have to touch in there eventually.  I'm
sorry.  But I want to start kind of with the smell test
of this one, gentlemen.  And even if you believe there's
misconduct, I hope you can see that it wasn't born out
of malice or failure on Sergeant Stein's part such as we
often see in my line of work selfishness, greed,
violence, lust, things of that nature.

Here's what I see and here's what I heard the testimony
today:  That Sergeant Stein has courage, he has
conviction, and he has leadership.  Sergeant Stein is a
leader.  He's a leader of Marines and in politics.  He
has his website and he advocates his position.

259

001057

You heard about how he led in church.  You heard about
how he led in student counsel.  That's just who he is.
And he loves to be in front of Marines and he loves to
lead.  That's a good thing.  Sergeant Stein has
conviction.  He has his beliefs.  And they're not
universally held, but it's not a fringe either.  There
are a lot of people that have those beliefs.  And he has
those -- he has a strong conviction in those beliefs.
And that's something that we encourage in our Marines as
well to have conviction of belief.

And he obviously has courage.  The easy thing, the
cowardly thing to do is to do nothing.  It takes courage
to say something that might be disagreed with, that
might be controversial.  Marines, leaders have to do
controversial things all the time.  We can't make a hard
decision and make everyone happy, otherwise it's not a
hard decision.  And I hope, gentlemen, you look and you
see that if there is misconduct, it's because of these
values that Sergeant Stein has that made these sorts of
things possible.

Again, it's not because of some severe character defect
he has.  It's not a criminal who is greedy or a rapist
or anything like that.  This isn't that kind of serious
misconduct that the government's alleging.  It's that
he's passionate about what he believes in leading in a
political front.  That's really the worst thing that can
be said about him.

For a second, just forget about the legalism.  The
government is alleging that there's a commission of a
serious offense.  There's no hospital visits here.
There's no injuries.  There's no financial loss.  It's
words.  Words.  And not even words that betray any
secrets or anything like that.  It's just words.

Alright, gentlemen.  I need to dive into the legalism
here.  I want to talk first about the 134.  There's two
wings basically the government's advancing here.
They're saying, well, there's the 134 offense which I
think they're limiting to what was said on the METOC
site, basically the "screw Obama," "I wouldn't salute
him if he was here."  So that offense is obviously going
to be done on March 1.  And then there's kind of the
everything else offense, the 92, the violation of DoD
Directive 1344, basically impermissible political
activity.

001058

So let me start on the 134 wing of the government
offenses here first.  And this is a legal argument but
Captain Baehr brought this up before and it's included
in your materials, looking at the *Beaty* case, basically
requires that -- it says that if a -- if the president
hasn't given guidance to allow a greater punishment than
three months or if it's not closely related to another
statute, the maximum punishment is three months and no
BCD.  No BCD would be permitted for this offense if he
went to court-martial saying contemptuous words -- if we
agree that's what it is, contemptuous words about the
President on March 1, it's not a BCD offense.

The government has argued, well, it's close to
Article 88.  In the UCMJ, you've got articles 80 all the
way through 134.  Those are the punitive articles.  I
believe two of them start with the words, "any
commissioned officer."  That's Article 88 and that's
Article 133.  Everyone else starts with the words "any
persons subject to this chapter."

If Congress had meant for enlisted men to get BCDs for
contemptuous words to officials, then they would have
wrote 88 to say any person subject to this chapter that
use contemptuous words against the President.  That's
what Congress would have wrote.  When they drafted up
the UCMJ and passed it in 1950, that's what they would
have said if they wanted enlisted men to get BCDs.  They
didn't put it in that way.  They made it very clear any
commissioned officer who uses contemptuous words against
the President, Vice President, et cetera.  That's our
guidance.  That's the law.  And that's not a closely
related offenses to what Sergeant Stein is alleged to
have done here in this 134 offense.

And that just briefly explains why there is a difference
there.  The officers are supposed to be the interface
between society and the military.  They are the
military's representation to society.  And what they say
to society and how they represent themselves to society
is carries a lot more weight to how society looks to
them.  Society looks to them as the representatives of
the military.  Not just public affairs officers.  They
are officers.  And that's the way the system is built in
and that's why there's a distinction.

I want to talk about that a little bit more.  And not
only does it have to be -- have a BCD but they also have

261

001059

to prove the offense.  They have to prove that it's a
134 type offense; that there is comments here that goes
to prejudicial to good order and discipline.  And I look
at this and I think surely there has been thousands --
tens of thousands of people who have said things that
they regret, that are unprofessional, they said it in a
small circle, a lot of Marine Corps balls, a lot of
events with alcohol involved, and I know -- I know
people grab one another, they say, Hey, pipe it down.
The troops are over there.  That's what they say and
that's what happens.

But it doesn't take the words back.  The words are said.
But does it hurt good order and discipline just the fact
that the word escaped the mouth?  I mean, we saw what
happened here.  It was a semiprivate Facebook page.  It
was taken down almost immediately.  Government didn't
show any junior person who actually saw that site as it
was up there.  It was master sergeants, master gunnery
sergeants, chief warrant officer.  And none of them
said, Well, when I saw this, I was led to disorder.  It
made me -- it broke down order.  That's not happening.
Was there a potential for it?  Granted, there was
potential for it.

But if you look in the code, it has to be direct and it
has to be palpable.  Palpable is anything being touched,
felt, sensed.  It has to be right there.  It's not
enough that, well, remarks like these when they get out,
if they're repeated, et cetera, there could be harm.  I
mean, it has to actually happen.  And number of the
witnesses today talked about how what Sergeant Stein
said hurt the Marine in the performance of its mission.
Those words that were on that METOC page discouraged us.
Or anything like that.  There was no loss to morale,
nothing of that nature.

As I said, if that is an offense, it was done on
March 1st.  Once the words are out, that's it.  Then
you're done.  There's no more offense.

And historically, we've seen examples of people say
putting leaflets telling subordinates or other members
not to deploy to Vietnam, refusing to -- educating them
of that.  Those are actual prejudicial to good order and
discipline.  That is the kind of speech that actually
undercuts the mission.  When you go and encourage people
to refuse orders.  When you go and encourage people to

262

miss the ship.  That undercuts prejudice -- that's prejudicial.

What we have here is just like all those other Marines that maybe had too much to drink or whatever the situation is, they say something inappropriate, but it's not carried out.  They're not advocating people to do anything.

And what happens after March 1 is essentially out of Sergeant Stein's hands.  Even the interview that occurred afterwards.  They just wanted to know.  I think these interviews are generally good for the image of the Marine Corps.  He reinforces most of the interviews.  I have never received an unlawful order.  I want to clarify, I have not received an unlawful order.  I want to clarify, I'm not going to follow unlawful orders.  If the President was here, I would salute him.

He retracts what he said in that moment of heated exchange and he puts out for everyone to see in the media what the proper answers are.  I would salute the President if he was here.  I will follow lawful orders. I think the government and perhaps some of the witnesses are concerned that Sergeant Stein has commented on his case in the media.

And there's nothing improper about commenting on this case.  That's not a political activity.  It's his case after all.  He may comment on that in the media.  And it's not something that can be punishable.  It's not a 134 offense to comment on your own case in the media or at a Tea Party event.

And especially, it can become necessary to comment on it when the full story's not out there.  So when the first story gets out that a Marine said he wouldn't follow the President's order and he said screw Obama, it's the responsible thing to do is go, All right.  I respect the office of the President and I wouldn't follow unlawful orders but I would follow orders.  That's actually the responsible thing to do once the wrong statement gets out there to begin with.

And, again, the fault.  We can't hold Sergeant Stein responsible for what other responsible adults have done because of this.  It's action and reaction.

001061

You have situations like those demonstrated by Sergeant Barnhart, how they reacted to the situation.  And I can't help but feel that part of it is because of Sergeant Barnhart's miseducation.  He thinks he doesn't have First Amendment rights.  I direct your attention to the letter of Mr. Loy, the ACLU Marine writing on speech rights and citing military justice case.  Of course they do.  It's different context in the military, but we have our rights.

And so, frankly, these adverse interactions are not because of what Sergeant Stein said.  It's because of the surfaces that they're hitting.  When you throw it the sea at that shallow ground, you're not going to get a crop.  And that's what's happening.  When people like Sergeant Barnhart, when they hear about what Sergeant Stein's doing, they think well we don't have First Amendment rights, that's the kind of reaction that happens.  It's not Sergeant Stein's fault that he reacted that way.  And it's not Sergeant Stein's fault if people pontificate and opine in the press and they talk about, well, this is terrible.  That's terrible. It's not his fault when people are going off half-cocked without the facts.

We talked a lot about prejudicial.  I want to touch on Captain Torresala's notice that it was kind of the separate plank -- is this of a nature to discredit the armed forces.  I just want to point out that just because something is perhaps unpopular or some people don't like it doesn't mean that it's of a nature to discredit the armed forces or if someone disagrees with it.  I mean, we make, again, controversial decisions all the time.  I mean, every war or battle that we fight, there are people who put on protests about how much they hate what we're doing.

The decisions about Don't Ask, Don't Tell.  I mean, everyone who had a hand in that, no matter if they were for or against, they were written up and blasted in the press by one side or the other.  Just because what you do is unpopular, does not mean that it's service discrediting.

It really comes down to did he represent himself in such a way that people now think of the Marine Corps as a whole, they think that we sanctioned something improper. That's where we come service discrediting.  Not just

264

because they can look at it and say I don't like that
guy's point of view.  It's got to e more than that to be
a 134 Marine Corps discrediting offense.

I think Captain Torresala had an interesting choice of
words that it's Stein's fault that we're out there
airing our dirty laundry.  And I want to emphasize that
in a lot of ways it is our dirty laundry and the press
has had interest in this because they do what to do.  I
mean, what can service members say and what can't they
say?

And maybe as Captain Baehr said, it takes two to tango.
And there's definitely issues here.  And the public is
curious about this.  That's not a bad thing.  They want
to know what Marines can and cannot do.  They want to
know what the restrictions on speech are.  Sergeant
Stein didn't make those restrictions.  Are think they're
really more curious about the restrictions than they are
about Sergeant Stein.

All right.  Moving onto the second wing, the Article 92
offense.  They're alleging that this was a violation of
a DoD directive.  I remind you, gentlemen -- and it's
been entered in there -- the injunction that's in place
by *Rigdon*, to not enforce DoD Directive 1344.10 to
infringe on people's free speech rights.  This case is
sounding a lot about, of course, submission to civilian
authority.  Obviously it's coming up in the case of the
President.

Well, another form of civilian authority is a U.S.
federal court.  And it was asked that we consider the
*Rigdon* opinion which was issued by a U.S. federal court
saying that 1344, the Department of Defense and all the
way down is enjoined from using it as a punitive
measure.  Also, just consider that the order -- the
unclarity of it.  There is no definition for cause.  Are
we talking -- in cause, are we talking about -- is
advocating for First Amendment rights for troops is that
a cause?

001063

The government's included screen shots of Sergeant
Stein's website asking to contribute to his defense
fund.  Is that advocating for a cause?  I guess it's his
cause.  Is that impermissible for him to advocate for
his own cause?  It's not, gentlemen.  It's definitely
permitted under the First Amendment to advocate for a
cause.

Another one, what's a party?  Is a Tea Party a party
just because the word "party" is in there?  Is the
Occupy Wall Street movement, is that a party?  These
aren't defined.  And even if you don't believe that
Sergeant Stein's conduct is or is not within --

Yes, sir.

LA:        I didn't have anything.

CR (Capt Grey):  Even if you do not believe that his conduct was
           within there, I'd at least hope you see the ambiguity
           and see the environment in which a sergeant is trying to
           make decisions on what he can and cannot do on something
           that he's very passionate about.

           And also, what's the definition of sponsorship?  I think
           we've got a lot of discussions, Well, he can't appear in
           uniform.  That makes it sponsorship.  And you look at
           the attachment to Lieutenant Colonel Erickson's letter.
           It is Government Exhibit 20 -- 20B.  There's an
           attachment to it.  And on Page 2 of 2 of that
           attachment, gentlemen, it says at the top, general rule
           is what we like to give Marines.  General rules:

           Number one, not in uniform.  Two, no use of government
           proprietary or resources.  Three, no interference with
           duty.  And four, no implied government position,
           endorsement or involvement.

           Those are what he got in 2010.  This is the general
           guidance that he gets.  And as a junior Marine looking
           at that general guidance, he's like, okay.  Now, what
           can I do on Facebook?  Okay.  I'm not in uniform.
           Check.  No use of government property.  I'm at home.
           Check.  No interference of duty.  Again I'm on off duty
           hours.  I'm at home.  Check.  No implied government
           position.  Banner up there.  I don't represent the
           United States Marine Corps or the armed forces.  Check.

266

001064

This is the guidance that he gets in 2010.  This is his
general guidance.  There's simply no implication of any
officiality.  Even if he says, I'm Gary Stein.  By the
way, I'm a Sergeant in the United States Marines, he's
not making any statements that, and I speak on behalf of
Marines or this is what Marines think or this is what I
can do for your group on behalf of the Marines.  There's
no representation as that.  Being a Marines is
incidental.  To be -- just like any other adornment to
your name -- doctor, Ph.D., Esquire.  Whatever.  He's a
sergeant.  That's what he is.  He's not going out there
and saying because I'm a sergeant, because I'm with the
Marines, I got the Marines backing me up and that's why
what I'm saying is important.  That's not what he's
saying.

Captain Baehr made an excellent point.  Why are we
concerned about the military involvement in politics?
It goes way back to Caesar, the process of you don't
want a military leader taking over.  You know, got it.
But this is a Sergeant of Marines peacefully expressing
his opinion on politics on Facebook.  We're miles and
miles and miles away from the actual concern of a
neutral armed forces.

In it, the regulation is so clear, gentlemen -- here's
the real question:  Why hasn't anyone given specific
guidance, an order, to Sergeant Stein?  We heard from
Major Nichols, we heard from his company commander that,
in fact, they considered doing a 6105.  They considered
giving a specific guidance and Page 11 and they almost
took a hands-off approach.  They just let the
preliminary inquiry run its course.

And all anyone could say is adhere to the directive.
Adhere to the directive.  I'm not going to tell you take
down your Facebook page.  I'm not going to tell you you
can't do interviews.  We're not going to say that.
We're just going to say adhere to the directive.  You
figure out what it means.  You figure out how it
applies.  I'm not going to tell you how it applies.
That's not fair for officers and leaders to tell a
Marine here's a directive, you apply it.  I'm not going
to tell you.  I'm not going to say take down your
Facebook page.

Sergeant Stein, do you have any questions?  Yes, sir, I
do.  Does this mean I have to take my Facebook page

267

001065

down?  No, I'm not saying that.  That's his guidance
from the very top.  No one told him don't do interviews.
Just tell me when you're going to do them, so I know
what's coming down the pipe tomorrow.  No one told him
don't do interviews and now they're upset that he does
interviews.  No one tells him you can't go to a Tea
Party rally.  That's the whole purpose of 6105.

Gentlemen, directives such as 1344.10, they give -- they
give guidance.  Direct your attention to Paragraph 5.2
of the directive.  I believe the directive is
Exhibit 14.  This is their last page, basically, of that
exhibit.  Paragraph 5 -- second to last page.  It's
Paragraph 5.2 and it talks about responsibilities.  5.2.
Secretaries of the military departments shall issue
appropriate implementing documents for their respective
departments.

So it's recognized among high that these are the
policies -- these are the guidance that's coming out and
now push it down into specifics.  That's what this --
going back to 2008 when this was put out, that was the
directive back then.  Here's the guidance, here's the
policy now.  Service secretaries, push it down for
specifics.  And that never happened.  There is no
Department of Navy direction.  There is no Marine Corps
order on this in light of this order.  And obviously
there is no direct hands-on leadership giving that
guidance.

And the last point, commission of a serious offense.
This applies both to the Article 92 and the 134 if
you're not convinced that it's not a serious offense.
This goes to 6210.6 of the MARCORSEPMAN.  This is a
definition of a serious offense.  And we talked about at
great length.  It's got to require a BCD.  One has to be
authorized.  But the second plank on there is does the
specific circumstances of offense warrant separation.
That's sort of what I was talking about before that
there's no blood, there's no financial loss, these are
just words.  These aren't the specific type
circumstances that warrant separation.

Circumstances you should consider, though:  What happens
to everyone looking in to the Marine Corps when they see
that someone who campaigns against the President gets
kicked out of the Marine Corps?  Not best interest of
the service.  Not with an honorable, but with an OTH.

268

That's what's being advocated.  When they see a Marine
exercising something that every civilian can do without
even criticism.  There's a lot of things in the Marine
Corps that are legal to us but are -- maybe legal in
society, like adultery, that are still frowned on.
Political activity is not even that kind of conduct
that's just frowned on.  It's perfectly permitted
knowing there's no storm to it.

And I want to just, gentlemen, think about the specific
circumstances of this alleged offense.  As a Marine gets
kicked out with an OTH, society looks on that, what's
that going to do to retention?  What's it going to do to
morale?  And what's it going to do to our enlistment
process?

Because there is a segment of people out there that are
like Sergeant Stein.  They share his political beliefs.
They share his upbringing.  They share his religious
values.  There's a lot of people who identify with
Sergeant Stein.  And if they see that someone like them
is getting kicked out like this -- they see that this is
what the Marine Corps is like, it makes it much more
less likely for them to join or want to stay in.

All right.  Moving onto that second question, gentlemen,
the retention.  If you find that a serious offense has
been committed, should Sergeant Stein, nonetheless, be
retained.  And I want to address that.  When we listened
to the testimony of Major Nichols, the S-3, he said he
can use Sergeant Stein for the next four months.
Sergeant Stein is doing good work, has been doing good
work.  He put him in his top 25 percent.

It was recommended that he be granted an extension.  Now
you don't have the power to grant extension.  You don't
have the power to give him this.  That's not your real
consideration.  Your consideration is should he be
allowed to finish this contract right now.  And right
now, Major Nichols can use him, he's been doing good
work with or without a TS.

Again, think about those qualities I talked about
before.  Maybe those qualities had gotten him in
trouble.  His desire to be a leader and his courage.
Maybe some people call stubbornness and his conviction,
but those are good things in a lot of ways for Marines.
From childhood, his leadership at church, student

269

001067

counsel.  As an adult, as an father, he's an NCO, and
even his political activities.  That speaks well of him
that he's so concerned for our country's well-being that
he's willing to dedicate his off duty time to try to do
a what he thinks is the right thing.  Courage.  He
joined the armed forces during OEF.  He reenlisted when
OEF and OIF were going on.  He's deployed to Iraq.  And
again, he speaks his mind.  That takes courage to do.
It takes courage to speak your mind.  You can think
leaders to say nothing.  Just to invite no comment.

And lastly, conviction.  He joined to defend the
Constitution.  We want Marines to join for that very
reason.  I think when we went from the draft force to
the all volunteer, there was a lot of concern, well,
it's going to be a mercenary force.  Well, you know,
people like Sergeant Stein make sure that it's not a
mercenary force.  They join because their values
coincide with the constitution.  They want to support
and defend.  So he fights for it in uniform and he
argues for it on his blog.

And, gentlemen, lastly I want to direct your attention
to Paragraph 6105 of the MARCORSEPMAN.  6105.1, Marine
Corps policy is that reasonable efforts at
rehabilitation should be made before initiation of
separation proceedings.  If you think that what he's
done is wrong, you think that he shouldn't do it, I
would say a reasonable effort at rehabilitation would be
to say:  Sergeant Stein, specifically I'm saying don't
post on Facebook.  I'm saying don't do any of these.
Whatever it is.  Give him specific -- say stop, wait for
four months, then done.  That's my proposal for the
rehabilitation efforts.

It's already been done.  It was done on the 23rd.
Sergeant Stein messes up again.  He's gotten his notice.
You can kick him out then.  That's rehabilitation and
that's what 6105 requires.  We got this Marine, we got
all this training in him.  It's a waste kicking him out
before -- four months early.  The Marine Corps' contract
with him for an additional four months.  He's adding
value for our service.  It's just a waste.  It's a waste
and it sends a wrong message.

Thank you, gentlemen.


270


001068

SMBR:      There's a major standing outside the hatch.  Do you want
           to come in?

Maj Workman:  No, thank you, sir.  I was just listening out here.

SMBR:      Okay.  Either come in or move away.

Maj Workman:  Aye, sir.

RCD:       You want me to close the hatch, sir?

SMBR:      Yes, please.

           Okay.  Recorder, before we move to you for final
           arguments -- and if I had this out of order, you let me
           know.

LA:        Yes, sir.

SMBR:      Earlier, you made objections to the legal adviser; some
           issues you brought up.

CR (Capt Baehr):  The --

SMBR:      You objected to the legal adviser.

CR (Capt Baehr):  Earlier in the day, sir, or earlier in the
           argument?

SMBR:      No.  Today.

CR (Capt Baehr):  Today.

SMBR:      Is there anything --

LA:        You have a standing objection --

CR (Capt Baehr):  Yes --

LA:        -- to the legal adviser?

CR (Capt Baehr):  -- we do, sir.

LA:        I think the Lieutenant Colonel wants to clarify what --
           on the record which objections you had to which rulings
           I made.

271

001069

CR (Capt Baehr):   Sir, again, we would offer a standing objection
                   because we -- we voir dired the legal adviser this
                   morning.  We think a couple things that came out during
                   the voir dire and in the discussion about the members
                   led us to that decision.  Because we challenged the
                   legal adviser and the legal adviser was kept on this
                   board by Colonel Dowling, any decision from that point,
                   we would just offer a standing objection.  I can't
                   articulate because I don't remember every exact
                   objection that's been made over the last 12, 13 and a
                   half hours, sir.

SMBR:              Okay.  All right.

RCD:               Sir, I get a second chance to talk with you, gentlemen,
                   so I can discuss some of the points that the defense
                   made.  And, again, I ask that you confer with your legal
                   adviser, sir, if there's any -- any questions at all of
                   legality in these proceedings.  And the reason is is
                   that both of these sides are -- cannot give you a fully
                   unbiased opinion.  We all have our opinions based in
                   large part on which side we're on.  They're obviously
                   going to argue one side.  We're going to argue the
                   other.  I ask that you refer to the legal adviser for
                   clarification on any -- on what the law is if you have
                   any questions whatsoever, sir.

                   With regards to some of the comments made, Colonel
                   Dowling's reenlistment recommendations.  Those were
                   obviously made well before the events that took place
                   here.  Colonel Dowling was obviously unaware, obviously
                   because it hadn't happened yet, of what Sergeant Stein's
                   integrity and commitment to the Marine Corps was.  And
                   obviously, his opinion has changed.  His opinion has
                   changed, because he's notified him for separation and
                   recommended an other-than-honorable discharge.
                   Obviously, his opinions have changed.  What happened
                   between the reenlistment and now?  That's what we've
                   been talking about today.

                   Misconduct not born out of malice.  So that's the
                   standard now that we're going to tell junior Marines.
                   There may be misconduct, you may have done something
                   wrong, but there's no malice so you're not accountable.
                   That can't be the message that we send.  This conduct is
                   misconduct.  And the reason why it's misconduct is
                   because you didn't adhere to the rules and regulations.

001070

You may disagree -- a lot of us disagree with some of the rules and regulations that are in place but we follow them because they're the rules and regulations. We may disagree with our superiors, but we follow the rules and regulations.  We follow lawful commands. Malice really isn't an issue.  It's did you have the professional judgment to do what you've been told?

Now, with regards to the 134, they brought up -- we call it the *Beaty* issue, lawyers call that.  Obviously, there is no max punishment listed for the general article because it's the general article.  The whole point of that is that you need to find a closely analogous statute or article in order to compare the maximum punishment.  There will never be a maximum punishment for Article 134, prejudicial to good order and discipline.  You have to look for something analogous.

So the closely analogous statute in this case is Article 88.  The reason why it's analogous because it's contempt toward official.  The only difference is that one is for -- is that it's for commissioned officers. It doesn't change the fact that it's analogous.  And the reason why, if you know the background of Article 88, is that it's presumed -- that's why -- for a commissioned officer.  Presumed to be prejudicial.

For enlisted men, that's why we're using Article 134. We have to demonstrate to you, gentlemen, that it was prejudicial to good order and discipline.  It can't just be presumed.  I have to show you that.  It's directly analogous.  The only difference is I have to show you that it's prejudicial to good order and discipline.

Haven't proven the offense.  Captain Grey said, no, there was no actual impact on good order and discipline and no junior Marines saw that post.  Well, there has been an impact on good order and discipline.  And Sergeant Barnhart described exactly what that impact has been on good order and discipline.  And it's, again, common sense.  Does it have the capability to effect good order and discipline, these comments?  Absolutely. And multiple witnesses have discussed that.

Captain Grey mentioned that he -- that Sergeant Stein has gone on the media and he's retracted what he said. That's the way they want to characterize it.  And, gentlemen, I characterize it -- the government

273

characterizes it as an acceptance that what he did was
wrong and then trying to clarify it later.  He
understands that, uh-oh, I'm going to get in trouble for
this.  People are looking at me.  I better go out and
reclassify what I'm saying.  Consciousness of guilt is
what we call it.  Consciousness of guilt.  Instead of
taking responsibility right then and there, I did it, he
goes on the media and tries to get out of it.  That's
not what I meant.

The Article 92, some of the legal issues, the *Rigdon*
injunction.  Gentlemen, I briefed that in the government
exhibits.  Again, refer to the legal officer.  That was
a case 15 years ago in a different circuit, not a
military court, that applied to the plaintiffs of that
case for totally different reasons.  It does not apply
here.  There's been no injunction issued by the federal
court.  Nothing stops this proceeding and that was
decided yesterday.

No definitions.  Again, we don't define words that have
common meaning you have to use your common sense,
professional judgment, experience, training when you
decide what words mean.  Under this order, the
government would say it's pretty clear what those words
mean.  Speak before partisan political gatherings, group
discussions, advocate for or against a partisan
political party, candidate or cause.  We can stay here
all night and argue whether the Tea Party is actually a
partisan political party, cause, movement, whatever.  We
have to use our commonsense judgment.  And our
commonsense judgment -- is the President of the United
States a partisan candidate for office?  Absolutely.

No implementing guidance.  And I offer these into
evidence.  This is the CMC guidance on political
activities, 20 January 2012, that was pushed to all
commands which First Sergeant Rocha testified to was
pushed out to everyone in his command.  This is a
MARADMIN dated June 30, 2010, 365/10.  Social media
guidance.  Unofficial internet posts.  This was
published to the entire Marine Corps.

There's actually a website, www.Marines.mil\omg.  It
gives additional guidance and it outlines the same
things as what's in the Commandant's message, as what's
in DoD Directive 1344.10.  I'd like to offer these in
now at this time.

274

001072

CR (Capt Baehr):   Sir, we would just object to that unless the
                   counsel for the respondent has an additional opportunity
                   to argue because we're in an argument period.   This is
                   just a recitation of things that have already been
                   presented excessively to the board and we do not
                   believe -- we believe it's cumulative.   Our objection is
                   that it's cumulative.   Things have already been
                   presented.   Furthermore, if it is brought into evidence,
                   we would request permission to offer some comments as
                   well, sir.

SMBR:       I'm not going to accept it.

RCD:        It mentions 6210.6, circumstances don't warrant
            separation.   So if a Marine can go on a Marine Facebook
            page, say screw the President of the United States, I
            will not follow his orders, I will not salute him, he's
            the domestic, religious and economic enemy, and that's
            not something that's deserving of separation.   That's an
            illogical conclusion from the government's position.   An
            illogical conclusion.

            People identify with Sergeant Stein, they won't join if he
            he gets kicked out.   That was a point the defense made.
            We have no evidence of that whatsoever.   No evidence of
            that whatsoever.

            Rehabilitative potential.   Captain Grey mentioned --
            tell him what he can and cannot do.   They told him you
            can't violate this order.   They've gave him the order,
            they told him don't violate it.   He wants you to say --
            and Captain Grey mentioned it -- don't have this
            Facebook page.   Don't do interviews.   That's what they
            want him to say.

            He's playing word games with this order.   This order
            doesn't say you can't do interviews.   It says you can't
            go and discuss partisan political activities.   That's
            what it says.   He wants to pigeonhole, just like he did
            the commanding officer when he got that counseling.   He
            asked the commanding officer, So you're telling me I
            can't have this Facebook page?   Obviously that's not
            what Colonel Dowling was saying.   And he said, No.   I'm
            telling you to abide by this order.   How much clearer
            does he have to be?   Sergeant Stein wants to play word
            games with this order.

                                275

Rehabilitative potential.  There is no definition that's going to satisfy Sergeant Stein.  He's going to continue doing what he wants to do, continue advocating what he wants to advocate, continue believing what he wants to believe, and that's fine.  I'm saying let him do it on the outside.  He's disparaged us enough, he's disparaged the Commander in Chief, he's embarrassed this command, he's embarrassed the Marine Corps, and the government's recommending that he be separated with an other-than-honorable discharge.

Thank you, sir.

SMBR:     The board is advised that findings and recommendations will be determined in closed session.  Only the voting members will be present during these sessions.  We shall determine whether or not the allegations set forth in the proposed separation are supported by a preponderance of the evidence.

If we should find that the evidence does support the allegations as set forth in the proposed separation, we will determine whether or not the findings warrant separation.

Further, if separation is deemed appropriate, the voting members will recommend the appropriate characterization of the separation and, if applicable, whether or not the respondent should be transferred to the Fleet Marine Corps Reserve, retired in the present pay grade or in the next inferior pay grade.

Our determinations will be based upon majority vote. However, if any member disagrees with the vote of the majority, that member will provide, in detail, the reasons for his dissent.  Each voting member is advised that his decision must be an individual decision based upon the information provided.

The board will be closed.

The time and date shall be noted for the record.

RCD:      Time on deck is now 2140, 5 April 2012.  Going off record.

[The administrative separation board closed at 2140, 5 April 2012.]

276

001074

[The administrative separation board opened at 2244,
5 April 2012.]

SMBR:      This board will come to order.

           Note the time and date.

RCD:       Time on deck is 2244, 5 April 2012.  Resuming
           administrative separation board for Sergeant Gary A.
           Stein, United States Marine Corps.

SMBR:      And the Lieutenant is going to state his qualifications?

RCD:       Yes, sir.  I'll actually do it for him, sir.

SMBR:      Okay.

RCD:       Lieutenant Gwartney was detailed as assistant recorder.
           He is a lawyer certified in accordance with
           Article 27(b), Uniform Code of Military Justice.  That's
           it.

SMBR:      Okay.  This board has concluded its deliberations with
           the following findings, following results:

           Findings.  The board determined by majority vote that
           the preponderance of the evidence proves all acts or
           omissions alleged in the notification.

           Recommendations.  Separation from the Marine Corps.

           Characterization.  Other-than-honorable; should not be
           suspended.

           The board did consider such matters from preservice or
           prior service matters but only on the issue of
           retention, not considered for characterization.  There
           was no minority dissent and is signed.

           I wish to remind respondent that you have the right upon
           written request to the convening authority to be
           provided with a copy of the report of the board and the
           endorsements thereon.

           This board will be closed.  The time and date shall be
           noted for the record.

277

RCD:          Time on deck is now 2245, 5 April 2012.  Going off
              record.

[The administrative separation board adjourned at 2245,
5 April 2012.]

<p align="center">**[END OF PAGE]**</p>

## COURT REPORTER ATTESTATION

In accordance with R.C.M. 807(b)(1)(A) and (b)(2)(D), I am a qualified, certified, and sworn court reporter in the U.S. Marine Corps, assigned to Legal Services Support Section, Camp Pendleton, California, 92055.

I affirm that the preceding transcript is a true and accurate verbatim account of the Administrative Separation Board in the case of the *United States v. Sergeant Gary A. Stein, U.S. Marine Corps,* on 5 April 2012.

K. C. Myers
SSgt, U.S. Marine Corps
Court Reporter

11 APR 2012
date

279

001077